### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDWARD BANKS**<br>    Central Detention Facility<br>    1901 D Street SE<br>    Washington, DC 20003,<br><br>**D'ANGELO PHILLIPS**<br>    Central Detention Facility<br>    1901 D Street SE<br>    Washington, DC 20003,<br><br>**KEON JACKSON**<br>    Correctional Treatment Facility<br>    1901 E Street SE<br>    Washington, DC 20003,<br><br>**ERIC SMITH**<br>    Correctional Treatment Facility<br>    1901 E Street SE<br>    Washington, DC 20003,<br><br>              *Plaintiffs-Petitioners*<br><br>          v.<br><br>**QUINCY BOOTH**, in his official capacity<br>as Director of the District of Columbia Dep't<br>of Corrections,<br>    2000 14th Street NW, 7th Floor<br>    Washington, DC 20009<br><br>**LENNARD JOHNSON**, in his official<br>capacity as Warden, D.C. Dep't. Corrections<br>    1901 D Street SE<br>    Washington, DC 20003<br><br>              *Defendants-Respondents*. | No. 1:20-cv-849 |

### CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRITS OF HABEAS CORPUS

Plaintiffs Edward Banks, D'Angelo Phillips, Keon Jackson, and Eric Smith (collectively, "Plaintiffs") on behalf of a class of similarly situated detained people in the custody of the District of Columbia's Department of Corrections ("DOC"), of Quincy Booth, Director of the DOC, and of Lennard Johnson, Warden of the DOC (collectively, "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      The District of Columbia's Department of Corrections now has five confirmed cases of COVID-19, the disease caused by the highly contagious SARS-CoV-2 virus.  For those who become infected, COVID-19 creates significant odds of death or severe illness, which can include extreme chest pain and difficulty breathing, and can in some cases require highly invasive and psychologically traumatic life-support treatments.  The global pandemic caused by COVID-19 has been predicted by epidemiologists to be the worst since the 1918 influenza pandemic, one of the deadliest in human history.

2.      In the past month, the vulnerable residents of the District of Columbia's correctional facilities watched in panic as the COVID-19 epidemic spread across the world, the United States, and the District of Columbia, wondering what, if anything, the Department of Corrections would do to keep them safe.  Now that the virus is confirmed to have entered the DOC, the answer is clear: too little and far too late.  Like much of society, these residents watched the news and saw the President of the United States and the Mayor of the District of Columbia imploring — and in some instances requiring — all Americans to practice "social distancing," to avoid congregating in groups, to wash their hands and use hand sanitizer regularly, to disinfect frequently touched surfaces, and to seek prompt medical attention if symptoms develop.  Unlike the rest of society — people who are able to, and must, heed this guidance — DOC residents cannot.  Although they are fully aware of the risks of COVID-19 and the precautions that need to

be taken to prevent those risks, Plaintiffs are systematically denied the opportunity to take the same preventative care that others are required or urged to take by local and federal officials. That is because, despite knowledge of these directives, the DOC has failed to implement many basic procedures — steps as simple as distributing sufficient hygienic products and providing prompt medical attention and testing to those with COVID-19 symptoms — and has waited far too long to implement others. Consequently, experts predict that COVID-19 will "spread like wildfire" in DOC facilities. The DOC has violated Plaintiffs' rights under the Fifth Amendment's Due Process Clause and the Eighth Amendment's protection against cruel and unusual punishment.

3.      Defendants are the leadership of the Department of Corrections, which operates two physically connected jail buildings, the Correctional Treatment Facility ("CTF") and the Central Detention Facility ("CDF"), between which staff pass back and forth each day. The named plaintiffs in this lawsuit are four people who are currently in Defendants' custody. The named plaintiffs include a pretrial detainee at CTF, a pretrial detainee at CDF, a post-conviction detainee at CTF, and a post-conviction detainee at CDF.

4.      Defendants' ongoing failure to take reasonable precautions to prevent the spread and severity of a COVID-19 outbreak gravely jeopardizes the safety of Plaintiffs and all of the approximately 1,600 individuals confined in the CDF or CTF. While the world watched COVID-19 spread in January and February, Defendants did not act until March 11, 2020 — over six weeks after the World Health Organization declared a "public health emergency of international concern" and four days after the first positive COVID-19 test in the District of Columbia — to begin even the most basic screening of visitors to their facilities. Since then, despite multiple declarations of emergency and guidance regarding practices for correctional institutions, Defendants have not taken necessary steps to ensure Plaintiffs' safety.

5.      While Defendants have moved slowly and meekly in response to the threat of COVID-19, jurisdictions around the world and in the United States have taken bold actions to save lives for inmates and for the community.  Germany released "1,000 prisoners who are close to the end of their sentences"; Canada released "1,000 inmates in the state of Ontario"; and Iran "temporarily release[d] 85,000 prisoners, with 10,000 of them being granted pardons."[1]  Closer to home, the New Jersey Supreme Court announced that it would release "as many as 1,000 people from its jails"[2] and New York City is releasing more than 1,000 people from its jails.[3]  This effort to downsize facilities like prisons and jails, which are breeding grounds for the highly contagious virus, is not limited to the East Coast.  It is an urgent nationwide effort.  Cuyahoga County, Ohio, announced plans to rapidly release around 600 people from the county jail just two days after President Trump declared a national emergency; Washington County, Oregon, released more than 120 people from the local jail; Alameda County, California, released 314 people from their jail; the Iowa Department of Corrections began to release 700 people from state prisons; Mercer County, Pennsylvania, released 60 of 308 people in their jail.[4]

6.      The District of Columbia Department of Corrections has not taken similar precautions.  Defendants' failures to act are recorded and documented by the people in Defendants' custody, by lawyers who have observed first-hand the lack of preparation, and perhaps most alarmingly of all, by the union of Defendants' correctional officers, who unanimously voted "no

---

[1]    Michael Nienaber et al., *Lock 'Em Up or Let 'Em Out? Coronavirus Prompts Wave of Prisoner Releases*, REUTERS, March 25, 2020.

[2]    Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. TIMES, March 23, 2020.

[3]    *NYC to Release More Than 1,000 Prison Inmates Due to Coronavirus Concerns*, ASSOC. PRESS, March 25, 2020.

[4]    Kimberly Kindy et al., *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, WASH. POST, March 25, 2020.

confidence" in Defendants' leadership for "guaranteeing and accelerating the rampant spread of COVID-19."[5]  In a damning rebuke of Defendants' preparedness, DOC staff wrote on March 25, 2020, that staff have "no masks, insufficient gloves, no gowns, no disinfectants, and [that] no comprehensive cleaning occurs on a regular basis."[6]  They report that residents "coming into the Jail are not screened for symptoms of COVID-19," that residents "are not required to engage in any of the behaviors which the Mayor recommends for the general population, such as 'social distancing', repeated hand-washing, and health monitoring"; and that "[t]here is no distancing [for staff] at entrances, no distancing at roll calls, [and] no attempt to obtain or record health concerns of each officer."[7]  These observations are the canary in the coalmine.

