**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

EDWARD BANKS, *et al.*,

          *Plaintiffs-Petitioners*

    v.

QUINCY BOOTH, in their official capacity
as Director of the District of Columbia
Department of Corrections, *et al.*,

        *Defendants-Respondents*.

No. 1:20-cv-849

---

**PLAINTIFFS AND PROPOSED CLASS MEMBERS' MEMORANDUM IN SUPPORT
OF THEIR APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND
MOTION FOR PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

"These are extraordinary times."[1]  COVID-19 poses an unprecedented threat to a group of

District of Columbia residents in the custody of the District of Columbia Department of

Corrections ("DOC").  The DOC has already announced five positive cases, four of which are

from different units in its facilities.  The risk of rapid and pervasive infection is high.  Indeed, the

virus already appears to be spreading exponentially, from one positive test on March 25, to two

positive tests on March 27, to four positive tests on March 28, and a fifth positive case on March

29.

The speed and breadth of this problem for incarcerated people is stark.  At the peak of the

outbreak in Wuhan, China — the province where COVID-19 originated — over <u>half</u> of all reported

---

[1]  This is how Magistrate Judge Thomas Hixson began his opinion ordering the release of a man
detained in a California jail.  *Matter of Extradition of Toledo Manrique*, No. 19-MJ-71055 (TSH),
2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020).

COVID-19 cases were incarcerated people.  On Rikers Island, the rate of infection among incarcerated people is <u>over seven times</u> the rate of infection in New York City generally, and 25 <u>times</u> higher than the rate in Wuhan, China.[2]  This crisis recalls the 1918 flu pandemic, in which a cluster of infections at San Quentin Prison in California became "one of the primary foci" of a worldwide epidemic that killed between 20 million and 100 million people.  *See* Niyi Awofeso, *Prisons Show Prophylaxis for Close Contacts May Indeed Help in Next Flu Pandemic*, 329 BMJ 173, 173 (2004); GINA KOLATA, FLU: THE STORY OF THE GREAT INFLUENZA PANDEMIC OF 1918 AND THE SEARCH FOR THE VIRUS THAT CAUSED IT 5 (2011).

The risk of mass contagion in the Central Detention Facility ("CDF") and Correctional Treatment Facility ("CTF") — DOC's two interconnected jails — facilities is high, and the effects of the outbreak will be devastating.  Many cases can result in horrible pain, fevers, diarrhea, and difficulty breathing.  More serious cases will require hospitalization, and severe cases can cause death or permanent lung and heart conditions.  Among adults with preexisting medical conditions like high blood pressure, asthma, and diabetes — features that disproportionately characterize incarcerated people — the hospitalization and death rates are greatly elevated.

With over 1,600 vulnerable residents in its care and months to prepare for this coming catastrophe, the Department of Corrections has proven that it will not, and cannot, ensure the reasonable health and safety of its residents.  The evidence in the record includes:

- Declarations from residents in DOC facilities who detail the days-long delays before they can receive medical care, the lack of soap, hand sanitizer, and disinfectant, the policies that require large groups of residents to congregate in close proximity, the lack of testing of residents showing

---

[2]      These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released.  The rates of infection rely on publicly released data collected by the Legal Aid Society. *See* LEGAL AID SOCIETY, *Analysis of COVID-19 Infection Rate in NYC Jails* (last visited March 30, 2020, 11:00 AM), https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.

symptoms, and the lack of personal protective equipment for staff and residents;

- Declarations from attorneys and investigators of the Public Defender Service for the District of Columbia ("PDS"), who witnessed first-hand the DOC's failures to implement effective visitor and staff screening procedures, all but ensuring the virus's introduction to DOC facilities; and

- Expert declarations from Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine and former Infectious Disease physician for York Correctional Institution in Connecticut, and Dr. Marc Stern, an internist who most recently served as the Assistant Secretary of Health Care for the Washington State Department of Corrections. Drs. Meyer and Stern explain that the virus will spread rapidly in the DOC; that the DOC's response has been, and is, entirely lacking; and that downsizing the incarcerated population is the best solution to ensure the safety of residents, staff, and the community.

This evidence, damning on its own, is all the more troubling because it is confirmed by reports from DOC staff. DOC staff themselves report that, even as of March 25, 2020, DOC staff have "no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis." *See* Ex. 1, Decl. of Dr. Jaimie Meyer ("Meyer Decl."), Attch. C, Labor Committee Letter, at 3. They go on to identify the failure of the DOC to screen even new residents coming into the jail for COVID-19 and the failure of the DOC to provide social distancing between residents. *Id.* at 3–4.

The cumulative result of DOC's failings is, in the professional judgment of Dr. Meyer, that the DOC is "dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community." Ex. 1, Meyer Decl. ¶ 28. In reaching that conclusion, Dr. Meyer reviewed the District of Columbia's own audits and evaluations of CDF and CTF, as well as the declarations from residents and PDS staff detailing the conditions in those facilities in the last few weeks. She identified the following problem areas: cleaning and disinfecting practices; hygiene; personal

protective equipment; screening of inmates, staff, and visitors; social distancing; management of the disease in the facility; sufficiency of isolation spaces; and medical care for other health conditions. *Id.* ¶ 28(a)-(d).  In sum, Dr. Meyer concluded that the evidence in the record "make[s] it clear that conditions in the DC jails during this pandemic are dangerous." *Id.* ¶ 33.

These are indeed extraordinary times.  But in the face of "true urgency," *id.* ¶ 31, and institutional failures such as those documented here, courts have taken a leading role.  Across the country, state and federal court judges have issued orders that have resulted in the immediate release of incarcerated people, reducing the risk to the safety and health of those people and the community.  On March 22, 2020, for instance, the New Jersey Supreme Court put in place a procedure for the release of 1,000 men and women serving sentences in New Jersey jails. *See In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020).

Plaintiffs and proposed class members are the over 1,600 residents of the D.C. Jail, which consists of two interconnected detention facilities: the CDF and the CTF.  Defendants are the Director of the DOC and the warden of the Jail.

Plaintiffs seek a temporary restraining order and preliminary injunction directing Defendants to take all actions within their power to reduce the inmate population of CDF and CTF and appointing an expert to effectuate the rapid downsizing of those facilities, consistent with CDC guidance.  Plaintiffs also ask the Court to require Defendants to immediately implement new procedures that will bring the DOC in compliance with expert guidance and to appoint an independent monitor to ensure such compliance.  For the reasons that follow, the Court should enter that order.

## FACTUAL BACKGROUND

**I.      COVID-19 poses a grave risk of serious injury or death to anyone who is infected.**

As the Court well knows, COVID-19 is a coronavirus that has caused a worldwide global pandemic.  There is no vaccine and no cure for COVID-19, a highly infectious and sometimes fatal disease.  The World Health Organization ("WHO") estimates that as of March 29, 2020, there are 638,146 confirmed cases, 30,105 confirmed deaths, and 203 countries, areas, or territories with confirmed cases.  Docket No. 1 ("Compl."), at ¶ 20.  The Centers for Disease Control and Prevention ("CDC") estimates that as of March 29, 2020, there are 122,653 confirmed cases and 2112 confirmed deaths in all 50 states and the District of Columbia.  *Id.* ¶ 21.  Due to the highly contagious nature of COVID-19, data and statistical modeling show that absent intervention, COVID-19 will continue to grow exponentially.  *Id.* ¶ 23.

People in all age brackets are at risk of serious injury and death from COVID-19.  Reviewing data collected by the CDC, Dr. Marc Stern — an expert on correctional health care and a board-certified internist — explains:

> Early reporting on the impacts of COVID-19, based in part on preliminary data emerging from China, seemed to indicate that the virus' impact would remain relatively mild for younger people.  Recent data released by the CDC suggests that this initial narrative is incorrect, and that adults aged 20-44 also face a risk of experiencing severe health outcomes as a result of contracting the disease.

*See* Ex. 2, Decl. of Dr. Marc Stern ("Stern Decl.") at ¶ 14.  Nearly 40 percent of people requiring hospitalization due to COVID-19 were between the ages of 20 to 54.  *Id.*

For people who contract COVID-19, the symptoms can be extremely severe.  Dr. Meyer writes that "[s]erious illness occurs in up to 16% of cases, including death."  Ex. 1, Meyer Decl. ¶ 23.  COVID-19 can cause intense pain, and recent research suggests that, in addition to the short-term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term

medical conditions, including cardiovascular disease.  Compl. ¶ 27.  One respiratory physician

explained that the lungs "become filled with inflammatory material" and "are unable to get enough

oxygen to the bloodstream."  *Id.* ¶ 25.

