# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

EDWARD BANKS, et al.,            :
                                   :
             Plaintiff,       :       Civil Action No.: 20-00849 (CKK)
                                   :
      v.                     :
                                   :
QUINCY BOOTH, et al.,         :
                                   :
            Defendants.    :

**FRATERNAL ORDER OF POLICE FOR THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS LABOR COMMITTEE'S MEMORANDUM OF
POINTS AND AUTHORITIES AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

The Fraternal Order of Police for the District of Columbia Department of Corrections

Labor Committee (FOP/DOC), through its attorneys with HANNON LAW GROUP, LLC,

respectfully present this memorandum as *amicus curiae* in support of the position of Plaintiffs.

**FACTUAL BACKGROUND[1]**

The Fraternal Order of Police for the District of Columbia Department of Corrections

Labor Committee (FOP/DOC) is the recognized bargaining unit for corrections officers, case

managers, transportation personnel, and some ancillary employees who work at the D.C. Jail.

The D.C. Jail consists of two detention centers: the Central Detention Facility (CDF) for men

and restricted inmates; and, the Central Treatment Facility (CTF) for women and men.  The

relationship between the DOC and the FOP/DOC is governed by a Collective Bargaining

Agreement and D.C. Personnel law and regulations.

---

[1]      If necessary and if called upon to testify, the undersigned represents to the Court that the
members of the FOP/DOC Labor Committee and its Stewards will testify on personal knowledge
to the facts set forth in this section.  The facts presented are also known to the undersigned from
his personal participation as counsel.

HANNON LAW GROUP has represented FOP/DOC as its general counsel since 2006, the first year of the administration of DOC Director Devon Brown.  During Brown's administration of the Jail, HANNON LAW GROUP represented dozens of FOP/DOC members who were proposed for discipline or dismissal by Director Brown.  In winning the majority of those cases, HANNON LAW GROUP obtained well over $3 million dollars in back pay for members and attorneys' fees.

During the administration of the DOC's current Director Quincy Booth, the rate of discipline proposed by Director Booth mimics that of Director Brown.[2]  Once again, HANNON LAW GROUP has succeeded in overturning almost all of the disciplinary actions, again resulting in a loss to the taxpayers of well over $1 million dollars in back pay and attorneys' fees.

The FOP/DOC is led by five elected members of the Labor Committee: Cpl. Benjamin Olubasusi, Chairman; Cpl. Arnold Hudson Sr., Vice Chairman; Sgt. Jannease Johnson, Executive Secretary; Cpl. Laurrine Ellis, Recording Secretary; and Cpl. Naomi Namata, Treasurer.  Twelve Shops Stewards also represent the FOP/DOC in the Jail.  The Labor Committee meets regularly among themselves, and during the COVID-19 crisis meets daily with HANNON LAW GROUP.

### Failure of DOC Leadership to Communicate with the FOP/DOC Over the COVOD-19 Crisis

As part of good operational practice, the FOP/DOC and the DOC should conduct a labor/management meeting on a monthly basis.  The FOP/DOC first meets with the warden at the Jail, and next the team meets with the Director at the Reeves Center.  Director Booth has

---

[2] During the interim administration of Director Thomas Faust, proposals for discipline were at a minimum.  The FOP/DOC lobbied the City Council and the Mayor for appointment of Director Faust to succeed Devon Brown.  Labor/Management relations during that period were excellent.

2

canceled these meetings for January, February and March 2020 during this COVID-19 crisis. As we discuss further below, the DOC leadership has consistently refused to communicate with the Labor Committee or their counsel during this crisis.

On March 25, 2020, the Mayor announced the number of positive COVID-19 infected persons in the District of Columbia increased that day by 46 new cases to a total of 183. Notably, of the new cases 13 were in their 20s, 12 were in their 30s, and only 7 were over the age of 60. The Mayor's update attributed this increase, in part, to correctional and detention centers:

> With ongoing community transmission, contact tracing is focused on positive cases associated with childcare facilities, schools and universities, healthcare facilities, senior care facilities, *correctional and detention centers*, and facilities serving individuals who are experiencing homelessness. Guidance will be published for healthcare providers, employers and the public to provide information on what to do if you have been diagnosed with or are a contact of someone who has COVID-19.

