# EXHIBIT I

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

EDWARD BANKS, *et al.*,               :
                                          :

      Plaintiffs-Petitioners,        :
                                            :

v.                                 :    No. 1:20-cv-849
                                          :

QUINCY BOOTH, *et al.*,          :
                                          :

      Defendants-Respondents.    :

## DECLARATIONS OF J. MICHAEL HANNON, ESQ. AND FRATERNAL
## ORDER OF POLICE /DEPARTMENT OF CORRECTIONS LABOR COMMITTEE

On this 2nd day of April, 2020, I, J. Michael Hannon, Esq., do hereby declare:

1.     I am the founding partner at HANNON LAW GROUP, LLP, which represents

Fraternal Order of Police/Department of Corrections ("FOP/DOC LC") in their Motion for Leave

to File an *Amicus Curiae* brief filed in the above captioned case.

2.     My firm, HANNON LAW GROUP, LLP, has served as Legal Counsel for the

FOP/DOC LC from 2006 through the present in a variety of matters.

3.     I submit this declaration in support of the FOP/DOC/LC's *Amicus Curiae* brief.

**Educational Background and Professional Experience of J. Michael Hannon**

4.     After earning my Bachelor of Arts degree from Princeton University in 1972, I

attended graduate school at the University of Michigan, where I earned a Masters in American

Studies in 1976.  I then earned my Juris Doctor degree from The Catholic University of America,

Columbus School of Law in 1980.

5.     I was admitted to the Bar of the District of Columbia in 1981 and the Bar of

Maryland in 1982.  I am also admitted to practice before the United States Supreme Court, the

U.S. Court of Appeals for the District of Columbia Circuit, U.S. Court of Appeals for Veterans

Claims, U.S. Court of Appeals for the Federal Circuit, U.S. Court of Appeals for the Ninth

Circuit, U.S. Court of Appeals for the Fourth Circuit, U.S. District Court for the District of

Columbia, United States District Court for Maryland, and U.S. District Court for Colorado.

6.      From 1980 to 1981, I served as Law Clerk to the Honorable Frank Q. Nebeker of

the District of Columbia Court of Appeals.

7.      From 1981 to 1988, I served as an Assistant United States Attorney for the

District of Columbia where I investigated and prosecuted violent and white-collar offenders.

From 1983 to 1985, I was responsible for the investigation and prosecution of homicide and sex

offense cases in the Superior Court.  I was promoted to the Special Prosecutions Section where I

investigated and prosecuted racketeering, international fraud, and terrorism cases in the United

States District Court for the District of Columbia.

8.      In 1988, I entered private practice as a Partner at the law firm Thompson

O'Donnell, LLP, where I practiced for 18 years.  During that time, I argued the first appeal

before the United States Supreme Court from the United States Court of Appeals for Veterans

Claims in October of 1994.  The Supreme Court ruled unanimously in favor of my veteran client,

overturning a 70-year practice by the Department of Veterans Affairs of denying compensation

to medically injured veterans.  *See Brown v. Gardner*, 513 U.S. 115 (1994).

9.      I founded HANNON LAW GROUP, LLP, in May of 2006, to expand the range

of legal resources available to my clients.

2

10.     I have participated in over 200 jury trials, bench trials, arbitrations, mediations, and other forms of litigation.

11.     On March 27, 2020, I attended a national virtual conference hosted by the Department of Homeland Security and Centers for Disease Control (CDC) on the proper protocols for correctional facilities and personnel.  The written guidelines are attached as Exhibit B to our *Amicus* brief.

12.     Pursuant to these guidelines and in the absence of any guidance for inmates and staff with regard to modifying operations in the face of COVID-19, the FOP/DOC LC and their counsel developed a COVID-19 protocol in compliance with CDC guidelines on March 28, 2020.

