**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **EDWARD BANKS**, *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>**v.**<br><br>**QUINCY BOOTH**, *et al.*,<br><br>　　　　*Defendants*. | **Civil Action No. 20-0849 (CKK)** |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

## INTRODUCTION

Plaintiffs seek a temporary restraining order (TRO) against Quincy Booth, Director of the District of Columbia Department of Corrections (DOC), and Lennard Johnson, DOC Warden, in their official capacities (collectively, DOC or the District).[1] Plaintiffs allege that DOC's practices inside District of Columbia jail facilities warrant a TRO mandating immediate, sweeping and detailed relief in light of the COVID-19 pandemic. But plaintiffs have not made the requisite showing for the extraordinary remedy of a TRO. The allegations they proffer to support their arguments do not reflect the extensive measures DOC has taken to address the rapidly unfolding events of the pandemic.

Plaintiffs have not shown that they are likely to succeed on the merits of their Fifth or Eighth Amendment claim because they have not established either an unreasonable risk of harm

---

[1]　　　　The four plaintiffs are inmates currently housed in DOC facilities:　two as pretrial detainees, one awaiting sentencing post-conviction, and one serving a sentence post-conviction. *See* Compl. ¶¶ 14–17 and p. 11, below.

or deliberate indifference on the part of District officials, and they do not have standing to seek most of their requested relief. Plaintiffs have also failed to show a likelihood of irreparable harm absent emergency relief, or that the balance of the equities and the public interest weigh in their favor. Because plaintiffs have not shown they are entitled to any relief, their request for a Court-appointed expert and independent monitor is unwarranted.

As discussed below, DOC has taken and continues to take extensive measures to ensure that the District's incarcerated population remains safe and secure amid this pandemic, despite supply shortages, a fast-moving informational landscape and evolving recommendations from public health experts worldwide. Court intervention is not necessary. Plaintiffs' application for a TRO should be denied.

## BACKGROUND

### I.    COVID-19 in the District of Columbia

On March 7, 2020, officials announced the District's first confirmed case of COVID-19, also known as the novel coronavirus, an infectious respiratory virus that has spread rapidly across the globe since its first detection in humans in late 2019. *See* Press Release, Gov't of the District of Columbia, DC Department of Health Confirms First Coronavirus Case (March 7, 2020), available at https://coronavirus.dc.gov/release/dc-department-health-confirms-first-coronavirus-case; D.C. Health, COVID-19 FAQs, available at https://coronavirus.dc.gov/node/1464356. Although the virus's sufferers have exhibited a range of symptoms, severe cases have been known to cause shortness of breath, pneumonia and even death. *Id.* The World Health Organization (WHO) has declared the spread of COVID-19 a global pandemic. *See* "WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020," World Health Organization, March 11, 2020, available at https://www.who.int/dg/speeches/detail/who-director-

general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

Municipalities across the country have hastened to respond to COVID-19's unprecedented spread in just a few short weeks. Since early March 2020, U.S. cities and states have ordered the closure of schools and non-essential businesses, banned large gatherings and recommended that individuals who do not live in the same household abide by now-familiar "social distancing" measures where feasible. *See, e.g.*, Jesse McKinley and Michael Gold, *Ban on Large Gatherings in N.Y. as Coronavirus Cases Rise Sharply*, N.Y. Times, March 12, 2020, available at https://www.nytimes.com/2020/03/12/nyregion/coronavirus-nyc-event-ban.html; Dominic Fracassa, *SF bans large gatherings as nation moves to confront pandemic*, San Francisco Chronicle, March 11, 2020, available at https://www.sfchronicle.com/bayarea/article/Mayor-London-Breed-bans-all-large-gatherings-15123312.php.

The District is no exception. On February 28, 2020, more than a week before the District recorded its first case of COVID-19, Mayor Muriel Bowser issued an order preemptively activating the District's Emergency Operations Center and requiring all District agencies to ensure they had up-to-date plans for emergency operations. *See* Mayor's Order 2020-035, February 28, 2020, available at https://dchealth.dc.gov/sites/default/files/dc/sites/doh/page_content/attachments/2020-035-District-Government-Preparation-for-the-Coronavirus-COVID-19.pdf. As described below, DOC moved promptly. *See* Decl. of Dr. Beth Jordan (Jordan Decl.) [20-2] ¶¶ 4, 5, 11; Decl. of Lennard Johnson (Johnson Decl.) [20-1] ¶ 4.[2] While the District prepared in earnest, events unfolded quickly. By March 11, 2020, Mayor Bowser issued a Declaration of Public Emergency and a Declaration of Public Health Emergency based on the

---

[2]     In its filing of the Declaration of Lennard Johnson, the District inadvertently failed to attach a referenced list of DOC supplies. That list is included here as Exhibit A.

WHO declaration of a pandemic, as well as on the outbreaks seen in other cities throughout the world. *See* Mayor's Order 2020-045, March 11, 2020, available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.Declarationof PublicEmergency03.11.20.pdf; Mayor's Order 2020-046, March 11, 2020, available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicHealthEmergency03.11.20.pdf. Both Declarations have since been extended through at least April 24, 2020, and the District is now under a stay-at-home order. *See* Mayor's Order 2020-054, March 30, 2020, available at https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order.

Despite federal, state and local government efforts across the country, COVID-19 has continued to spread rapidly, generating immense demand for protective face masks, gloves, hand sanitizer and other products used to limit transmission of pathogens; a shortage of all these items has resulted. *See* United States Conference of Mayors, "Shortages of COVID-19 Emergency Equipment in U.S. Cities: A Survey of the Nation's Mayors," March 27, 2020, available at https://www.usmayors.org/issues/covid-19/equipment-survey/ (noting, for example, that 91.5% of cities surveyed do not have an adequate supply of face masks for their first responders). The District has taken unusual measures in response, commissioning assistance from local businesses to fill in supply gaps where possible. *See* Press Release, "Mayor Bowser Commissions Hand Sanitizer from DC Businesses to Support Frontline DC Workers," Government of the District of Columbia, March 23, 2020, available at https://coronavirus.dc.gov/release/mayor-bowser-commissions-hand-sanitizer-dc-businesses-support-frontline-dc-workers (announcing District commissioned local distillery and coffee shop to produce hand sanitizer). This case arises in the context of an unprecedented response to an unprecedented situation.

## II.    **DOC's Response**

DOC is the agency charged with safely and securely housing pretrial detainees, those serving sentences for misdemeanor offenses, and those adjudicated guilty but awaiting sentencing for offenses in the District. DOC is responsible for ensuring "the safekeeping, care, protection, instruction, and discipline of all persons committed to [its] institutions." D.C. Code § 24-211.02(a). The agency also plays an important role in ensuring the safety of those inside and outside its facilities. *See, e.g.*, 28 DCMR § 500.3 (permitting DOC to take individuals charged with criminal violations into involuntary protective custody who are "found to be in danger from a clear and present threat to that resident's safety"); *Id.* § 507.10 (allowing DOC to withhold from residents information "which may endanger any resident(s) or other person(s), or cause a riot, other major disturbance, or damage to property"); *Teamsters Local Union 1714 v. Pub. Emp. Relations Bd.*, 579 A.2d 706, 712 (D.C. 1990) (observing DOC employees "are involved directly with public safety").

