**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EDWARD BANKS, et al.,
      Plaintiffs

      v.

QUINCY L. BOOTH, *et al.*,
      Defendants

Civil Action No. 20-849(CKK)

**MEMORANDUM OPINION**
(April 19, 2020)

This case is brought by various inmates of the District of Columbia's Department of Corrections ("DOC") detained in the Central Detention Facility ("CDF") and the Correctional Treatment Facility ("CTF"). Plaintiffs bring claims against Quincy Booth, in his official capacity as Director of the DOC, and Lennard Johnson, in his official capacity as Warden of the DOC. Plaintiffs' claims are brought pursuant to the due process clause of the Fifth Amendment of the United States Constitution and the Eighth Amendment of the United States Constitution relating to the conditions of their confinement during the COVID-19 pandemic.

Before the Court is Plaintiffs' [5] Motion for a Temporary Restraining Order ("TRO"), which is opposed. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record for purposes of this motion, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' [5] Motion. The Court concludes that Plaintiffs have shown a likelihood of success on the merits, irreparable harm, and that the balance of the equities and the public interest favors

---

[1] The Court's consideration has focused on the following documents:
    • Pls.' App. For a Temp. Restraining Order ("Pls.' Mot."), ECF No. 5;
    • Defs.' Opp'n to Pls.' App. For a Temp. Restraining Order ("Defs.' Opp'n"), ECF No. 25; and
    • Pls.' Reply Brief in Support of App. For a Temp. Restraining Order ("Pls.' Reply"), ECF No. 26.

injunctive relief. However, as will be further explained below, the Court concludes that some of the relief requested by Plaintiffs is not appropriate at this time.

## I.      BACKGROUND

Prior to proceeding through the procedural background of this case, the Court notes that the hearings held in this matter have been conducted either telephonically or through video conferencing. Due to the restrictions of the COVID-19 pandemic, the United States District Court for the District of Columbia postponed all civil hearings to occur before June 1, 2020. In Re: Extension of Postponed Court Proceedings in Standing Order 20-9 and Limiting Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic, Standing Order No. 20-19 (BAH), April 1, 2020. As such, in compliance with the standing order and recommended precautionary measures, the Court has conducted these emergency matters virtually.

On March 30, 2020, Plaintiffs filed their Complaint in this matter. That same day, Plaintiffs also filed a Motion to Certify a Class of all persons confined or to be confined in DOC facilities, a Motion for a Temporary Restraining Order—the motion currently before the Court, and a Motion for a Preliminary Injunction. ECF Nos. 3, 5, 6.

On March 31, 2020, the Court ordered that a teleconference be held to discuss scheduling for Plaintiffs' pending Motion for a TRO. March 31, 2020 Minute Order. During the hearing, the Court ordered Defendants to provide specific, relevant information to the Court over the following two days. For example, the Court ordered Defendants to provide a list of the names of the approximately 94 inmates who have been sentenced to misdemeanors and who could be released; the numbers of people who had been tested for COVID-19 and a break-down of the identities of those individuals (such as inmates, visitors, etc.) and the results of those tests; the date on which Defendants began testing people coming into the jails; the number and a breakdown of the results of COVID-19 tests which had been done on those who were

incarcerated prior to the date on which Defendants began testing all incoming inmates; all relevant written procedures and practices concerning COVID-19; and Defendants' process which is in place or will be put in place to allow legal counsel to communicate with their clients electronically or by other means. April 1, 2020 Minute Order. The Court also ordered Defendants to provide Declarations about the processes and procedures in place and the current conditions of DOC facilities in light of COVID-19. *Id.* The Court further set a briefing schedule for Plaintiffs' Motion for a TRO and stayed Defendants' Responses to Plaintiffs' Motion for a Preliminary Injunction, Complaint, and Motion for Class Certification pending the resolution of the TRO. *Id.* A court reporter was present at the hearing and a transcript of the hearing is on the docket. ECF No. 18.

On April 1, 2020 and April 2, 2020, Defendants filed Responses to the Court's Order. ECF Nos. 19, 20, 21.

On April 2, 2020, the Fraternal Order of Police for the District of Columbia Department of Corrections Labor Committee filed for leave to submit an amicus curiae brief in support of Plaintiffs' Motion for a TRO. ECF No. 23. After considering Defendants' opposition, the Court granted the motion, finding that the amicus brief could assist the Court in its analysis of certain, relevant issues. April 3, 2020 Minute Order.

On April 3, Plaintiffs filed an Emergency Motion to Expedite the Hearing on the Application for a TRO. ECF No. 24. In consideration of Plaintiffs' arguments, the Court scheduled a videoconference on the merits of Plaintiffs' Motion for a TRO for April 7, 2020. April 3, 2020 Minute Order.

Prior to the hearing on Plaintiffs' Motion for a TRO, Defendants filed their Opposition to Plaintiffs' Motion for a TRO on April 3, 2020, and Plaintiffs filed their Reply in support of their Motion on April 4, 2020. ECF Nos. 25, 26.

On April 7, 2020, the court conducted a two-hour video conference on the merits of Plaintiffs' Motion for a TRO. A court reporter was present and a transcript of the hearing is on the docket. ECF No. 37. Also, on that day, the Court conducted a second teleconference with the parties. The parties determined that they would confer and propose names for an amicus of the Court to inspect the conditions of CTF and CDF. April 8, 2020 Minute Order.

On April 8, 2020, the Court again conducted a teleconference with the parties to ascertain their proposed amicus of the Court. The parties ultimately agreed to the appointment of Grace Lopes and Mark Jordan as amici of the Court to provide information on the actual conditions of CTF and CDF and to make findings on Defendants' responses to COVID-19. A court reporter was present and a transcript of the hearing is on the docket. ECF No. 33. On April 9, 2020, the Court issued a consent order appointing Ms. Lopes and Mr. Jordan as amici. ECF No. 34.