7.      Corrections experts recognize that the only way to minimize the harm done by COVID-19 is through "thoughtful downsizing of the incarcerated population . . . in tandem with aggressive, responsive prevention measures that are developed and guided by public health and medical experts."[8]

8.      Defendants violate the due process rights of pretrial detainees — who are presumed innocent — when they "recklessly fail[] to act with reasonable care to mitigate the risk" of a condition that Defendants "knew, or should have known" posed an excessive risk to health or safety.  *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

---

[5]    Sophie Kaplan, *Union Votes 'No Confidence' in D.C. Jail Leaders for Handling of COVID-19*, WASH. TIMES, March 20, 2020.

[6]    Letter from J. Michael Hannon to Quincy L. Booth ("Labor Committee Letter") at 3 (March 25, 2020), https://www.hannonlawgroup.com/wp-content/uploads/sites/379/2020/03/here.-1.pdf.

[7]    *Id.*

[8]    Exhibit A, Declaration of Dr. Marc Stern ("Stern Decl."), at ¶ 9.

9.   Defendants violate the Eighth Amendment by acting with "deliberate indifference" to an "unreasonable risk of serious damage" to a post-conviction detainee's health. *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).

10.   Because of Defendants' ongoing, systemic violations of Plaintiffs' constitutional rights, Plaintiffs seek class-wide relief requiring Defendants to join other jurisdictions in reducing the population in their facilities and to implement other basic policies and procedures that would mitigate the risk to Plaintiffs' health and safety.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, specifically 28 U.S.C. § 2241 and 42 U.S.C. § 1983.

12.   Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–02, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

13.   Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred, and continue to occur, in this District.

## PARTIES

14.   Plaintiff-petitioner D'Angelo Phillips is currently in the custody of the DOC at the Central Detention Facility, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pre-trial custody and is presumed innocent.

15.     Plaintiff-petitioner Edward Banks is currently in the custody of the DOC at the Central Detention Facility, where he is at risk of death or serious injury if exposed to COVID-19. He has pleaded guilty and is awaiting sentencing.

16.     Plaintiff-petitioner Eric Smith is currently in the custody of the DOC at the Correctional Treatment Facility, where he is at risk of death or serious injury if exposed to COVID-19.  He is being held in pre-trial custody and is presumed innocent.

17.     Plaintiff-petitioner Keon Jackson is currently in the custody of the DOC at the Correctional Treatment Facility, where he is at risk of death or serious injury if exposed to COVID-19.  He is being held post-conviction.

18.     Defendant-respondent Quincy Booth is the Director of the District of Columbia's Department of Corrections and is being sued in his official capacity.  The DOC is responsible for the safekeeping, care, protection, instruction, and discipline of "all persons committed to" the "Jail."  D.C. Code § 24-211.02(a).  As the Director of the DOC, Defendant Booth is responsible for developing, administering, and enforcing DOC policies.  *Id.* § 24-211.01.

19.     Defendant-respondent Lennard Johnson, Plaintiffs' immediate custodian, is the Warden of the Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF) and is being sued in his official capacity.

## STATEMENT OF FACTS

***a.   COVID-19 is a highly contagious virus that poses a serious risk of injury and death for anyone who is infected.***

20.     COVID-19 is the disease caused by the SARS-CoV-2 virus that has caused a global pandemic.  The World Health Organization ("WHO") estimates that as of March 30, 2020, there

are 638,146 confirmed cases, 30,039 confirmed deaths, and 203 countries, areas, or territories with confirmed cases.[9]

21.     The Centers for Disease Control and Prevention ("CDC") estimates that as of March 30, 2020, there are 122,653 confirmed cases and 2,112 confirmed deaths in all 50 states and the District of Columbia.[10]

22.     COVID-19 is highly contagious.  COVID-19 is thought to survive for three hours in the air in droplet form that can be inhaled or transferred to surfaces, up to twenty-four hours on cardboard, up to two days on plastic, and up to three days on steel.[11]

23.     Due to the highly contagious nature of COVID-19, data and statistical modeling show that absent intervention, the rate of COVID-19 infections has grown, and is expected to grow, exponentially.[12]

24.     People in all age brackets are at risk of serious injury and death from COVID-19.[13]

25.     Although only about "one person in six becomes seriously ill" from COVID-19, the virus causes excruciating pain to those who become ill.  One respiratory physician explained

---

[9]   *See* WORLD HEALTH ORG., *Coronavirus disease (COVID-19) Pandemic* (last visited March 30, 2020, 11:00 AM), https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

[10]   *See* CTRS. DISEASE CONTROL & PREVENTION, *Cases in U.S.* (last visited March 30, 2020, 11:00 AM), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[11]   Neeltje van Doremalen et al., Correspondence, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENGLAND J. MEDICINE, March 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[12]   Kenneth Chang, *A Different Way to Chart the Spread of Coronavirus*, N.Y. TIMES, March 20, 2020 ("Unconstrained, the coronavirus spreads exponentially, the caseload doubling at a steady rate.").

[13]   CTRS. DISEASE CONTROL & PREVENTION, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020* tbl. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

that the lungs "become filled with inflammatory material" and "are unable to get enough oxygen to the bloodstream."[14]

26.     The virus leads to acute respiratory distress syndrome, in which fluid displaces the air in the lungs. The sensation of that illness is akin to being drowned.[15] Some individuals who have survived the illness experienced fatigue so extreme they cannot get out of bed or walk to the bathroom and a cough severe enough to prevent sleep.[16] In more serious forms, the individual can experience excruciating pain, days or weeks of fever and chills, uncontrollable diarrhea and inability to keep down food or water, and extremely labored breathing requiring oxygen therapy.[17] The most severe forms — of which symptoms such as vomiting and diarrhea are thought to be early signs — require hospitalization and often artificial ventilation to preserve life.  The artificial ventilation process is highly invasive and many who have undergone the process describe it as psychologically traumatic.  Some patients are placed in medically induced comas for such treatment.  Some do not survive.

27.     Emerging medical research also demonstrates that, in addition to the short-term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term medical conditions, including cardiovascular disease and permanent reduction of lung function.[18]

---

[14]   Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus*, GUARDIAN, March 24, 2020.

[15]   Lizzie Presser, A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients, PROPUBLICA, March 21, 2020.

[16]   *Id.*

[17]   Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, HEALTH, March 20, 2020.

[18]   Tian-Yuan Xiong et al., *Coronaviruses and the Cardiovascular System: Acute and Long-Term Implications*, EURO. HEART J, ehaa231 (2020).