The available data from the CDC to date shows that, in total, 20.7 to 31.4 percent of people

who tested positive for COVID-19 require hospitalization, 4.9 to 11.5 percent require admission

to the ICU, and 1.8 to 3.4 percent die.  Compl. ¶ 29.  By way of comparison, the WHO estimates

that the COVID-19 mortality rate is between three and four percent, while the mortality rate of

seasonal influenza is well below 0.1 percent.  *Id.* ¶ 30.  Unlike the flu, however, there is no vaccine

or cure for COVID-19.  *Id.* ¶ 32.

## II.     Jails and prisons are particularly vulnerable to COVID-19 and pose a public health risk to the broader community.

Correctional facilities are environments that enable and facilitate the spread of COVID-19.

Dr. Marc Stern, an expert on correctional health care systems and a board-certified internist, has

studied COVID-19 and "its transmission—especially in crowded and unsanitary conditions—and

its ability to quickly spread through correctional facilities."  *See* Ex. 2, Stern Decl. at ¶ 6.  Because

people — staff, residents, contractors, attorneys, community members, and others — constantly

cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring

the virus into the facility.  For example, in Jining, China, 207 people in a correctional facility

contracted COVID-19 because a prison guard contracted it outside of the facility and then came to

work, not knowing he was infected.  Compl. ¶ 35.  Even if correctional institutions screen

outsiders, including staff and visitors, for symptoms of COVID-19, that will not stop the

introduction of COVID-19 from the outside, as Dr. Meyer explains, because "people can transmit

the virus before they start to show symptoms or for weeks after their symptoms resolve."  Ex. 1,

Meyer Decl. ¶ 22.

Correctional facilities also are highly susceptible to rapid person-to-person transmission of the virus because cramped conditions place residents and staff in close proximity. Meyer Decl. ¶ 10. "Institutional settings such as jails, prisons, shelters, and inpatient treatment programs are congregate environments where people live, eat, and sleep closely together. In these environments, infections like COVID-19 can spread more rapidly." Ex. 2, Stern Decl. ¶ 10. For example, in New York City, the first case of COVID-19 infection in a jail detainee was diagnosed on March 18, 2020. Within two days, thirty-eight cases had been diagnosed at the Rikers Island Correctional Complex. The current rate of infection in New York City jails is 3.00 percent. Compl. ¶ 42. This is seven times higher than the rate of infection in New York City generally (0.2 percent), over four times higher than the rate of infection in Lombardy, Italy (0.3 percent), and over ten times higher than the rate of infection in Wuhan, China (0.1 percent). *Id.*

The crisis at Rikers Island mirrors what has happened in prisons worldwide. Approximately one month into the pandemic in the province of Hubei, China, where the COVID-19 outbreak started, over half of reported COVID-19 cases were from jails. *Id.* ¶ 43. In South Korea, which has enacted radical and effective public health measures to slow and stop the spread of the virus, "the single largest COVID-19 outbreak and mortality cluster was from the Daenam Prison Hospital, where 101 inmates were infected and seven died." *Id.* ¶ 44.

Because incarcerated populations are so vulnerable to this disease, jurisdictions around the world and in the United States have taken bold actions to save lives for inmates and for the community. Germany released "1,000 prisoners who are close to the end of their sentences"; Canada released "1,000 inmates in the state of Ontario"; and Iran "temporarily release[d] 85,000 prisoners, with 10,000 of them being granted pardons." *Id.* ¶ 5. Closer to home, the New Jersey Supreme Court announced that it would release "as many as 1,000 people from its jails," *In the*

*Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. March 22, 2020). New York City is doing the same. Compl. ¶ 5. This effort to depopulate facilities like prisons and jails that are breeding grounds for the virus is not just limited to the East Coast. It is an urgent nationwide effort. Cuyahoga County, Ohio, released around 600 people from the county jail in a matter of days; Washington County, Oregon, released more than 120 people from the local jail; Alameda County, California, released 314 people from its jail; the Iowa Department of Corrections began to release 700 people from state prisons; Mercer County, Pennsylvania, released 60 of 308 people in its jail. *Id.*

### III.    The Department of Corrections has failed to take even basic precautions that would mitigate the spread and risk of COVID-19.

On February 28, 2020, Mayor Bowser called to activate the District's Emergency Operations Center to coordinate responses to COVID-19, requiring Defendants to "remind their staff and constituencies" of "basic infection practices," including to "[w]ash hands with soap and water" or an "alcohol-based hand sanitizer," to "[a]void close contact with people who are sick," and to "[c]lean and disinfect frequently touched objects and surfaces." D.C. Mayor's Order 2020-035, § 10(a). The Executive Order specifically requires that "[a]ll relevant District agencies shall review their copy of the District Response Plan to evaluate the potential impacts of COVID-19 on emergency roles and responsibilities and take necessary steps to ensure continued performance." *Id.* § 3(a).

Declarations from Plaintiffs, attorneys who have visited Defendants' facilities, and medical professionals demonstrate Defendants' failure to properly respond to this life-threatening pandemic. To adequately respond to COVID-19, correctional facilities must implement two measures: "thoughtful downsizing of the incarcerated population" along with "aggressive,

responsive prevention measures that are developed and guided by public health and medical experts." Ex. 2, Stern Decl. ¶ 12.  To date, Defendants have done neither.

### A. Defendants have failed to significantly decrease the population of their facilities.

Dr. Stern emphasizes the import of decreasing the jail population, stating that it "serves two critical public health aims: (1) targeting residents who are elevated risk of suffering from severe symptoms of COVID-19; and (2) allowing those who remain incarcerated to better maintain social distancing and avoid other risks associated with forced communal living." Ex. 2, Stern Decl. ¶ 13.  Although defendants have had the opportunity to begin reducing the jail population, they have not done so.  Downsizing jail populations . . . will help to 'flatten the curve' overall—both within the jail setting and without." *Id.* ¶ 13.  Yet nearly a hundred people serving sentences for misdemeanors remain in the D.C. Jail, despite emergency legislation authorizing Defendants to release them immediately.  *See* 67 D.C. Reg. 3093, *COVID-19 Response Emergency Amendment Act of 2020* (March 20, 2020).  Defendants' failure to deploy the tools available to them illustrates their disregard for the health and safety of Plaintiffs and their fellow class members.

### B. Defendants have maintained dangerous, unsanitary conditions.

"The jail must be required to provide hand soap, disposable paper towels, and access to water to allow residents to wash their hands on a regular basis, **free of charge** and ensure replacement products are available as needed . . . . residents should be allowed to use hand sanitizer with alcohol when they are in locations or activities where hand washing is not available." Ex. 2, Stern Decl. ¶ 16(e) (emphasis in original).  Occasionally, a staff member makes an announcement for residents to "wash their hands." Ex. 3, Cicurel Decl. ¶ 6(a).  But Plaintiffs "have no hand sanitizer" and very little soap has been provided.  Ex. 4, Banks Decl. ¶ 8.

Even after making repeated requests for soap, residents have not been provided the soap necessary to engage in regular, let alone frequent, handwashing.  *See* Ex. 3, Cicurel Decl. ¶ 6(d). While some residents were issued "a single bar of soap a couple of weeks ago," Ex. 4, Banks Decl. ¶ 8, others were not provided their bar of soap until March 21, 2020, Ex. 5, Jackson Decl. ¶ 8. Because soap was not being supplied, "some residents were using shampoo to wash their hands in lieu of anything else; others had nothing with which to wash their hands."  Ex. 3, Cicurel Decl. ¶ 6(a).  On one unit, soap dispensers that had recently been installed were removed and residents were "informed that the soap was not for them, but only for staff."  *Id.* ¶ 6(b).  At times, Plaintiffs have been deprived of access to their cell for several hours at a time, rendering them unable to wash their hands.  Ex. 5, Jackson Decl. ¶ 9.  Even residents who previously had access to hand sanitizer while outside of their cells no longer do, as "CTF officials took the dispenser off the wall and placed it behind glass so that only officers could use hand sanitizer."  Ex. 5, Jackson Decl. ¶ 11; *see also* Ex. 6, Eric Smith Decl. ¶ 7.