On March 19, HANNON LAW GROUP sent an email to DOC on behalf of the FOP/DOC regarding the quarantine of 50 inmates who came in contact with an infected U.S. Marshal at the Courthouse, requesting immediate provision of Personal Protective Equipment (PPE) for its members. (Exhibit A) We received no response.

On the same date March 19, we sent a "Request for Information on Potentially Dangerous Conditions at the DOC Facilities" to DOC's General Counsel Eric Glover and to its HR Director. (Exhibit D) Among the request for information were the following:

> · Have all in-person visits, programming and volunteer activities at all Agency facilities in fact been suspended?
>
> · Have DOC officials established Incident Command Team? Who is on that team? Are any members of the Union on that team?
>
> · Is the Medical Staff meeting with each housing unit and officer roll call? Please provide details as to time, place and frequency of the meetings that the Medical Staff is holding.
>
> · What is the Agency's strategic communications plan with regard to COVID-

19, and how has it been communicated to the staff? Is it updated and communicated regularly as this situation evolves? The last update on the DOC web page is dated March 14, 2020.

· What does "enhanced cleaning efforts" mean? Have those "enhanced cleaning efforts" been implemented, especially within common areas? How often is this level of cleaning being done?

· The Agency promised to order additional cleaning and sanitation supplies, including protective gloves, masks and clothing for staff. No information was provided about dispensing these items. Have these items been received and distributed? Are there any supplies you need that you do not have? Have sanitizing wipes been provided by the Agency? Is the staff permitted to bring personal sanitation material, other than wipes? Are inmates being provided safety materials that the staff is not?

· Was there a two-hour cleaning of the entire facility? How many times has this happened? Is this occurring daily/regularly?

· Please describe the Agency's efforts in partnering and/or sharing information with criminal justice partners?

· Are daily updates continuing to be sent via emails to the staff regarding COVID-19? Can you please make those available?

· Have the DOC employees (officers and medical staff) been provided appropriate protective devices/material/training? Are staff members knowledgeable on and adequately equipped to prevent transmission, minimize spread and protect themselves and the inmate population from contacting COVID-19?

· Is the DOC working in close connection with the DC Department of Health? What medical support does the Agency have specifically for the virus?

· Are all incoming inmates, staff and other individuals with access to the DOC facilities questioned as to their level of risk?

· What is the procedure for processing all new inmates to the facilities?

· What is the procedure for assessing the risk to existing inmates?

· What testing is being offered to confirm a diagnosis of COVID-19?

· What procedures are in place if an inmate is symptomatic?

· What procedures are in place if an inmate tests positive?

· What procedures are in place for quarantines?

· Are there any of the following:

> · Asymptomatic inmates currently housed at any of the facilities who are at high-risk for contracting COVID-19?

> · Symptomatic inmates currently housed at any of the facilities? If so, what actions are being taken with regard to those individuals?

> · Inmates currently housed at any of the facilities who have tested positive for COVID-19?

· What is being done to track any inmates, visitors, staff, or other individuals with access to any of the facilities who have been at any DOC facility within the past two weeks, including any individuals who were held and released or transferred?

· What is the impact of the Agency's response to the Mayor's Order 2020-048: Prohibition on Mass Gatherings During Public Health Emergency - Coronavirus (COVID-19)?

The next morning, DOC's General Counsel responded: "DOC is preparing a response to your inquires and will contact you as soon as possible." We have received no response.

Also on March 23, 2020, the FOP/DOC Labor Committee delivered to the DOC leadership and posted throughout the D.C. Jail an Announcement regarding critical actions to be addressed by the Labor Committee regarding COVID-19, as well as the failure to prosecute an inmate for the brutal beating of a corrections officer. (Exhibit C)

Instead of communicating with the Union as requested on March 19, 2020, Director Booth issued a notice on the same date of March 23, announced at every roll call, falsely stating: "It has come to the agency's attention that employees of the DOC intend to engage in either a walkout and/or protest on the grounds of the DOC." Rather than communicating honestly with the Union on these critical conditions of work, Director Booth threatened the corrections officers

with discipline.  This action was clearly in retaliation for the Union presenting legitimate concerns about DOC's failure to implement protections for inmates and corrections officers.