13.     The protocol included the following requirements:

a.  All individuals in the facility must maintain more than 6' distance from any other person (for staff-once arriving at the parking lot and throughout the shift and for inmates throughout the facility), unless provided with appropriate personal protective equipment (PPE).

b.  Physical searches of another person must not be conducted without the use of a mask, gloves, and if appropriate, gown.

c.  Upon reporting for duty at any DOC facility entrance, Union members must complete a COVID-19 report form and provide it to the Member posted at the entrance who is conducting the temperature check.  If no medical staff is at

3

the entrance to take the temperature of the entering Member, that Member must not enter the Jail.

d.   Members should not accept assignment to a Housing Unit unless hand disinfectant, face masks, gloves, and disinfectant wipes are available in the bubble.

e.   Members will not leave the bubble when inmates are on the floor of the unit. This means that 30-minute security checks will not take place during the time that inmates are on the floor.

f.   Members may conduct security checks without PPE when inmates are in their cells.

g.   Members may not deliver food trays to inmate cells without being provided face masks and gloves.

h.   Members must routinely clean all surfaces in the bubble during their shift.

i.   Case Managers may not report to their offices if face masks, gloves, hand disinfectant, and cleaning disinfectant is not available in the office.

j.   Case Managers may not meet with inmates in their offices unless the inmate is provided and wears a face mask and gloves.

k.   Case Managers must disinfect surfaces in the office before and after meeting with each inmate.

4

l.  If a Member observes that the Housing Unit is not properly cleaned and disinfected, the Member should contact a supervisor and an Officer of the Labor Committee or Shop Steward.

m.  Members must not accept a post in a Quarantine Unit unless provided with an N95 or equivalent face mask, eye protection, gloves, gown, hand disinfectant, and cleaning disinfectant.

n.  A Member may not escort an inmate without being provided with a face mask, eye protection, and gloves.

o.  Members assigned to any form of inmate transport requiring contact with inmates may not report to post if not provided with face mask, gloves, hand disinfectant, cleaning wipes, and eye protection.

p.  Members concerned that the vehicle has not been disinfected should request disinfectant of the vehicle from a supervisor and contact an Officer of the Labor Committee or Shop Steward, if not provided.

q.  Members at any post must engage in distancing.

r.  No member may be required to contact an inmate unless provided with appropriate PPE, depending on whether the inmate is in general population (face mask, eye protection and gloves) or quarantined (face mask, eye protection, gloves and gown).

5

s.   No Member may be required to escort or guard an inmate outside the Jail who
is symptomatic or positive for COVID-19.

t.   Any Member required to escort or guard an inmate outside the Jail who is not
infected or symptomatic must be provided with face mask, eye protection and
gloves.

The DOC had provided minimal guidance, and continues to refuse to offer proper health and
safety protocols for the staff or the inmates.

**Professional Experience of Benjamin Olubasusi**

14.     Benjamin Olubasusi is a Correctional Officer at the D.C. Department of
Corrections (DOC), and has achieved the rank of Corporal.  Cpl. Olubasusi has been an
employee of the DOC for approximately ten (10) years.

15.     Throughout his tenure, he has worked in various posts inside the DOC's Central
Detention Facility (CDF), including Northwest One (NW1) (maximum security unit), Southwest
Two (SW2) (maximum security unit), South One (1) (Restrictive Housing Unit).

16.     Cpl. Olubasusi currently is serving as the Chairperson of the FOP/DOC LC,
having been elected to that position in May, 2019.

17.      Corporal Olubasusi has witnessed that social distancing is not be followed by the
inmates in the quarantine unit, who are individuals identified as having had contact with an
inmate who tested positive for COVID-19.  As of March 31, 2020, there were approximately 50
inmates on one unit and approximately 40 on the other.  In each of these units, the inmates were

required to go on recreation together in close proximity.  They were guarded by only one officer, who had only a mask and gloves.  The officer was required to stand in close proximity of potentially infected individuals.

18.     Cpl. Olubasusi has witnessed personally that Union members assigned to the quarantine unit do not have gowns or face shields, when working in an area where inmates have come in close contact with COVID-19-infected inmates.

19.     Cpl. Olubasusi has asked Director Booth for Labor/Management meetings to discuss the impact of and response to COVID-19 on staff and inmates in the DOC facilities, and has been refused at every request.

20.     Cpl. Olubasusi requested that management of Unity Health Care and DOC medical staff, including Beth Jordan, M.D., meet with the FOP/DOC LC Executive Board to discuss the proper health protocols for staff and inmates for COVID-19, and has been refused to date.

## Professional Experience of Arnold Hudson

21.     Arnold Hudson is a Correctional Officer at the D.C. Department of Corrections (DOC), and has achieved the rank of Corporal.  Cpl. Hudson has been an employee of the DOC for over 28 years.