DOC operates a system consisting of two primary correctional facilities:  the Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF). *See* D.C. Department of Corrections, "Correctional Facilities," available at https://doc.dc.gov/page/correctional-facilities. DOC also contracts with two privately operated halfway houses to provide various services. *Id.* Despite their combined capacity of more than 3,600 residents, these facilities currently house fewer than 1,600 individuals in total—less than half their total capacity. *See* DOC Inmate Count March 28, 2020 to April 3, 2020, Ex. B.

District and DOC officials have nevertheless remained cognizant of how COVID-19 might affect both residents and staff in its facilities. DOC continues to take the steps described below to ensure the safety and well-being of its staff and residents.

### A.  Cleaning Measures and Resident Hygiene

DOC ensures that its facilities are properly cleaned and sanitized. In addition to its standard cleaning practices, DOC now cleans all common spaces and housing unit common areas every two hours between 8:00 a.m. and 12:00 a.m., and twice each night between 12:00 a.m. and 8:00 a.m. to sanitize "high use and high touch" areas. Johnson Decl. ¶ 6. Residents have access to cleaning materials, including peroxide-based cleaner and disinfectant, to clean their cells. *Id.* ¶ 7.

Each week, residents also receive a new supply of personal hygiene items free of charge. These include a new bar of soap, a roll of toilet paper, clean towels, and clean sheets, as well as the opportunity to launder their washcloths. *Id.* ¶¶ 8-9. They can also purchase additional soap through DOC's commissary. *Id.* ¶ 8. All residents have access to sinks with both hot and cold water for hand washing. *Id.* Because of local and nationwide shortages, DOC does not have enough hand sanitizer to guarantee a supply for each resident; residents in CTF (not CDF) nevertheless have access to hand sanitizer from wall-mounted dispensers. *Id.* ¶ 10. To keep everyone in DOC facilities as safe as possible, "high-risk" staff receive priority access to the limited supply of hand sanitizer; this includes staff working in isolation and quarantine units, officers working transportation and escort details, and staff conducting COVID-19 screenings. *Id.* Residents receive regular information from DOC staff about COVID-19 prevention measures. Jordan Decl. ¶ 8. DOC has placed signs and posters throughout its facilities to alert both residents and staff of prevention measures they should take. Johnson Decl. ¶ 12.

### B.  Screening Measures

As of March 13, 2020, everyone entering DOC facilities—including legal visitors, DOC employees, and new residents—gets screened for symptoms of COVID-19 by completing a

screening survey and having their temperature taken. Jordan Decl. ¶ 5.[3] The staff member conducting these screenings wears a face mask and gloves while doing so, and DOC maintains a record of each screening. *Id.* Regardless of screening results, every new resident entering a DOC facility is placed into quarantine for 14 days before being assigned to their permanent housing unit. Jordan Decl. ¶ 7. Residents who screen positive receive additional medical attention and treatment by qualified medical staff where appropriate. *Id.* ¶ 6. DOC medical staff meet regularly with staff and residents in DOC housing units to discuss COVID-19 prevention measures. *Id.* ¶ 8.

## C.  Response Measures

DOC provides medical treatment based on guidance and recommendations from the District of Columbia Department of Health (DOH) and the Centers for Disease Control and Prevention (CDC). *Id.* ¶ 4. Residents who test positive for COVID-19 are reassigned to isolation units and checked by medical staff at least twice daily. *Id.* ¶ 11. As of April 2, 2020, DOC has conducted 22 tests, 12 have come back positive, and 4 have come back negative, with results pending for the remaining 6. *Id.* Also as of April 2, 2020, 125 residents are in quarantine units. Decl. of Kathleen Jo Landerkin (Landerkin Decl.) [21-2] ¶ 7.

## D.  Resident Movement and Communications Access

To further prevent the spread of COVID-19, DOC has also made changes to inmate

---

[3]        In their motion for a TRO, plaintiffs assert that "DOC staff themselves report" that, among other things, DOC does not screen new residents for COVID-19. *See* Pls.' Mem. in Support of App. for TRO [5-1] at 3. But for this proposition, plaintiffs cite a letter, attached to their expert's declaration, written by an attorney on behalf of the Fraternal Order of Police Department of Corrections Labor Committee dated March 25, 2020. *See* Exhibit B to Exhibit 1 of Pls.' App. for TRO [5-2] at 32. (Plaintiffs appear to have cited it incorrectly in their brief.) In addition to being hearsay within hearsay, this document is not a declaration or affidavit made under oath and therefore is inadmissible. *See* Fed. R. Evid. 805. In addition, the letter was written five days before plaintiffs filed their TRO motion. As indicated, DOC policies and procedures have been changing rapidly as events have unfolded, and the Court should place little if any weight on vague statements rebutted by more recent and accurate accounts of contemporaneous events at DOC facilities.

movements. DOC residents are now moved from their housing units only for court appearances, medical and dental appointments, work details, and legal visits (whether conducted in-person or remotely); CDF residents are also moved for video conferencing. Johnson Decl. ¶ 11.

On March 11, 2020, the day Mayor Bowser first issued emergency declarations for the District, DOC instituted a policy of screening "all staff and visitors (friends, family members, attorneys, contractors, volunteers, etc.)" for COVID-19 at the main entrances of all facilities. *See* D.C. Department of Corrections, Coronavirus Prevention, available at https://doc.dc.gov/page/coronavirus-prevention. As events unfolded rapidly, DOC continued to take additional measures. Just three days later on March 14, 2020, DOC formally suspended "all in-person visits, programming, and volunteer activities" for the duration of the District's Public Health Emergency. *See id.* DOC also provided residents with the means to video conference with friends and loved ones. *See id.* (residents still have access to in-unit "video visitation visits").

Even though residents are still permitted to receive in-person visits from their attorneys, DOC provides each resident with one ten-minute phone call each day to their attorney of record. Decl. of Camile Williams (Williams Decl.) [21-1] ¶ 7. The call is provided free of charge, and each phone call is unmonitored. *Id.* Although the system for providing these calls is newly implemented, DOC "is making all reasonable efforts to ensure that all inmates can have access to legal calls." *Id.* ¶ 9.