The amici reviewed records from the DOC facilities and conducted unannounced and unescorted site visits on multiple shifts at both CDF and CTF on April 10, 11, and 12, 2020. Defendants cooperated with amici in providing them with necessary materials and in providing them access to the facilities, staff, and inmates during their visits.

On April 15, 2020, the Court held a telephone conference at which the amici presented their oral preliminary findings and both parties as well as the Court asked questions. A court reporter was present and a transcript of the hearing is on the docket. ECF No. 45.

On April 18, 2020, the amici submitted their final written report. Attachment 1. The Court incorporates that report into this Memorandum Opinion. The Court has excerpted portions

of the report in this Memorandum Opinion, focusing on the issues which are most exigent and most relevant to the resolution of Plaintiffs' Motion for a TRO.

The Court further notes that on April 17, 2020, following the amici's oral presentation of their preliminary findings, Mr. Booth provided a memorandum to all DOC employees and contractors entitled "Reminders and Updated COVID-19 Policies and Procedures." Exhibits to Report Submitted by Amicus Curiae, Attachment 2, Ex. 11. In this memorandum, Mr. Booth addresses some of the deficiencies identified by the amici. The Court commends Defendants for their prompt response. However, the Court has no record evidence that the updates discussed in Mr. Booth's memorandum have been implemented. Accordingly, in resolving Plaintiff's Motion for a TRO, the Court relies on the record evidence as it currently stands, including the findings in the amici's final report.

In consideration of the above information, the materials which have been provided, and the present factual record, the Court now issues its decision on Plaintiffs' Motion for a TRO.

## II.      LEGAL STANDARD

A temporary restraining order is an extraordinary form of relief. An application for a TRO is analyzed using factors applicable to preliminary injunctive relief. *See, e.g., Gordon v. Holder*, 632 F.3d 722, 723-24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an

extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; internal quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291. Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.

The Court notes that it is not clear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)). However, the D.C. Circuit has yet to hold definitively that Winter has displaced the sliding-scale analysis. *See id.; see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each

of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## III.    DISCUSSION

The Court will proceed to analyze each of the requirements for granting a TRO. However, first, the Court will address a preliminary issue—standing.

### A. Standing

As a threshold matter, Defendants contend that Plaintiffs do not have standing to seek the requested relief. Four named Plaintiffs filed this lawsuit. D'Angelo Phillips is currently in the custody of DOC at CDF where he is being held pre-trial. Edward Banks is currently in the custody of DOC at CDF awaiting sentencing. Eric Smith is currently in the custody of DOC at CTF where he is being held pre-trial. Compl., ECF No. 1, ¶¶ 14-16. Keon Jackson was in the custody of DOC at CTF where he was awaiting sentencing; but, he has since been released from custody and is no longer party to this suit.  April 7, 2020 Tr., ECF No. 37, 38: 22-24. In order to meet the requirements for standing, a plaintiff must plead an injury, causation, and redressability. "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 733-34 (2008) (internal quotation marks and citations omitted). Defendants contend that Plaintiffs have failed to show that their injuries are redressable by certain forms of requested relief which would flow to inmates other than Plaintiffs.

To begin, the Court notes that Plaintiffs have filed a motion to certify a class consisting of all persons confined or to be confined by DOC in CDF or CTF. ECF No. 3. However, at this point in the litigation, the Court has not ruled on Plaintiffs' Motion to certify the class. As such, Defendants contend that the standing analysis should focus only on the named Plaintiffs, and Plaintiffs do not dispute this assertion.

Considering only the named Plaintiffs, the Court finds that Plaintiffs have pled an injury which was caused by Defendants and is redressable by the relief requested. Plaintiffs' claimed injury is the risk of contracting COVID-19. The Court finds that the risk of contracting a disease is a legally cognizable risk for purposes of standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015) (explaining that pleading an increased risk of foodborne illness is sufficient for standing). Additionally, Plaintiffs have pled that they have an increased risk of contracting COVID-19 due to Defendants' failure to take appropriate precautionary measures. Finally, Plaintiffs have pled that their injury of an increased risk of contracting COVID-19 would be redressed by the requested relief.

Plaintiffs have produced unrebutted expert declarations positing that the requested relief would redress the claimed Plaintiffs' injuries by reducing their risk of contracting COVID-19. "The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of the risk of transmission, exposure, and harm to individuals who become infected." Dec. of Jaimie Meyer, ECF No. 5-2, ¶ 9. The risk of infectious diseases, such as COVID-19, is higher in jails and prisons because they are congregate settings which "allow for rapid spread of infectious diseases that are transmitted person to person." *Id.* at ¶ 11. In settings such as these, it is often difficult to appropriately socially distance and many facilities are poorly ventilated which allows disease to spread faster. *Id.*

Due to the unique posture of jails and prisons, steps taken to reduce the risk of infection among any inmates, such as reducing the inmate population or providing adequate cleaning supplies, would also reduce the named Plaintiffs' risk of contracting COVID-19. Additional precautions which directly affect inmates who are not a party to this suit also affect the named Plaintiffs by reducing the risk that the disease will spread amongst the population and eventually

infect the named Plaintiffs. *See Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (explaining that all prisoners, even those that remain detained, benefit from the release of some inmates to counter overcrowding because the detained inmates "are that system's next potential victims").

For these reasons, the Court concludes that Plaintiffs have stated an injury—an increased risk for contracting COVID-19—which is caused by Defendants' untimely and insufficient precautions and would be remedied by the requested relief. As such, Plaintiffs have standing to request a TRO.