28.     Because of these short-term and long-term dangers, treating COVID-19 requires a team of health care providers, including nurses, respiratory therapists, and intensive care physicians.[19]

29.     The available data from the CDC to date shows that, in total, 20.7 to 31.4 percent of people who tested positive for COVID-19 require hospitalization, 4.9 to 11.5 percent require admission to the ICU, and 1.8 to 3.4 percent die.[20]   Patients in DOC custody who require hospitalization will also require, by DOC policy, a round-the-clock guard by law enforcement and constant shackling while hospitalized, which inhibits emergency medical care.

30.     The WHO estimates that the COVID-19 mortality rate is between three and four percent.  The CDC estimates that the COVID-19 mortality rate in the United States is between 1.8 and 3.4 percent.[21]   By comparison, the mortality rate of seasonal influenza is well below 0.1 percent.[22]

31.     The CDC reports that in China, the mortality rate was "as high as 12 percent in the center of the epidemic."[23]

32.     There is no vaccine or cure for COVID-19.[24]

**b.   COVID-19 has already, and will, spread with vicious speed in correctional institutions.**

---

[19]   Pauline W. Chen, *The Calculus of Coronavirus Care*, N.Y. TIMES, March 20, 2020.

[20]   *Id.*

[21]   CTRS. DISEASE CONTROL & PREVENTION, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020* tbl. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

[22]   WORLD HEALTH ORG., CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT – 46 p. 2 (2020).

[23]   Kenji Mizumoto, *Estimating Risk for Death from 2019 Novel Coronavirus Disease, China, January–February 2020*, 26 J. EMERGING INFECTIOUS DISEASES (2020).

[24]   CTRS. DISEASE CONTROL & PREVENTION, WHAT YOU NEED TO KNOW ABOUT CORONAVIRUS DISEASE 2019 (COVID-19) (2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

33.     Like nursing homes, cruise ships, and college dormitories, correctional facilities are environments that enable, and in fact facilitate, the spread of COVID-19.

34.     Because people — staff, residents, contractors, community members, and others — constantly cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring the virus into the facility.

35.     In Jining, China, 207 people in a correctional facility contracted COVID-19 because a prison guard contracted it outside of the facility and then came to work, not knowing he was infected.[25]

36.     Even if correctional institutions screen outsiders, including staff and visitors, for symptoms of COVID-19, that will not stop the introduction of COVID-19 from the outside because the CDC confirms that COVID-19 can be spread "before people show symptoms."[26]

37.     Correctional facilities also are highly susceptible to rapid person-to-person transmission of the virus because cramped conditions place residents and staff in close proximity.[27]

38.     History also bears out that prisons and jails become breeding grounds for epidemics that eventually spread out to broader communities.

39.     Public health research shows that an "influenza epidemic in San Quentin prison" spread to 26 percent of prisoners and became "one of the primary foci" of the 1918 flu epidemic.[28]

---

[25]   N.Y. TIMES, *New Clusters of the Virus are Found in China's Prisons*, Feb. 21, 2020, https://www.nytimes.com/2020/02/21/world/asia/china-coronavirus.html.

[26]   *See* CTRS. FOR DISEASE CONTROL & PREVENTION, *How It Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed March 23, 2020).

[27]   Kindy et al., *supra* note 4.

[28]   Niyi Awofeso, *Prison Show Prophylaxis for Close Contacts May Indeed Help in Next Flu Pandemic*, 329 BMJ 173, 173 (2004).

The outbreak at San Quentin was started by the introduction of a "newly received prisoner" who had the influenza.[29]

40.     During the H1N1 epidemic in 2009, jails and prisons were also epicenters for transmission.[30]

41.     In New York City, the first case of COVID-19 infection in a jail detainee was diagnosed on March 18, 2020.  Within two days, thirty-eight cases had been diagnosed at the Rikers Island Correctional Complex.

42.     As of March 30, 2020, the rate of COVID-19 infection in New York City jails is 3.00 percent.  This is over seven times higher than the rate of infection in New York City generally (0.40 percent), over seven times higher than the rate of infection in Lombardy, Italy (0.41 percent), and 25 times higher than the rate of infection in Wuhan, China (0.12 percent).[31]

43.     Approximately one month into the pandemic in the province of Hubei, China, where the COVID-19 outbreak started, over half of reported COVID-19 cases were from jails.[32]

44.     In South Korea, which has enacted radical and effective public health measures to slow and stop the spread of the virus, "the single largest COVID-19 outbreak and mortality cluster was from the Daenam Prison Hospital, where 101 inmates were infected and seven died."[33]

---

[29]   Stuart A. Kinner et al., Comment, *Prisons and Custodial Settings Are Part of a Comprehensive Response to COVID-19*, LANCET, March 17, 2020.

[30]   Nicole Westman, *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, VERGE, March 12, 2020.

[31]   LEGAL AID SOCIETY, *Analysis of COVID-19 Infection Rate in NYC Jails* (last visited March 30, 2020, 11:00 AM), https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.

[32]   Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, DIPLOMAT, March 9, 2020, https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

[33]   Nancy Gertner & John Reinstein, Opinion, *Compassionate Release Now for Prisoners Vulnerable to the Coronavirus*, BOSTON GLOBE, March 23, 2020.

45.     The spread of COVID-19 in District of Columbia correctional institutions is not only a risk to Plaintiffs and Defendants' staff, it is a risk to the entire D.C. community.

46.     "Substantial epidemiological research shows that mass incarceration raises contagion rates for infectious disease — both for people in jails, and for the community at large."[34]

47.     Empirical evidence shows how outbreaks in correctional institutions quickly reflect back into the greater community: In 1997, near the height of the HIV epidemic, fully 20 percent of all HIV-infected Americans had been in a correctional facility at least once during that year.[35]

   c.   *While many jurisdictions took decisive action as COVID-19 rapidly spread, the Department of Corrections failed to take necessary precautions.*

48.     As COVID-19 spread around the world from December through early March, nearly every level and sector of government, from international organizations, to countries, states, cities, and the District of Columbia, issued emergency declarations warning of the spread of the virus.

49.     Despite these clear calls of emergency, of which Defendants were no doubt aware, Defendants did not take sufficient precautions.

50.     On January 21, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[36]

51.     On January 30, 2020, the WHO declared a "public health emergency of international concern."[37]

---

[34]   Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, THE APPEAL, March 24, 2020, https://theappeal.org/coronavirus-jails-public-health/.

[35]   Anne C. Spaulding et al., *HIV/AIDS Among Inmates of and Releasees from US Correctional Facilities, 2006: Declining Share of Epidemic but Persistent Public Health Opportunity*, 4 PLOS ONE 7558 (2009).