To mitigate the spread of COVID-19 in the CTF and CDF, Defendants "must be required to provide adequate sanitation of high use/high touch areas and cells in accordance with CDC or local health authority guidelines."  Ex. 2, Stern Decl. ¶ 16(d); *see also* Ex. 1, Meyer Decl. ¶ 13 ("High-touch surfaces . . . should also be cleaned and disinfected regularly with bleach to prevent virus spread . . . .").  But Defendants have failed to maintain even the most basic levels of sanitation.  At CDF, other "inmates come in and sweep the unit," but "jail staff is not doing anything additional to clean [the] unit."  Ex. 7, Phillips Decl. ¶ 7.  Individual cells are not cleaned and they "do not wipe down surfaces with disinfectant."  Ex. 4, Banks Decl. ¶ 9.  Though residents are responsible for cleaning their own cells, "disinfectant was not provided or available."  Ex. 8, Pond Decl. ¶ 6(a); Ex. 3, Cicurel Decl. ¶(a); Ex. 9, Cyphers Decl. ¶ 6(a).  Communal showers have

not been cleaned regularly; in the past month, showers have been cleaned only "once or twice." Ex. 5, Jackson Decl. ¶ 13.

The limited cleaning supplies that are available in Defendants' facilities are ineffective at best and potentially counterproductive at worst.   Cleaning solutions are "watered down," and mops, when available, are old, "molding and stinking up the unit."  Ex. 5, Jackson Decl. ¶ 12. Some residents were given only Windex to clean. Ex. 3, Cicurel Decl. ¶ 6(a).  One attorney visited CDF just yesterday and observed "a cleaning cart" where the only cleaning supply on the cart was "a bottle with a 'Windex' brand label on it."   Ex. 16, Sylvia Smith Decl. ¶ 4(f).   Dr. Meyer specifically cautions that "Windex . . . contains 4% isopropyl alcohol, as compared to the 70% alcohol-containing products or bleach needed to disinfect, per CDC recommendations," and, in fact, "since Windex contains 28% ammonia, it could actually be harmful if mixed with bleach because the reaction generates chlorine gas that irritates the respiratory tract, eyes, and skin."  Ex. 1, Meyer Decl. ¶ 28(a)(ii).   While this level of sanitation is inadequate at any time, it is potentially life-threatening during a viral pandemic.

The lack of "personal protective equipment" (or "PPE") for staff and residents compounds the problem.  Dr. Meyer explains: "The lack of personal protective equipment ("PPE") for both D.C. DOC staff and inmates, as described in the declarations of inmates and attorneys, will result in an increased risk of COVID-19 infection."  *Id.* ¶ 28(a)(iii).  DOC correctional officers "do not wear masks or gloves regularly."  Ex. 4, Banks Decl. ¶ 10; *see also* Ex. 8, Pond Decl. ¶ 5(c).  In one instance, a correctional officer, who had been "eating dinner with his bare hands" immediately patted Plaintiff Banks down "with hands that had just been in or near his mouth."  Ex. 4, Banks Decl. ¶ 4.  More alarmingly, when Plaintiff Banks went to receive his daily medication, a nurse, who is responsible for distributing medicine to approximately forty people, placed a cup of

medication to Plaintiff's mouth.  "Even though the nurse's hands get very close to, and sometimes even touch, [his] mouth, the nurse does not replace gloves between patients."  Ex. 4, Banks Decl. ¶ 5.  During the pandemic, inmates have been given a shared cooler of juice and "[a]ll day long inmates dip their cups into the top of the juice cooler to get ice out of it."  Ex. 6, Eric Smith Decl. ¶ 6.  To the extent that there are regulations and procedures for Defendants' staff to follow, either they permit the kinds of unsanitary, contagion-enabling practices described above, or there is insufficient enforcement of whatever procedures are in place.  Either way, the actions of Defendants' staff promise that the infection will pass from one resident to the next.

### C. Plaintiffs in Defendants' custody are not properly quarantined after potential exposure to COVID-19.

Defendants "must establish non-punitive quarantine for all individuals believed to have been exposed to COVID-19, but are not yet symptomatic, and non-punitive isolation for those believed to be infected with COVID-19 and potentially infectious."  Ex. 2, Stern Decl. ¶ 16(c). "In short, every possible effort must be made to separate infected or potentially infected individuals from the rest of the incarcerated population."  *Id.*  But individuals who have been quarantined under suspicion of being infected with the coronavirus were only "gone for about a week" before being "back on the unit."  Ex. 7, Phillips Decl. ¶ 6; Ex. 3, Cicurel Decl. ¶ 6(c).  Plaintiff Phillips, who was present in the courthouse the same week as the Deputy Marshal who tested positive for COVID-19, was never placed in a quarantine unit.  Ex. 7, Phillips Decl. ¶ 5.  Plaintiff Eric Smith, whose unit is next to a quarantine unit, describes the ventilation as "very poor" and "not sealed off" from his own unit.  Ex. 6, Eric Smith Decl. ¶ 3.  Shockingly, the units share a remote control, which has been brought back and forth between the units while some residents have been quarantined.  *Id.* ¶ 4.

**D. Defendants' failure to implement proper screening protocol heightens the risk that Plaintiffs will be repeatedly exposed to COVID-19.**

It is "critical" that "[c]orrectional authorities must be required to screen each employee or other person entering the facility *every day* according to current CDC or local health department guidelines." Ex. 2, Stern Decl. ¶ 16(b); *see also* Ex. 1, Meyer Decl. ¶ 28(b) ("It is . . . imperative that people entering closed confinement settings like prisons are properly screened to ensure that they do not bring the virus into the facility."). Although Defendants tout a policy of screening every individual who enters into their facilities, the reality has been far different. Up through March 11, 2020 — four days after the District of Columbia saw its first confirmed case of COVID-19 — no screening took place. *See* Ex. 8, Pond Decl. ¶ 5(a); Ex. 10, Wong Decl. ¶ 5(a); Ex. 9, Cyphers Decl. ¶ 5(a); Ex. 11, Resetarits Decl. ¶ 4. Once implemented, screening initially consisted only of filling out a three-question form, with visitors self-reporting whether they "had recently had a fever, dry cough or shortness of breath"; "had recently travelled to China, South Korea, or Italy," or "had recently been in contact with a person exhibiting those symptoms or who had travelled to those countries." Ex. 8, Pond Decl. ¶ 5(a); *see also* Compl. Ex. B, Questionnaire. In the days that followed, a nurse was often, but not always, stationed at the entrance of Defendants' facilities to take the temperature of visitors and staff. When a staff member complained because the nurse was not wearing gloves, the nurse commented that "taking temperatures was only a 'cosmetic' step anyway and that the jail was doing it only to make visitors *feel* safer." Ex. 12, Johnson Decl. ¶ 5(a) (emphasis in original).

On March 16, 2020 — after the screening measures were purportedly in full effect — several visitors were in CTF when "an announcement over the CTF loudspeaker asking everyone who had entered the CTF that morning to come back to security for coronavirus screening." Ex.

5, Jackson Decl. ¶ 8.  By that time, it was too late, as anyone who had entered the facility who should have been prohibited from entering already came in contact with residents.

### E. Plaintiffs are unable to take proper "social distancing" measures to protect themselves from infection.

Despite the CDC guidance regarding social distancing practices, DOC residents are forced to remain in close contact with large groups of people.  *Id.* ¶ 5.  "Residents [are] not being prevented from, or even advised against, eating or spending time in large groups, and crowds of people [have] been congregating together."  Ex. 3, Cicurel Decl. ¶ 6(d).  Visitors have observed staff members failing to practice social distancing.  Ex. 8, Pond Decl. ¶ 5(b-d).  Defendants' staff confirm this problem, raising several complaints to DOC leadership about the lack of effort to permit social distancing among staff.  *See, e.g.*, Ex. 1, Meyer Decl., Attch. C, Labor Committee Letter, at 3 (criticizing Defendants, *inter alia*, for failing to provide necessary equipment and for continuing to require residents and staff to gather in groups and in close proximity).  These and other of Defendants' actions have left Plaintiffs to believe that Defendants are not "taking coronavirus seriously."  Ex. 5, Jackson Decl. ¶ 2.  In fact, when Plaintiff Jackson expressed concern about "not gathering in groups larger than 10 and staying six feet apart," DOC staff accused him of "hyping this up" and instructed him to "stop watching the news."  *Id.* at ¶ 5.  Plaintiff Jackson was not "hyping this up;" as Dr. Meyer declares: "The lack of ability to practice social distancing in the CDF and CTF is also concerning and will the increase rate of spread of the virus."  Ex. 1, Meyer Decl. ¶ 28(c).