In the afternoon of March 24, 2020, Director Booth summoned the FOP/DOC Labor Committee Chairman Cpl. Benjamin Olubasusi to his office at the Reeves Center.  Without notice to HANNON LAW GROUP, the Director then put Deputy Mayor Kevin Donahue and Mayor Bowser on speaker phone.  The Mayor then falsely warned Cpl. Olubasusi that it is a "crime" for D.C. corrections officers "to walk out of the Jail."  Director Booth asked Cpl. Olubasusi, "What do you want?"

Also on March 24, HANNON LAW GROUP participated in a National Conference Call sponsored by the National Fraternal Order of Police on COVID-19.  Speakers on the call included high-ranking experts from the Department of Homeland Security, FEMA, and the White House, as well as FOP State Representatives from all 50 states.  The purpose of the call was to implement protocols for law enforcement officers and corrections officers nationwide. Highlights from the call are the following:

Increasing infections will reduce the number of officers on duty.

Loss of officers on duty will increase the work load on the uninfected officers.

The resultant lack of officers will lead to additional crime and risk in the corrections system.

PPE equipment is not being provided to officers nationwide.

Because "social distancing" is impossible in law enforcement, the infection rate among officers will be higher than the general population.

Coordination and Communication between and among political leaders and officers is the most important criteria to meet this challenge.

State health departments, which are in control of the distribution of PPE, must make law enforcement and corrections officers a priority group for receipt of PPE and education.

On March 25, 2020, HANNON LAW GROUP also participated in a national conference call sponsored by the Department of Homeland Security at which medical experts with DHS reviewed with participants the March 23, 2020, "CDC Interim Guidance for Management of the Coronavirus 2019 (COVID-19) for Correctional and Detention Facilities." (Exhibit B) HANNON LAW GROUP alerted DOC leadership to the conference and provided them with registration information.

Also on March 25, 2020, in response to Director Booth's question of Cpl. Olubasusi "What do you want?", HANNON LAW GROUP sent a letter to Director Booth outlining conditions at the Jail and listing those actions urgently requested by FOP/DOC. (Exhibit E) The letter reported the current conditions at the Jail, as reported by members working in the Jail, as follows:

1.     There is no Communication and Coordination between DOC leaders and the FOP/DOC Labor Committee. Labor/Management meetings are repeatedly cancelled, including one meeting scheduled during this critical time period.

2.     Inmates coming into the Jail are not screened for symptoms of COVID-19.

3.     Corrections Officers receiving and discharging inmates have no PPE; however, they must have direct contact with these inmates.

4.     Inmates continue to move within the Jail. Those inmates in the four restricted housing units must be escorted by hand by corrections officers without any PPE. Inmates in non-restricted housing units travel alone through the Jail as required for appointments. At latest count, there were 1,149 inmates in the Central Detention Facility and 509 in the Correctional Treatment Facility.

5.     The corrections officers assigned to housing units have no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units. In each unit, one corrections officer is required to be out among the inmates at all times, without any protection.

6.     Inmates are not required to engage in any of the behaviors which the Mayor recommends for the general population, such as "social distancing", repeated hand-washing, and health monitoring.

7.       Case workers must meet with inmates in small offices with no PPE or other distancing measures.

8.       Inmates continue to engage in recreation in a common yard, also without social distancing or other protections from the spread of COVID-19.

9.       Corrections officers enter the Jail three shifts a day.  There is no distancing at entrances, no distancing at roll calls, no attempt to obtain or record health concerns of each officer.

10.      When the D.C. Jail was forced to quarantine 65 inmates who were at risk to exposure to COVID-19 when they were at court, an ERT was designated to remove them from the general population to a "quarantine" housing unit.  The ERT members refused the assignment without provision of gowns and other appropriate PPE protection.  They were ordered to remove the inmates with only masks and gloves.  During the extraction, one of the members was spit upon by an inmate.  Sgt. Alexander and Sgt. Graham were then removed from the ERT team and assigned to another post outside the Jail.

11.      These inmates were not "quarantined" in any meaningful manner.  They were housed two to a cell, and the corrections officers on the unit were not provided with any PPE or other means for protection against infections.