22.     Throughout his tenure, he has worked in various posts and positions, including at the Lorton, VA facilities from 1991 to 1997 in Maximum Security from 1991 to 1993, in South

One (S1) (Status Block) and South Three (S3) (Mental Health) from 1993 to 1997.  In 1997, he

began working in the CDF and from that time, he has been assigned to the Laundry division.

23.     Cpl. Hudson currently is serving as the Vice-Chairperson of the FOP/DOC LC,

having been elected to that position in May, 2019.

24.     Cpl. Hudson has tested positive for COVID-19, and is on administrative leave.

He has informed the DOC about his positive result, but to date has not been contacted for contact

tracing for quarantine of either staff or inmates in close contact with him.

25.     It has been reported to Cpl. Hudson as recently as April 2, 2020, that only one

officer is assigned in the Special Management Unit – B (SMU-B), where all inmates who have

tested positive for COVID-19 have been housed.  The officer assigned to SMU-B is provided

with disposable mask, gloves and gown, but is required to reuse the eye shield.  The officer

assigned to SMU-B is required to feed the infected inmates and take them for their showers.

**Professional Experience of Jannease Johnson**

26.     Jannease Johnson is a Correctional Officer at the D.C. Department of Corrections

(DOC), and has achieved the rank of Sergeant.  Sgt. Johnson has been an employee of the DOC

for over 28 years.

27.     Throughout her tenure, she has worked in various posts and positions.  She

worked at the Youth Center in Lorton, VA from June, 1992 until it closed in 2000.  From 2000 to

date, she has worked at the CDF as Relief Officer, Count Book and Compliance Officer,

Southeast Two Officer-In-Charge (OIC), Command Center OIC, Major's Aide, and Adjustment Board Chair.

28.     Sgt. Johnson currently is serving as the Executive Secretary of the FOP/DOC LC, having been elected to that position in June, 2018.

29.     Sgt. Johnson personally has witnessed cleaning crews in the CDF that only clean the administrative side of the DOC facilities.  The cleaners use the same rag to wipe down everything they are instructed to wipe down with bleach.  All were wearing gloves; some had masks.

30.     It was reported to Sgt. Johnson by a Correctional Officer assigned to escort the cleaning staff that Deputy Warden Landerkin had instructed that Officer not to take the cleaning crew to the infirmary.   It was also reported to Sgt. Johnson that those cleaners use the bathroom while cleaning, and do not wash their hands before going back to cleaning duties.

31.     Front line Correctional Officers have reported to Sgt. Johnson completely unsanitary conditions, complete lack of ventilation, and that they have to fight with management to get Personal Protective Equipment.

32.     Sgt. Johnson has witnessed inmates, as recently as April 1, 2020, travelling within the facilities and during their assigned recreation periods without practicing any social distancing.  The inmates were "elbow to elbow" in proximity to each other.

33.     It has been reported to Sgt. Johnson that there are at least ten (10) inmates displaying symptoms in Southeast Two (SE2) with no PPE for the officers assigned there, no quarantine for the inmates, and no guidance from DOC medical staff.

**Professional Experience of Lawanda Reddick**

34.     Lawanda Reddick is a Correctional Officer at the D.C. Department of Corrections (DOC), and has achieved the rank of Corporal.  Cpl. Reddick has been an employee of the DOC for approximately twelve (12) years.

35.     Throughout her tenure, she has worked in various posts inside the DOC's CDF. Currently, she is assigned to Receiving and Discharge (R&D), where Correctional Officers receive new intakes and court returns, and also send inmates out to other jurisdictions, court or other facilities.

36.     Cpl. Reddick currently is serving as a Chief Shop Steward of the FOP/DOC LC, having been elected to that position in May, 2019.

37.     The post to which she is currently assigned (R&D) has masks available, but only for incoming inmates.  No Correctional Officers are provided masks.  DOC Management (Deputy Warden Landerkin) has informed the staff assigned to R&D that masks are for incoming inmates and not for Correctional Officer use.

38.     The City is not being truthful on how inmates coming into the facilities are processed.  Inmates are having their temperatures taken only.  No other procedures are in place to screen incoming inmates.

10

39.     At Roll Call, Cpl. Reddick witnessed an entire shift of Correctional Officers being told by management (Deputy Warden Landerkin) that the Officers are exempt from the social distancing requirement imposed by the Mayor and CDC because they work for the DOC.