### E.  Reduction of Resident Population

Since the Mayor's emergency declarations on March 11, 2020, DOC's resident population has decreased by more than 16 percent as of April 3, 2020. *Compare* DOC Inmate Count March 7, 2020 to March 13, 2020, Ex. C (1,863 inmates at all DOC facilities as of March 11, 2020) *with* DOC Inmate Count March 28, 2020 to April 3, 2020, Ex. B (showing 1,557 inmates at all DOC

facilities as of April 3, 2020). On March 15, 2020, the Chief Judge of the Superior Court of the District of Columbia granted District law enforcement the discretion "to release an individual not otherwise eligible for release … upon approval of the prosecuting authority." *See* Superior Court of the District of Columbia Order, March 16, 2020, available at http://www.dccourts.gov/sites/default/files/Order_3-16-20.pdf. As a result, the Metropolitan Police Department (MPD) announced that it would expand criteria for releasing individuals pending a future court date who otherwise would have been taken into custody. *See* Metropolitan Police Department Operational Adjustments During COVID-19, March 18, 2020, available at https://mpdc.dc.gov/release/metropolitan-police-department-operational-adjustments-during-covid-19.

DOC does not have the legal authority to unilaterally release individuals from its custody. Before this pandemic, District of Columbia law provided DOC discretion to award a limited number of sentencing credits to those serving sentences for misdemeanors, for good behavior, D.C. Code § 24-221.01c(a), and "up to 3 credits per calendar month for each" of certain designated rehabilitation, work detail, or other special programs, *id.* § 24-221.01c(b).[4] Individuals can also earn "educational good time credits of no less than 3 days a month and not more than 5 days a month" for participating in specified academic or vocational programs." *Id.* § 24-221.01(a). Until recently, the law expressly stated that "[n]o person shall receive more than 10 credits per calendar month" when combining all of these categories. *Id.* § 24-221.01c(c) (2016).

On March 18, 2020, however, the D.C. Council passed the COVID-19 Response Emergency Amendment Act of 2020 (COVID-19 Emergency Act). *See* D.C. Act 23-247, March 17, 2020, available at http://lims.dccouncil.us/Download/44469/B23-0718-SignedAct.pdf.

---

[4]     Each credit counts as one day of an individual's sentence.

Among other measures, the COVID-19 Emergency Act amended Section 24-221.01c(c) to specify that "during a period for which a public health emergency has been declared …, [DOC] shall have discretion to award additional credits" to those serving misdemeanor sentences "to effectuate immediate release of persons sentenced for misdemeanors"—with the qualification that this discretion could only be exercised "consistent with public safety." *See* D.C. Code § 24-221.01c(c) (2020).

DOC has used its newly-granted discretion to double the maximum number of monthly sentencing credits a resident serving a misdemeanor sentence may receive from 10 to 20. *See* DOC Change Notice #20-002, March 18, 2020 [19-2], ¶ 2c.[5] Since making this change, DOC has applied this policy to effectuate the early release of dozens of residents. *See* Natalie Delgadillo and Rachel Sadon, "D.C. Now Has Nearly 600 Confirmed Coronavirus Cases, 11 Deaths," DCist, April 1, 2020, available at https://dcist.com/story/20/04/01/d-c-now-has-nearly-600-confirmed-coronavirus-cases-11-deaths/.

The Superior Court of the District of Columbia, in response to an "Emergency Motion for an Order to Show Cause Why Persons Serving Misdemeanor Sentences at the Department of Corrections Should Not Be Released Forthwith in Light of the Crisis Created by the COVID-19 Pandemic" filed by the Public Defender Service for the District of Columbia (PDS), ordered expedited responses by the United States Attorney's Office (USAO) and the Office of the Attorney General for the District of Columbia (OAG). *See In Re Sentenced Misdemeanants*, 2020 CNC

---

[5]     It has since been changed a second time to expand the circumstances in which residents can receive credits. *See* DOC Change Notice #19-002, April 1, 2020 [19-1].

000120 (Super. Ct. of D.C. March 31, 2019) (Order).[6] The court's order noted "that nothing in this Order shall prevent the filing of a D.C. SCR Rule 35 motion for sentence reduction to be filed on behalf of an individual defendant serving a misdemeanor sentence" and directed that such motions shall be filed with Judges McKenna and Dayson, and require a response from USAO or OAG within two business days. *Id.* As of this filing, the Superior Court has not yet ruled on PDS's motion.

## III.   **Plaintiffs' Allegations**

Plaintiffs in this case are four individuals currently in DOC custody; plaintiffs Phillips and Banks reside at CDF, while plaintiffs Smith and Jackson reside at CTF. Compl. [1] ¶¶ 14-17. Plaintiff Phillips is incarcerated pending trial and was denied bond. *See id.* ¶ 14; *United States v. D'Angelo Phillips*, Case No. 2020 CF3 002932 (D.C. Super. Ct.). Plaintiff Banks has pled guilty to a felony and awaits sentencing. *See* Compl. ¶ 15; *United States v. Edward M. Banks*, Case No. 2019 CF1 010956 (D.C. Super. Ct.). Plaintiff Smith is incarcerated pending trial. Compl. ¶ 16. And plaintiff Jackson "is being held post-conviction." *Id.* ¶ 17.

Although the Complaint does not state any specific allegations pertaining to plaintiffs in particular, it does lay out a number of general allegations concerning DOC's response to COVID-19. Plaintiffs allege that DOC's "response was slow and insufficient." Compl. ¶ 63. They acknowledge that beginning on March 3, 2020, DOC began taking various precautions such as notifying employees of risks associated with the virus. *Id.* ¶ 64. However, plaintiffs allege deficiencies as of early March in the provision of hygienic products such as soap, towels, hand sanitizer, cleaning supplies, face masks, and gloves. *Id.* ¶¶ 66-67, 73-79. They also allege

---

[6]     The USAO and OAG opposed the motion on April 1, 2020. *See* Docket, *In Re Sentenced Misdemeanants*, 2020 CNC 000120 (Super. Ct. of D.C.) (available at https://www.dccourts.gov/eaccess).

deficiencies as of mid-to-late March in certain visitor screening procedures, *id.* ¶¶ 68-70, 72, quarantine procedures, *id.* ¶¶ 80-82, and resident testing and medical treatment, *id.* ¶¶ 83-84, 87. In addition, plaintiffs allege inadequate measures to ensure sufficient distancing from others. *Id.* ¶¶ 86-91, 94-96. Although plaintiffs allege that, in the past, inadequate provisions were made for residents to speak with their lawyers on unmonitored phone lines, *id.* ¶ 93, they acknowledge that "[s]ome limited arrangements have been provided in the last few days," *id.*

Plaintiffs raise two legal claims, one under the Fifth Amendment and one under the Eighth Amendment, both alleging unconstitutional conditions of confinement. *Id.* ¶¶ 153-74. They also raise allegations on behalf of two putative classes. *Id.* ¶¶ 148-52. As relief, plaintiffs request that the Court issue a 20-part injunction, most of which orders the District to take specific actions. *Id.* at 34-37.