**B. Plaintiffs Establish a Likelihood of Success on the Merits**

Moving to the standards for granting a TRO, first the Court considers whether or not Plaintiffs have established a likelihood of success on the merits. In order to meet this first requirement, Plaintiffs must show that they have a likelihood of success on the merits of their Fifth Amendment claim for pre-trial detainees and of their Eighth Amendment claim for post-conviction detainees. The Court concludes that Plaintiffs have made a sufficient showing.

It is undisputed that the proper avenue for relief for pre-trial detainees, such as Plaintiffs Phillips and Smith, is the Fifth Amendment due process clause and the proper avenue for relief for post-conviction detainees, such as Plaintiff Banks, is the Eighth Amendment. However, the parties dispute whether or not the standards for sustaining a claim under the different Amendments are the same. Defendants state that the standard for sustaining a claim under the due process clause and Eighth Amendments are the same. Defendants contend that to show a violation of either Amendment, jail officials must have (1) exposed inmates to an unreasonable risk of serious damage to their health and (2) acted with deliberate indifference in posing such a risk. Defs.' Opp'n, ECF No. 25, 14-15. Plaintiffs agree that Defendants have stated the correct standard for an Eighth Amendment claim by post-conviction detainees, but they argue that the

standard for a due process claim for pre-trial detainees is different. Pls.' Reply, ECF No. 26, 7. Under the due process clause, Plaintiffs argue that they need only show that the Defendants knew or should have known that the conditions posed an excessive risk to the health of the inmates. The main difference being that the due process clause analysis does not require a finding of deliberate indifference.

The rights of pre-trial detainees are different than the rights of post-conviction detainees. Because pre-trial detainees are presumed innocent, they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)).

In *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), the United States Supreme Court considered the differences between pre-trial and post-conviction detainees in deciding that, to state an excessive force claim, a pre-trial detainee need only show that the use of force was objectively unreasonable. 135 S.Ct. at 2473-74. The officers' subjective state of mind in using the force was irrelevant. *Id.* While *Kingsley* relates to excessive force rather than prison conditions, in making its decision, the *Kingsley* court relied on *Bell v. Wolfish*, 441 U.S. 520 (1979), a case pertaining to prison conditions. According to the *Kingsley* court, "as *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* Together

*Kingsley* and *Bell* provide persuasive authority that a pre-trial detainee need only show that prison conditions are objectively unreasonable in order to state a claim under the due process clause.

The parties did not cite and the Court could not find a D.C. Circuit case interpreting *Kingsley* in the context of a claim for deficient prison conditions. However, many circuit courts have extended *Kingsley's* objective standard to apply to other due process claims by pre-trial detainees. For example, the United States Court of Appeals for the Second Circuit has held that, following *Kingsley*, in the context of challenged prison conditions for pre-trial detainees, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d 2017); *see also Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (applying *Kingsley* standard to failure to protect claims by pre-trial detainees); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (finding that "*Kingsley's* objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees"). And, at least one district court within this Circuit has also applied *Kingsley's* objective standard to due process claims brought by pre-trial detainees. *See United States v. Moore*, Case No. 18-198-JEB, 2019 WL 2569659, *2 (D.D.C. June 21, 2019) (explaining that a pretrial detainee could prevail on a due process claim "if she either introduces evidence of a subjective intent to punish or demonstrates that a restriction is objectively unreasonable or excessive relative to the Government's proffered justification").

Based on the pertinent reasoning of *Kingsley* and the persuasive authority of other courts, the Court concludes that pre-trial detainee Plaintiffs Phillips and Smith do not need to show deliberate indifference in order to state a due process claim for inadequate conditions of

confinement. As such, under the due process clause, pre-trial detainee Plaintiffs Phillips and

Smith are likely to succeed on the merits by showing that the Defendants knew or should have

known that the jail conditions posed an excessive risk to their health. And, under the Eighth

Amendment, post-conviction detainee Plaintiff Banks must show that the jail conditions exposed

him to an unreasonable risk of serious damage to his health and that Defendants acted with

deliberate indifference in posing such a risk.

Despite recognizing that pre-trial detainee Plaintiffs need not demonstrate deliberate

indifference to show a likelihood of success on their due process claims, the Court will also

analyze the deliberate indifference prong as such a showing is still required for post-conviction

Plaintiff's Eighth Amendment claim.

### 1.  Unreasonable risk to Plaintiffs' Health

Now that the Court has determined the standards under the due process clause and the

Eighth Amendment, the Court will assess whether or not Plaintiffs have shown a likelihood of

success in proving that they have been exposed to an unreasonable risk of damage to their health.

Determining whether or not Plaintiffs have been exposed to an unreasonable risk is an objective

analysis which "requires a court to assess whether society considers the risk that the prisoner

complains of to be so grave that it violates contemporary standards of decency to expose *anyone*

unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).

In sum, Plaintiffs "must show that the risk of which [they] complain[] is not one that today's

society chooses to tolerate." *Id.*

Both parties and the Court recognize the seriousness of the threat posed by COVID-19.

Despite the seriousness of the threat, Defendants argue that Plaintiffs are unlikely to succeed in

establishing that they have been exposed to an unreasonable risk to their health. Specifically,

Defendants ague that Plaintiffs "have not shown that the risk posed by DOC's practices raises plaintiffs' risk of exposure substantially over the risk experienced by the outside community." Defs.' Opp'n, ECF No. 25, 16. Defendants further argue that, for the most part, Plaintiffs are able to take the same precautions to prevent infection as those not detained. The Court disagrees.