[36]   Derrick Bryson Taylor, *A Timeline of the Coronavirus*, N.Y. TIMES, March, 2020 https://www.nytimes.com/article/coronavirus-timeline.html (last visited March 24, 2020).

[37]   *Id.*

52.     By February 12, 2020, the death toll in China reached 1,113, and the total number of confirmed COVID-19 cases worldwide reached 44,653.[38]

53.     By February 23, 2020, Italy locked down a vast region of the country, closing schools and cancelling events in order to promote social distancing.[39]

54.     By February 25, 2020, the CDC "warned of an almost certain outbreak" in the United States.[40]

55.     On February 28, 2020, the United States saw its first COVID-19 death.[41]

56.     On February 28, 2020, Mayor Bowser ordered the activation of the District's Emergency Operations Center to coordinate responses to COVID-19, requiring Defendants to "remind their staff and constituencies" of "basic infection practices," including to "[w]ash hands with soap and water" or an "alcohol-based hand sanitizer," to "[a]void close contact with people who are sick," and to "[c]lean and disinfect frequently touched objects and surfaces."[42]   The Executive Order specifically requires that "[a]ll relevant District agencies shall review their copy of the District Response Plan to evaluate the potential impacts of COVID-19 on emergency roles and responsibilities and take necessary steps to ensure continued performance."[43]

57.     By March 3, 2020, about 3,000 people worldwide had died from COVID-19.[44]

58.     On March 7, 2020, the District of Columbia announced that the first COVID-19 case in the District had been confirmed by laboratory testing.

---

[38]   *Id.*

[39]   *Id.*

[40]   *Id.*

[41]   *Id.*

[42]   D.C. Mayor's Order 2020-035, § 10(a).

[43]   *Id.* § 3(a).

[44]   *Id.*

59.    On March 13, 2020, President Trump declared a national emergency.[45]

60.    On March 15, 2020, the CDC issued guidance advising no gatherings of 50 or more people in the United States.[46]

61.    On March 16, 2020, Mayor Bowser ordered District of Columbia bars and restaurants to close.[47]

62.    On March 25, 2020, Mayor Bowser ordered all non-essential District of Columbia businesses to close.[48]

63.    Defendants' response was slow and insufficient.

64.    On March 3, 2020, Defendant Booth wrote a letter to all DOC employees informing them of symptoms of COVID-19, that the virus travels "[b]etween people who are in close contact with one another (within about 6 feet)," and asking employees who are "impacted by COVID-19" to "contact [their] immediate supervisor to request to be placed on sick or annual leave, leave without pay, or other earned leave."

65.    On March 11, 2020, Defendants for the first time began to ask visitors to the jail whether they had visited countries with high rates of infection in the preceding 14 days and whether they felt ill.[49]  The form specifically asked about China, Iran, South Korea, Italy, and Japan, but did not ask about travel to other countries or domestic travel, even though other countries and

---

[45]   President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, March 13, 2020.

[46]   CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance for Coronavirus Disease 2019 (COVID-19)* (March 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html.

[47]   D.C. Mayor's Order 2020-048, § I(C).

[48]   D.C. Mayor's Order 2020-053.

[49]   *See* Exhibit B, Department of Corrections Visitor Questionnaire.

states had greater numbers of confirmed cases or higher rates of infection than one of the listed countries.[50]

66.     Around March 11, 2020, Defendants represented in public statements that they began to broadcast regular announcements over the Jail's loudspeaker reminding residents to wash their hands.

67.     Facility residents state that they have rarely or never heard such announcements, and visitors who spent as long as five hours inside of the facility on days after March 11 did not hear any announcements.  Residents who did hear sporadic announcements report that they did not see staff washing their hands in response to the announcement and that no hand soap or towels were provided to residents so that they could wash their hands in response to the announcement.

68.     On March 13, 2020, Defendants' staff began to take entrants' temperatures with non-contact, infrared thermometers.

69.     These thermometers are either broken or mis-used by Defendants' staff.  One visitor was permitted in after a temperature reading 93 degrees — a temperature that signals severe and near-fatal hypothermia.  Another visitor was admitted after the thermometer displayed an error message and never registered a temperature reading.

70.     On at least one occasion after implementing their screening protocols, Defendants' staff forgot to screen several visitors to CTF until after they had entered that facility and were on units where residents live.

71.     On March 14, 2020, Defendants halted social visits, but legal and mental health visits continued, and caseworkers were still cycling in and out of the facility.

---

[50]     *Id.*

72.     While Defendants implemented screening protocols for visitors and staff, Defendants did not implement screening protocols for new residents coming into the jail. Defendants' staff state that as of March 25, 2020, "[i]nmates coming into the Jail are not screened for symptoms of COVID-19."[51]

73.     Around this time, Defendants provided a single bar of soap to most residents at CDF.  Prior to that distribution, new entrants to the jail had not been provided with free hygiene packets at entry and had been told since March 3, 2020 that the jail was out of soap and had none to provide.  Residents without access to the Jail's commissary due to lack of funds, status, or new entry to the facility, therefore had no soap for at least a week during the escalation of COVID-19 in the District.

74.     Defendants have not provided additional soap free of charge since the first distribution of the single bar of soap, nor did Defendants inform residents when they will receive more soap.  Consequently, some residents have already run out of their single allotted bar, while others are not using the single bar because they do not know when the next bar will come.

75.     Defendants also have not provided access to hand sanitizer, have denied residents' requests to use hand sanitizer, and have removed hand sanitizer that was previously available to residents and made it so that only staff could use hand sanitizer.

76.     Defendants did not provide staff and residents adequate cleaning supplies, free of charge and in the proper concentration, to prevent transmission of the virus from surfaces in housing units or other parts of common space in the facilities.  The units are cleaned primarily by DOC residents, whose work is not inspected by staff.  The people cleaning the units are not

---

[51]   Labor Committee Letter at 3.

provided with masks, gloves, or other equipment that would allow them to protect themselves from germs while conducting a thorough cleaning.

77.     Nor have Defendants provided residents and staff with cleaning supplies to clean their own cells, ensuring that residents who share a cell will quickly transmit illness to each other. Residents are instructed to clean their own cells with water and their own soap, and officers have no access to cleaning materials or clean rags to provide residents to wipe down surfaces within their cells.  They are then required to use the same bath towels and washrags to clean and dry their own hands and bodies when they wash their hands or bathe.  On at least one unit, a closet full of cleaning supplies and clean rags is present, but residents are told they will be punished if they attempt to access or use those supplies to clean the unit, their own cells, or their hands and bodies.

78.     Defendants do not regularly disinfect surfaces in Defendants' facilities.  In at least one instance, a unit ran out of the watered-down cleaning solution residents use to clean common areas, and were told to use just water.  In another unit, Defendants took away all cleaning materials that contained bleach.