### F. Plaintiffs do not have immediate access to health care.

Dr. Stern is clear: "It is critical that inmates have rapid access to responsive medical treatment." Ex. 2, Stern Decl. ¶ 16(f).  Yet, Plaintiffs have had difficulty accessing prompt medical care during the pandemic.  Several PDS attorneys and intern investigators have reported residents

14

experiencing symptoms including coughs, chest pains, chills, fevers, and body aches.  *See* Ex. 3, Cicurel Decl. ¶ 5; Ex. 13, Kuenzle Decl. ¶ 4(a).  One PDS attorney observed first-hand that her client had "a deep, guttural cough" and had to interrupt their "conversation several times to cough extensively." Ex. 3, Cicurel Decl. ¶ 6(b).   Residents themselves declare that "it takes days before you get a visit with anyone from the medical unit."  Ex. 7, Phillips Decl. ¶ 4; *see also* Ex. 6, Eric Smith Decl. ¶ 5 ("It takes days before anyone can get medical staff to come see them, even if you say you are having trouble breathing."); Ex. 3, Cicurel Decl. ¶(d) (describing a client who was waiting "several nights before" anyone from medical responded to his "request for an asthma pump").  This was particularly concerning for Dr. Meyer, who writes that "[t]he failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic."   Ex. 1, Meyer Decl. ¶ 28(d)(ii).

Defendants are also ill-equipped to offer the type of medical treatment that will be needed during an outbreak.  Dr. Meyer reviewed reports of Defendants' facilities and concluded that they will be grossly insufficient when the outbreak expands: "The 2019 D.C. Auditor report suggests there is a single medical isolation space in CTF with negative pressure capacity, located in the Medical 82 unit.  The same report notes that, at the time of the audit, the remainder of the 40 beds were nearly entirely filled (at 73% capacity), which would leave few beds available for COVID-19 patients.  *To say this is unacceptable is an understatement*." Ex. 1, Meyer Decl. ¶ 28(d)(i).  In other words, Defendants' residents are at "significantly higher risk of harm" because there are insufficient health care resources to treat the widespread outbreak that conditions at the D.C. Jail facilities.

The evidence in the record also shows that Defendants are not conducting sufficient testing to contain the outbreak.  Testing is "crucial in identifying and managing widespread outbreaks of infectious diseases."  Ex. 1, Meyer Decl. ¶ 17; *see also* Ex. 2, Stern Decl. ¶ 16(a) ("Patients  who require testing, based on public health recommendations and the opinion of a qualified medical professional, should be  tested for COVID-19.").  But Defendants are not testing even those people who exhibit symptoms of COVID-19.  One defense attorney, Rachel Cicurel, observed that her client had "a deep, guttural cough" and had to interrupt their "conversation several times to cough extensively."  Ex. 3, Cicurel Decl. ¶ 6(b).  Her client — like the other residents identified in declarations and in Defendants' staffs' own observations — had not been tested for COVID-19, despite displaying symptoms of COVID-19.  *Id.*

Defendants' actions have led Plaintiffs to believe that Defendants are not "taking coronavirus seriously."  Ex. 5, Jackson Decl. ¶ 4.  It is not only Plaintiffs and who stand in fear due to Defendants' inaction.  Correctional officers have rung the alarm on Defendants' failed response to the pandemic.  On March 20, 2020, the Labor Committee for DOC unanimously voted "no confidence" in the jail's leadership for "guaranteeing and accelerating the rampant spread of COVID-19."  *See* Compl. ¶ 6.  A subsequent letter of March 25, 2020, sent to Director Booth on behalf of the Labor Committee detailed Defendants' continued deficiencies.  *See* Ex. 1, Meyer Decl, Attch. C, Labor Committee Letter.  According to the letter, prior attempts to bring these issues to Defendant Booth's attention had gone ignored.  *Id.* at 2.

Some of the Labor Committee's chief grievances mirror those of Plaintiffs:

- "The corrections officers assigned to housing units have no masks, insufficient gloves, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units."

16

- "Inmates are not required to engage in any of the behaviors which the Mayor recommends for the general population, such as 'social distancing,' repeated hand-washing, and health monitoring."

- "Inmates [who were thought to be exposed to a Deputy Marshal who had tested positive] were not 'quarantined' in any meaningful manner. They were housed two to a cell, and the corrections officers on the unit were not provided with any [personal protective equipment] or other means for protection against infections."

- "Corrections Officers enter the Jail three shifts a day. There is no distancing at entrances, no distancing at roll calls, no attempt to obtain or record health concerns of each officer."

*Id.* at 3–4.

Further highlighting the issues at Defendants' facilities, the officers' requests include "regular disinfection of the CDF and CTF," "establish[ing] a quarantine unit," "[personal protective equipment] for officers," and a "COVID-19 protocol" to include social distancing at DOC facilities and official reporting of symptoms affecting residents and inmates. *Id.* at 4.

The March 25, 2020 letter did not spur the DOC into action. Four days later, after the DOC failed to take necessary steps to address the pandemic, the Labor Committee put out a press release, announcing that "DOC is not following the 'Guidance on Management of COVID-19 at Correctional and Detention Facility.'" Ex. 1, Attch C, Labor Committee Press Release, at 2. The Committee again reiterated the basic procedures that are not being followed:

- "Personal Protective Equipment (PPE), recommended by CDC is not present at the Jail for corrections officers or is in short supply and hoarded by supervisors under lock and key."

- "Cleaning and disinfection of the Housing Units is inadequately performed by inmates, and the Department of Health has not conducted inspections of the Housing Units to our knowledge."

- "Testing is inadequate at the D.C. Jail. . . . No testing is available for corrections officers."

*Id.*  The Committee stated that "approximately 25%" of corrections officers working at CTF are quarantined." *Id.*  "Soon," the Committee warned, "the Jail will have no corrections officers."  *Id.*

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing on others.  *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999).  The Circuit has suggested, but not decided, that an independent showing of likelihood of success is required.  *See Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20-22).  Under either approach, Plaintiff makes the necessary showing here.  Standards for issuing a temporary restraining order and a preliminary injunction are "the same" and can therefore be analyzed together.  *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016).

### A. Plaintiffs and proposed class members are likely to succeed on the merits of their claims.

Plaintiffs and proposed class members are substantially likely to prevail.  Defendants' myriad failures to protect the health and safety of Plaintiffs and proposed class members constitute deliberate indifference to their wellbeing in violation of the Fifth Amendment (for pre-trial detainees) and in violation of the Eighth Amendment (for post-conviction detainees).  Moreover, the record evidence — in the form of sworn affidavits from residents in Defendants' custody and from attorneys and investigators from PDS who have witnessed first-hand the conditions of Defendants' facilities, and two expert declarations from infectious disease and corrections

specialists — amply demonstrates the breadth and scope of Defendants' unconstitutional actions and inactions.  Notably, the evidence concerning conditions at CDF and CTF that residents and PDS staff supply is confirmed by assertions by Defendants' own staff, who corroborate these other accounts.

> **1. Plaintiffs and proposed class members are likely to prevail on the merits of their Eighth Amendment claim.**

"A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  *Brown v. Plata*, 563 U.S. 493, 510–11 (2011).  To amount to the infliction of cruel and unusual punishment: (1) prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test), and (2) prison officials must have acted with deliberate indifference to the risk posed (a subjective test).  *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).  Both prongs are met here.

> **a. The conditions at the District of Columbia jail, coupled with the risks posed by COVID-19, pose a substantial risk of serious harm to Plaintiff and proposed class members' health.**

To prevail on the first prong of the Eighth Amendment analysis, Plaintiffs must show a "substantial risk of serious harm" to their health or safety.  *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015).  At bottom, the Supreme Court has explained, this prong requires Plaintiffs to show that "the risk of which [they] complain[] is not one that today's society chooses to tolerate."  *Helling*, 509 U.S. at 36.  Plaintiffs, who are prohibited by Defendants from taking nearly all of the precautions that "today's society" mandates to mitigate risk of exposure to COVID-19, have made that showing here.