The letter, yet again, detailed FOP/DOC's repeated request for help:

## WHAT DO WE WANT?

1.       A Daily Meeting among the Labor Committee, its Shop Stewards, its counsel and the DOC Director, Deputy Director, and its counsel to discuss conditions and responses to COVID-19;

2.       A COVID-19 Protocol for officers and inmates including the following:

         Restricted movement of inmates
         Distancing among inmates/inmates, officers/officers, and officers/inmates
         Incident Reporting of officers and inmates' symptoms of illness

3.       Regular Disinfection of the CDF and CTF

4.       Priority for PPE for officers

5.       Discontinuation of inmate transport for court appearances

6.       14-day Quarantine for new inmates

7.       Establish a quarantine unit

8.      Establish an on-site testing unit for those meeting CDC test criteria, including
        persons living in the household of a corrections officer

9.      Treat COVID-19 among officers as duty-connected

Again receiving no response, the Labor Committee then established Protocols for its

membership based on CDC Guidance.  (Exhibit F)  On March 28, 2020, these detailed Protocols

were delivered to DOC leadership for implementation and distributed throughout the Jail, along

with copies of the March 23, 2020, CDC Guidance for Correctional Facilities.  (Exhibit B)  Once

again, no response was received from the leadership.  Although the Labor Committee urged

members to refuse to comply with an order to violate those Protocols, members consistently

relented when ordered, for example, to escort quarantined inmates to showers without any PPE.

## FOP/DOC Decides to Support the PDS/ACLU Lawsuit

On March 29, 2020, the Labor Committee learned that the 50-year-old wife of one of the

elected members of the Labor Committee, a 29-year veteran, is infected with COVID-19.  She is

hospitalized in serious condition.  Her husband, our officer and friend, has been tested for

COVID-19, and learned on April 1, 2020, that he too is positive for COVID-19.  The Labor

Committee also learned that two inmates most recently testing positive at the Jail for COVID-19

were among the 65 inmates who were quarantined after exposure to a COVID positive U.S.

Marshal at Superior Court.  That quarantine lasted for only two days, when DOC's Public

Information Officer Keena Blackman announced that the quarantine was being lifted without any

of those inmates being tested.  The reason given by Dr. Blackman follows:

> After sending out yesterday's Open Letter we learned through the Department of Justice
> (DOJ) and the DC Department of Health (DC Health) full investigation into the U.S.
> Marshal's contact tracing that none of the DOC residents were in contact with the
> individual. The quarantine has been lifted.

Our conclusion from this is that whoever is conducting the "tracing" and "investigations" are not doing so in a professional, effective and reliable manner.

The Labor Committee also learned that the Public Defender Service for the District of Columbia and the American Civil Liberties Union intended to file suit in federal court against the DOC, alleging that failure to protect inmates from COVID-19 is a violation of the Fifth and Eighth Amendments of the Constitution of the United States.

Therefore, the Labor Committee decided to issue a Press Release to correct and supplement information issued by various organizations regarding conditions at the D.C. Jail, namely: the Executive Office of the Mayor, the Department of Corrections, Deputy Mayor Kevin Donahue, Councilmember and Chair of the Public Safety Committee Charles Allen, the United States Attorney for the District of Columbia, the Public Defender Service for the District of Columbia, and various media.  (FOP/DOC Press Release, March 29, 2020, Exhibit G)  The Labor Committee announced its own conclusion that: (1) the City does not have the resources to combat COVID-19, and the Jail is the lowest priority among the health and safety community; and, (2) the City wants to keep the truth from the public.  The Mayor said as much at her press conference when she announced that corrections officers will not be provided with protective equipment because the officers do not provide medical care.

The FOP/DOC Press Release also announced that the Labor Committee decided that the Public Defender Service is correct that DOC is not following the "Guidance on Management of COVID-19 at Correctional and Detention Facilities", issued and updated regularly by the Center for Disease Control.  Personal Protective Equipment recommended by CDC is not present at the Jail for corrections officers or is in short supply and hoarded by supervisors under lock and key.

Cleaning and disinfection of the Housing Units is inadequately performed by inmates, and the Department of Health has not conducted inspections of the Housing Units.

In the meantime, the administrative wing of the Jail, occupied by the warden and his staff, is disinfected daily by a team of workers in protective clothing.  The Director of the Jail, Quincy Booth, and his leadership staff actually do not even work at the Jail.  They are located at the Reeves Center in splendid isolation from the inmates, issuing directives to officers through texts and email.  Our Labor Committee members have not seen Director Booth at the Jail in weeks.