40.     Correctional Officers also have been told that the risk of contracting COVID-19 is just part of their job, and that is why they have health insurance.

## Professional Experience of Cherno Mballow

41.     Cherno Mballow is a Correctional Officer at the D.C. Department of Corrections (DOC), and has achieved the rank of Corporal.  Cpl. Mballow has been an employee of the DOC for approximately six (6) years.

42.     Throughout his tenure, he has worked in various posts inside the CDF.  Currently, he works DOC auxiliary posts and environmental.  He assists in preparing the units for inspection by the D.C. Department of Health (DOH).

43.     Cpl. Mballow currently is serving as a Chief Shop Steward of the FOP/DOC LC, having been elected to that position in May, 2019.

44.     Cpl. Mballow has seen severe shortage in personal protective equipment, to include masks, gloves, gowns and eye shields.

## Operational Activities at the DOC

45.     As of the date of this declaration, the DOC continues to operate in many respects as business as usual.  Very few changes to the daily operations have been implemented in preparation for and in response to COVID-19.

11

46.     No actual changes in protocols for cleaning of individuals or physical locations, or distribution of cleaning, sanitizing or disinfecting products have been communicated clearly to the staff or inmates or executed.

47.     No actual changes in protocols for cleaning of individuals or physical locations handling of inmate food preparation or distribution of food have been communicated clearly to the staff or inmates or executed.

48.     There is no true quarantine.  Cell mates of inmates who have tested positive for COVID-19 remain in General Population.  The 65 inmates who had contact with the U.S. Marshal assigned to the D.C. Court and who tested positive initially were quarantined, but then two days later were released back to general population.  Six of those 65 inmates have tested positive for COVID-19.

49.     Inmates continue to meet with case managers and treatment specialists in violation of the social distancing requirements as of April 1, 2020, and without any protective equipment.

50.     There was an Open Letter sent to the DOC staff on April 2, 2020 by Dr. Keena Blackmon.  The letter was from Director Quincy Booth regarding COVID-19 testing for DOC staff.  The letter states, in part, "Correctional Officers are highly encouraged to take advantage of the coronavirus (COVID-19) screenings and should contact the Infection Control Group at (202) 844-5994 or infection.control@dc.gov to schedule an appointment."  Sgt. Johnson called upon receipt of the letter, and was informed, "I don't know why your agency told you to call the

number because we only service DC Fire and EMS." The representative also told Sgt. Johnson

that the DOC should contact DOH.   She was refused an appointment.

### Responses to Declaration of Dr. Beth Jordan on April 2, 2020

Counsel for the FOP/DOC LC received the Declaration of Dr. Beth Jordan on April 2, 2020,

and refutes the following representations made to this Court based on the personal knowledge of the

above identified FOP/DOC members as communicated to him.

51.    (Dr. Jordan Declaration #3)  The DOC does not implement operational and

medical procedures in response to COVID-19 based on guidance from the CDC.

52.     (Dr. Jordan Declaration #5) Sgt. Johnson personally witnessed as recently as

April 2, 2020, that the screening procedure outlined by Dr. Jordan is not what is occurring.  The

screening survey is a three-question form that is left on a table for individuals to complete; it is

optional, not required.  The DOC staff that screen entrants to the facility may or may not be

wearing gloves and a mask.  The thermometer is not being used properly, and often does not

work.   In addition, the logistical nature of the front entrance makes it impossible for employees

to stand 6 feet apart.

53.    (Dr. Jordan Declaration #6) At the Inmate Reception Center (IRC), the incoming

inmates wait in a waiting room before being seen at a glass window, where they talk to the staff

by phone.  It is unknown if the inmates are practicing social distancing while waiting to be seen.

Once the inmates are past that checkpoint, they are taken to at least three different stations

(including having their photos taken and being strip searched) where there is contact with staff

who are not protected with gloves or masks or gowns or eye protection.

13

54.     (Dr. Jordan Declaration #7) All new inmates are assigned to South Two unit. The maximum time that new inmates were housed in that unit was 72 hours until on or about March 25, 2020, when the policy changed to 14 days.  It was reported to Cpl. Hudson that as recently as April 2, 2020, that no new inmates have been placed in quarantine for 14 days.  As of April 2, 2020, the longest any new inmate has been housed in South Two is eight days.  Some of these new inmates were housed in a single cell and some have cellmates.  The officers assigned to that unit do not have any PPE.