## IV.   <u>Procedural History</u>

Plaintiffs filed their lawsuit on March 30, 2020. *See* Compl. Along with the Complaint, plaintiffs filed a motion for class certification, an application for a temporary restraining order, and a motion for preliminary injunction. *See* Mot. to Certify Class [3]; Application for Temporary Restraining Order [5]; Mot. for Preliminary Injunction [6].

On March 31, 2020, the Court held a telephone conference with the Parties and ordered DOC to provide the following by 1:00 p.m. on April 1, 2020:

> a list of the names of the approximately 94 inmates who have been sentenced to misdemeanors and who Defendants are considering for release; the numbers of people who have been tested for COVID-19 and a break-down of the identities of those individuals (such as inmates, visitors, etc.) and the results of those tests; the date on which Defendants began testing people coming into the jails; the number and a breakdown of the results of COVID-19 tests which have been done on those who were incarcerated prior to the date on which Defendants began testing all incoming inmates; all relevant written procedures and practices concerning COVID-19; and

> Defendants['] process which is in place or will be put in place to allow legal counsel to communicate with their clients electronically or by other means.

*See* Minute Order of April 1, 2020. The Court further ordered that by April 2, 2020, DOC provide "[d]eclarations about the processes and procedures actually in place and the current conditions of the jail, concentrating on Plaintiffs' requests for relief 2-9," as enumerated in the proposed order attached to their application for a TRO. *Id.* Lastly, the Court ordered that DOC file by 4:30 p.m. on April 3, 2020, a response to plaintiffs' application for a TRO, focusing on "the merits of Plaintiffs' 5th and 8th Amendment claims as well as on the need for an independent monitor and expert."

## LEGAL STANDARD

A temporary restraining order "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

A plaintiff seeking a TRO must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Sherley*, 644 F.3d at 392. Because injunctive relief is an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013); *Winter*, 555 U.S. at 22. The plaintiff bears the burden of doing so. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Norton*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (*CFGC*) (same). Where, instead, a plaintiff seeks a "mandatory injunction"—*i.e.*, one that would compel a positive act by the defendant—courts generally require the plaintiff to meet a higher standard and show "extreme or very serious damage" or that plaintiff is "clearly entitled" to immediate relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013) (citations omitted)); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32 (D.D.C. 2014).

## ARGUMENT

### I.   Plaintiffs Cannot Show a Likelihood of Success on the Merits.

First and foremost, plaintiffs have not carried their burden to show they are likely to succeed on the merits of their case. Demonstrating a likelihood of success on the merits is a free-standing requirement. *Sherley*, 644 F.3d at 393 (internal quotation marks omitted). Failing to meet the burden on this prong "is alone sufficient to defeat" a motion for emergency injunctive relief. *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013). The Court need not conclude that plaintiffs will definitely lose on the merits, only that they have not met the demanding burden of showing a clear entitlement to immediate, extraordinary relief. *Sweis*, 950 F. Supp. 2d at 48. To overcome this burden, plaintiffs must show not merely that success is a "possibility" but that it is "likely." *Winter*, 555 U.S. at 20-22.

### A.   Plaintiffs' Fifth and Eighth Amendment Claims Are Not Likely To Succeed.

In their Complaint, plaintiffs allege unconstitutional conditions of confinement. The standard for finding a violation of the Fifth Amendment (for pre-trial detainees) and Eighth

Amendment (for post-conviction detainees) is the same:  jail officials must have (1) exposed inmates to "an unreasonable risk of serious damage" to the inmates' health (an "objective factor"), and (2) acted with "deliberate indifference" to posing such a risk (a "subjective factor"). *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Young v. District of Columbia*, 107 F. Supp. 3d 69, 77 (D.D.C. 2015). Here, plaintiffs have not satisfied either prong.

### 1. Plaintiffs Fail To Demonstrate That the Risk of Serious Harm to Inmates Violates Contemporary Standards.

The "unreasonable risk" prong of the analysis—the objective factor—"requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36 (emphasis in the original). DOC does not dispute the seriousness of the COVID-19 pandemic. However, the objective test "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to" the virus. *Id.* Plaintiffs "must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* They have failed to meet that burden.

The current state of the COVID-19 pandemic exposes everyone to the risk of falling ill. DOC's response is aligned with the best available medical advice for mitigating the risks associated with the pandemic. *See* Jordan Decl. ¶ 4 (DOC has implemented response protocols "based on guidance and recommendations from" DOH and the CDC, and consultation with subject matter experts). DOC has implemented the same risk-reduction practices among the inmates that are recommended for the community at-large:  providing soap for hand washing, frequently disinfecting high-touch areas, quarantining individuals who may be exposed, restricting large gathering of inmates, limiting inmates' exposure to members of the community, decreasing movements around the facilities, and screening individuals who enter the facilities for COVID-19

symptoms. *See* Background Section II, above. These practices are precisely the measures deemed capable of reducing the risk of transmission and how "today's society chooses to tolerate" that risk. *Helling*, 509 U.S. at 36.

Although complete social distancing and isolation is not possible for each inmate in the DOC facilities, plaintiffs have not shown that the risk posed by DOC's practices raises plaintiffs' risk of exposure substantially over the risk experienced by the outside community. *See Hines v. Youssef*, Civil Action No. 13-00357, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate."). Plaintiffs have not shown that inmates' limited interaction with other residents and staff poses an exceptional level of risk *beyond* that posed to anyone who shares a living space with others. The evidence now presented by DOC shows that, among other things, all staff, visitors, and new residents are screened before entering DOC facilities, Jordan Decl. ¶ 5; all new residents are quarantined for 14 days as a precaution, *id.* ¶ 7; every resident who tests positive is isolated from other residents and checked twice daily, *id.* ¶ 11; common spaces are cleaned every two hours each day, Johnson Decl. ¶ 6; all residents have access to peroxide-based disinfectant to clean their cells, *id.* ¶ 7; all residents are given soap, towels, and regular access to hot water, *id.* ¶ 8; and DOC staff have limited resident movement out of their units to reduce resident-staff contact, *id.* ¶ 11.

It is impossible to eliminate all risk factors for transmission of COVID-19. Nevertheless, the facts DOC has presented here make clear that any risks faced by those inside DOC facilities are comparable to the general risks faced by everyone. Plaintiffs have not met their burden to

establish an objectively "unreasonable risk" posed by their confinement inside DOC facilities, *see Helling*, 509 U.S. at 36, or even that they face more risk than other inmates.

### 2. Plaintiffs Fail To Establish That DOC Has Acted with Deliberate Indifference.

Plaintiffs have also failed to satisfy the second prong of the legal standard, which requires them to show "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The test is subjective, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837.