As an initial matter, the data for COVID-19 infection rates decries Defendants' argument that Plaintiffs' risk of infection is the same as that of the outside community. It is undisputed that, as of April 4, 2020, the infection rate in DOC facilities was over seven times the infection rate of the District of Columbia at large. Pls.' Reply, ECF No. 26, 8. This statistical data is also supported by Plaintiffs' unrefuted expert declaration.  In her Declaration, Dr. Jaimie Meyer, who reviewed reports on conditions in DOC facilities, posited that "individuals placed in [CDF and CTF] are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at significantly higher risk of harm if they do become infected." Dec. of Jaimie Meyer, ECF No. 5-2, ¶ 33.

Additionally, Plaintiffs have provided evidence that they cannot take the same precautions as those who are not detained. There are many precautionary policies which Defendants contend are in place and are disputed by Plaintiffs. However, one of the most important risk-reduction policies which has not been adequately addressed by Defendants is social distancing. Plaintiffs have provided expert evidence that social distancing is a crucial part of containing the spread of COVID-19. Dec. of Marc Stern, ECF No. 1-1, ¶ 13. With the closures of schools, theaters, and restaurants, governments across the nation have emphasized social distancing as a way to slow the spread of the disease. In the District of Columbia, Mayor Muriel Bowser has implemented an order for social distancing which requires "[m]aintaining at least six (6)-foot social distancing from other individuals." Stay Home DC Order,

https://coronavirus.dc.gov/stayhome (March 30, 2020). However, Defendants have produced no evidence that Plaintiffs are able to comply with social distancing precautions.

Plaintiffs have produced uncontroverted evidence that social distancing was slow to be instituted and has not been fully operationalized in CTF or CDF. Plaintiffs have submitted a declaration from a DOC inmate stating that, as of April 4, 2020, "[n]o one from DOC has ever told us about social distancing. There are no signs about social distancing." Dec. of James Guillory, ECF No. 26-2, ¶ 14. And, Plaintiffs have also submitted a declaration from a DOC staff member who works in the age-50-and-over unit asserting that, as of April 3, 2020, "[s]ocial distancing is not happening in my unit." Dec. of Lennette Nesbitt, ECF No. 24-2, ¶ 14.

During the April 7, 2020 hearing, Defendants asserted that they have recently implemented new social distancing practices, such as limiting the number of inmates who can use the recreation areas at the same time. April 7, 2020 Tr., ECF No. 37, 40:2-41:11. However, Defendants have yet to submit any evidence that these practices are being implemented. Nor, have Defendants provided specifics such as the number of inmates who can use the common areas at the same time or the steps that are being taken to ensure that individuals maintain a suitable distance when in a shared space.

When the amici of the Court visited the DOC facilities, they reported that, in defiance of social distancing regulations, "[m]ore than five inmates were consistently out of their cells at one time, and sometimes between 10 and 20 inmates were out of their cells at one time." Report Submitted by Amicus Curiae, Atch. 1, 20. Additionally, the amici reported that "[s]ocial distancing practices were not enforced and there were no attempts by the correctional staff to enforce social distancing even when numerous inmates crowded into a contained area." *Id.* The amici attributed the failure to enforce social distancing, at least in part, to an understaffing of

correctional officers and their supervisors. *Id.* The DOC has a current workforce of 994 funded correctional positions, of which 45 positions are vacant. Of the 949 filled positions, 281 correctional staff were unavailable for duty as of April 16, 2020. *Id.* Understaffing during a crisis situation such as the COVID-19 pandemic makes it difficult to enact and enforce the necessary precautionary measures.

The Court recognizes that Defendants' response to this sudden and unprecedented pandemic is ongoing. Additionally, the Court recognizes that additional evidence will likely be provided as litigation proceeds. But, based on the current record, the Court finds Defendants' argument that the risk of infection experienced by Plaintiffs is equivalent to that experienced by the general population is disputed by statistical evidence, Plaintiffs' expert evidence, the declarations of DOC inmates and staff, and the amici report. Accordingly, based on the limited record before the Court, the Court finds that Plaintiffs have established a likelihood that they will be able to show that they have been exposed to an unreasonable risk of damage to their health.

Before the Court proceeds to analyzing deliberate indifference, the Court notes that based on the unreasonable risk to Plaintiffs' health, pre-trial detainee Plaintiffs Phillips and Smith have already established a likelihood of success on the merits of their due process claim. Nevertheless, the Court will proceed to analyze deliberate indifference.

### 2. Deliberate Indifference

The Court will next determine whether or not Plaintiffs have shown a likelihood of success in establishing Defendants' deliberate indifference. A showing of deliberate indifference requires "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). In order to establish deliberate indifference,

"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

There does not appear to be any dispute that Defendants are aware of the threat that COVID-19 poses to the health of Plaintiffs. Instead, the only dispute appears to be whether or not Defendants have recklessly disregarded the risk to Plaintiffs' health.

In analyzing this standard, the Court recognizes that COVID-19 poses an unprecedented challenge and that the precautionary measures taken by Defendants are rapidly evolving. As evidence of COVID-19 precautions, Defendants have provided the Declarations of Lennard Johnson, the Warden of the DOC, and Beth Jordan, the Medical Director and Health Services Administrator for the DOC. ECF Nos. 20-1, 20-2. Both declarations outline policies designed to combat the threat of COVID-19. For example, Mr. Johnson claims that residents have access to proper cleaning materials, that residents receive a free bar of soap each week, and that the common areas in DOC facilities are cleaned regularly. Dec. of Lennard Johnson, ECF No. 20-1, ¶¶ 6-12. And, Ms. Jordan claims that everyone entering a DOC facility is screened for symptoms using a thermometer and a survey, that all new inmates are quarantined for 14 days before they are assigned to a housing unit, and that the DOC medical staff meets regularly with staff and residents to discuss preventative measures. Dec. of Beth Jordan, ECF No. 20-2, ¶¶ 5-8.