79.     Defendants also did not make soap or hygiene supplies available in common areas, recreational areas, or food preparation areas.  Defendants have provided neither paper towels nor other means to dry hands after washing them, meaning that residents who do wash their hands must reuse the same bath towels repeatedly, or wipe their hands on their jail-issued uniforms, which are laundered infrequently and are exposed to surfaces that could be contaminated.

80.     On March 19, 2020, the DOC announced that it had quarantined 65 residents whom it believed had contact with a law enforcement officer who had tested positive for COVID-19.[52]

---

[52]   Kyley Schultz, *65 Inmates in Self-Quarantine, 1 Tested Positive for Coronavirus at DC Jail*, WUSA9, March 19, 2020.

81.     This was a "quarantine" in name only and was ineffective to prevent the spread of the virus.  Defendants' staff report that "[t]hese inmates were not 'quarantined' in any meaningful manner.  They were housed two to a cell, and the corrections officers on the unit were not provided with any [personal protective equipment] or other means for protection against infections."[53]

82.     Further, this "quarantine" policy is ineffective at preventing the spread of COVID-19 among residents and staff.  Residents perceive quarantine as punitive because the conditions of the quarantine are even worse than conditions of punitive solitary confinement, as residents in quarantine cannot access recreation or other programming opportunities.  Residents are thus deterred from self-reporting COVID-19 symptoms.  Residents also worry that quarantining will interrupt their programming, which is part of DOC's "good time credit" calculation and can influence residents' release.

83.     Defendants had in their custody residents who complained of cough, fatigue, and shortness of breath — some of the most common early symptoms of COVID-19.  Nevertheless, Defendants did not test any residents, even those who presented with symptoms consistent with COVID-19, until around March 20, 2020.

84.     Many residents have exhibited symptoms of COVID-19 and have not received a test for the virus.  For instance, on March 20, 2020, a resident at CTF with a cough, chest pains, fever, and chills, was seen by medical staff, but was denied a COVID-19 test.  The resident was returned to his unit, risking his own health and possibly infecting additional residents of his unit.

85.     Defendants have also failed to provide DOC staff with sufficient personal protective equipment, nor have Defendants' staff used what little equipment they may have.  Defendants' staff members regularly work with bare hands and do not wear gloves or masks.  Staff

---

[53]   Labor Committee Letter at 3-4.

members and jail residents who prepare food, clean and pass out food trays, and clean dining areas are not provided with masks or gloves.  Residents report that they receive trays that appear not to have been cleaned between uses, showing remnants of food and dirt from the previous user.

86.     Defendants' staff state that "[t]he corrections officers assigned to housing units have no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units."[54]  DOC staff also report that "Corrections Officers receiving and discharging inmates have no [personal protective equipment]," even though those officers "must have direct contact with these inmates."[55]

87.     Defendants also have failed to provide sufficiently prompt access to responsive medical treatment.  Many residents wait days after submitting requests to see medical personnel, even when they complain of having difficulty breathing — a common symptom of COVID-19.

88.     Defendants have not implemented the required social distancing policies, and in fact, have encouraged actions that run directly counter to social distancing protocols.  Residents of Defendants' facilities are constantly in close contact with each other and with staff, have limited agency to relocate or increase their personal space, and have no control over the movements of others with whom they are required to congregate on a daily basis.  They are required to remain in the areas where Defendants order them to be, and are punished if they move without permission, even if they are moving in an attempt to self-quarantine or move away from a person displaying symptoms of illness.

89.     Unless special circumstances apply, cells are shared by more than one resident. Those cells are enclosed rooms where social distancing is impossible. The cell's toilet is within a

---

[54]   Labor Committee Letter at 3.

[55]   *Id.*

few feet of the bed and other areas of the cell. The cell doors are closed and locked during periods when people are required to be in their cells, preventing air circulation.

90.     Residents regularly congregate, and interact freely, in the unit common spaces — often the only place that they can go when they are not locked in their cells.  Even residents who voluntarily seek to avoid close contact with others are forced to break social distancing rules in order to obtain food, seek medical care, attend professional visitation, and engage in daily population counts and other activities required by Defendants.

91.     On March 25, 2020, Defendants encouraged legal visits to take place in person.

92.     Legal visiting rooms are small and unventilated.  In order to obtain the necessary privacy to maintain privilege, the door must remain closed throughout the visit.  In order to consult about case-related matters, counsel and a client often pass papers back and forth, view a small laptop screen at the same time, or use the same writing utensil.  Legal visiting rooms are not cleaned or sanitized between attorney visitors or between residents when an attorney visits more than one person on the same day.

93.     When counsel and professional visitors initially inquired about the availability of secure phone or video visitation, all such requests were turned down.  The only way for counsel and a client to speak, other than in person, was via a telephone call that is monitored by Defendants' staff throughout the call. When asked to provide privacy for a legal call, one DOC staff member told a client that they were not permitted, under Defendants' regulations, to leave a resident alone in an office with a phone, even to talk to counsel.  Some limited arrangements have been provided in the last few days.

94.     As of March 24, 2020, residents were still required to engage in programming in groups of 30, where they sat for hours, less than one foot apart.  Residents who choose not to go

to programs can be punished for failing to attend, or can lose credit that allows them to seek early release from incarceration. Defendants are, for example, providing additional good time credits only to residents who engage in programming.

95.     Defendants have also made social distancing impossible by continuing to require "[c]ase workers [to] meet with inmates in small offices with no [personal protective equipment] or other distancing measures."[56]

96.     Compared to other correctional facilities, Defendants acted unreasonably slowly, and have still not implemented an adequate response to the pandemic.

97.     By way of example, in Washington State, the Department of Corrections ("WADOC") contacted all staff members on February 20, 2020 and provided information about COVID-19. On March 3, 2020, WADOC staff began to track all "staff call ins due to flu like symptoms" to understand whether any staff might have COVID-19.[57]

98.     On March 3, 2020 — before any positive COVID-19 test in the state — Indiana's Department of Corrections issued a "Preparedness and Response Plan" that:

- Required facilities to "obtain and distribute hand sanitizer throughout the institution and make it available to staff and offenders";
- Required facilities to clean "high touch surfaces" on "a more frequent schedule";
- Required facilities to "arrange for the immediate evaluation and treatment of any offender with symptoms";
- Required visitors to be "questioned about illness prior to entering the facility" and required facilities to deny entrance to anyone with "observed current symptoms."[58]

---

[56]   Labor Committee Letter at 3.

[57]   WASHINGTON STATE DEP'T OF CORRECTIONS, SIGNIFICANT EVENTS TIMELINE 13 (2020), *available at* https://www.doc.wa.gov/news/2020/docs/daily-situation-report.pdf.