First, the risk to Plaintiffs and proposed class members is substantial.  Notably, Plaintiffs do not need to show that they are currently infected or suffering "serious health problems" to show

that they face a "substantial risk" of serious harm. *Helling*, 509 U.S. at 34. The Supreme Court squarely rejected that proposition in *Helling v. McKinney*, 509 U.S. 25, concluding that "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33. The Court went on: "Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Id.*

Ample record evidence, expert reports, and persuasive decisions from other circuits demonstrate that people in correctional institutions face a substantial risk of contracting COVID-19. Most significantly, according to Defendants, there are already five confirmed cases of COVID-19 in their facilities. For the reasons explained above, these five cases are undoubtedly harbingers of even greater infection. The first resident to test positive for COVID-19 had been in Defendants' custody since July 2019, ensuring that he contracted the virus while he was in Defendants' care and suggesting that he was infected by an outsider (a staff member or visitor) who likely infected others. The second resident to test positive did not live in the same housing unit as the first resident, all but guaranteeing that he contracted COVID-19 from a separate source. It is also troubling that the virus appears to be spreading rapidly, from one positive test on March 25 to five positive tests by March 29 — mirroring the rapid spread of the virus in correctional facilities that has been documented worldwide.

Dr. Stern's and Dr. Meyer's expert declarations also support Plaintiffs' claim that their risk of contracting COVID-19 is substantial. In his expert report, Dr. Stern explains that "infections like COVID-19 can spread more rapidly" in correctional institutions where "people live, eat, and

sleep closely together." Ex. 2, Stern Decl. ¶ 13. Likewise, Dr. Meyer explains that "[t]he risk

posed by infectious diseases in jails and prisons is significantly higher than in the community, both

in terms of risk of transmission, exposure, and harm to individuals who become infected." Ex. 1,

Meyer Decl. ¶ 7. Dr. Meyer cites the "[r]educed prevention opportunities" that lead to the "rapid

spread of infectious diseases," including:

- the lack of ability to practice social distancing (the "best initial strategy" to combat infection), because residents "must share bathrooms, showers, and other common areas";

- the lack of "adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable";

- the lack of adequate cleaning of "[h]igh-touch surfaces," which must be "cleaned and disinfected regularly with bleach to prevent virus spread";

- the lack of a "containment strategy" that calls for "people who are ill with symptoms to be isolated and . . . caregivers [who] have access to personal protective equipment, including gloves, masks, gowns, and eye shields";

- the lack of "negative pressure rooms" for treatment of infected persons to ensure that the virus is not transmitted "through droplets to others";

- the lack of "access to testing equipment, laboratories, and medications," which are "crucial in identifying and managing widespread outbreaks of infectious diseases"; and

- the lack of sufficient ventilation, which "promotes highly efficient spread of diseases through droplets."

*Id.* ¶¶ 8–17.

Critically, after reviewing the evidence in the record, including the Office of the District of

Columbia Auditor's 2019 report, the District of Columbia Corrections Information Council 2019

report, and declarations from residents in Defendants' custody, Dr. Meyer concluded that CDF

and CTF are "dangerously under-equipped and ill-prepared to prevent and manage a COVID-19

outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community."  *Id.* at ¶ 28.

Dr. Meyer's conclusion that Defendants are "dangerously under-equipped and ill-prepared" is made plain in the declarations of residents in Defendants' custody.  They describe first-hand plainly dangerous conditions, including requiring residents to attend "group sessions" of "around 30 people" sitting in close proximity and passing pens and papers around for hours a day, Ex. 5, Jackson Decl. ¶ 7; the passing back-and-forth of a remote control between the so-called "quarantine" unit and another housing unit; the removal of hand sanitizer that was previously available to residents, *id.* ¶ 2; the providing a single "big cooler of juice" into which residents "dip their cups into the top of the juice cooler to get ice out," Ex. 6, Eric Smith Decl. ¶ 6; the days-long delays to receive medical attention, Ex. 7, Phillips Decl. ¶ 4, even if you "say you are having trouble breathing," Ex. 6, Eric Smith Decl. ¶ 5; and the lack of disinfectant for commonly touched surfaces, Ex. 4, Banks Decl. ¶ 9.

Dr. Meyer's specific concerns about the lack of screening procedures to protect residents from infected visitors and staff are also revealed in declarations of PDS attorneys and staff who have themselves been through the screenings.  Those declarations reveal that there was no visitor screening of any kind until March 11, 2020, Ex. 10, Wong Decl. ¶ 5(a); that the screening procedure implemented on that day asked only about travel to limited international countries, Ex. 8, Pond Decl. ¶ 5(b); that when temperature screenings were implemented on March 13, 2020, they utilized broken thermometers that generated a reading of 93 degrees (which is two degrees below the threshold for hypothermia), Ex. 14, Naini Decl. ¶ 5(c); and that staff who interact with visitors coming and going from CDF and CTF do not wear personal protective equipment, *see, e.g.*, Ex. 12, Johnson Decl. ¶ 5(a); Ex. 15, Murphy Decl. ¶ 5(b).

Reports from Defendants' own staff echo the very same conditions identified by residents and PDS staff.  Defendants' officers report, consistent with the declarations of residents and PDS staff, that their officers "have no masks, insufficient gloves, no gowns, no disinfectants, and [that] no comprehensive cleaning occurs on a regular basis in [housing] units."  Ex. 1, Attch. C, Labor Committee Letter, at 3.  Defendants' officers also expose the inability to practice social distancing at CTF and CDF, both for residents and staff.  *Id.*  These officers also cast grave doubt on Defendants' so-called "quarantine" policy, under which residents are "housed two to a cell" on a unit with staff who "were not provided with any PPE or other means for protection against infections."  *Id.* at 4.

On the basis of much thinner records — and, in many cases, before positive COVID-19 tests in the respective facilities — other district courts have granted TROs recognizing the rapid spread of COVID-19 and requiring the immediate release of detained people.  Central District of California Judge Hatter granted a TRO on March 27, 2020, explaining that:

> As the Court writes this order, the number of confirmed COVID-19 cases in the United States has already exceeded the number of confirmed cases in every other country on this planet. Indeed, all of the experts and political leaders agree that the number of confirmed cases in the United States will only increase in the days and weeks ahead. The number of cases in the United States has yet to peak.

Temporary Restraining Order and Order to Show Cause at 10, Docket No. 32, *Castillo v. Barr*, No. 20-cv-605 (TJH) (C.D. Cal. March 27, 2020).  Just a day earlier, on March 26, 2020, Southern District of New York Judge Torres recognized that "[t]he spread of COVID-19 is measured in a matter of a single day — not weeks, months, or years" and granted a TRO requiring the immediate release of ten people.  *See Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. March 26, 2020).  On March 23, 2020, a panel of Ninth Circuit judges granted emergency relief and ordered a detained person released "[i]n light of the rapidly escalating public

health crisis." *Xochihua-Jaimes v. Barr*, 18-71460, Doc. No. 53 (9th Cir. Mar. 23, 2020) (unpublished).

At least one judge in this District has already granted a motion for emergency release from Defendants' custody in light of the risks of COVID-19.  On March 26, 2020, Judge Moss granted an emergency motion to be released from Defendants' custody pending sentencing, recognizing that "[a]ll responsible government agencies have advised of the risk of transmission posed by large gatherings," and expressing concern that residence at CDF and CTF requires being "housed in a unit with dozens of other detainees and inmates."  Order at 1–2, *United States v. Harris*, Docket No. 35, No. 19-cr-356 (RDM) (D.D.C. March 26, 2020).  Prophetically, the Court observed that "[t]he risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real." *Id.* at 2; *see also* Minute Order, *United States v. Jaffee*, 19-cr-88 (RDM) (D.D.C. March 26, 2020) (same).

In sum, the record evidence shows that Plaintiffs and proposed class members face a "substantial risk" of contracting COVID-19.  Plaintiffs need not show, or even allege, that "the likely harm would occur immediately" or that the possible infection would "affect all of those exposed." *Helling*, 509 U.S. at 33 (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).  Plaintiffs have shown that they are likely to succeed on the merits of showing their "substantial" or "significant" risk of contracting COVID-19.

Plaintiffs also must show that they suffer a substantial risk of "serious harm."  Put differently, the Supreme Court explained, this Court should ask "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36.

To conclude that COVID-19 poses a risk of serious harm, the Court need look no further than the drastic way that society has been reshaped in a matter of months solely in response to the pandemic.  Schools are closed.  Travel is restricted.  Even this Court's own operations have been dramatically changed by the "pandemic," in Chief Judge Howell's words, "reflecting the seriousness of the need to combat the community spread of the virus."  *In re: Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-9 (BAH), at 1–2.