Based on the reports of our members who are on-site eye-witnesses and victims of DOC's perfidy, the Labor Committee concludes that DOC misleads the public in its reporting of positive cases of COVID-19 among inmates.  Testing is inadequate at the D.C. Jail.  Inmates are only tested when it is too late to protect other inmates, and the results take hours to days.  No testing is available for corrections officers.  Any corrections officer exposed to COVID-19 or with symptoms is sent home for 14-day self-quarantine.

These officers and their family members are unable to obtain testing while on quarantine without going to a hospital with testing.  More importantly, the DOC is not addressing the obvious: the rate of quarantine of corrections officers working in the Central Treatment Facility was 25% of the force on March 27, to increase significantly after the announcement of two infected inmates in CTF.  Officers assigned to the Central Detention Facility are being re-assigned to CTF due to the number of CTF officers on quarantine.  Soon the Jail will have no corrections officers.

Late in the evening of March 31, 2020, the FOP/DOC announced a Press Conference to be held the next morning, April 1, 2020, in front of the D.C. Jail.  (Exhibit H)  One of the

11

purposes of the Press Conference was to announce that the FOP/DOC, on behalf of its members

working in the D.C. Jail, had authorized HANNON LAW GROUP to seek status in the

PDS/ACLU lawsuit as a "friend of the court" in support of the inmates.

Pursuant to the Collective Bargaining Agreement, HANNON LAW GROUP made the

following notification to the DOC Public Information Officer:

> Due to the high number of media inquiries re: COVID-19 at the Jail, the FOP/DOC Labor
> Committee and it Stewards will be giving an open press conference to the media.  This
> notice is sent pursuant to the Collective Bargaining Agreement, and none will violate the
> guidance and requirements of the agency stated therein.

At 10:45 p.m. that evening, Eric Glover, Esq., General Counsel for the DOC, sent an email to

HANNON LAW GROUP, stating:

> Per my previous email to you, per DOC's media policy, "[e]mployees approached by the
> media for an interview that has any bearing on DOC shall notify the PIO for appropriate
> review and authorization." As no review has taken place by the agency's PIO, DOC does
> not authorize the below referenced media event. Thank you.

HANNON LAW GROUP responded:

> There is nothing to review, and the CBA does not require authorization from the DOC.
> Thank you.

Shortly before the Press Conference ended, the Deputy Warden called the Protective

Service Division Police in an attempt to break up the press conference.  The officers took no

action.

## The Structure of the D.C. Jail

The physical structure of the Jail is important to understand in the context of this crisis.

The following depicts the usual posts for corrections officers at the D.C. Jail:

> Housing Units in CDF – 18 Housing Units with 80 double cells (with one exception)

> Housing Units in CTF –  20 Housing Units with inmate occupancy that varies from 2-50
> per unit

Number of Entrances for CDF (Approximately 5) CTF (Approximately 4)

Total Number of Posts in CDF: #1 Shift 90; #2 Shift 160 ; #3 Shift 132

Total Number of Posts in CTF:  #1 Shift 66; #2 Shift 101; #3 Shift 81

Total Number of Transportation Officers 30

Total Number of Vehicles Used for Transportation: (9) Medical Holding Unit (2) CCB (10) Court Transport

Each Housing Unit is supervised by 1-3 officers working in a control module known as the "bubble".  The bubble is self-contained and allows a view of most of the cells which project out from the bubble in two directions like spokes.  Each of the two wings has four tiers, or levels. The cell doors are controlled from the bubble.  Showers can be accessed from the tiers, but out of view of the bubble.  At least one officer is required to be on the "floor" at all times.

Each Housing Unit in CDF has an office for the unit's Case Manager.  The Case Manager ordinarily meets with her clients face to face in the office.  Case Managers, before this COVID-19 crisis, afforded their clients use of the phone for legal calls.

Supervisors from the rank of Lieutenant up to Major work in their own module known as the Command Center.

Inmates ordinarily may leave the Housing Unit to go to court, the infirmary, to the visiting hall, and to appointments without escort.  However, there are 4 Housing Units at the CDT with restricted movement.  The inmates in these units must be escorted at all time by an officer when outside the unit.  At the current time, inmates are permitted only 2 ½ hours of free time outside of their cells.  This time is spent in the open areas of the unit.  An officer must be on the floor at all times.