55.     (Dr. Jordan Declaration #8)  No members of the Union leadership have witnessed any meetings held by DOC's medical staff with staff and residents.  Cpl. Olubasusi has requested a meeting with DOC's medical staff to include Dr. Jordan, but his requests have been ignored or refused.  It is very unlikely that DOC's medical staff has met with DOC staff and residents on a regular basis.  To do so, medical staff would have to enter 38 separate Housing Units.  It is also unlikely because meeting with inmates in groups of ten would take days.

56.     (Dr. Jordan Declaration #11) It was reported to Cpl. Olubasusi, Cpl. Hudson and Sgt. Johnson as recently as April 2, 2020, that there are only two units within the DOC facilities that are housing positive inmates—SMU-B and Medical 82.  As of today, there were reported 13 inmates in SMU-B and two of the 12 inmates in Medical 82 have tested positive.  The official number of inmates who have tested positive that has been released to the public is six.  It has been reported to Sgt. Johnson that two inmates have been quarantined in the Protective Custody Housing unit, presumably for COVID-19-related symptoms.  If as Dr. Jordan declared there are

14

22 inmates who have been tested, the whereabouts of all 22 is unknown.  It has been reported to

Sgt. Johnson that at least one of the inmates whose test results are pending is in general

population.  We do not know where all of these 22 inmates are at this time in the DOC facility.

Per the Department of Health Director's public statements, individuals who have had COVID-19

exposure but have tested negative still should quarantine for 14 days.  There is no evidence this

is happening with the inmates who have tested negative or the ones with test results pending.

57.     (Dr. Jordan Declaration #13) Based on the personal observations of Cpl.

Olubasusi, Cpl. Hudson, Sgt. Johnson, Cpl. Reddick, Cpl. Mballow and the dozens of staff who

have reported to them, the DOC is not providing either the staff or the residents access to

necessary medical care or working to keep staff safe with regular (or any) prevention guidance or

access to appropriate PPE.

**Responses to Declaration of Warden Lennard Johnson on April 2, 2020**

Counsel for the FOP/DOC LC received the Declaration of Warden Lennard Johnson on April

2, 2020, and refutes the following representations made to this Court.

58.     (Warden Johnson Declaration #4) Cpl. Olubasusi, Cpl. Hudson, Sgt. Johnson,

Cpl. Reddick, Cpl. Mballow are unaware of what the DOC Incident Command System is;

however, there have been no meetings whatsoever with the FOP/DOC LC leadership (the union

being a key detention stakeholder) to discuss COVID-19 preventative measures at  the  DOC's

facilities. There have been no notices of any of the meetings referenced in this paragraph, and

the FOP/DOC LC would like to participate in meetings regarding the working conditions for the

staff.  In addition, the FOP/DOC LC would like to be informed as to the details regarding,

15

minutes of and outcomes from any meetings of the DOC Incident Command Team and the daily

meetings of the Criminal Justice Coordinating Council (CJCC) for the District of Columbia.

59.     (Warden Johnson Declaration #5) The DOC has taken minimal steps to mitigate

the spread of the COVID-19 virus; in fact, the measures taken are likely to result in the rapid

spread of the virus.  To date, the Mayor of the District of Columbia has released publicly that one

DOC staff member has tested positive for COVID-19; however, this has not been communicated

to the DOC staff.  Cpl. Olubasusi, Cpl. Hudson and Sgt. Johnson are aware of at least three DOC

staff members who have tested positive and alerted the DOC.  No contact tracing has been done

for at least one if not all of these staff members with regard to whether inmates or other staff

should be quarantined.

60.     (Warden Johnson Declaration #6)  It was reported to Sgt. Johnson as recently as

April 2, 2020, that the only scheduled sanitization that occurs is an announcement over the

Public Address (PA) system that requests inmates to participate in cleaning their areas.  The PA

system is not designed to be heard throughout the facility and all Housing Units, and there are no

clear instructions or policies for how inmates are supposed to clean their areas.  There are no

consequences for inmates who choose not to clean.  There are no instructions given to inmates

for what is considered a "high use" and "high touch" areas for special cleaning.