DOC is actively apprised of COVID-19's spread throughout the District. But plaintiffs are simply incorrect that DOC "steadfastly refused" to heed policy and practice guidance from DOH and the CDC. *See* Pls.' Mem. in Support of App. for TRO [5-1] at 28. On the contrary, the record demonstrates that DOC heeded those recommendations specifically and continues to do so. On March 11, 2020, the day Mayor Bowser made her public health declarations, DOC imposed a visitor screening policy clearly explaining that it "continue[d] to monitor COVID-19 … and follow guidance from DC Health and Centers for Disease Control and Prevention" to ensure residents could "continue to safely receive visitors." *See* D.C. Department of Corrections, Coronavirus Prevention, available at https://doc.dc.gov/page/coronavirus-prevention. On March 14, when announcing that it was halting all in-person visitations, DOC cited its tracking of "Centers for Disease Control and DC Health guidelines." *Id.* DOC's Medical Director Dr. Beth Jordan specifically attests that "DOC implements operational and medical procedures in response to

COVID-19 based on guidance and recommendations from [DOH] and the [CDC]," among others. Jordan Decl. ¶ 4.

Plaintiffs' allegations reflect, at most, that DOC may have changed some of its practices over time, but that is because recommendations from these very bodies have been changing rapidly. *Id.* ¶ 15 (DOC medical operations are "review[ed] regularly" and "modif[ied] consistent with guidance and recommendations from DOH and CDC" according to "this guidance and changing conditions"); Johnson Decl. ¶ 14 (DOC operations modified based on recommendations from medical staff and "subject to change or modification based on this guidance and changing conditions"). The record demonstrates that DOC has kept pace with the changing landscape of public health recommendations and relied on the best available information to inform its responses.

Although the "deliberate indifference" inquiry is ultimately subjective, courts may properly go beyond officials' mental states and also consider "the constraints facing the official[s]" for context. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *see Helling*, 509 U.S. at 37 ("The inquiry into this factor also would be an appropriate vehicle to consider arguments regarding the realities of prison administration."). Here, the significant constraints on DOC and the measures they have taken in spite of those constraints preclude a finding of deliberate indifference. *See Hines*, 2015 WL 164215, at *5 (finding no deliberate indifference when "Plaintiff has failed to show that the policy Plaintiff contends should have been adopted was within the range of policies that the proposed Defendants could reasonably have promulgated."). For example, DOC lacks enough hand sanitizer to provide a supply for every inmate because the District—and the entire country—is dealing with a shortage of hand sanitizer. *See* Johnson Decl. ¶ 10. DOC has chosen to marshal these scarce resources to most efficiently mitigate the risk of illness spreading. *See, e.g.*, *id.* (DOC providing "high-risk staff priority access to its limited supply of hand sanitizer").

The rapidly changing nature of public health recommendations is also significant. When applying the deliberate indifference standard, the official's state of mind "must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'" *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (Section 1983 complaint against prison doctor properly dismissed where "hindsight suggests that [his] treatment decisions may have been mistaken, even gravely so"). With each piece of new guidance from DOH, CDC, and outside experts, DOC has adapted its policies to increase the efficacy of its practices in limiting COVID-19's potential harm to inmates based on the best available knowledge. *See* Johnson Decl. ¶ 14.

Similarly, the exercise of professional medical judgment cannot constitute deliberate indifference. *See Estelle*, 429 U.S. at 107 (explaining that "the question whether … additional diagnostic techniques or forms of treatment … is indicated is a classic example of a matter for medical judgment"). "[T]he existence of alternative treatment options does not itself render the treatment received unconstitutional." *Perniciaro v. Lea*, 901 F.3d 241, 258-59 (5th Cir. 2018). Plaintiffs contend that DOC "fail[ed] to follow established guidelines" by "adopting policies, and failing to adopt others, that would mitigate the risk of harm of the virus." Pls.' Mem. at 32. However, as discussed above, DOC's medical staff has adopted policies and guidelines based on the recommendations of DOH, the CDC, and outside experts. Jordan Decl. ¶ 4. A difference of opinion among medical professionals about the proper approach to medical care does not amount to deliberate indifference to serious medical needs. *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (holding that a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation").

Plaintiffs cannot show they are entitled to a TRO without showing it is "likely," and not merely "possible," that their claims will succeed. *Winter*, 555 U.S. at 20-22. Because they have not done so, their application for a TRO should be denied.

### B.   Plaintiffs Lack Standing To Seek Most of the Requested Relief.

Regardless of the merits of their Fifth and Eighth Amendment claims, the four plaintiffs here are unlikely to succeed because they lack standing to seek most of the relief requested in the Complaint. Every plaintiff in federal court must meet the constitutional minimum for Article III standing by showing an injury, causation and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The third of these, redressability, requires showing "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[I]f a favorable judicial decision is unlikely to correct the alleged wrong, there is no case or controversy within the meaning of Article III." *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 566 (D.D.C. 2018).

The Complaint recites twenty items of injunctive relief that plaintiffs seek through "a temporary restraining order, preliminary injunction, and permanent injunction and/or writs of habeas corpus." Compl. at 34. But the four plaintiffs in this action (no class has been certified) have not pled facts sufficient to show that granting the relief they have requested would remedy any purported individualized injuries they are suffering. There are no allegations that any of the four is serving a misdemeanor sentence as required for release under the COVID-19 Emergency Act, Compl., Requested Relief ¶¶ B.1, 2; that any plaintiff has been deprived of any of the cleaning

or personal hygiene implements described, *See id.* ¶¶ B.3-6, 14; that any plaintiff has come into contact with or otherwise been negatively affected by any staff member lacking adequate personal protective equipment, *see id.* ¶¶ 7-8; that any plaintiff has been quarantined in a punitive setting, *id.* ¶ 16; that any plaintiff received an insufficient response to a request for medical care, *see id.* ¶ 17; or that any plaintiff has been denied remote access to court appearances or meetings with legal counsel, *see id.* ¶¶ 18-19. Although plaintiffs' application for a TRO and accompanying exhibits allege some facts specific to them, plaintiffs cannot rely on these allegations or anything else outside of their pleadings to establish standing. *See Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014) (complaint cannot be amended by briefing on motion). If plaintiffs lack standing, they cannot show a likelihood of success on the merits, let alone entitlement to the relief they seek.

## II.    Plaintiffs Fail to Show They Will Suffer Irreparable Harm.

Aside from the merits of plaintiffs' claims, "failure to demonstrate irreparable harm is grounds for refusing to issue a [TRO], even if the other three factors … merit such relief." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citation and internal quotation marks omitted); *see also CFGC*, 454 F.3d at 297 (observing that there is "a high standard for irreparable injury"). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted). If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for preliminary relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Additionally, injunctive relief that "goes well beyond simply maintaining the status quo …

is particularly disfavored." *Stanley v. Univ. of S. Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994). It is a

"judicially inflicted injury," and many circuits therefore make the movant's already high burden

even "more stringent." *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973,

978 (10th Cir. 2004) (citing cases); *see also Sweis*, 950 F. Supp. 2d at 47 (where relief requested

would change rather than preserve the status quo, plaintiffs must show "extreme or very serious

damage" or that they are "clearly entitled" to immediate relief).