However, it is not clear whether or not these declarations are based on Mr. Johnson and Ms. Jordan's personal observations of the conditions at the facilities. Both declarations state that the information is based on personal knowledge "including information provided to me by other District of Columbia employees in the course of my official duties." ECF No. 20-1, ¶ 1; ECF No. 20-2, ¶ 1. As such, there is some uncertainty as to whether these declarations are based on

policies which are on the books or the actual conditions of the facilities. And, Plaintiffs have

submitted the declaration of at least one DOC staff member strongly suggesting that, as of April

2, 2020, Defendants' written policies have not been adequately communicated to DOC staff for

operationalization. *See* Dec. of Doreen Deterville, ECF No. 24-1, ¶¶ 5-8.

     To compound this uncertainty, Plaintiffs have also submitted numerous declarations from

inmates and DOC staff rebutting that Defendants' policies are being fully implemented. For

example, Plaintiffs have submitted declarations stating that they have not been given free bars of

soap. Dec. of Edward Banks, ECF No. 5-2, ¶ 8; Dec. of Keon Jackson, ECF No. 5-2, ¶ 10; Dec.

of Eric Smith, ECF No. 5-2, ¶ 8. And, Plaintiffs have submitted declarations stating that inmates

do not receive adequate cleaning supplies. Dec. of Keon Jackson, ECF No. 5-2, ¶ 12. And,

Plaintiffs have submitted declarations stating that not all new inmates are properly screened and

quarantined when transferred between units. Dec. of Michael Cohen II, ECF No. 26-4, ¶ 18.

Having a written policy in place but not fully implemented cannot protect Defendants from a

finding of deliberate indifference. *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C.

Cir. 2000) (explaining that "a 'paper' policy cannot insulate a municipality from liability where

there is evidence, as there was here, that the municipality was deliberately indifferent to the

policy's violation.").

     The written findings of the amici support some of these declarations. In conducting their

visits, the amici determined that "the need for more intensified education of staff and inmates

[about COVID-19] is apparent." Report Submitted by Amicus Curiae, Atch. 1, 15. Amici further

noted that access to cleaning supplies varied from unit to unit. *Id.* at 30. In some units, cleaning

supplies were depleted and, in other units, inmates could not access the supplies to clean their

cells. *Id.* Additionally, no inmates had facility-issued rags for cleaning their cells. Instead, many

inmates used "tattered and soiled" rags that they made by tearing facility issued towels or t-shirts. *Id.* Moreover, "[i]t was evident that knowledge regarding the appropriate use of the different cleaning and sanitizing agents was generally at a very low level." *Id.* Challenges with cleanliness persisted outside the inmates' cells, with the cleanliness of common spaces inconsistent among housing units with little quality control. *Id.* at 31-32.

The Court further notes that, while amici reported that Defendants screened all staff and visitors at the entrances to both CDF and CTF, there are issues with the screening procedures. On entering DOC facilities, all visitors and staff are questioned as to whether or not they have experienced COVID-19 symptoms. *Id.* at 15-16. And, all visitors and staff have their temperatures checked with a non-contact infrared thermometer. *Id.* at 16. However, amici reported that two out of eight reported temperature readings appeared to be inaccurate, registering in the low 90 degrees. *Id.* Amici posit that the inaccurate temperature readings are caused by user error and inadequate training with the thermometer. *Id.* While it is not is not clear if the medical staff use the same type of thermometer to measure the temperatures of inmates in the medical unit, amici indicated that a "review of electronic health records also identified a number of questionably low temperature readings." *Id.*

Additionally, there are certain precautionary steps that Defendants do not address. For example, as already explained, social distancing is one of the most crucial precautionary measures in slowing the spread of COVID-19. However, Defendants' declarations make little to no mention of social distancing measures. During the hearing, Mr. Bluming stated, "pre-COVID-19, we had 80 people in the recreational area together. At the end of last week, we were down to half that, so 40 people at a time." April 7, 2020 Tr., ECF No. 37 41: 7-11. Mr. Bluming further

stated that, the DOC's website indicated that they may be allowing no more than 10 individuals in the recreational area at a time. *Id.* at 41: 1-3.

The Court notes that, besides counsel's argument, there is no record evidence that these procedures are being implemented. As recently as April 4, 2020, an inmate stated that "[p]eople on my unit still give each other high fives. People still eat and drink each other's food and beverage bottles. Staff do not warn people these things are unsafe." Dec. of Michael Cohen II, ECF No. 26-4, ¶ 51. Additionally, as per Defendants' own argument, three weeks into the COVD-19 pandemic, Defendants were still allowing 40 inmates to congregate in the recreation yard. Given the spread of infection at DOC facilities, such a delayed response is not a sufficient or a timely response to the risk posed to Plaintiffs' health. And, as previously discussed, in their review of the facilities, the amici determined that, as recently as April 12, 2020, as many as 10 to 20 inmates were out of their cells at one time and correctional staff were not able to implement or enforce social distancing practices. Report Submitted by Amicus Curiae, Atch. 1, 20.

Additionally, while Defendants' declarations addressed screening for new inmates and isolation for those who test positive for COVID-19, it remains unclear what steps are being taken to prevent the spread of COVID-19 by those inmates who already reside in DOC facilities and have not yet tested positive for infection. This is especially concerning as Defendants primarily rely on inmates to self-report symptoms in order to determine who may be infected. *Id.* at 9. Plaintiffs have submitted an unrebutted declaration that "at least three DOC staff members … have tested positive and alerted DOC" but "[n]o contact tracing has been done for at least one if not all of the staff members with regard to whether inmates or other staff should be quarantined." Dec. of Michael Hannon, ECF No. 23-11, ¶ 59. Additionally, amici reported one case in which an inmate who worked in the Culinary Unit tested positive for COVID-19. Report Submitted by

19

Amicus Curiae, Atch. 1, 26-27. While that inmate was placed in isolation, the DOC did not attempt to determine whether the contract staff who had worked with that inmate in the Culinary Unit were close contacts of the inmate and should self-quarantine at home for 14 days. *Id.* at 27-28. Additionally, it appeared that "the detail inmate who tested positive was not contacted about any individuals with whom he had close contact." *Id.* at 28.