[58]   INDIANA DEP'T OF CORRECTION, PREPAREDNESS AND RESPONSE PLAN 5-8 (2020), *available at* https://www.in.gov/idoc/files/IDOC%20Pandemic%20Response%20Plan%203-3-2020.pdf#response%20plan

> **d. Conditions in Department of Corrections facilities are so poor, and the procedures in place so inadequate, that the spread of virus will be rapid.**

99.     As of March 30, 2020, there are 1,620 people in DOC custody in the CDF or CTF.[59]

100.     On March 19, 2020, the DOC announced that it had quarantined 65 residents whom it believed had contact with a law enforcement officer who had tested positive for COVID-19.[60]

101.     On March 25, 2020, after performing four total tests on detained people, the DOC confirmed that a resident of CTF had tested positive for COVID-19.[61]

102.     As of March 26, 2020, the DOC has publicly stated that it "has quarantined 36 inmates."[62]

103.     As of March 26, 2020, the DOC claimed to have tested four residents for the virus, that one test was positive, two tests were negative, and one test result is pending.[63]

104.     On March 27, 2020, the DOC confirmed that a second resident of CTF had tested positive for COVID-19.[64]

105.     The next day, the DOC announced that two more residents tested positive.

106.     On March 29, 2020, the DOC announced its fifth positive case of COVID-19.

---

[59]   The precise number of residents at the CDF and CTF fluctuates daily and even hourly.  This number is based on the latest information available to undersigned counsel.

[60]   Kyley Schultz, *65 Inmates in Self-Quarantine, 1 Tested Positive for Coronavirus at DC Jail*, WUSA9, March 19, 2020.

[61]   Keith L. Alexander, *After D.C. Jail Confirms First Inmate With COVID-19, Officials Isolate 36 Other Inmates* ("*First Positive Test*"), WASH. POST, March 26, 2020.

[62]   *Id.*

[63]   *Id.*

[64]   Keith L. Alexander, *Second D.C. Jail Inmate Tests Positive for Coronavirus* ("*Second Positive Test*"), WASH. POST, March 28, 2020.

107.    Defendants claim that they do not know how the first resident came in contact with the virus.[65]

108.    Defendants state that the first resident "has been jailed since July 29 [2019]."[66]

109.    Defendants state that "the [first] two inmates [who tested positive] were not in the same unit."[67]

110.    Because the first resident to test positive has been incarcerated since before the COVID-19 outbreak began, it is certain that the resident contracted COVID-19 while he was in Defendants' custody.

111.    According to Defendants, the first resident who tested positive "complained of being sick" and was then placed in isolation on or about March 20, 2020.[68]

112.    Because the virus can be transmitted before symptoms develop, it is highly likely that the five residents who have tested positive have already transmitted the virus to other residents, staff members, visitors, or contractors.

113.    It is also highly likely that whoever infected the first resident to test positive who has already tested positive has infected other residents at CTF.

114.    Department of Corrections facilities feature many of the characteristics, and operate by many policies, that will lead to rapid spread of COVID-19.

115.    A February 2019 report by the Office of the District of Columbia Auditor found that Defendants were "repeatedly cited by [the Department of Health] for violations of industry standards related to environmental conditions, including water penetration through the walls from

---

[65]    Alexander, *First Positive Test*, *supra* note 61.

[66]    *Id.*

[67]    Alexander, *Second Positive Test*, *supra* note 62.

[68]    Alexander, *First Positive Test*, *supra* note 61.

a leaking roof, mold growth on walls, damaged shower stalls and temperatures outside of allowable standards."[69]  The Department of Health has also "cited both DOC and the food service provider Aramark for repeated violations of District regulations related to public health and food service."[70]

116.    Ventilation in Defendants' facilities is poor.[71]

117.    Between FY 2014 and FY 2018, Defendants sought $62.4 million for facility improvements and received only $15.7 million.[72]

118.    COVID-19 will continue to spread to Defendants' facilities because numerous people in the District of Columbia law enforcement community, who interact with Plaintiffs and proposed class members, have already tested positive for COVID-19.

119.    On March 18, 2020, a Deputy United States Marshal working in the Superior Court of the District of Columbia testified positive for COVID-19.[73]

120.    The Deputy Marshal who tested positive worked in Courtroom C-10 cellblock of the D.C. Superior Court (the high-volume courtroom where dozens of arraignments and presentments occur daily) and thus interacted with people who are now in Defendants' custody.[74]

121.    On March 23, 2020, two court security officers in D.C. Superior Court tested positive for COVID-19.[75]

---

[69]    OFFICE OF THE D.C. AUDITOR, POOR CONDITIONS PERSIST AT AGING D.C. JAIL; NEW FACILITY NEEDED TO MITIGATE RISKS i (2019).

[70]    *Id.* at 7.

[71]    *Id.* at 9.

[72]    *Id.* at i.

[73]    *See* Dana Hedgpeth & Justin Jouvenal, *D.C. Superior Court to Cut Back Operations*, WASH. POST, March 18, 2020.

[74]    *Id.*

[75]    Keith Alexander, *Two D.C. Court Security Officers Test Positive*, WASH. POST, March 23, 2020.

122.    As of March 27, 2020, at least three Metropolitan Police Department ("MPD") officers have tested positive for COVID-19.[76]

123.    MPD officers lack the personal protective gear that would decrease the risk that they will spread the disease.[77]

124.    COVID-19 will spread rapidly in Defendants' facilities because of the belated and inadequate policies discussed above and the failures to take other policies that are recommended and required by the CDC and other experts.

### e.   *Incarcerated people are, by definition, at elevated risk for death or serious injury if they contract COVID-19.*

125.    Like residents of nursing homes, residents of prisons and jails face greater risk of serious injury or death if they become infected with COVID-19.

126.    Public health officials writing in *The Lancet* explain the characteristics that increase mortality rates among incarcerated people who become infected:

> Prisons are epicentres for infectious diseases because of the higher background prevalence of infection, the higher levels of risk factors for infection, the unavoidable close contact in often overcrowded, poorly ventilated, and unsanitary facilities, and the poor access to healthcare services relative to that in community settings.[78]

127.    Incarcerated people in America have poorer health than the general population.  The Department of Justice estimates that "half of state and federal prisoners and local jail inmates

---

[76]   Metro. Police Dep't, *Third MPD Member Tests Positive for COVID-19* (March 26, 2020), https://mpdc.dc.gov/release/third-mpd-member-tests-positive-covid-19.