The record before the Court also confirms what is now obvious to the world: COVID-19 poses a risk of serious harm.  Dr. Stern explains that this severe risk extends not only to the elderly, but to "younger individuals" who "are not protected from severe complications requiring hospitalization and placement in intensive care." Ex. 2, Stern Decl. ¶ 12.  The available data from the CDC bears this out, showing that of Americans generally who tested positive for COVID-19, nearly a third require hospitalization, many others require admission to the ICU, and between 1.8 and 3.4 percent of people die.  *See* Compl. ¶ 29.  From a clinical and public health perspective, COVID-19 poses a risk of serious harm to anyone who contracts it.

Moreover, applying the Supreme Court's reference to whether "society considers the risk . . . to be so grave" to COVID-19 likewise results in the inexorable conclusion that it poses a serious risk of harm.  The declarations of emergency from nearly every level of government is strong evidence COVID-19 is a risk that society considers to be grave.  In declaring a national emergency on March 13, 2020, President Trump proclaimed that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems."  Compl. ¶ 59.  Mayor Bowser's Declaration of Public Health Emergency includes the finding that COVID-

19 "poses a significant risk of substantial future harm to a large number of people in the District of Columbia."  Mayor's Order 2020-046, § I(C) (March 11, 2020).

For these and other reasons, courts roundly agree that COVID-19 poses a risk of serious harm.  The Court in *Basank*, 2020 WL 1481503, pointed to "[a] number of courts in this district and elsewhere [that] have recognized the threat that COVID-19 poses to individuals held in jails and other detention facilities."  *Id.* at *3 (citing *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *United States v. Garlock*, No. 18-cr-418 (VC), 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)).  The New Jersey Supreme Court, in approving an order resulting in the release of around 1,000 people from New Jersey jails, described "the profound risk posed to people in correctional facilities arising from the spread of COVID-19."  *In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. March 22, 2020).

These conclusions are even more pronounced when considered in connection with Dr. Meyer's conclusion that compared to "the population in the community," individuals in Defendants' custody are "at a significantly higher risk of harm if they do become infected." Ex. 1, Meyer Decl. ¶ 34.  Dr. Meyer cites specific features of Defendants' facilities that will increase the risk of serious harm to Plaintiffs and proposed class members who contract COVID-19.  For example, Dr. Meyer relies on the "day-long delays to see medical staff" as a factor that will "increase the risk of infection-related morbidity and mortality," as well as the fact that the Department of Health does not conduct "compliance checks [which are] essential to determining whether medical care is adequate."  Ex. 1, Meyer Decl. ¶ 28(d).  Dr. Meyer also identifies the "[l]imited bed space," both in Defendants' facilities themselves or in area hospitals, that increases the risk of "preventable complications and possibly death."  *Id.* ¶ 28(d)(i).

Finally, this Court also need look no further than the consensus among federal courts that exposure to tuberculosis — a less severe disease, at least in terms of mortality rate[3] — is a "serious harm" for Eighth Amendment purposes.  *See, e.g.*, *Jeffries v. Block*, 940 F. Supp. 1509, 1514 (C.D. Cal. 1996) (citing the determination of the California Legislature that "tuberculosis is a serious contagious disease, which presents a serious risk to inmate health"); *cf. Brown v. District of Columbia*, 514 F.3d 1279, 1285 (D.C. Cir. 2008) (concluding, under the slightly different deliberate indifference to "serious medical needs" test, that gallstones were "easily" in the "category of serious medical needs," a point conceded by the District of Columbia).

Taken together, the evidence in the record, and evidence of which the Court can and should take judicial notice, supports the conclusion that COVID-19 is a serious harm.  To recap: Plaintiffs and proposed class members are likely to succeed on the merits of the first prong, or the "objective" prong, of the Eighth Amendment, by having shown that (1) they are at substantial risk of contracting COVID-19; and (2) contracting COVID-19 would cause them serious harm.

### b. The Department of Corrections has acted with deliberate indifference to this risk.

To succeed on the second prong of the Eighth Amendment test, Plaintiffs and proposed class members must show that Defendants acted with deliberate indifference to the risk posed.  *See Helling*, 509 U.S. at 33–35.  Plaintiffs may do so by showing that the identified risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  Plaintiffs must show both that (1) the defendant

---

[3]   Studies suggest "a TB-related mortality rate of 2.1% [in the United States], which was comparable to studies in Canada."  Chou-Han Lin, *Tuberculosis Mortality: Patient Characteristics and Causes*, 14 BMC INFECTIOUS DISEASES (2014).

"knows of" the identified risk, and (2) the defendant "disregards an excessive risk to inmate health or safety."  Both prongs are satisfied here.

There is overwhelming evidence, much of it from Defendants themselves, that they "knew of a substantial risk" posed by COVID-19.  For one, Defendants' boss — Mayor Bowser — announced as much on March 11, 2020, declaring that COVID-19 "poses a significant risk of substantial future harm to a large number of people in the District of Columbia."  Mayor's Order 2020-046, § I(C) (March 11, 2020).  The next day, the DOC announced that it was "continu[ing] to monitor COVID-19 in our community and follow[ing] guidance from DC Health and the Centers for Disease Control and Prevention."  *See* D.C. Corrs. Info. Council, *Statements from the BOP and the DOC Concerning the Coronavirus 2019 (COVID-2019)* (March 12, 2020), https://cic.dc.gov/release/statements-bop-and-doc-concerning-coronavirus-2019-covid-2019.   Of course, that guidance repeatedly emphasized policies and procedures that Defendants steadfastly refused to take.  *Compare, e.g.*, CTRS. FOR DISEASE CONTROL & PREVENTION, INTERIM GUIDANCE FOR BUSINESSES AND EMPLOYERS TO PLAN AND RESPOND TO CORONAVIRUS DISEASE 2019 (COVID-19) (March 21, 2020) (calling on employers to minimize employees' contact with workers, customers and visitors, and to increase ventilation rates), *with* Ex. 1, Meyer Decl. ¶ 28(c) (describing the frequent and close-proximity contact between residents and staff and the poor ventilation in the facilities).

Defendants have also demonstrated that they were aware of particular deficiencies in their facilities that would increase the risk and severity of a COVID-19 outbreak in its premises.  In responding to the Office of the District of Columbia Auditor's report on their facilities, Defendants admitted in 2019 that "[t]he current HVAC system has significant design problems that inhibit proper airflow."  *Id.*  Regarding the lack of Department of Health ("DOH") compliance checks on

Defendants' medical facilities, Defendants "recognize[d]" the Auditor's recommendation that the medical unit should receive DOH inspections.  *Id.*

Moreover, Defendants were also put on notice by their own staff of the myriad shortcomings of their response to the COVID-19 pandemic.  On March 20, 2020, the union of Defendants' corrections officers unanimously voted "no confidence" in the jail's leadership, highlighting the lack of personal protective equipment and medical professionals trained in COVID-19 response.  *See* Compl. ¶ 6.  And, as of March 25, 2020, Defendants were made acutely aware (if they were not already) of additional, specific shortcomings of their response to the COVID-19 pandemic.  It was on that date that they received a detailed list of inadequacies from their own staff.  *See* Ex. 1, Attch. C, Labor Committee Letter at 3–4.

Defendants are not spared liability by claiming that they are not aware of the risk of COVID-19 to specific individual residents.  (Such a claim would be factually dubious, as for the reasons discussed above, all residents in Defendants' care are at serious risk of harm if they contract COVID-19.)  The Supreme Court held in *Farmer v. Brennan*, 511 U.S. 825 (1994) that it "does not matter," under the deliberate indifference prong, "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843.  For that proposition, the Supreme Court relied upon *Helling*'s observation "that the Eighth Amendment requires a remedy for exposure of inmates to 'infectious maladies' such as hepatitis and venereal disease 'even though the possible infection might not affect all of those exposed.'"  *Id.* at 844 (quoting *Helling*, 509 U.S. at 33).