An inmate sent out to a hospital must be accompanied by a corrections officer.

13

## REBUTTAL TO THE AVERMENTS OF THE DOC

Attached to this brief as Exhibit H is a joint declaration of undersigned counsel and four members of the FOP/DOC Labor Committee and its Stewards.  The information contained in the Declaration was obtained during the conference calls held by the FOP/DOC and HANNON LAW GROUP on a daily basis.  Any information not actually witnessed by the declarant officers was provided to them directly by other corrections officers.  Some of those conversations were witnessed by attorneys at HANNON LAW GROUP.  Corrections officers at the D.C. Jail are law enforcement officers as a matter of law; although, the DOC limits their authority to act as LEOs and to exercise some of the privileges of LEOs.  Nevertheless, information received from other corrections officers is deemed reliable for assessment of probable cause in the criminal context.

We shall not repeat or summarize here what is said in the declaration.  However, the declaration contains a section specifically rebutting the sworn statements of Beth Jordan, M.D., and Warden Lennard Johnson.  There are several conclusion to be drawn from comparison of the declarations provided by the DOC and statements by their counsel with the declaration provided by the FOP/DOC Labor Committee members.

1.     No one is in charge at the DOC, and the attorneys representing them in this litigation are woefully uninformed by their clients.  There are no declarations from Director Quincy Booth, who is appointed by the Mayor and confirmed by the City Council.

2.     There is no evidence of how the task of identifying symptomatic inmates and corrections officers is conducted at the Jail.  At some point, the Court is told that an inmate is tested.  How is that information obtained, to whom is it communicated, and what are the consequences?

3.     No one is engaging in the most critical task: to trace contacts from symptomatic inmates and COVID-19 positive inmates to the rest of the Jail community of inmates and corrections officers in order to stem the inevitable spread of this disease.  The FOP/DOC is not even told by DOC which of its members have tested positive and which of its members are sent home to quarantine.  How can we protect our colleagues and the inmates we protect who have had contacts with these persons.  This failure is most evident in the decision to "de-quarantine" 65 inmates only two days after being placed in quarantine.  Thereafter, four of this group tested positive for COVID-19 while in the general population.

4.     The Mayor of the District of Columbia does not want to tell the citizens the truth about the COVID-19 crisis in the D.C. Jail.  We have implored Deputy Mayor Kevin Donahue, the deputy for public safety, to interact with us, and we are greeted by silence.  We monitor the Mayor's daily press conference on the COVID-19 crisis, which is becoming less informative and more evasive every day.  The Deputy Mayor's announcement of the number of COVID-19 cases at the Jail is always lower than what we know is the truth.  There is never any information provided by the Mayor regarding the number of masks, gloves, and other protection on hand, not only for the corrections officers, but also for MPD, the Fire Department and others.  For that reason, we contacted FEMA which reported to us the number of such PPE equipment and apparel that has been shipped to the District of Columbia from the federal stockpile.  That information is contained in the declaration.

As far as we can determine in our investigation, the District of Columbia has not requested that FEMA arrange for the installation of portable hospitals in the District of Columbia, such as are being completed in New York City, Chicago, and New Orleans to name only a few locations.  A field hospital could easily be assembled in the parking lot of the Jail or

15

in the D.C. Armory adjacent to the Jail.  In that event, all quarantined and COVID-19 positive

inmates could be isolated from the rest of the Jail population.

## THE CENTER FOR DISEASE CONTROL'S
## GUIDANCE SHOULD INFORM THE COURT'S RULINGS

The FOP/DOC has consistently insisted that the DOC conform its conduct to CDC

Guidance.  Declarations filed in this case by the DOC claim the same.  The CDC Guidance from

March 23, 2020, is attached as Exhibit B.  Our summary of the salient portions is as follows:

**1.      The Need for Vigilance in Corrections Facilities:**

The CDC Guidance summaries the heightened concerns related to Corrections Facilities

during this pandemic as follows:

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from

16

issuing guidance or providing services to other employers or their staff within the same
setting. Similarly, correctional and detention facilities may house individuals from multiple
law enforcement agencies or jurisdictions subject to different policies and procedures.