61.     (Warden Johnson Declaration #7)  It was reported to Cpl. Olubasusi and Sgt.

Johnson as recently as April 2, 2020, that the cleaning materials for residents to clean their own

cells are not generally available to the residents.  They are under lock and key, and the residents

have to request them, if they are even aware that they exist.  The ECOLAB Peroxide that is used

may not be sufficient to ensure proper sanitization.  It takes anywhere from 45 seconds to five

minutes for the cleaning solution to kill germs effectively, depending on the concentration used.

There is no evidence that any staff or inmates have been made aware of this requirement.

62.     (Warden Johnson Declaration #8)  Not all inmates have sinks in their cells.  For

those inmates who do not, they have to ask an officer to let them out of their cell to be able to use

a sink.  It is the personal experience of Cpl. Olubasusi and Sgt. Johnson that inmates do not

regularly ask to do this.  Given that inmates are currently allowed out of their cells only 2 ½

hours a day, there is likely very little inmate hand cleaning taking place for those inmates.

63.     (Warden Johnson Declaration #9)  The residents often carry their washcloths in

and around their housing unit.  There is no requirement to keep them in an individual cell.  While

the inmates can request that the washcloth be laundered, Cpl. Hudson's personal experience is

that many do not.  In addition, there is no requirement to wash the jumpsuits that the inmates

wear.  Many do not put out their jumpsuits for laundering, and are not required to do so.

64.     (Warden Johnson Declaration #10)  Hand sanitizer is available in CTF in a wall

dispenser; however, any inmate that wishes to use it must be out of their cell to do so, which

requires the inmate to ask and an officer to release them.  High-risk staff may have "priority

access" to hand sanitizer, but Cpl. Olubasusi and Sgt. Johnson are unaware of any staff who are

aware of that fact.  There is no "priority access" to proper PPE for any high-risk staff who come

in contact with high risk residents, and what PPE there is completely insufficient.  In SMU-B, for

17

example, the unit which houses inmates who test positive for COVID-19, the "protective" suits

given to the staff are made out of paper and made only to protect from non-hazardous material

and dry particulates. (http://www.cellucap.com/index.php?display=yes&productid=68).  These

are not CDC approved gowns.

65.    (Warden Johnson Declaration #11)  Some activities for the residents have been

curtailed; however, they are allowed in-house recreation each day, and it occurs in groups, not

individually.  There is no social distancing encouraged.

66.    (Warden Johnson Declaration #13)  There was no attachment with a current list of

COVID-19-related supplies.  In any event, the FOP/DOC LC Executive Board is unaware of

sufficient PPE, cleaning/disinfecting supplies or hand sanitizer for the staff or the residents.

Cpl. Olubasusi, Cpl. Hudson and Sgt. Johnson are unaware of what the DOC's Operations

Support Team is; however, repeated attempts by FOP/DOC LC officials to ascertain the

inventory of the COVID-19-related supplies has been denied.

67.    (Warden Johnson Declaration #13)  On March 31, 2020, I J. Michael Hannon

called the FEMA liaison to state governments.  The FEMA liaison maintains data on the PPE

shipped from the United States stockpile to each state.  The FEMA liaison reported that the

following were shipped to the District of Columbia from the stockpile: Surgical masks 314,601;

N95 masks 132,437; Gloves 383,760; Gowns 55,657; Face shields 67,644; and Coveralls 3,550.

HANNON LAW GROUP has monitored the Mayor's daily press briefings, and to our

knowledge the Mayor has never provided statistics as to the amount of PPE available to the District of Columbia.

I HEREBY SWEAR under the penalty of perjury that the foregoing is true and correct as to the knowledge attributed to me.


*s/J. Michael Hannon*
_____

_____
Cpl. Benjamin Olubasusi[1]


_____
Cpl. Arnold Hudson, Sr.


_____
Sgt. Jannease Johnson


_____
Cpl. Lawanda Reddick


_____
Cpl. Cherno Mballow

_____

[1]      Original signatures will be filed with the Court tomorrow.

19

Dated: April 2, 2020

Respectfully submitted,

HANNON LAW GROUP, LLP

*/s/ J. Michael Hannon*

J. Michael Hannon, #352526
333 8th Street, NE
Washington, DC 20002
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com
*Attorneys for Fraternal Order of*
*Police/Department of Corrections Labor*
*Committee*