Here, because plaintiffs have not pled facts sufficient to show that granting injunctive relief

would remedy any purported individualized injuries they are suffering, *see* Section I.B above, they

cannot demonstrate that they will suffer irreparable harm absent a TRO. Plaintiffs seek

extraordinary relief that disrupts DOC's efforts to combat the health crisis, and the Superior Court

has already established a process to adjudicate the potential release of inmates. *See* Background

Section II.E above. As a result, and because plaintiffs fail to make any showing of a specific injury

that is not generalized to the inmate population, plaintiffs fail to meet their burden of demonstrating

irreparable harm.

III.   **The Balance of Equities and Public Interest Militate Against Preliminary Relief.**

Even if plaintiffs could show a likelihood of success on the merits and that irreparable harm

would result without a TRO, they must additionally show both that "the balance of equities tips in

their favor," and that "an injunction is in the public interest." *Sherley*, 644 F.3d at 392; *In re Navy

Chaplaincy*, 738 F.3d at 428 (plaintiffs cannot use strong showing on some factors to make up for

weak showing on others). These two factors "merge when the Government is the opposing party"

and are thus analyzed together. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,

920 F.3d 1, 10 (D.C. Cir. 2019) (citation and internal quotation marks omitted). "[W]here the Court

has a less intrusive means" of ensuring legal compliance, "the public interest would weigh towards choosing such options, especially where … the plaintiffs seek a mandatory ('do this') rather than prohibitory ('don't do this') injunction." *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 160 (D.D.C. 2018).

DOC does not dispute either the gravity of COVID-19 or its duty to ensure the well-being of the more than 1,500 individuals in its custody during a pandemic. *See* D.C. Code § 24-211.02(a). But the broad and detailed relief plaintiffs seek here would impose a remarkable level of intrusion on DOC's day-to-day operations that is simply not warranted under these circumstances. Plaintiffs' proposed relief would require, among other things, that DOC:

- Abdicate to the Court—and to a court-appointed expert—the agency's legislatively-granted discretion to determine who should be awarded sentencing credits for expedited release, *see* Compl. Requested Relief ¶ B.2;

- Provide "all inmates" (all but four of whom are not parties to this case) with hand sanitizer, which is currently in short supply around the country, with specifications down to the percentage content of alcohol, *see id.* ¶ B.5;

- Take the temperature daily of each of more than 1,500 individuals, regardless of staff capacity, *see id.* ¶ B.9; and

- "Assess (through questioning) … daily" each of more than 1,500 individuals for possible signs of COVID-19, regardless of staff capacity, *id.* ¶ B.10.

Aside from the merits of plaintiffs' legal claims, it is important to note how much of DOC's autonomy such relief would usurp—on a record that includes contemporaneous, sworn declarations by DOC officials that they are already complying with many of the practices plaintiffs ask this Court to impose. *See, e.g.*, Johnson Decl. ¶ 6 (housing unit common areas cleaned every two hours during the day and twice each night); ¶ 7 (residents provided peroxide disinfectant to clean cells); ¶¶ 8-9 (each resident provided access to hot running water as well as weekly bar of soap, roll of toilet paper, and clean linens); ¶ 10 (hand sanitizer available to residents in CTF

despite shortage); ¶ 12 (signs posted to alert residents of COVID-19 prevention measures); Jordon Decl. ¶ 8 (DOC medical staff regularly meet with residents to discuss COVID-19 prevention); ¶ 12 (testing conducted in accordance with DOH guidelines where residents exhibit specified symptoms).

There is a well-established public interest in permitting the government to carry out its authorized functions where doing otherwise would needlessly upend its operations. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (finding lower court could have reasonably concluded that ordering redrawing of electoral district map would have contravened public interest where "injunction might have worked a needlessly chaotic and disruptive effect upon the electoral process" (citation and internal quotation marks omitted)); *Garnett*, 313 F. Supp. 3d at 160 (public interest "would disfavor the Court's interference" in legal process of administering food stamp benefits "in light of [federal agency's] expertise and role" in carrying it out). This is especially true in the midst of a public health emergency in which DOC is actively taking part in a District-wide emergency response protocol. *See* Johnson Decl. ¶ 4.

Although the extent to which COVID-19 will affect the inmates in the District's correctional facilities is not yet clear, plaintiffs have not demonstrated that the relief they seek will be more effective than the actions DOC is already implementing to keep inmates safe, and the process created by the Superior Court for evaluating requests for inmates' early release. The balance of the equities and the public interest weigh in DOC's favor and counsel against granting a TRO.

## IV.   **Plaintiffs' Request for a Court-Appointed Expert and Independent Monitor Should Be Denied.**

In seeking a TRO, plaintiffs have asked for a sweeping array of immediate relief from changes to DOC practices in corrections facilities to the Court's appointment of an expert and

monitor. *See* Pls.' Proposed Am. TRO Proposed Order (Pls.' Proposed Order) [16-1] ¶ 1-20.[7] As discussed, plaintiffs have fallen well short of meeting their burden to establish grounds for a TRO. They have not shown the likelihood of succeeding on either a Fifth or an Eighth Amendment claim, and they have not shown that the balance of equities or the public interest weighs in their favor. Without making these fundamental showings, this Court should not grant any relief, let alone the specific relief plaintiffs request. *See Guedes*, 920 F.3d at 10 (plaintiff bears burden of persuasion in motion for preliminary relief).

Additionally, for the reasons explained below, there is no basis to appoint an expert or an independent monitor. *See* Pls.' Proposed Order ¶¶ 19-20.

## A.  Plaintiffs Are Not Entitled to a Court-Appointed Expert.

Plaintiffs ask the Court to "[a]ppoint an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding how many and which class members to order released so as to ensure that the number of prisoners remaining at the CDF and CTF can be housed consistently with CDC guidance on best practices to prevent the spread of COVID-19 ...." Pls.' Proposed Order ¶ 20. Plaintiffs, however, have only asked for the release of a small subset of DOC residents:  those whom it is "within [DOC's] power" to release, *see id.* ¶ 1, which amounts only to those who have already been sentenced for misdemeanor offenses. As discussed above, the COVID-19 Emergency Act is DOC's only pertinent source of legal authority to designate individuals in their custody for release. During an active public health emergency, the law only gives DOC the discretion "to award additional credits ... to effectuate immediate release of persons sentenced for misdemeanors"—and only when doing so is "consistent with public safety." *See* D.C. Code § 24-

---

[7]      On March 31, 2020, plaintiffs filed an amended version of a proposed TRO [16]. DOC references the proposed amended version.

221.01c(c) (2020).