Plaintiffs have also presented unrebutted evidence that Defendants are slow to respond to those inmates who display symptoms of COVID-19. Multiple PDS attorneys and investigators have reported that their clients display COVID-19 symptoms such as coughs and fevers which have not been adequately addressed by the medical unit. Dec. of Rachel Cicurel, ECF No. 5-2, ¶ 6(b); Dec. of Katherine Kuenzle, ECF No. 5-2, ¶ 4. And, inmates who have requested medical aid for COVID-19 symptoms report long waits for medical care, testing, or separation from the general population. Dec. of D'Angelo Phillips, ECF No. 5-2, ¶ 4 (stating that "it takes days before you get a visit from anyone from the medical unit"); Dec. of Eric Smith, ECF No. 5-2, ¶ 5 ("It takes days before anyone can get medical staff to come see them, even if you say you are having trouble breathing"). According to Plaintiffs' expert, "[t]he failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic." Dec. of Jaimie Meyer, ECF No. 5-2, ¶ 28(d)(ii).

Plaintiffs have also presented evidence that the quarantine unit is not properly sealed off from the general population. An inmate next to the unit explained that air could travel freely between his cell and the quarantine unit. Dec. of Eric Smith, ECF No. 5-2, ¶ 3. And, Plaintiffs have submitted evidence that those in the general population share a television remote control

with those in the quarantine unit. *Id.* at ¶ 4. The lack of separation for those in quarantine is especially concerning due to Plaintiffs' evidence that "[t]he ventilation conditions described in the District of Columbia's Auditor's report … will increase the rate of the spread of the virus." Dec. of Jaimie Meyer, ECF No. 5-2, ¶ 28(c).

In addition to the quarantine unit not being properly secluded, the amici identified several other issues with both the quarantine and isolation units. Anyone entering a quarantine housing unit, except for inmates, is required to wear gloves and a mask at all times. Report Submitted by Amicus Curiae, Atch. 1, 18. Despite this requirement, most of the correctional staff in the quarantine unit wore a variety of masks which they purchased for themselves and were often ill-fitting and soiled. And, generally, correctional staff did not wear gloves. *Id.* Inmates housed in quarantine units are also required to wear masks outside their cells. However, the amici found that the inmates were not consistently wearing their masks and many of the masks did not fit and were soiled. *Id.* Amici did note an abrupt increase the personal protective equipment distributed to correctional officers over the course of their multiple visits. *Id.* at 25. However, this delayed response in providing protective equipment to those working and living in quarantine units is notable.

Amici also highlighted the conditions for inmates living in isolation units. Some inmates have already spent 12 to 15 days in isolation units. Those in the isolation units are not permitted to shower. *Id.* at 22. And, laundry services for inmates in isolation have been limited with some inmates wearing the same soiled clothes for the duration of their stay in isolation. *Id.* Some inmates with sinks in their cells can use those for cleaning, and, as of April 14, 2020, the DOC intended to provide inmates in isolation with body wipes. *Id.* However, these punitive conditions for those in isolation are not acceptable. Additionally, inmates in isolation at CTF are not

permitted to use the telephone for any reason, including legal calls. *Id*. It was unclear whether or not inmates in CDF are permitted to use the telephone. *Id.* As the DOC is primarily relying on inmates to self-report symptoms of COVID-19, the punitive conditions of isolation make it more likely that inmates will hide their symptoms to avoid the potential for isolation and continue to infect others in the general population.

The Court will address one other deficiency highlighted by amici—lack of access to confidential legal calls. As the Court already stated, it appears that individuals in isolation units have no access to telephones. *Id.* And, this issue persists for those in other housing units. Telephone calls in confidential settings are generally organized by DOC case management staff; however, most of those staff are either on quarantine or working remotely. *Id.* at 21. "Thus, as a general matter, there has been no access to confidential legal calls for inmates confined on quarantine and non-quarantine housing units." *Id.* Some inmates have been able to make calls using telephones in the day rooms; however, these calls are monitored and do not afford the confidentiality required to communicate about legal issues with counsel. *Id.*

Based on the current record, Plaintiffs have provided evidence that Defendants are aware of the risk that COVID-19 poses to Plaintiffs' health and have disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus. Again, the Court acknowledges that additional development of the record may show that Defendants are taking sufficient precautions and that Defendants' response continues to evolve. However, on the current record, the Court finds that Plaintiffs have established a likelihood of success in showing deliberate indifference.

### C. **Plaintiffs Show Irreparable Harm**

Next, the court considers whether or not Plaintiffs have made a showing of irreparable harm. "[P]erhaps the single most important prerequisite for the issuance of a preliminary

injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed.2013)). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted, emphasis in original).

Plaintiffs' theory of irreparable harm rests on the risk of contracting COVID-19 and the resulting health complication. The Court concludes that Plaintiffs' risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm. *See Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 766 (9th Cir. 2004) (finding irreparable harm from pain, infection, and possible death due to delayed treatment from the reduction of hospital beds). "Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (citing *Wilson v. Group Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (granting preliminary injunction where cancer patient's "health and future remain[ed] in serious doubt" and insurance would not pay for life-saving treatment)).