[77]   Simone Weichselbaum, *D.C. Cops Balance Bravado and Caution During COVID-19 Pandemic*, MARSHALL PROJECT, March 18, 2020

[78]   Kinner et al., *Prisons and Custodial Settings Are Part of a Comprehensive Response to COVID-19* p.1, LANCET.

reported ever having a chronic condition," and "[t]wenty-one percent of prisoners . . . reported ever having an infection disease."[79]

128.    Individuals incarcerated in Defendants' facilities also have poorer health than the general population.

129.    Plaintiffs and proposed class members are also at heightened risk because they lack access to quality medical care equipped to handle a disease outbreak.

130.    Plaintiffs and proposed class members regularly wait days to receive any medical care, even when they complain of difficulty breathing.

131.    Plaintiffs and proposed class members are not given masks or gloves even after they exhibit symptoms of COVID-19, including chronic coughing.  Defendants' staff do not have masks to provide to sick residents, or do not provide them if they are made available to staff.

132.    Several residents have requested masks after observing other residents in their unit coughing, sneezing, and exhibiting other signs of COVID-19, but those requests were denied.

### f.   *Rapid and systemic downsizing of the number of people in Defendants' custody is necessary to protect the community.*

133.    Downsizing the population in Defendants' custody is the only strategy to ensure the reasonable health and safety of Plaintiffs and proposed class members.

134.    On March 17, 2020, the New York City Board of Correction called on New York City to "immediately remove from jail all people at higher risk from COVID-19 infection."[80]

---

[79]   U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, MEDICAL PROBLEMS OF STATE AND FEDERAL PRISONS AND JAIL INMATES, 2011-12 p. 1 (2016).

[80]   Press Release, N.Y.C. Bd. of Corr., New York City Board of Correction Calls for City to Begin Releasing People from Jail as Part of Public Health Response to COVID-19 (March. 17, 2020).

135.   Dr. Marc Stern, a correctional health expert, declares that "[t]houghtful downsizing [of the jail population] should be implemented in tandem with aggressive, responsive prevention measures that are developed and guided by public health and medical experts."[81]

136.    Dr. Stern, reviewing the specific conditions in Defendants' facilities, and in light of "the four confirmed cases of COVID-19 inside of DOC facilities," specifically recommends that "downsizing the inmate population as much as possible will reduce the risk of contraction and transmission of COVID-19—and the attendant risks of serious harm and death—within DOC facilities."[82]

137.   Dr. Robert Greifinger, another correctional health expert, declares that "even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of individuals is a key part of a risk mitigation strategy."  Dr. Greifinger goes on to say that in his opinion, "the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage."[83]

138.   Defendants have the authority to downsize the population of the CDF and CTF via the COVID-19 Response Emergency Amendment Act of 2020, which allows the Department of Corrections "to award additional credits beyond the limits described . . . to effectuate the immediate release of persons sentenced for misdemeanors[.]"  67 D.C. Reg. 3106 (March 20, 2020).

   **g.   In addition to downsizing, proper hygiene and other procedures must be implemented to ensure the safety of Plaintiffs and proposed class members.**

---

[81]   Stern Decl. ¶ 12.

[82]   Stern Decl. ¶ 11.

[83]   Decl. of Robert Greifinger ¶ 13, Docket No. 4, *Dawson v. Asher*, No. 20-cv-409 (MAT) (W.D. Wash., March 16, 2020).

139.    Proper access to free and effective hygiene supplies and precautionary measures is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

140.    Immediate testing of all residents who require testing — where that requirement is based not on Defendants' subjective and inadequate criteria, but rather on guidance from knowledgeable medical professionals and public health organizations — is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

141.    This testing must include all residents, including asymptomatic residents, who have been in contact with positive COVID-19 cases.

142.    Effective screening protocols of visitors and staff is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

143.    Non-punitive quarantine, with full access to phones, mail, video visitation, commissary, recreation, and other privileges, for all individuals believed to be exposed to COVID-19 is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.  Only by ensuring that quarantine does not pose a danger to individuals' rights and their mental and physical health can Defendants' incentivize residents to promptly and fully disclose their symptoms and avoid spreading infection.

144.    Free and effective liquid hand soap, hand sanitizer, sanitizing cleaning solution, paper towels or rags, and frequently laundered and replaced personal towels and clothing, are necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

145.    Regular cleaning of common areas and high-touch surfaces using effective disinfectants is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

146.    Requiring staff members to wear gloves and masks and to replace gloves between close contacts with residents is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

147.    Authorizing regular, in-person monitoring of Defendants' facilities by an independent expert on correctional health is necessary to ensure that the DOC implements practices proven to reduce the transmission of COVID-19 and to ensure the health and safety of Plaintiffs and proposed class members.

## **CLASS ALLEGATIONS**

148.    Pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2), Plaintiffs bring this action as a class consisting of all persons confined or to be confined in the D.C. Department of Corrections ("DOC") Central Detention Facility or Correctional Treatment Facility, including as subclasses: (i) persons confined pre-trial, and (ii) persons confined pursuant to a judgment of conviction.  Plaintiffs reserve the right to amend the class definition or establish sub-classes as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

149.    Numerosity: The class is so numerous that joinder is impracticable.  Based upon information and belief, the size of the class is approximately 1,600 people and is therefore so numerous that joinder is inherently impracticable for that reason alone.  Joinder is also inherently impracticable for other, independent reasons.  The class includes unnamed, future class members who cannot by definition be joined.  Further, proposed class members are highly unlikely to file

individual suits on their own, as all are incarcerated and many are indigent, and thus have limited access to their retained or court-appointed counsel due to Defendants' policies, are currently incarcerated, fear retaliation from filing suits against Defendants, and lack access and financial resources to obtain qualified counsel to bring such suits.

150.   <u>Commonality</u>: The claims of the class share common issues of fact and law, including but not limited to whether Defendants' policies regarding health and hygiene as relevant to the COVID-19 pandemic — policies that systemically affect all proposed class members — violate the Fifth and Eighth Amendments to the United States Constitution.  The resolution of this question will drive the outcome of the litigation.

151.   <u>Typicality</u>: The claims of Plaintiffs are typical of those of the class as a whole, because each Plaintiff is currently in Defendants' custody and Plaintiffs' claims arise from the same policies and procedures (or lack thereof) that provide the basis for all proposed class members' claims.

152.   <u>Adequacy</u>: Plaintiffs are adequate class representatives who meet all of the requirements of Rule 23(a)(4).  They have no conflicts of interest in this case with other class members.  They will fairly and adequately represent the interests of the class, and each understands the responsibilities of a representative.  Counsel for Plaintiffs will vigorously prosecute the interests of the class and include attorneys with extensive experience with the factual and legal issues involved in representing jail and prison inmates, in asserting constitutional rights, and/or in pursuing class actions.

## **CAUSES OF ACTION**

### **FIRST CLAIM FOR RELIEF**
### **FIFTH AMENDMENT**

153.    The Fifth Amendment to the United States Constitution guarantees pretrial detainees the right to be free from punitive conditions of confinement.