Plaintiffs and proposed class members are also likely to prevail in showing that Defendants have disregarded and continue to disregard the excessive risk to their health or safety.  Dr. Meyer explains that the policies adopted by Defendants "lead [her] to conclude, in [her] professional

judgment, that the residents, visitors, and employees of these facilities are at imminent risk of contracting COVID-19." Ex. 1, Meyer Decl. ¶ 28. Dr. Meyer also concludes given "the state of limited medical care for residents at these facilities, any resident of [CDF and CTF] who contracts COVID-19 faces a serious and substantial risk of death from COVID-19." *Id.*

The very failures of Defendants in this case have been found to constitute deliberate indifference in like cases. For instance, in *Feliciano v. Gonzales*, 13 F. Supp. 2d 151 (D.P.R. 1998), the Court found that the defendant's "inability . . . to properly isolate cases of active tuberculosis," the "insufficient medical dormitory beds," the failure to "fully screen incoming inmates," and the failure to "provide for a sick call system that ensures access to care and that is capable of effectively handling emergencies" constituted deliberate indifference. *Id.* at 208–09. In other cases, the defendant's inability to "adequately quarantine or remove inmates and support staff known to have active tuberculosis" was found to constitute deliberate indifference. *See Shimon v. Dep't of Corr. Servs. for N.Y.*, No. 93-cv-3144 (DC), 1996 WL 15688, at *1 (S.D.N.Y. Jan. 17, 1996). And in *Joy v. Healthcare CMS*, 534 F. Supp. 2d 482 (D. Del. 2008), the Court found that the plaintiffs stated a claim under the Eighth Amendment where the warden "was aware that inmates were not thoroughly screened for disease before going into general population and that Correctional Medical Services does not have a policy in place to examine inmates before placing them into general population." *Id.* at 485. As discussed above, the record is replete with Defendants' deficient performance in all of these categories, including their failed quarantine policy, rampant medical delays, and ineffective screening procedures.

Defendants' deliberate indifference can also be shown by reference to their failure to follow accepted medical standards. The Court in *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015) explained that "known noncompliance with generally accepted guidelines for

inmate health strongly indicates deliberate indifference to a substantial risk of serious harm." *Id.* at 943.  Here, Dr. Meyer explains that Defendants are out of compliance in nearly every relevant category, including cleaning and disinfecting practices, hygiene policies, provisions of personal protective equipment, screening policies, social distancing requirements, and medical treatment facilities and protocols.  Ex. 1, Meyer Decl. ¶ 28(a)-(d).

In the context of COVID-19, courts have granted the relief requested here — immediate release — finding deliberate indifference on similar records.  For instance, in *Coronel v. Decker*, 20-cv-2472 (AJN), 2020 WL 1487274 (S.D.N.Y. March 27, 2020), Judge Nathan pointed to "a series of problems" identified by the petitioner in his facility, including the failure to keep accurate and sufficient medical records and inadequate screening and testing procedures, in finding that the respondent was deliberately indifferent.  *Id.* at *5.  In *Basank v. Decker*, 2020 WL 1481503, the Court rejected the measures taken by the jail in that case, including "screening detainees upon intake for risk factors, isolating detainees who report symptoms, . . . providing soap and hand sanitizer to inmates, and increasing the frequency and intensity of cleaning jail facilities."  *Id.* at *5.  Regarding those policies, the Court held that they "are patently insufficient to protect Petitioners," because the jail "could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another, as recommended by the CDC."  *Id.*  Notably, even the policies and procedures that were found to be insufficient by the *Basank* court are even above and beyond what Defendants here are providing.  Far from providing hand sanitizer to residents, Defendants actively removed it; instead of isolating detainees who report symptoms, Defendants placed "quarantined" inmates two-to-a-cell with no ventilation separation from non-quarantined inmates.

The record evidence thus shows that Defendants knew, and know, of the risk of COVID-19, but that they have recklessly disregarded that risk.  They have done so by failing to follow established guidelines for preventing the spread and severity of COVID-19 and by adopting policies, and failing to adopt others, that would mitigate the risk and harm of the virus.  Plaintiffs and proposed class members are therefore likely to succeed on the deliberate indifference prong of the Eighth Amendment.

> ## 2.  Plaintiffs and proposed class members are likely to prevail on the merits of their Fifth Amendment claim.

Plaintiffs and proposed class members who are detained pretrial have due process protections against punishment under the Fifth Amendment.  Pretrial detainees are presumed innocent, and they are thus "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *see also Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished.").  "While a convicted prisoner is entitled to protection only against cruel and unusual punishment under the Eighth Amendment, a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (cleaned up).

Because pretrial detainees are entitled to protections "at least as great as the Eighth Amendment protections available to a convicted prisoner," *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), conditions that would violate the Eighth Amendment are more than enough to also violate pretrial detainees' Fifth Amendment rights. *Hardy*, 601 F. Supp. 2d at 189.

The Fifth Amendment and Eighth Amendment analysis differs in that under the former, a plaintiff can prevail in showing that the defendant "knew, or should have known, that the

[challenged] condition posed an excessive risk to health or safety," *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017), while under the latter, a plaintiff must show that the defendant was deliberately indifferent to the risk posed, *Helling*, 509 U.S. at 33–35.  In other words, the Eighth Amendment calls for a subjective analysis of the defendant's intent, while the Fifth Amendment requires only an objective analysis of whether the defendant should have known of the risks of harm.  In any event, as discussed above, Plaintiffs and proposed class members face no hurdle in establishing that Defendants knew of the risk of COVID-19 and that they recklessly disregarded that risk.  By meeting their burden under the Eighth Amendment, Plaintiffs and proposed class members have, by definition, met their burden under the Fifth Amendment.

## B.  Plaintiff and proposed class members will suffer irreparable harm.

Immediate injunctive relief is necessary because the danger here — vulnerable people in inadequate and ill-equipped facilities condemned to severe illness and potential death — is the quintessential irreparable harm.  COVID-19 is a serious, and possibly fatal, disease, that is rapidly spreading throughout Defendants' facilities.  As it did on Rikers Island, in Cook County, Chicago, in other prisons, on cruise ships, and in nursing homes, COVID-19 is infecting exponentially more residents day by day.  Absent injunctive relief, Plaintiff and proposed class members will suffer irreparable harm.

With the exponential growth of infection rates and a confirmed case of COVID-19 already having emerged in Defendants' facilities, time is of the essence for Plaintiffs and proposed class members.  To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical," and it must be imminent.  *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted) (emphasis in original).  Far from speculative, an outbreak is now a certainty — five individuals detained in

Defendants' custody have already tested positive for COVID-19.  The first, a 20-year-old male, has been detained at CTF since July of 2019, and Defendants claim to be unaware of how he contracted it.  It is certain that this resident contracted COVID-19 while in Defendants' custody, almost certainly transmitted from a visitor or staff member entering the jail from the community. Other residents were exposed to the virus, and the disease will continue to spread.  Just two days later, Defendants announced that a second resident, a 44-year-old male tested positive; that man lived on a different housing unit as the first positive resident and had been housed with a cellmate. Less than 24 hours later, Defendants announced that two more residents had tested positive, and the following day the DOC announced that a fifth inmate had tested positive.  Given the contagious nature of the disease and the conditions at Defendants' facilities, absent a temporary restraining order, Plaintiffs and proposed class members face serious illness, long-term health issues, and possible death from a virus with no known cure and no vaccine.  This establishes the irreparable harm necessary to justify injunctive relief.

Facing requests for preliminary injunctive relief, "courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding irreparable harm where "the threat of death or serious physical deterioration [was] real and imminent.").  The Court must not wait until each individual is infected with COVID-19 — by then it will be too late to prevent the irreparable harm Plaintiffs and proposed class members face.  *See id.* ("It goes without saying that this Court need not wait to issue injunctive relief until a [plaintiff] has died.").  Even the failure to test for a disease has been sufficient to support a finding of irreparable harm.  *See Boone v. Brown*, No. 05-cv-750 (AET), 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate irreparable harm); *Austin v. Pa.*

*Dep't of Corr.*, No. 90-cv-7497 (JED), 1992 WL 277511, at *7 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing and protocol for tuberculosis).

Courts have expressed no hesitation in finding that risk of contracting COVID-19 constitutes irreparable harm where plaintiffs are housed in facilities with a confirmed case of COVID-19.  In *Basank*, 2020 WL 1481503, the Court observed that because "[e]ach of the jails where a Petitioner is being housed has reported confirmed cases of COVID-19," the "risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in . . . detention constitutes irreparable harm warranting a TRO."  *Id.* at *4.  There are already five confirmed cases of COVID-19 among the population in Defendants' custody, with more sure to come.