• Incarcerated/detained persons and staff may have medical conditions that increase their risk
of severe disease from COVID-19.

• Because limited outside information is available to many incarcerated/detained persons,
unease and misinformation regarding the potential for COVID-19 spread may be high,
potentially creating security and morale challenges.

• The ability of incarcerated/detained persons to exercise disease prevention measures (e.g.,
frequent handwashing) may be limited and is determined by the supplies provided in the
facility and by security considerations. Many facilities restrict access to soap and paper
towels and prohibit alcohol-based hand sanitizer and many disinfectants.

• Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care
due to co-pay requirements and fear of isolation.

(CDC Guidance at 2, Ex. B)

**2.      Close Contact Requiring Precautions:**

Precautions are required if a CO or inmate is "within approximately 6 feet of a COVID-

19 case for a prolonged period" or in "direct contact with infectious secretions."  (CDC Guidance

at 3, Ex. B)

**3.      Medical Isolation:**

Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a

single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce

the risk of transmission.  (CDC Guidance at 4, Ex. B)

**4.      Quarantine:**

Quarantine refers to the practice of confining individuals who have had close contact with a

COVID-19 case to determine whether they develop symptoms of the disease.  Quarantine for

COVID-19 should last for a period of 14 days.  Ideally, each quarantined individual would be

quarantined in a single cell with solid walls and a solid door that closes.  (*Id.*)

17

5. **Social Distancing:**

Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. (*Id.*)

6. **Communication and Coordination:**

The first principle of the CDC Guidance is for the facility to communicate and coordinate with all constituents, including staff, inmates, the courts, law enforcement and facilities in adjacent jurisdictions. (CDC Guidance at 5, Ex. B)

7. **Operations and Supplies:**

Facilities must ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility. (CDC Guidance at 7, Ex. B)

8. **Training:**

Facilities must ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities. (CDC Guidance at 8, Ex. B)

9. **Cleaning and Disinfecting Practices:**

Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to CDC recommendations, in an attempt to prevent spread of COVID-19 if introduced. (CDC Guidance at 9, Ex. B)

10. **Implementation of Practices:**

If an individual has symptoms of COVID-19 (fever, cough, shortness of breath), the facility must require the individual to wear a face mask.  Similarly, the facility must ensure that staff who have direct contact with the symptomatic inmate wear recommended PPE.  (CDC Guidance at 10, Ex. B)  In addition, the facility must implement social distancing strategies to increase the physical space between inmates "regardless of the presence of symptoms."   (CDC Guidance at 11, Ex. B)  The facility must communicate clearly and frequently with inmates about changes to their daily routine and how inmates can contribute to risk reduction.  (CDC Guidance at 12, Ex. B)

**11.    Personal Protective Equipment:**

The Facility should comply with this table for use of PPE:

**Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response**

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | ✓ | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\*   If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

25

**12.    Control Movement of Quarantined Inmates:**

The facility must keep quarantined inmates' movement to an absolute minimum.  Medical

evaluation and care should be provided inside or near the quarantined space.  Meals should be served

inside the space, and individuals must be excluded from all group activities.  (CDC Guidance at 19,

Ex. B)

**13.    Communication with Staff:**

The facility must provide clear information to staff about the presence of COVID-19 cases

within the facility, and the need to enforce social distancing and encourage hygiene precautions.

(CDC Guidance at 22, Ex. B)

**CONCLUSION**

The FOP/DOC Labor Committee and its represented members respectfully request that

the Court grant a temporary restraining order as requested by Plaintiffs.  In particular, we request

that the Court appoint a master, in consultation with the parties and the FOP/DOC, to investigate

the Plaintiffs allegations.

Dated: April 2, 2020                                    Respectfully submitted,

                                                       HANNON LAW GROUP, LLP

                                                       /s/ J. Michael Hannon
                                                       J. Michael Hannon, D.C. Bar #352526
                                                       HANNON LAW GROUP, LLP
                                                       333 8th Street, N.E.
                                                       Washington, D.C. 20002
                                                       Tel:  (202) 232-1907
                                                        Fax:  (202) 232-3704
                                                       jhannon@hannonlawgroup.com

                                                       *Attorneys for Plaintiff*

21