The appointment of an expert would serve no purpose because the named plaintiffs cannot seek relief for non-parties, and plaintiffs have not explained how an expert would aid the Court in deciding whether to grant relief.

### 1.   None of the Named Plaintiffs Is Eligible for Release.

Based on plaintiffs' own pleadings, none of them is eligible for the release remedy they seek. Plaintiffs Phillips and Smith allege they are "being held in pre-trial custody." *See* Compl. ¶¶ 14, 16. And plaintiff Banks alleges he "has pleaded guilty and is awaiting sentencing." *Id.* ¶ 15. Even plaintiff Jackson only pleads that he "is being held post-conviction," without specifying whether he is being held pre- or post-sentencing, and whether the offense for which he is being held is a misdemeanor or a felony. *Id.* ¶ 17. An expert would serve no purpose if none of the four named plaintiffs is even eligible for the relief they are seeking.

But even if plaintiff Jackson is eligible to receive sentencing credits at DOC's discretion, he would still be the only resident eligible for relief in this case (at this stage). Although plaintiffs filed this case as a putative class action, "there is no class of plaintiffs before the Court at this time towards whom relief could be directed." *Russell v. Barry*, Civil Action No. 87-2072, 1987 WL 15697, at *2 (D.D.C. Jul. 30, 1987). This Court should not grant relief to parties not before it. *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."). This applies equally to preliminary injunctive relief and relief from a final judgment. *Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 25 (D.D.C. 2012). Here, only the four named plaintiffs would be eligible for relief. *See Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 205 n.4 (D.D.C. 2018) ("[I]t is not clear that

the Court can or should issue class-wide injunctive relief without a certified class."); *Dorfmann v. Boozer*, 414 F.2d 1168, 1171 n.8 (D.C. Cir. 1969) (preliminary injunction "should not have been issued before the action was certified as a class action" where injunction "worked a transfer of money belonging to persons who were not within the jurisdiction of the court"). However, based on the existing record, none of the four plaintiffs has shown that he would be eligible for release.

### 2.   The Appointment of an Expert Would Not Assist the Court or DOC.

Even if the Court is inclined to order DOC to make determinations about awarding eligible residents additional good-time credits, this task is straightforward and well within the capability of DOC. As discussed above, DOC has already performed this task numerous times and continues to evaluate residents' eligibility for release. Although Federal Rule of Evidence 706 provides courts the discretion to designate expert witnesses, this is a "relatively infrequent occurrence." *Carranza v. Fraas*, 471 F. Supp. 2d 8, 9 (D.D.C. 2007) (internal quotation marks omitted) (quoting Fed. R. Evid. 706 Advisory Comm. Note)). Court-appointed experts are generally limited to "exceptional cases in which the ordinary adversary process does not suffice … or when a case presents compelling circumstances warranting the appointment of an expert." *Id.* at 9-10 (citations and internal quotation marks omitted).

Moreover, courts generally only even consider appointing experts to aid the court in fact-finding—not to advise the defendant on complying with a proposed remedy. *See, e.g.*, *Carranza*, 471 F. Supp. 2d at 10 (rejecting legal malpractice plaintiff's request for an expert when plaintiffs "made no showing that their malpractice claims are so complex, or that their case presents circumstances so compelling, that the appointment of an expert would aid the court"); *Applegate v. Dobrovir, Oakes & Gebhardt*, 628 F. Supp. 378, 383 (D.D.C. 1985) (considering but rejecting appointing an expert under Rule 706 to testify as *pro se* plaintiff's witness in legal malpractice

litigation where plaintiff did not present "compelling circumstances"); *see also Edmunson v. Magic Diamond Casino*, Civil Action No. 06-100, 2007 WL 9710369, at *1 (D. Mont. Nov. 16, 2007) ("[A] court's appointment of an expert under Rule 706 is generally for the purpose of assisting the court, not to assist a *pro se* litigant.").

Plaintiffs ask the Court to order DOC to "take all actions within their power to reduce the inmate population of [CDF] and CTF …." Pls.' Proposed Order ¶ 1. Plaintiffs have not explained how a court-appointed expert would assist the Court in interpreting the phrase "all actions within their power" or deciding whether to grant relief. *See Carranza*, 471 F. Supp. 2d at 10. Nor have they explained how this could even assist DOC. As discussed above, the only tool DOC has to unilaterally release residents is its discretion under the COVID-19 Emergency Act to award additional sentencing credits to those serving misdemeanor sentences to make them eligible for immediate release. DOC has exercised the discretion granted to it by significantly revising its sentencing credit policy to accomplish this in a manner "consistent with public safely." *See* D.C. Code § 24-221.01c(c) (2020); DOC Change Notice #19-002 ¶ 2c. Even if the Court believes DOC should further revise its policies and practices, DOC is fully capable of (1) determining who is serving a sentence for a misdemeanor and (2) determining who should receive additional sentencing credits.

It is also worth re-emphasizing that the Superior Court has created a process to allow a judicially-managed release of eligible individuals. *See* Background Section II.E above. This Court's intervention is not necessary, nor is the appointment of an expert. Plaintiffs' request falls well outside the purview of Rule 706 and does not constitute appropriate relief.

### B. There Is No Basis To Appoint a Monitor.

Plaintiffs are also not entitled to the appointment of an independent monitor. It is only "[i]n

unusual circumstances" that the appointment of an independent monitor "may be useful to oversee compliance with a court order." *Women Prisoners of District of Columbia Dep't of Corr. v. District of Columbia (Women Prisoners)*, 93 F.3d 910, 930 (D.C. Cir. 1996) (citing Fed. R. Civ. P. 53(b)); *see also* Fed. R. Civ. P. 53(b) (court-ordered referral to a special master "shall be the exception and not the rule."); *Cook v. Billington*, Civil Action No. 82-0400, 2003 WL 24868169, at *7 (D.D.C. Sept. 8, 2003) ("It is widely recognized that appointing a Receiver is essentially the remedy of last resort, and therefore, should be undertaken only when absolutely necessary" (alterations adopted) (citation and internal quotation marks omitted).).[8]

In other words, a court should consider whether an independent monitor "is really the only remedy left for the Court." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997). In so evaluating, "the court should consider whether there were repeated failures to comply with the Court's orders, whether continued insistence that [the defendant's] compliance with the Court's orders would lead only to confrontation and delay, if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, … whether resources are being wasted, … [and] whether a receiver can provide a quick and efficient remedy." *Id.* (citation and internal quotation marks omitted).