Defendants do not appear to contest that the risk of contracting COVID-19 constitutes irreparable harm. Instead, Defendants contend that, "because Plaintiffs fail to make any showing of a specific injury that is not generalized to the inmate population, plaintiffs fail to meet their burden of demonstrating irreparable harm." Defs.' Opp'n, ECF No. 25, 22. However, Defendants

cite no authority for the proposition that, because the threat of COVID-19 infection is widespread among the inmate population, Plaintiffs' threat of irreparable harm is somehow diminished. And, Plaintiffs have produced expert evidence that they are "at a significantly higher risk of infection with COVID-19 as compared to the population in the community" and "at a significantly higher risk of harm if they do become infected." Dec. of Jaimie Meyer, ECF No. 5-2, ¶ 33. The fact that many other inmates face this same risk does not diminish the risk faced by Plaintiffs.

Defendants, as well as society at large, are facing an unprecedented challenge. The risks of contracting COVID-19 are very real for those both inside and outside DOC facilities. However, Plaintiffs have produced evidence that inadequate precautionary measures at DOC facilities have increased their risk of contracting COVID-19 and facing serious health consequences, including death. The Court further notes that the number of inmates testing positive for COVID-19 is growing daily. Given the gravity of Plaintiffs' asserted injury, as well as the permanence of death, the Court finds that Plaintiffs have satisfied the requirement of facing irreparable harm unless injunctive relief is granted.

**D. The Balance of Hardships and the Public Interest Weigh in Plaintiffs' Favor**

The Court moves to the final factors to be considered in granting a temporary restraining order—the balance of the equities and the public interest. In this case, where the government is a party to the suit, the harm to Defendants and the public interest merge and "are one and the same, because the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). The Court finds that the public interest weighs in favor of granting injunctive relief.

First, the Court notes that Plaintiffs have established a likelihood that they will prevail on the merits of their due process and Eighth Amendment claims. And, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted). There is no harm to the Government when a court prevents unlawful practices.

Additionally, granting injunctive relief which lessens the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public health. No man's health is an island. If Plaintiffs contract COVID-19, they risk infecting others inside the DOC facilities. Plaintiffs also risk infecting DOC staff members who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large. Additionally, if Plaintiffs contract COVID-19 and experience complications, "they will be transported to community hospitals— thereby using scarce community resources (ER beds, general hospital beds, ICU beds)." Dec. of Marc Stern, ECF No. 1-1, ¶ 13. As such, ordering Defendants to take precautions to lower the risk of infections for Plaintiffs also benefits the public.

And, the Court finds that the relief which will be granted, to be detailed below, does not impose an undue burden on Defendants. The Court begins by noting that the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). Declarations by DOC officials claim that Defendants are already complying with much of the requested relief. *See, e.g.*, Dec. of Lennard Johnson, ECF No. 2-1, ¶ 6 (housing unit common areas cleaned every two hours during the day and twice each night); ¶ 7 (residents provided proper material to clean cells); ¶¶ 8-9 (each resident provided access to hot running water as well as weekly bar of soap, roll of toilet

paper, and clean linens); ¶ 10 (hand sanitizer available to residents in CTF despite shortage); ¶ 12 (signs posted to alert residents of COVID-19 prevention measures); Dec. of Beth Jordon, ECF No. 20-2, ¶ 8 (DOC medical staff regularly meet with residents to discuss COVID-19 prevention); ¶ 12 (testing for those with specified symptoms). And, the Court does not order Defendants to take precautions that are not already being undertaken by the majority of the population. Moreover, in lessening the number of inmates infected with COVID-19, Defendants actually lessen the healthcare burden that they will be facing in the weeks and months to come.

The Court acknowledges the public interest in permitting the government discretion to carry out its authorized functions. However, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown*, 563 U.S. at 511. The D.C. Circuit has previously authorized injunctive relief against correctional facilities, even where the injunctive relief imposes a particular set of conditions. *See Campbell v. McGruder*, 580 F.2d 521, 551-52 (D.C. Cir. 1978) (finding specific conditions not unduly intrusive because there was "no alternative if the rights of pretrial detainees are to be respected").

For the foregoing reasons, the Court finds that the balance of the equities and the public interest weigh in favor of granting injunctive relief.

**E.  Specific Relief Granted**

While the Court has concluded that, on the current factual record, Plaintiffs are entitled to some injunctive relief, the Court is not granting the totality of the relief requested.

The Court is not ordering the release of any inmates currently detained in DOC facilities. In addition to the many individual release petitions which are currently being filed by DOC inmates, the Superior Court of the District of Columbia has granted District law enforcement the

discretion "to release an individual not otherwise eligible for release … upon approval of the prosecuting authority." *See* Superior Court of the District of Columbia Order, March 16, 2020, available at http://www.dccourts.gov/sites/default/files/Order_3-16-20.pdf. Additionally, based on the authority granted to the DOC by the COVID-Emergency Act amended Section 24-221.0(c) "during a period for which a public health emergency has been declared …, [DOC] shall have discretion to award additional credits" to those serving misdemeanor sentences "to effectuate immediate release of persons sentenced for misdemeanors…consistent with public safety." *See* D.C. Code § 24-221.01c(c) (2020). DOC has since doubled the maximum number of monthly sentencing credits which a misdemeanant may receive from 10 to 20. *See* DOC Change Notice #20-002, March 18, 2020 [19-2], ¶ 2c.

Since beginning these practices, all but nine misdemeanants have been released from custody. April 15, 2020 Tr., ECF No. 45, 72: 22-23. Eight of those misdemeanants have been considered for release and denied, and one misdemeanant has not requested release. *Id.* 72: 24-73: 3. Based on the actions of D.C. Superior Court, Plaintiffs agree that the release of misdemeanants is no longer at issue in this case. *Id.* at 73: 15-18. As such, the Court does not find that injunctive relief on this ground is appropriate at this time. For this same reason, and due to ongoing processes for assessing individual inmates for release, the Court is not granting Plaintiffs' request for an expert in prison population reduction at this time.