154.    Defendants are violating Plaintiffs' and proposed class members' Fifth Amendment rights because "the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473–74 (2015).

155.    Defendants are also violating Plaintiffs and proposed class members' Fifth Amendment rights because they "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

156.    Defendants have recklessly failed to act with reasonable care to mitigate the risk of COVID-19 to Plaintiffs and proposed class members.

157.    Defendants knew of, or should have known, about the risks of COVID-19 to Plaintiffs and proposed class members.

158.    Defendants have acted with deliberate indifference towards Plaintiffs and proposed class members by failing to safeguard their health and safety adequately.

159.    Defendants have exposed Plaintiffs and proposed class members to a substantial — indeed grave — risk of serious harm, including death.

160.    Defendants knew of and disregarded the substantial risk to Plaintiffs and proposed class members' health or safety.

161.    Defendants have subjected Plaintiffs and proposed class members to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.

162.    Defendants continued detention of Plaintiffs and proposed class members fails to protect them adequately from the risks of contracting COVID-19.

163.    As a result of Defendants' unconstitutional actions, Plaintiffs and the proposed class are suffering irreparable injury.

## SECOND CLAIM FOR RELIEF
### EIGHTH AMENDMENT

164.    The Eighth Amendment to the United States Constitution protects Plaintiffs and proposed class members from cruel and unusual punishment.

165.    To amount to the infliction of cruel and unusual punishment (1) jail or prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test) and (2) prison officials must have acted with deliberate indifference to the risk posed (a subjective test). *Helling*, 509 U.S. at 33–35.

166.    Plaintiffs and proposed class members are subject to a risk of harm that today's society does not tolerate.

167.    Society does not tolerate the risk of exposure to COVID-19 to which Defendants' policies and procedures (or lack thereof) have subjected Plaintiffs and proposed class members.

168.    Indeed, the District of Columbia has warned against the dangers of the very behaviors in which Plaintiffs and proposed class members are required daily to engage as a direct result of Defendants' policies and procedures (or lack thereof).

169.    Plaintiffs and proposed class members suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

170.    Defendants have acted with deliberate indifference to the risks posed to Plaintiffs and proposed class members by COVID-19.

171.    Defendants knew of, and know of, the risks that COVID-19 poses to Plaintiffs and proposed class members.

172.    The risk of COVID-19 was, and is, obvious to Defendants.

173.    Defendants' response to COVID-19 has not been reasonable.

174.    As a result of Defendants' actions, Plaintiffs and proposed class members are suffering irreparable injury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs and proposed class members respectfully request that the Court:

A.  Certify the proposed class and subclasses;

B.  Enter a temporary restraining order, preliminary injunction, and permanent injunction and/or writs of habeas corpus requiring Defendants to:

    1.  Immediately take all actions within their power to reduce the inmate population of the D.C. Jail and CTF including, but not limited to, releasing as many people as possible through the COVID-19 Response Emergency Amendment Act of 2020, which allows the Department of Corrections "to award additional credits beyond the limits described . . . to effectuate the immediate release of persons sentenced for misdemeanors[.]" 67 D.C. Reg. 3106 (March 20, 2020);

    2.  Appoint an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding how many and which class members to order released so as to ensure that the number of prisoners remaining at the CDF and CTF can be housed

consistently with CDC guidance on best practices to prevent the spread of COVID-19, including the requirement that prisoners be able to maintain six feet of space between them and further order that such recommendations take into account CDC guidance concerning health factors that put individuals at elevated risk of death from COVID-19;

3. Ensure that each inmate receives, free of charge, an individual supply of hand soap, sufficient to allow frequent hand washing; paper towels; toilet paper; running water; and facial tissue;

4. Provide no-touch trash receptacles for tissue and paper towel disposal;

5. Ensure that all inmates, when not in cells with access to hand soap and running water, have access to hand sanitizer containing at least 60% alcohol;

6. Provide access to daily showers for each inmate and daily access to clean laundry, including clean personal towels and washrags after each shower;

7. Require that all DOC staff wear personal protective equipment, including masks and gloves when interacting with visitors and residents or when touching surfaces in common areas;

8. Provide an anonymous mechanism for residents to report staff who violate these guidelines so that appropriate corrective action can be taken to ensure staff compliance.

9. Take each inmate's temperature daily (with a functioning and properly operated thermometer) to identify potential COVID-19 infections;

10. Assess (through questioning) each inmate daily to identify potential COVID-19 infections;

11. Conduct immediate testing for anyone displaying known symptoms of COVID-19;

12. Immediately provide masks for any individual displaying or reporting COVID-19 symptoms until they can be evaluated by a qualified medical professional or placed in non-punitive quarantine;

13. Frequently communicate to inmates to provide information about COVID-19, reducing the risk of transmission, and any changes in policies or practices;

14. Provide inmates with an adequate supply of disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 (at the manufacturer's recommended concentration), to clean their cells and other surfaces;

15. Clean and disinfect frequently touched surfaces with disinfectant products effective against the virus that causes COVID-19 (at the manufacturer's recommended concentration), as well as surfaces in common areas, every two hours during waking hours, and at least once during the night;

16. Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

17. Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

18. Provide access to unmonitored, confidential legal calls and video visits with counsel to reduce the need for defense teams to enter into the facility and meet with clients in dangerously close quarters;

19. Facilitate video conferencing and telephonic conferencing, when requested, as an alternative to in-person court appearances; and

20. Appoint an independent monitor with medical expertise to ensure compliance with these conditions, and provide the monitor with unfettered access to medical units, confidential communication with detained individuals in and out of quarantine, and surveillance video of public areas of the facilities; and

C. Award such further relief as this Court deems appropriate.

DATED:  March 30, 2020                    Respectfully submitted,
             Washington, D.C.


                                    /s/ Steven Marcus_____
                                    Steven Marcus (D.C. Bar # 1630882)
                                    Jonathan Anderson (D.C. Bar # 475306)
                                    Jenna Cobb (D.C. Bar # 979506)
                                    Public Defender Service for the District of Columbia
                                    633 Indiana Avenue N.W.
                                    Washington, D.C. 20004
                                    Tel. 202-824-2524
                                    Fax 202-824-2525
                                    *smarcus@pdsdc.org*

                                    /s/ Scott Michelman
                                    Scott Michelman (D.C. Bar # 1006945)
                                    Arthur B. Spitzer (D.C. Bar # 235960)
                                    Michael Perloff (D.C. Bar # 1601047)
                                    American Civil Liberties Union Foundation
                                          of the District of Columbia
                                    915 15th Street NW, Second Floor
                                    Washington, D.C. 20005
                                    Tel. 202-457-0800
                                    *smichelman@acludc.org*