**C.  The balance of equities tips in Plaintiffs and proposed class members' favor and the public interest supports granting the injunction.**

Where, as here, plaintiffs demonstrate that their constitutional rights have been violated, it follows that granting injunctive relief is in the public interest.  "It is always in the public interest to prevent the violation of a party's constitutional rights."  *Simms v. District of Columbia*, 827 F. Supp. 2d 90, 105 (D.D.C. 2012).  That interest alone is sufficient to weigh in favor of injunctive relief.

Here, however, the public has an additional independent and overwhelming interest in preliminary relief that would require Defendants to take action to minimize the spread of COVID-19.  It is well established that "public health" is a "significant public interest."  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005).

Public health officials and medical professionals have concluded that the crucial step to minimize the spread of COVID-19 is to downsize jail populations.  In Dr. Stern's expert opinion, downsizing the population of the jail will "help to 'flatten the curve' overall—both within the jail setting and without."  Ex. 2, Stern Decl. ¶ 14.  That is because, given the churn of people —

residents, staff, visitors — through Defendants' facilities, the outbreak of COVID-19 in the jail will be impossible to confine to the DOC facilities. Compounding the problem, Dr. Stern explains, is that "vulnerable populations are at the highest risk of severe complications from COVID-19, and . . . when they develop severe complications they will be transported to community hospitals — thereby using scarce community resources (ER beds, general hospital beds, ICU beds)." Ex. 2, Stern Decl. ¶ 13. Thus, "avoid[ing] disease in this population is a critical contribution to public health overall." *Id.* For those reasons, the *Basank* Court explained, "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions." 2020 WL 1481503, at *6; *see also In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N. J. Mar. 22, 2020) (holding that "reduction of county jail populations, under appropriate conditions, is in the public interest to mitigate risks imposed by COVID-19" due to "the profound risk posed to people in correctional facilities arising from the spread of COVID-19").

Similarly, the balance of the equities weighs heavily in plaintiffs' favor. In evaluating this factor, the Court must "balance the competing claims of injury, which involves considering the effect on each party of the granting or withholding of the requested relief." *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018).

Here, a temporary restraining order and preliminary injunction will not "substantially injure other interested parties." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. To the contrary, given the nature of COVID-19, not issuing preliminary relief in this case would cause injury to parties beyond the plaintiffs, including the defendants, their staff and the public at large. As the Central District of California explained in granting a TRO:

> The balance of the equities tip sharply in favor of the Petitioners. The Petitioners face[] irreparable harm to their constitutional rights and health. Indeed, there is no

harm to the Government when a court prevents the Government from engaging in unlawful practices.

Temporary Restraining Order and Order to Show Cause at 10, *Castillo*, No. 20-cv-605.  Here too, other than the relatively minimal administrative burden, there is no identifiable "harm" to Defendants.  This burden is far outweighed by what is at stake to plaintiffs and the public if no TRO is issued.

**D. Release is the most effective remedy.**

Courts, public health experts, and corrections professionals agree: significantly downsizing populations in correctional institutions is the most important tool to combat the spread of COVID-19 among residents, staff, and the greater community.  Dr. Stern, the former Assistant Secretary of Health Care for the Washington State Department of Corrections puts it plainly: "Downsizing jail populations  serves two critical public health aims: (1) targeting residents who are at elevated risk of suffering  from severe symptoms of COVID-19 and (2) allowing those who remain incarcerated to better  maintain social distancing and avoid other risks associated with forced communal living." Ex. 2, Stern Decl. ¶ 13.  After reviewing the particular outbreak in Defendants' facilities and the specific conditions of CTF and CDF, Dr. Stern was "even more firmly convinced that downsizing the inmate population *as much as possible* will reduce the risk of contraction and transmission of COVID-19 — and the attendant risks of serious harm and death — within DOC facilities and the communities around them." *Id.* ¶ 11.

Dr. Meyer, who also reviewed the spread of COVID-19 in DOC facilities as well as the conditions and resources at CDF and CTF, comes to the same conclusion: "Reducing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large." Ex. 1, Meyer Decl. ¶ 34.  Dr. Meyer considered <u>both</u> the risks that Plaintiffs and proposed class members would contract COVID-19,

and the risk that they would suffer serious illness . . . and death" from the infection.  *Id.* ¶ 33. Because of the "significantly higher risk" to Plaintiffs and proposed class members, Dr. Meyer writes that "from a public health perspective," she is "strongly of the opinion that individuals who are already in those facilities should be evaluated for release."  *Id.* at ¶ 35.

Courts have ordered release in cases like this, on emergency bases, even without the mutually-confirming reports of residents, attorneys, and corrections officers.  *See Coronel*, 2020 WL 1487274 (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); 2020 WL 1481503 (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention); *United States v. Stephens*, 15-cr-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, recognizing inmates may be at heightened risk of contracting COVID-19); Mem. Decision & Order, *Jovel v. Decker*, Docket No. 27, 20-cv-308 (GBD) (S.D.N.Y. March 26, 2020) (granting emergency request for release of petitioner from immigration detention in light of the COVID-19 crisis); *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Sup. Ct., Bronx Cty. March 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *People ex rel. Stoughton on behalf of Hogan et al. v. Brann*, Index No. 51078/2020 (Sup. Ct., N.Y. Cty. March 27, 2020) (releasing 16 individuals held at Rikers Island jail on pre-trial detention who were particularly vulnerable to illness or death due to COVID-19); *Xochihua-Jaimes*, No. 18-71460 (ordering, *sua sponte*, that petitioner be immediately released from immigration detention "[i]n light of the

rapidly escalating public health crisis" related to COVID-19); *Castillo*, 20-cv-605 (C.D. Cal. Mar. 27, 2020) (ordering that petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); Mem. & Order, *Jimenez v. Wolf*, Docket No. 507, 18-cv-225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any inmate in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction).

This Court should also be guided by the Supreme Court's decision in *Brown v. Plata*, 563 U.S. 493 (2011).   In that case, the Supreme Court upheld the trial court's order requiring a "population reduction of 38,000 to 46,000 persons" in California state prisons.  *Id.* at 510.  The Court spelled out the State's obligation under the Eighth Amendment: "To incarcerate, society takes from prisoners the means to provide for their own needs.  Prisoners are dependent on the State for food, clothing, and necessary medical care."  *Id.* at 510.  "If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation."  *Id.* at 511.  Defendants have failed in the months preceding this outbreak to take necessary precautions, and they are failing now that the outbreak is upon them to take sufficient steps to protect residents who depend on them for "food, clothing, and necessary medical care." *Id.* at 510.

To vindicate Plaintiffs' and proposed class members' rights under the Fifth and Eighth Amendments, this Court should order a swift reduction in the population in Defendants' custody. In so doing, the Court would join the legion of other jurisdictions that have recognized what public health experts and correctional professionals like Dr. Stern and Dr. Meyer explain is the soundest

way to avoid a constitutional and community crisis: to rapidly and thoroughly downsize correctional institutions.  This Court has the authority to do so.  *See Aamer v. Obama*, 742 F.3d 1023, 1035 (D.C. Cir. 2014) ("[I]n a conditions of confinement claim [brought under 28 U.S.C. § 2241] . . . a court may simply order the prisoner released unless the unlawful conditions are rectified . . . .").  Given the irreparable harm posed by this pandemic to Plaintiffs and proposed class members, the strong public interest in public health, and the balance of the equities, the Court should issue the requested temporary restraining order.


DATED:  March 30, 2020              Respectfully submitted,
            Washington, D.C.



                                    /s/ Steven Marcus
                                    Steven Marcus (D.C. Bar # 1630882)
                                    Jonathan Anderson (D.C. Bar # 475306)
                                    Jenna Cobb (D.C. Bar # 979506)
                                    Public Defender Service for the District of Columbia
                                    633 Indiana Avenue N.W.
                                    Washington, D.C. 20004
                                    Tel. 202-824-2524
                                    Fax 202-824-2525
                                    *smarcus@pdsdc.org*

                                    /s/ Scott Michelman
                                    Scott Michelman (D.C. Bar # 1006945)
                                    Arthur B. Spitzer (D.C. Bar # 235960)
                                    Michael Perloff (D.C. Bar # 1601047)
                                    American Civil Liberties Union Foundation
                                        of the District of Columbia
                                    915 15th Street NW, Second Floor
                                    Washington, D.C. 20005
                                    Tel. 202-457-0800
                                    *smichelman@acludc.org*