By their formulation, these factors make clear that the appointment of a monitor is simply not appropriate at the outset of a case, without at least providing the defendant an opportunity to

---

[8]     Courts analyze the propriety of appointing independent monitors under the standards of Rule 53. *See, e.g.*, *Jamie S. v. Milwaukee Pub. Sch.*, Civil Action No. 01-C-928, 2009 WL 1615520, at *27 (E.D. Wisc. June 9, 2009), *vacated on other grounds by* 668 F.3d 481 (7th Cir. 2012) (analyzing propriety of appointing "independent monitor" under Rule 53's standards for appointing a "master" on grounds that "[s]ubstantively, the distinction is one without consequence"). The same is true for appointment of "receivers." *See Cook v. Billington*, Civil Action No. 82-0400, 2003 WL 24868169, at *7 (D.D.C. Sept. 8, 2003) ("The circumstances which justify the appointment of a Special Master … are essentially the same as those for a Receiver.").

comply with a court order on its own. Unsurprisingly, in the rare cases in which courts appoint monitors, they are appointed (1) when final judgment has been issued against the defendant, and (2) where there are good grounds to question whether the defendant will comply with court-ordered injunctions, *i.e.*, a history of uneven (or no) compliance. *See, e.g.*, *Women Prisoners*, 93 F.3d at 930 (citing *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544-45 (9th Cir. 1987)) (citing case in which Ninth Circuit "approv[ed] use of monitors to oversee compliance with court order where compliance with past orders has been sporadic"). The District is aware of no cases—and plaintiffs have pointed to none—in which a court has appointed an independent monitor to ensure compliance with a TRO at the outset of a lawsuit. An independent monitor at this juncture would be wholly unwarranted. The Court should deny plaintiffs' request.

### C. **Any Relief Must Be Narrowly Tailored**

If the Court is inclined to grant some form of emergency relief, the well-established rule is that injunctive relief must be "narrowly tailored to remedy the specific harm shown." *Nevada Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006); *see also District of Columbia v. USDA*, 2020 WL 1236657, *12 (D.D.C. March 13, 2020) (observing that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). As discussed above, even leaving aside phrases such as "take all actions within their power," plaintiffs either lack standing to pursue much of the relief they seek, or they should not receive such relief because DOC has already undertaken those measures.

### V. **The Court's April 3, 2020 Minute Order**

In response to the inquiries posed by the Court in its Minute Order issued today, April 3, 2020, DOC responds as follows.

30

A. **Basis for Opposing Motion To File *Amicus Curiae* Brief**

DOC opposes the Motion To File an Amicus Curiae Brief (Amicus Motion) by the Fraternal Order of Police for the District of Columbia Department of Corrections Labor Committee (Labor Committee) because it will not aid the Court in deciding the issues before it.

"An amicus curiae … does not represent the parties but participates only for the benefit of the Court." *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008) (citation and internal quotation marks omitted). The Court has full discretion over whether and to what extent to permit *amici* but should nevertheless "consider the presence of partiality with regard to an amici's admittance." *Id.* Additionally, leave to file a brief should be denied where "it is unlikely that [it] would provide the Court with any 'unique information or perspective[s].'" *Iacangelo v. Georgetown Univ.*, Civil Action No. 05-2086, 2009 WL 10693231, at *2 (D.D.C. June 11, 2009) (quoting *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 33 (D.D.C. 2002)).

The Labor Committee's proposed brief focuses on a number of topics not relevant to the legal issues in this case. *See* Labor Committee's Proposed Mem. as Amicus Curiae (Proposed Brief) [23-2]. The Proposed Brief, for example, spends significant time on matters such as labor-related disputes between the Labor Committee and District officials. *See id.* at 5-9. More significantly, many of the factual assertions the Labor Committee proposes to add are either devoid of citation, *see, e.g.*, *id.* at 11, 13; or based on a single declaration purporting to be on behalf of many different individuals—including the attorney filing on behalf of the Labor Committee—frequently failing to state who is attesting to which statements, *see, e.g.*, Proposed Brief Ex. I [23-11] ¶¶ 45-51, 53, 65. Many of those statements with attributions are unreliable hearsay statements about what the individual(s) in question heard. *See, e.g.*, *id.* ¶¶ 56, 60, 61, 67.

Instead of shedding light on the facts, the Labor Committee's Proposed Brief injects them

with unreliable, unattributed, and irrelevant assertions. It is also plainly partisan. The Court should decline to consider the Proposed Brief and deny the Labor Committee's motion.

### B.  Plaintiffs' Motion To Expedite the Hearing.

DOC opposes Plaintiffs' Emergency Motion to Expedite Hearing on Application for a Temporary Restraining Order [23] because it is inconsistent with the deadlines set by the Court on April 1, 2020, and based on the lack of time between plaintiffs' reply and the proposed merits hearing. Plaintiffs' reply in support of their application for TRO is due at 5:00 p.m. on Sunday, April 5, 2020, and plaintiffs have proposed that a merits hearing occur the following morning. DOC appreciates the urgency of this matter and is willing to accommodate a compressed schedule, but requests more than the overnight hours of Sunday evening to Monday morning to consult with District personnel regarding plaintiffs' upcoming filing and to properly prepare for a hearing on plaintiffs' application for a TRO. Although expedition is important here, too much haste prejudices DOC, by reducing the time it has to respond to the many, complicated arguments and allegations presented and—more importantly—reduces the time for the Court to consider all the evidence and arguments.

However, DOC defers to the Court. If the Court decides to hold a hearing on plaintiffs' application for a TRO on April 6, 2020, DOC requests—as plaintiffs propose—that plaintiffs' reply in support of a TRO be due Saturday, April 4, 2020, at 5:00 pm.

### C.  COVID-19 Procedures

Regarding plaintiffs' assertion that COVID-19 procedures are not being followed, DOC disputes that the anecdotes described in the declarations are an accurate representation of the COVID-19 response practices currently being implemented. As summarized above, and noted in the declarations of DOC officials, *see* Background Section II, DOC is taking all available

precautions to protect inmates from the spread of COVID-19. The specific complaints noted in the declarations do not represent the current practices in DOC facilities (*e.g.*, professional cleaners now clean the common areas daily and cleaning of common areas takes place every two hours), others are mistaken (cleaning supplies are widely available to staff and inmates), and others are the result of unavoidable constraints (*e.g.*, the distribution of masks and other PPE is limited to individuals who have screened positive and DOC staff performing high risk functions, and the ability to practice social distancing is limited). The response has evolved quickly, with ever-evolving changes and enhancements based on medical guidance and availability of resources.

### D.  **DOC's Pandemic Plan**

The plan proffered by plaintiffs is not DOC's currently operative pandemic response plan and should not have been available to staff (because it is not operative and is confidential). However, that plan clearly shows that DOC regularly updates the plan as the agency has indicated, and DOC is in the midst of an ongoing revision process.

### CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' application for a temporary restraining order.

Dated:  April 3, 2020.                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

33

*/s/ Micah Bluming*
MICAH BLUMING [1618961]
PAMELA DISNEY [1601225]
Assistant Attorneys General
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-7272
(202) 730-1833 (fax)
micah.bluming@dc.gov
pamela.disney@dc.gov
andy.saindon@dc.gov

*Counsel for Defendants*