However, the Court does grant the following injunctive relief, in line with the amici recommendations. In light of the medical surveillance and monitoring that is occurring currently in the quarantine units, Defendants shall ensure that the triage process associated with sick call requests on the non-quarantine units is expedited and reflects appropriate sensitivity to the wide variety of symptoms associated with COVID-19 disease. Correctional officers and other staff

who are in contact with inmates should ensure that the medical staff are promptly informed about inmates who present with symptoms of COVID-19 and medical staff should respond to the housing unit on an expedited basis. Any inmate grievances that include allegations of delay in medical assessment should be prioritized and submitted to the DOC medical director immediately. Additionally, in light of the fact that the DOC is relying on inmates to self-report symptoms of COVID-19, Defendants shall provide better documentation as to the dates and times of sick calls and urgent care calls, the inmates' reported symptoms, the dates and times the inmates are seen by medical professionals, and the outcomes to allow for better tracking of the response to inmates' complaints of COVID-19 symptoms.

If the Defendants are not already doing so, they shall that ensure that cell restrictions are appropriately monitored, tracked, and corrective action is undertaken on an expedited basis if warranted.

In instances in which inmates are transferred from the intake unit to a different unit before the 14-day quarantine period expires, Defendants shall ensure that appropriate housing, surveillance and monitoring is afforded to the inmate in the receiving unit.

Defendants shall consult with public health professionals regarding strategies that can be implemented to strengthen the COVID-19-related education program for both staff and inmates. Moreover, Defendants shall explore appropriate supports that can be provided on an expedited basis to both staff and inmates who are living and working in an extremely stressful and high-risk environment and are at substantial risk of exposure.

Defendants shall conduct additional staff training on the use of the non-touch, infrared thermometers consistent with manufacturer guidelines and provide guidance to staff regarding what to do when thermometers produce results that appear on their face to be inaccurate.

Defendants shall take immediate steps to provide consistent and reliable access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status.

Defendants shall ensure appropriate and consistent implementation of social distancing policies by addressing limitations in current staffing levels, supervisory oversight of line staff, and provide enhanced education related to the importance of social distancing.

Defendants shall communicate clear expectations, in writing, to correctional staff about the types of PPE required to perform the various supervision and operational functions that are conducted throughout the facility, including the PPE they should expect to be given on each shift for each specific category of post assignment; the proper donning, doffing and disposal of the PPE; and an explanation of the related rationale. Clear communication to staff regarding differences in risk exposures and providing consistent PPE over time could help lower anxiety levels among staff.

In addition, Defendants shall also ensure that all PPE issued is properly fitted. For example, N95 respirators must be properly fitted to ensure that they provide the intended protection. During the site visits that amici conducted, none of the correctional staff who were wearing N95 respirators in isolation units reported that they had been fitted for the respirators.

Defendants shall ensure that all DOC staff receive instruction on the proper disposal of PPE, and appropriate and accessible receptables for immediate disposal must be readily available. During the site visits, amici observed that receptables for disposal of PPE were not accessible on a consistent basis, including to staff assigned to isolation units at the CTF.

There is a critical need for the defendants to strengthen the environmental health and safety program at both the CDF and the CTF. It is recommended that the DOC immediately

retain a registered sanitarian to oversee the environmental health and safety programs at both facilities and provide training so that cleaning tools and products are used properly. A registered sanitarian should bring the appropriate knowledge, oversight, and quality control necessary to mitigate at least some of the critical public health concerns that are evident in both facilities.

In addition to engaging a sanitarian, supervisory correctional staff must ensure that housing unit staff properly manage the work performed by the inmate detail workers. In order to accomplish that goal, correctional staff and detail workers require guidance from a sanitarian trained to oversee the facility's environmental health program.

In addition to engaging a sanitarian, the defendants shall consider contracting for professional cleaning services on the non-secure side of the facility at least until a sanitarian is hired to bolster the existing environmental health and safety program at both facilities. Additionally, proper cleaning supplies that have been sanitized regularly shall be immediately provided to each unit, and a schedule for cleaning common areas and cells shall be established and enforced.

Defendants shall reduce the extent to which common spaces encourage inmates to congregate in close quarters (e.g., around a single television in a small enclosed area, or next to one another in order to use telephones that are mounted closer than six feet apart). The effectiveness of this strategy would increase if Defendants were to consistently apply their stated policy of allowing no more than small groups of inmates out of their cells at any given time. Whatever strategies Defendants adopt, increased active and direct supervision will be required by both housing unit correctional officers and the midlevel managers responsible for overseeing and supporting the correctional officers assigned to housing units. Enforcing social distancing standards as a public health measure is a new responsibility for correctional staff and they must

be supported as they adjust to this new role. Moreover, Defendants shall assess whether any additional security staff are needed to provide appropriate supervision, on a unit-by-unit basis, taking into consideration the layout of the housing units, the number of inmates housed on the units, and the security designation of the unit, in order to enforce social distancing policies.

Finally, Defendants shall ensure that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters.

As relief, the Court has adopted in general the recommendations set out by the amici in their final report. The Court has not set out each detail in the report which supports these recommendations. However, the Court expects Defendants to address those specific deficiencies set out in the final report, which support the recommendations, and to rectify those deficiencies.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' [5] Motion for a TRO is GRANTED IN PART AND DENIED IN PART.  Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of the hardships and the public interest weigh in their favor. Accordingly, Plaintiffs are entitled to the injunctive relief which is detailed above. However, the Court finds that some of the relief requested by Plaintiffs, such as the immediate release of inmates and the appointment of a downsizing expert, is inappropriate at this time on the current factual record.

An appropriate Order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
