# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EDWARD BANKS, *et al.,*

              Plaintiffs,

    v.

QUINCY BOOTH, in his official capacity
as Director of the District of Columbia
Department of Corrections, *et al.,*

              Defendants.

No. 1:20-cv-849 (CKK)

## REPORT SUBMITTED BY *AMICUS CURIAE* PURSUANT TO APRIL 9, 2020 CONSENT ORDER*

Pursuant to the April 9, 2020 Consent Order issued in the above-captioned matter, *Amici*, Grace M. Lopes and Mark Jordan, submit the following report for the Court's consideration.

## I.  INTRODUCTION

On April 9, 2020 *amici* were appointed to provide specific information to the Court regarding medical services and environmental health and hygiene at two detention facilities operated by the District of Columbia Department of Corrections ("DOC"), the Central Detention Facility ("CDF") and the Correctional Treatment Facility ("CTF").  In the wake of the order, *amici* collected and analyzed data obtained from site visits at both facilities; conducted structured interviews with DOC managers, line staff, inmates, and contractors; reviewed electronic health records; and analyzed multiple electronic datasets extracted from information management

---

\* This filing corrects two typographical errors that appear in the version of this report that was submitted to the Court and the parties on April 18, 2020 by deleting the word "not" in line three on page 25 and substituting the word "secure" for "non-secure" in line eight on page 33.

systems maintained by the DOC or its contract services providers.  On April 15, 2020, *amici* participated in a teleconference with the Court and the parties and provided a preliminary summary of their findings, which are explained in greater detail below.  At the conclusion of the teleconference, the Court directed *amici* to include in this report recommendations regarding issues that *amici* have identified.

This report describes the methodology *amici* relied upon to conduct their assessment, the facilities subject to the assessment, and *amici's* findings and recommendations related to the questions delineated in the April 9, 2020 order.  Throughout this one-week investigation, the defendants have fully cooperated with *amici's* requests for information and actively facilitated *amici's* work.  DOC and contract staff at every level, as well as representatives from the Office of the Attorney General, have made themselves available on short notice, on every day of the week, and well after traditional officer hours.  Data reports and other records were produced on abbreviated timelines.  *Amici* acknowledge and appreciate the efforts the defendants have made to cooperate with and expedite their review.

## II. METHODOLOGY

Following the issuance of the April 9, 2020 order, *amici* reviewed the documents identified in the order and conducted unannounced and unescorted site visits on multiple shifts at both the CDF and CTF on April 10, 11, and 12, 2020.  During the site visits, at both facilities *amici* visited general population, maximum and medium security housing units, including housing units on isolation or quarantine status, as well as intake, special management, and mental health units.  Seven housing units at the CDF (S1, NW1, S2, NE2, N3, NE3, and N2) and five housing units at the CTF (D2A, D1B, C2A, C2B, and C4B) were visited.  Observations in housing units included cells, dayrooms, restrooms, and shower facilities.  At both facilities,

medical units (including the CTF infirmary), visitor entry areas, Command Centers, and the Culinary Unit at the CDF,[1] were visited.

Structured in-person interviews were conducted with the DOC Medical Director, the Medical Director and Deputy Medical Director for Correctional Health at Unity Health Care, Inc. ("Unity"),[2] the CDF/CTF Warden and his deputies, and dozens of correctional officers assigned to various posts throughout the facilities, including housing unit, environmental, and culinary posts.  In-person interviews were also conducted, in groups and individually, with over 100 inmates on isolation and quarantine status as well as in the general population at both facilities.

In addition, *amici* conducted informal in-person or telephone discussions with Unity staff, including infection control staff and managerial clinical health care providers, to obtain and/or verify information.  A range of DOC managers and staff with responsibility for administrative matters, including cleaning, hygiene and medical supplies, data management and analysis, warehouse functions, contractual cleaning services and human resources were also contacted and provided information that is reflected in this report.

In addition to the information collected during site visits and from interviews, *amici* requested and received access from the DOC to the electronic health records of inmates confined at the CDF and CTF.[3]   Review and analysis of samples from these records has been conducted

---

[1]  The Culinary Unit at the CTF was not operational at the time of the site visits and as a result the Culinary Unit at the CDF has been servicing both facilities.

[2]  Unity provides medical services on a contractual basis to inmates at the CDF and CTF.

[3]  Case record reviews were conducted by Janet Maher, an additional member of the team *amici* assembled.  Ms. Maher is an attorney who has extensive experience in working in institutional and health-care settings.  Ms. Maher headed the Office of Corporation Counsel's Mental Health Division from 1992 to 2000, worked as Deputy General Counsel and Chief of Staff for the District's Child and Family Services Agency from 2000 to 2007 and as DOJ Compliance Officer at Saint Elizabeths Hospital from 2007 to 2014.  From 2013 to her retirement in 2016, she headed the Hospital's Performance Improvement Department.  She also has provided consultative services to the Maryland and Pennsylvania behavioral health systems and to the Special Arbiter appointed by the Superior Court in *Jerry M. v. District of Columbia*, Superior Court of the District of Columbia, C.A. No. 1519-85.

and the results are described below.  The following data were also obtained from the DOC and

analyzed:

- Admissions data for both facilities for the period February 15, 2020 to April 10, 2020;
- Daily census data, including inmate housing assignments, for the period February 15, 2020 to April 13, 2020;
- Data related to sick call requests for the period February 5, 2020 to April 12, 2020;
- Data related to all COVID-19 tests conducted on inmates housed at both facilities through April 10, 2020;
- Data related to all urgent care encounters for the period February 15, 2020 through April 15, 2020;
- Inventory data for cleaning supplies as of April 13, 2020;
- Inventory data for personnel protective equipment as of April 17, 2020; and
- Data related to cleaning supplies and soap deliveries to both facilities for the period December 31, 2019 to April 13, 2020.

Aggregated data related to DOC correctional staffing levels was also reviewed and is

addressed below.

### III.  BACKGROUND

The CDF is a multi-story, secure detention center.  Recent population levels have

hovered near 1020 inmates.  The facility has 18 housing units, which are both single and double

celled.  Analysis of DOC housing data shows that as of April 13, 2020, 43 percent of the inmates

housed at the CDF were housed in single cells and 56 percent were housed in cells with another

inmate.[4]  At the time of *amici's* site visits, 16 housing units were open and two were closed.  Of

the 16 open housing units, two were quarantine units and one was an isolation unit.[5]  Cellblocks

are divided into two sides, and for most of the facility's housing units, each side contains two

tiers with 20 cells per tier.[6]  All cells at the CDF are "wet" cells, *i.e.,* they have toilets and sinks.

---

[4]  Ex. 1, Table, Number of Cells Housing One Inmate and Two Inmates at the Central Detention Facility, March 15 – April 13, 2020.  Two inmates did not have a recorded cell assignment.

[5]  The number of quarantine and isolation units is, of course, variable.  It is *amici's* understanding that since the time of their site visits additional quarantine units have opened.

[6]   There are two exceptions:  N1 is a restrictive housing unit with 72 cells and NE3 is a mental health step down unit with 36 cells.

Each cellblock tier of 20 cells has two showers, which are shared by inmates housed in the unit and located in a common area.  The CDF Culinary Unit, which is operated by a contractor and up until April 11, 2020 employed inmate workers, currently supports the food service program for both the CDF and the CTF.[7]

The CTF, which had a population of approximately 400 inmates at the time of *amici's* site visits, has 25 housing units.[8]  Eighteen have a capacity of 50 beds, four have a capacity of 96 beds, and one has a capacity of 65 beds.  There are two additional medical housing units and two special management units that have varying capacities and are not intended for general population housing.  As of April 13, 2020, 95 percent of the inmates at the CTF were housed in single cells.[9]  With the exception of eight housing units,[10] all of the CTF's housing units have wet cells.  At the time of *amici's* site visits, nine housing units were closed and there were eight quarantine units and three isolation units.  The isolation units and seven of the eight quarantine units operating at the time of *amici's* site visits have wet cells.  The CTF also has a 30-room infirmary with 40 beds.  The infirmary serves both facilities.

As of April 16, 2020, the DOC reported that 130 inmates have been tested for COVID-19 and a total of 65 inmates have been confirmed positive, 57 at the CTF and eight at the CDF.  Forty-three have tested negative, 22 are currently on isolation units and forty-three have recovered.  One inmate died while hospitalized and none are currently hospitalized.  Data

---

[7]  The CTF has a separate Culinary Unit that is responsible for that facility's food service program.  At the time of *amici's* site visits, DOC staff reported that the Culinary Unit at the CTF was closed due to a COVID-19 issue.  *Amici* have confirmed that the food service program at the CTF is not operational and that the CDF Culinary Unit is now supporting the food service program at the CTF.  *Amici* have not had an opportunity to confirm the date the CTF Culinary Unit closed, but staff reported it had been up to several weeks before the site visit.  The closure of the CTF Culinary Unit has put evident strain on the food service program at the CDF.

[8]  This total includes two special management units.  Inmates are also housed in a limited mobility medical unit and the infirmary.

[9]  Ex. 2, Table, Number of Cells Housing One Inmate and Two Inmates at the Correctional Treatment Facility, March 15 – April 13, 2020.

[10]  Three of the eight housings units that do not have toilets and sinks were open during the site visits.

regarding the number of DOC staff who have tested positive for COVID-19 have not been

provided. One member of the DOC correctional staff died earlier this week.  Not surprisingly, as

evidenced by the findings set out below, the COVID-19 pandemic has presented formidable

challenges for the defendants and had a significant impact on operations at both the CDF and the

CTF.

## IV.  FINDINGS AND RECOMMENDATIONS

*Amici's* findings and recommendations related to the questions delineated in the April 9,

2020 order are set forth below.

### A.    MEDICAL

**Question One:  When residents display COVID-19 symptoms, as defined by the CDC, are they seen by medical staff?**

**Question Two:  When residents display COVID-19 symptoms are they tested for COVID-19?**

**Question Three:  Are there requests for a sick call based on suspected COVID-19 symptoms where there is no response?**

**Question Four:   Is the response time for sick call requests of suspected COVID-19 symptoms for a resident to be seen by medical staff reasonable (assuming time of request and response time are recorded)?**

Questions One through Four address the identification of inmates who display symptoms

or who are suspected of having contracted COVID-19 and whether those inmates have access to

timely health assessments, services, and COVID-19 testing, as indicated.  As discussed below,

*amici* were not able to address Questions One through Four directly because the available

healthcare datasets did not enable identification of either the universe or representative samples

of inmates displaying symptoms or suspected of having contracted COVID-19.  *Amici* therefore

attempted to identify the mechanisms by which inmates with COVID-19 symptoms are identified

by medical staff and reviewed a sample of the electronic health records of inmates who had been tested for COVID-19 to assess timeliness and scope of service delivery in those cases.

In order to evaluate DOC performance relative to these questions, *amici* relied on multiple sources of information including the following:  interviews with DOC and contract medical staff, including executive staff; interviews with inmates; interviews with correctional officers; custom data reports from Unity's electronic health record system, including data regarding sick call requests and encounters and urgent care encounters; data regarding all COVID-19 testing conducted on inmates at the CDF and CTF through April 10, 2020; data regarding all sick call requests and encounters between February 5, 2020 and April 12, 2020;[11] data regarding all urgent care encounters between February 15, 2020 and April 15, 2020; and, two random samples of individual inmate health records, one drawn from the population of inmates tested for COVID-19 through April 10, 2020, and the second from a dataset of all sick call requests submitted between March 1, 2020 and April 12, 2020.[12]

According to medical staff, the two primary methods by which inmates access health care are through a sick call process, in which inmates complete a written sick call form and insert it into a locked box on their housing units and an urgent care process, whereby an inmate can inform a correctional officer that s/he would like to see medical staff.[13]  According to medical staff, in these circumstances the correctional officer contacts the medical unit and a nurse, in consultation with a medical provider,[14] triages the telephone call and either instructs the

---

[11]  In some cases, clinical encounters are recorded as sick call visits, but they do not have an associated written sick call request.  Medical staff have explained that when they visit housing units to conduct sick call, they allow inmates who did not submit sick call requests to access services.

[12]  Records of 28 of the 83 inmates who were tested as of April 10, 2020 were reviewed.  In addition, records of 40 inmates who submitted sick call requests during the review period were reviewed.  There were no overlapping cases in the two samples.

[13]  There are also chronic care clinics operating Monday through Friday at both the CDF and CTF for inmates with chronic health conditions.

[14]  Advanced medical providers are considered to be MDs, DOs, nurse practitioners, and physician assistants.

correctional officer to have the inmate escorted to the medical suite or schedules the inmate for sick call on the next day.[15]

*Amici* initially analyzed sick call request data for the period between February 5, 2020 and April 12, 2020 to assess whether the data could be used to identify sick call requests for CDC-defined COVID-19 symptoms (*i.e.*, fever, cough, and shortness of breath) and thereafter to assess the time from the request to the time of any responsive medical evaluation.  The data included a total of 6,840 records.

For two principal reasons, *amici* determined that these data could not be used as the basis for findings related to identification of inmates with COVID-19 symptoms and assessment of the timeliness of their access to medical services.  First, nearly 5,000 of the records did not include a description of the symptoms for which the inmate requested medical care, making it impossible to identify either the universe of or a representative sample of inmates with COVID-19 symptoms.[16]  Second, *amici* reviewed data regarding all 83 COVID-19 tests administered to inmates through April 10, 2020 and cross referenced the names of the tested inmates against sick call request records.  Of the 83 inmates tested, 69 did not submit a sick call request at any point between February 5, 2020 and the date of their test.  Based on a  review of a sample of electronic health records of the 13 inmates who tested positive for COVID-19 for whom there was a record of a sick call request between February 5, 2020 and the date of their test, *amici* found that the sick call request was not associated with COVID-19 symptoms in any of the cases.

---

[15]  Triage decisions require symptomatic information from the patient.  Medical staff stated that at times the correctional officer will allow an inmate requesting urgent care to speak directly with the nurse and at times the inmate informs the correctional officer of their symptoms and the correctional officer reports that information to the nurse.  It is not appropriate to require inmates to disclose health information to correctional staff in order to access medical services.  The possibility of doing so could deter inmates from seeking necessary medical care.

[16]  For example, the relevant data field in many cases recorded "initial visit," "follow-up visit," or "SC [sick call] slip."

However, based on *amici's* review of data related to inmates tested for COVID-19, it appeared that most inmates displaying symptoms or suspected of having contracted COVID-19 were presenting to medical staff by a method other than through the submission of a sick call request.  Managers of the DOC medical program confirmed this impression.  One manager stated that the first positive COVID-19 cases were identified after inmates presented to health care staff through the urgent care process.  Once they were confirmed positive for COVID-19, the DOC began to quarantine housing units in which the COVID-19 positive inmates were housed as a containment precaution.  Medical staff implemented a practice of monitoring quarantined inmates' temperatures twice daily and reported that this daily surveillance process identified multiple subsequent positive COVID-19 cases, principally at the CTF.

Medical staff members stated that inmates who are not subject to daily monitoring in a quarantine unit also are most likely to be identified as having symptoms of COVID-19 through the urgent care process.  Accordingly, *amici* obtained and analyzed data regarding urgent care encounters at the CDF and CTF for the period February 15, 2020 through April 15, 2020.  The data indicate that during that period there were a total of 3,439 urgent care encounters, 2,488 at the CDF and 951 at the CTF.[17]  In comparison, over approximately the same time period there were a total of 5,244 sick call requests and encounters, 4,360 at the CDF, 525 at the CTF, and 359 at locations that could not be determined from the available data.[18]  Based on these totals, it appears that during the period reviewed urgent care represented 40 percent of the combined volume of sick call and urgent care encounters, and sick call represented 60 percent of the total.

---

[17]  Ex. 3, Chart, Urgent Care Visits at Central Detention Facility and Correctional Treatment Facility, by Day, February 15 – April 15, 2020.
[18]  Ex. 4, Chart, Sick Call Requests and Encounters, by Day, February 15 – April 12, 2020.

To assess whether inmates with symptoms of COVID-19 utilize the urgent care process, *amici* analyzed the urgent care dataset for any references to the term "COVID." The data indicate that the first reference to COVID-19 in the data was on March 15, 2020 at the CDF (for an inmate who was later ruled out for COVID-19), and March 21, 2020 at the CTF. Beginning on March 26, 2020, there were nearly daily and steadily increasing references to COVID-19 in the urgent care encounter data.[19] Thus, it appears that inmates who are not housed in quarantine units are using the urgent care system to present with COVID-19 symptoms to medical staff at the CDF and CTF.

Given time constraints, it was not possible for *amici* to assess how accessible the urgent care system is to inmates. Available data sources included only records of completed visits and do not reflect attempts to access the system. Numerous factors could impact inmate access to the urgent care system, including the availability of escort staff, willingness of correctional officers to facilitate calls to medical staff while they perform other duties on the unit, and the willingness of inmates to disclose confidential health information when they are within earshot of non-medical staff.

Notwithstanding the evidence that most inmates with symptoms or who are suspected of having contracted COVID-19 appear to present to medical staff by a method other than sick call, in order to evaluate and to assess the responsiveness of the sick call process more generally, in the instances in which inmates submit sick call requests, *amici* assessed whether those requests are collected and the inmate is seen by medical staff on a timely basis. *Amici* selected a random sample of 41 sick call requests submitted by inmates between March 1, 2020 and April 12, 2020

---

[19] Ex. 5, Chart, Urgent Care Medical Encounters With Clinical Summary Descriptions Including the Word "COVID," by Day, February 15 – April 15, 2020. The data appear to include daily follow-up assessments of isolated inmates, which explains in part the dramatic increase in volume over time.

and reviewed the individual health records associated with each request.  One sick call request was excluded from the analysis.[20]  Of the 40 requests reviewed, 31 included a date of request recorded by the inmate.  Of those 31 requests, 26 included a time stamp reflecting when medical staff collected the form. The time stamp was used to analyze the time that elapsed between the date recorded by the inmate on the sick call request form and the date of pick up.  Of those 26 requests, 23 requests, 89 percent, were collected within one day.  The remaining three were collected within two, four, and 14 days respectively.

Among the 31 requests that included a date of request recorded by the inmate, review of the corresponding electronic health records indicate that 23 inmates were seen within three days of submitting their request, 74 percent.[21]  One inmate was seen six days after the request was made.[22]  In two instances involving the same inmate, the inmate was seen every day for ten days for adult preventative care relating to COVID-19 exposure, but the notes in the electronic health records documenting these encounters do not specifically address the issue reflected in the inmate's sick call request.  The other three requests were scheduled for appointments, but the inmates were not seen.[23]  Two requests that were recorded as scheduled for appointments were cancelled.[24]

*Amici* also assessed whether the issue raised by the inmate in his or her sick call request was addressed by the medical provider.  In the 33 cases in which the inmate was seen by a medical provider, the medical provider addressed the specific request made by the inmate in 28

---

[20]  One of the cases sampled was excluded because the corresponding written request form was not available for review.
[21]  In 22 of the 23 cases the inmates were seen within two days and in one case the inmate was seen within three days.
[22]  The inmate requested treatment for tooth pain.
[23]  In the three cases, the health record noted that the sick call appointment was cancelled because the inmate was in court, was "unavailable" or was a no show.
[24]  In one case an inmate indicated he had a "possible" broken finger and in the second the inmate requested fungal cream.

cases, 85 percent.  In some cases the inmate was referred to specialty providers, but in most

cases the inmate received interventions intended to provide immediate relief.  In a minority of

cases the specific intervention requested by the inmate was not provided but the clinical basis for

the decision was reflected in the record.

**Recommendation**:   In light of the medical surveillance and monitoring that is occurring

currently in the quarantine units, defendants should ensure that the triage process associated with

sick call requests on the non-quarantine units is expedited and reflects appropriate sensitivity to

the wide variety of symptoms associated with COVID-19 disease.  Correctional officers and

other staff who are in contact with inmates should ensure that the medical staff are promptly

informed about inmates who present with symptoms of COVID-19 and medical staff should

respond to the housing unit on an expedited basis.  Any inmate grievances that include

allegations of delay in medical assessment should be prioritized and submitted to the DOC

medical director immediately.

**Question Five:  Are residents suspected of COVID-19 isolated from other people?**

Health care staff reported that if an inmate is suspected by a medical provider of having

contracted COVID-19, a request for testing is made to the D.C. Department of Health.  As of

April 10, 2020, all requests for testing made on behalf of DOC inmates had been approved.

Heath care staff report that pending the testing results, the inmate is placed on cell restriction in

their housing unit.

There is evidence that cell restriction practices are being implemented.  The sample of

electronic health records of inmates who tested positive for COVID-19 that *amici* reviewed

document cell restriction orders entered by medical staff at the time COVID-19 testing was

ordered by the provider.  Inmates on isolation status at both facilities reported being placed on

cell restriction prior to testing and before being moved to an isolation unit. During site visits *amici* noted that there were inmates on cell restriction status in some housing units. Correctional officers assigned to housing unit posts who were interviewed by *amici* reported that inmates who are on cell restriction are not permitted to leave their cells for any reason.

Moreover, health care and facility management staff report that in instances in which an inmate tests positive for COVID-19, the inmate is moved to an isolation unit. According to those staff, only inmates who have tested positive for COVID-19 are housed in isolation units. DOC records indicate that as of April 10, 2020, 82 inmates were tested for COVID-19. Of the 82 inmates, 52 were COVID-19 positive, 26 were negative, and the balance were pending results. *Amici* reviewed a sample of 28 health records reflecting positives, negatives and pending test results. There were 16 COVID-19 positives in the sample. *Amici's* review of DOC housing records for this cohort indicates that all of the 16 inmates in the sample who tested positive were moved from their housing unit to another housing unit within no more than two days, and most within one day of the positive test result. Based on what *amici* have learned about current DOC business practices, it is likely this cohort was on cell restriction status at the time of testing before being moved to an isolation unit.

Accordingly, although *amici* have not had an opportunity to conduct a systematic review related to the implementation of cell restriction orders, it appears that inmates suspected of having COVID-19 are placed on cell restriction and isolated from other inmates.

**<u>Recommendation</u>**:   If the defendants are not already doing so, they should that ensure that cell restrictions are appropriately monitored, tracked, and corrective action is undertaken on an expedited basis if warranted.

**Question Six:  Are new residents who enter DOC quarantined for 14 days?**

DOC facility executives and medical staff reported a practice of quarantining newly

admitted inmates for a 14-day period prior to moving them to another housing unit.  To assess

whether this practice was being implemented *amici* analyzed intake and housing data for the

period from March 15, 2020 to April 10, 2020.  The data indicate that starting March 25, 2020

the defendants implemented a practice of housing new admissions on SO2, the intake unit at the

CDF, for 14 days, or until the inmate was released from custody, if the release occurred prior to

the expiration of the 14-day period.

*Amici* identified six instances after March 25, 2020 in which an inmate was moved out of

the intake unit prior to the end of the 14-day period.  Five of the six cases involved inmates who

were placed on a specialized mental health housing unit before the 14-day quarantine period was

completed.[25] *Amici* were not able to determine whether these six inmates were placed on cell

restriction after being moved to a non-intake housing unit.  *Amici* alerted Unity's medical

director of these six transfers so that a determination can be made about the propriety of the

transfers and any special precautions that should be implemented on the receiving housing units.

**Recommendation**:  In instances in which inmates are transferred from the intake unit to a

different unit before the 14-day quarantine period expires, defendants should ensure that

appropriate housing, surveillance and monitoring is afforded to the inmate in the receiving unit.

---

[25]  The sixth case involved an inmate who was moved to a special management housing unit and subsequently to a
less restrictive mental health housing unit.

**Question Seven:  How frequently do DOC medical staff and/or Unity Health Care staff meet with DOC staff and residents to inform them about COVID-19 symptoms and precautions, and what information is conveyed?**

Unity providers and the DOC Medical Director report that they have conducted multiple education sessions on the housing units and during roll call at both facilities.  They indicate that these sessions focus on COVID-19 symptoms and infection-control precautions.  More extensive individualized education and counseling is provided on the quarantine and isolation units, which are visited at least twice daily by health care providers.  Signage explaining COVID-19 symptoms and precautions is displayed in many common areas throughout both facilities.  Nevertheless, the need for more intensified education of staff and inmates is apparent.  Most, albeit not all, of the correctional staff and supervisors interviewed expressed substantial concerns about working in the facility in light of what they perceive as their increased risk of contracting COVID-19.  Virtually all of the inmates interviewed outside of isolation units expressed fear that they would contract the virus and many of those who tested positive expressed fear that they would relapse or become infected again.

<u>**Recommendation**</u>:  The defendants should consult with public health professionals regarding strategies that can be implemented to strengthen the COVID-19-related education program for both staff and inmates.  Moreover, the defendants should explore appropriate supports that can be provided on an expedited basis to both staff and inmates who are living and working in an extremely stressful and high-risk environment and are at substantial risk of exposure.

**Question Eight:   What visitor screening is conducted? Do the thermometers used for visitor screening work and are they used properly?**

Upon entry to the two facilities, all staff and visitors are required to have their temperature checked and to complete a written questionnaire with three questions.  The three questions correspond to the CDC-defined symptoms of COVID-19 (*i.e.,* fever, cough, and

shortness of breath).  An earlier version of the screening questionnaire included questions

pertaining to recent travel to areas of the world with known COVID-19 outbreaks and known

contacts with individuals with COVID-19.  The DOC has updated its visitor and staff screening

questionnaire in response to evolving knowledge about COVID-19.

The defendants use non-contact, infrared thermometers at the entrances of both the CDF

and the CTF.  According to the manufacturer's instructions the device is calibrated at the factory

and calibration by a user is not necessary.  One *amicus* recorded eight temperature readings at

the two facilities, five at the CDF and three at the CTF and observed that two of the readings,

both on the same night at the CDF, appeared to be inaccurate.[26]  In both cases, the temperature

reading was taken immediately adjacent to an external door and the ambient temperature outside

the facility was substantially colder than the temperature inside the facility.

The manufacturer's instructions for the thermometer indicate that users should "avoid

drafts."[27]  It seems probable that user error may be resulting in some false temperature readings

by the staff who are screening visitors.  Medical staff report that they also use non-touch,

infrared thermometers in their medical practice at both facilities.  *Amici* have not had an

opportunity to determine whether the thermometers used at visitor entry points are the same

model of thermometers that are used by the medical staff.  However, review of electronic health

records also identified a number of questionably low temperature readings.[28]

**Recommendation:**  *Amici* recommend that defendants conduct additional staff training on the use

of the non-touch, infrared thermometers consistent with manufacturer Guidelines and provide

---

[26]  In both instances the temperature registered in the low 90 degrees.  After the second apparently incorrect reading, *amicus* requested that another reading be taken approximately 30 seconds later, and the thermometer registered what appeared to be an accurate temperature reading.
[27]  The instructions also state that "if there is a significant change in the surrounding temperature, allow the thermometer to adjust to the 'new' temperature for at least 15 minutes before use in order to obtain a reliable result."
[28]  In reviewing health records, *amici* also noted several instances of unusually low temperatures recorded on flow sheets or on assessments, with some as low as 93 or 94 degrees.

guidance to staff regarding what to do when thermometers produce results that appear on their face to be inaccurate.

**Nine:    How do the conditions of the quarantine housing compare to conditions in nonquarantine housing, and are residents deterred from reporting symptoms?**

As explained in detail below, except for the isolation units, quarantine housing units are intended to operate like all other types of housing units except for twice daily monitoring of inmates by medical staff and the use of specified PPE.

### A.  Daily Monitoring and Specified PPE

While both facilities have different types of specialized housing,[29] three broad categories of housing are implicated by Question Nine:

- Quarantine housing;
- Isolation housing; and
- Non-Quarantine/Non-Isolation housing (*i.e.,* general population or some type of special housing unit)

The DOC began operating quarantine housing units in March 2020.  These units are designated for the following inmates:  inmates suspected of having COVID-19 and inmates who are asymptomatic but determined to have been exposed to someone who has tested positive. Health care staff report that when one inmate on a housing unit tests positive, every inmate in the housing is quarantined on the unit.  Moreover, staff who have been assigned to the unit are released from duty for a 14-day self-quarantine period.  There is a reported practice of maintaining each discrete cohort of quarantined inmates separately.  The anecdotal evidence suggests that there may be deviations from this practice; however, *amici* have not had an

---

[29]  For example, both the CDF and CTF have special management units and the CDF has mental health and mental health step down units.

opportunity to explore this issue.  Additionally, *amici* have not had an opportunity to confirm the

quarantine procedures that are implemented when DOC staff who are assigned to posts with

inmate contact test positive for COVID-19 (*i.e.*, whether inmates are quarantined after exposure

to a staff member who is known to have contracted COVID-19).

According to the current DOC policy guidance, quarantine housing units should operate

like all other housing units except for the isolation units, in all respects except two: 1) inmates

housed in quarantine units have their temperatures monitored by medical staff twice daily; and 2)

except for inmates -- who are required to have masks -- anyone entering a quarantine housing

unit is required to wear gloves and a mask at all times.[30]  During the site visits *amici* conducted

at multiple quarantine units in both facilities, for the most part the correctional staff wore a

variety of masks that they had purchased for themselves.  In some instances, the masks were ill-

fitting and in poor condition.  As a general matter, the correctional staff were not wearing gloves.

DOC policy requires inmates housed in a quarantine unit to wear masks whenever they

are outside of their cells.  Many inmates housed in the quarantine units that *amici* visited had

masks, but they were not consistently wearing them nor were they required by the correctional

staff to do so.  In some instances, the masks were ill-fitting, visibly soiled, and ripped.

In contrast to the quarantine units, inmates and staff on non-quarantine units did not have

masks during the site visits *amici* conducted.[31]  The defendants did not have sufficient quantities

of masks for staff or inmates during March; however, as explained in the next section of this

report, the DOC received a shipment on April 10, 2020, and on the next day began issuing masks

to staff at roll call.  The defendants report that earlier this week, subsequent to *amici's* site visits,

---

[30]  *See* §VII. Medical Restrictive Housing Unit (Quarantine), Post Order, dated March 28, 2020.
[31]  A small number of inmates who indicated that they had serious medical conditions had masks that were obtained
from health care providers.

they began to replace masks for inmates on a daily basis and are now providing masks to all inmates on all housing units.  On April 14, 2020, the defendants reported that they are now requiring all staff and all inmates to wear masks.  *Amici* have not had an opportunity to confirm these representations.

### B.  Conditions in Quarantine and Other Units Except Isolation

#### 1.  Cell Restriction

The defendants implemented a Medical Stay in Place policy directive on April 4, 2020.[32] Pursuant to the directive, as of April 4, 2020, inmates housed in quarantine and other housing units, except for isolation units, have been restricted to their cells except for 30 minutes each day for phone calls, showers and cleaning their cells.  The directive provides contradictory information regarding out-of-cell time.  In relevant part it states that inmates "will largely be restricted to their cells with the exception of a modified recreation schedule, where groups no larger than five are out at any one time."[33]  However, the directive also requires staff to "[s]top all group activities and minimize the number of residents participating in recreation on tier (no more than 10 at a time)."[34]  It also states that inmates are required to "practice social distancing of six feet to the fullest extent possible."[35]  According to facility management, at some point after the policy was issued, it was modified to require one hour of out-of-cell time; however, during site visits many correctional staff and inmates *amici* interviewed were unaware of this change. Indeed, inmates consistently commented that it is not really possible to shower, make one phone call and clean a cell in 30 minutes.

---

[32] Ex.6, Medical Stay in Place, effective April 4, 2020.
[33] *Id.* at 1.
[34] *Id.* at 2.
[35] *Id.* at 1.

During site visits to quarantine and non-quarantine units, *amici* observed the following:

- More than five inmates were consistently out of their cells at one time, and sometimes between 10 and 20 inmates were out of their cells at one time; and
- Social distancing practices were not enforced and there were no attempts by the correctional staff to enforce social distancing even when numerous inmates crowded into a contained area (*e.g.,* to watch television).

The failure to enforce social distancing requirements is a supervision deficit.  This appears at least in part to be attributable to significant understaffing of correctional officers and their supervisors at both facilities.  According to data obtained from managers at the CDF and CTF, as of April 10, 2020,  the CDF had a total staffing complement of 675 correctional staff (493 correctional officers and 182 supervisory staff) and the CTF had a total staffing complement of 283 correctional staff (259 correctional officers and 24 supervisory staff).  In response to inquiries from *amici*, the DOC Human Resources Unit was unable to provide a breakdown of current correctional officer and supervisory staffing levels at the CDF and the CTF, including, for each facility, the number of funded positions that are vacant and the number of staff assigned to the complement who are unavailable for duty for quarantine or some other COVID-19 related status.[36]  However, management staff in the DOC Human Resources Unit were able to provide aggregate data regarding the agency's total correctional workforce that provides insight into current staffing level at both facilities.  According to these data, the DOC has a current workforce of 994 funded correctional positions, 45 of which are vacant.  Of the remaining 949 positions, 281 correctional staff were unavailable for duty as of April 16, 2020.

---

[36]  Many categories of leave render staff unavailable for duty, including workers compensation, administrative leave, AWOL status, military leave, leave without pay, and family and medical leave.

Thus, approximately one third of the total funded correctional work force is unavailable to work.[37]

According to DOC managers, the reduction in the size of the workforce that is available for duty has fueled excessive reliance on overtime in order to cover a minimum number of essential posts at both facilities.  In response, both facilities converted recently from staffing three eight-hour shifts per day to two, 12-hour shifts per day during weekdays.  During this period when the workforce is already stretched thin, there is also an enhanced need for active, direct supervision of inmates to enforce social distancing to mitigate the risk of transmission of the highly infectious novel coronavirus.  With fewer available correctional staff and supervisors available to fill essential posts, the DOC has less flexibility to adopt strategies involving increased staff levels to achieve social distancing policies on housing units.

Telephone calls in settings that allow for confidentiality are arranged at both the CDF and CTF by DOC case management staff.  DOC staff report that most of the case managers assigned to provide services for inmates at both facilities are either on quarantine status or working remotely.  Thus, as a general matter, there has been no access to confidential legal calls for inmates confined on quarantine and non-quarantine housing units.  There is some evidence that the defendants recently began to allow scheduled legal calls using the telephones in the housing unit day rooms.  These telephones are used by inmates to make monitored telephone calls.  *Amici* have not had an opportunity to determine whether the scheduled legal calls are monitored; however, even if they are not monitored, the telephones in the housing unit day rooms do not afford the confidentiality required to communicate with counsel.

---

[37]  In addition to the CDF and CTF, the data the defendants provided indicate that the total workforce includes correctional staff assigned to a transportation unit and to the Central Cell Block.

## 2.      Conditions in Isolation Relative to Other Units

Inmates housed in isolation units at both the CDF and CTF are restricted to their cells. Inmates in isolation at the CTF are not permitted to use the telephone for any reason, including legal calls.  During the site visits *amici* conducted, inmates in isolation at the CDF were able to make monitored telephone calls from their cells.  *Amici* were recently informed this may no longer be the case; however, we have not had an opportunity to follow up.  Medical staff visit inmates in isolation at least twice per day to check temperatures, vital signs, and conduct assessments if indicated.

The first cohort of inmates who were isolated for COVID-19 were housed in a special management unit at the CTF.  Several inmates in this cohort report that they were handcuffed when escorted to and from the showers.  Showers are no longer afforded to inmates in the isolation housing units.  To the extent they can bathe, inmates on isolation status must use the sinks in their cells to do so.  The supply of towels does not appear adequate.  In lieu of showers, the defendants planned to provide inmates on isolation status with body wipes, which were not available until April 14, 2020.

The evidence indicates that inmates have spent up to and even over two weeks on isolation status.  Analysis of housing assignment data associated with the first 15 inmates who tested positive for COVID-19 shows that the inmates in this sample were housed on isolation status for a minimum of five days.  Three inmates in the sample had already spent 12, 14, and 15 days, respectively, in isolation status and remained in isolation as of the date of this analysis.

Laundry services for inmates in isolation has been limited.  Many inmates reported wearing the same clothes throughout their stays in the isolation units, and in fact most of the inmates *amici* met wore visibly soiled clothing and reported substantial delays in receiving fresh linens.  Most of the inmates *amici* interviewed in the isolation units stated the conditions are far

too punitive, noting that if they had it to do over again, they would not have reported their symptoms.  Deprivation of showers, the absence of any ability to contact family members, the lack of access to legal calls, clean clothing and clean linens are plainly a disincentive and are likely to deter inmates from reporting symptoms of COVID-19.

**Recommendation**:  *Amici* recommend that the defendants take immediate steps to provide consistent and reliable access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status.  The defendants should ensure appropriate and consistent implementation of social distancing policies by addressing limitations in current staffing levels, supervisory oversight of line staff, and provide enhanced education related to the importance of social distancing.

### B.   ENVIRONMENTAL HEALTH & HYGIENE

**Question One:   What are the quantities of personal protective equipment and cleaning products in the DOC stockpile?**

As of April 17, 2020, the DOC reported to *amici* the following inventory of PPE:

Personal Protective Equipment:

- Surgical Mask: 71,680
- N95 Respirators:  12,774
- Face Shields:  190
- Goggles:  200
- Gowns:  2,400
- Gloves:  Total Not Available[38]
- Small PPE Kits:  400

---

[38]  DOC representatives provided data indicating that between March 28, 2020 and April 15, 2020, 39,237 pairs of gloves were used.

According to the DOC estimates, based on current usage rates, as of April 17, 2020, the

defendants had approximately a 32-day supply of masks on hand.  The DOC Compliance Officer

informed *amici* that the processing of additional procurement orders was underway.

As of April 13, 2020, the DOC reported to *amici* that the following inventory of cleaning

products was stored on site.

Cleaning Products:

- Ecolab Disinfectant:  144, 2.5-gallon cases;[39]
- Ecolab Peroxide Multi Surface Cleaner/Disinfectant: 32, 2-gallon cases;
- Ecolab Multi-Quat Sanitizer: 139, 2.5-gallon cases;[40]
- Ecolab Orange Force: 129, 2.5-gallon cases; and
- Ecolab Glass Cleaner: 30, 2.5-gallon cases.

**Question Two: Are residents provided with a weekly bar of soap?**

Many inmates *amici* *i*nterviewed reported that they purchase soap through the

commissary.  Most explained they had access to soap through the housing unit officers and

everyone interviewed at their cells was able to show *amici* their bars of soap.  There were limited

supplies of soap available for distribution in a number of the housing units.  Inmates housed in

special management units are provided with small packets of liquid soap; they are not provided

with bars of soap.

**Question Three:  Do staff who interact with visitors and residents have access to, and wear, sufficient personal protective equipment?**

Staff who interact with visitors have access to and wear sufficient PPE.  *Amici* observed

screening staff posted at the entrances of both the CDF and the CTF wearing PPE consistent with

CDC Guidelines.[41]  Additionally, staff assigned to units housing inmates who are COVID-19

---

[39] This product is dilutable to make larger volumes of solution.

[40] This product is dilutable to make larger volumes of solution.

[41] CDC Guidelines recommend that staff performing temperature checks on any group of people wear a mask, eye protection, gloves, and a gown or coveralls.  *See* Ex. 7, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, March 23, 2020 at 25.

positive wore PPE consistent with CDC Guidelines, including N95 respirators, eye protection, gloves, and a gown.  None of the correctional staff interviewed who were wearing N95 respirators reported that they had been fitted for them as required by the Occupational Health and Safety Administration.

The defendants issued post orders for quarantine and isolation housing units on March 28, 2020 that included minimum PPE requirements.[42]  Nevertheless, as of April 10, 2020, the day of the first unannounced site visit, *amici* observed that the post orders were not being adhered to and there was no clear, common understanding among the staff *amici* interviewed regarding what PPE they should wear.  Most staff expressed considerable anxiety about not having access to appropriate PPE.  Some staff were observed wearing masks that they purchased and brought to the facility themselves, few staff wore gloves, and other staff wore no PPE at all. Multiple staff stated that prior to April 10, 2020, PPE was not widely distributed to correctional officers.

*Amici* were informed that beginning on April 10, 2020, masks and gloves were being distributed to correctional officers at the start of each shift.  Over the course of the three days of site visits, *amici* observed that PPE was more consistently worn by staff throughout the facilities and staff stated that there was an abrupt increase in the PPE that was distributed to correctional officers.  As noted above, the defendants reported that earlier this week, subsequent to *amici's* site visits, they began to replace masks for inmates on a daily basis and are now providing masks to all inmates on all housing units.  On April 14, 2020, the defendants reported that they are now

---

[42] *See supra* note 30 regarding the March 28, 2020 DOC policy applicable to quarantine housing units.  On the same day the defendants issued a post order for isolation housing units.  The PPE requirements in the post order related to the isolation units includes only a mask and gloves, less than the PPE recommended in the CDC Guidelines.  As previously noted, however, in practice, in contrast to the observations *amici* made in the quarantine units, *amici* observed correctional officers on the isolation units wearing PPE consistent with CDC Guidelines.

requiring all staff and all inmates to wear masks at all times. *Amici* have not had an opportunity to confirm these representations.

**Recommendation**: *Amici* recommend that the defendants communicate clear expectations, in writing, to correctional staff about the types of PPE required to perform the various supervision and operational functions that are conducted throughout the facility, including the PPE they should expect to be given on each shift for each specific category of post assignment; the proper donning, doffing and disposal of the PPE; and an explanation of the related rationale. Clear communication to staff regarding differences in risk exposures and providing consistent PPE over time could help lower anxiety levels among staff.

In addition, the defendants should also ensure that all PPE issued is properly fitted. For example, N95 respirators must be properly fitted to ensure that they provide the intended protection. As noted above, during the site visits that *amici* conducted, none of the correctional staff who were wearing N95 respirators in isolation units reported that they had been fitted for the respirators.

Finally, defendants must ensure that all DOC staff receive instruction on the proper disposal of PPE, and appropriate and accessible receptables for immediate disposal must be readily available. During the site visits, *amici* observed that receptables for disposal of PPE were not accessible on a consistent basis, including to staff assigned to isolation units at the CTF.

**Question Four: Are staff and prisoner-workers given masks and gloves, particularly in food service, and are they instructed to wear that equipment?**

A*mici* toured the Culinary Unit at the CDF on April 11, 2020. At that time, all correctional staff and contractors were wearing masks, hairnets, and gloves. There were no inmate workers in the Culinary Unit during the site visit. They had been replaced by correctional officers. *Amici* learned that the inmate work detail in the Culinary Unit was suspended because

an inmate housed at the CDF, who had been assigned to the detail for at least several months,

tested positive for COVID-19 on April 10, 2020.  *Amici* have not had an opportunity to confirm

the instructions regarding the use of masks and gloves that DOC staff, contractors, and inmates

working in the Culinary Unit receive; however, during the site visit *amici* observed the consistent

use of masks, gloves, and hairnets by the numerous contractors and DOC staff who were

working in the food service area.

     An interview conducted by *amici* with a supervisor for the food service contractor, (who

reported working in the CDF Culinary Unit since the latter part of 2019), revealed that the

contract staff assigned to the CDF did not know why the inmate detail workers were no longer

working and had been replaced by correctional officers.  In light of the fact that it appeared the

detail inmate who tested positive prepared and served food along with the contractor's staff for at

least several months, *amici* sought to ascertain whether the DOC made any attempt to determine

whether the contract staff who worked alongside the detail inmate who tested positive were

"close contacts" as defined by the applicable CDC Guidelines.[43]  According to the Guidelines,

"an individual is considered a close contact of a COVID-19 case if they a) have been within

approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact

with infectious secretions from a COVID-19 case (*e.g.*, have been coughed on)."[44]  The Guidelines

further provide that all staff who were a close contact of the inmate, whether employed by DOC

or by the contractor,[45] should have been placed on self-quarantine status.  Specifically, the

Guidelines provide that if a staff member or contractor is identified as a close contact of a

---

[43] *See* Ex. 7 at 3.
[44] *Id.*
[45] The CDC Guidelines define staff as "all public sector employees as well as those working for a private contractor within a correctional facility (e.g. private healthcare or food service).  Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators."  *Id*. at 4.

COVID-19 case (whether in the facility or in the community) that staff member should self-quarantine at home for 14 days and may return to work if symptoms do not develop after the 14-day period.[46]  It appears that these Guidelines have not been implemented with respect to any contractors who were in close contact with the detail inmate who tested positive for COVID-19.

According to the DOC administrator and staff responsible for the food service contract, on the morning of April 11, 2020, the DOC food contractor was informed that a detail inmate had tested positive and that the contractor's workers should self-quarantine if they did not feel well.  It appears that no effort was made to determine whether any of the contract food service workers were a "close contact" of the detail inmate who tested positive.  Indeed, *amici* contacted the DOC Medical Director, the Unity Medical Director, the Unity Infection Control Specialist, the DOC Deputy Director responsible for the food service contract, the DOC General Counsel, and lead counsel for the defendants in this litigation to inquire about this matter.  Based on the responses they provided to *amici's* inquiries, it appears that any contact tracing that may have been conducted did not include consideration of whether the food service contractors who worked alongside the detail inmate who tested positive might be deemed a close contact who *should* have been quarantined for 14 days.  *Amici's* understanding is that the detail inmate who tested positive was not contacted about any individuals with whom he had close contact.  Moreover, it does not appear that any effort was made to contact public health experts at the D.C. Department of Health to receive guidance about this matter.  In light of the implications attendant to having a close contact continue to work in the CDF Culinary Unit, promptly after learning about this matter a*mici* alerted counsel for both parties about their concerns.

---

[46] *Id.* at 12.

*Amici's* inquiries regarding the contact tracing conducted in the wake of the detail inmate's positive COVID-19 test results revealed that at least in this instance the defendants employed a fractured contact tracing effort that was not centralized nor informed by public health experts.[47]

**Recommendation**:  If they have not done so in the wake of *amici's* inquiries, the defendants should seek immediate guidance from public health professionals about identification of the detail inmate's close contacts.  Moreover, it is important to recognize that the defendants are working in an extremely challenging environment that requires a well-coordinated response to the range of infection control issues that are presented throughout the course of each daily shift.  Any individuals who are tasked with conducting contact tracing after a confirmed positive COVID-19 test should have appropriate training and be closely supervised.

 **Question Five: Do residents have access to cleaning supplies in sufficient quantity and concentration, including rags, to clean their cells?**

*Amici* reviewed records of cleaning supply deliveries to the CDF and CTF to assess whether supplies were made available to the facilities.  Department of Corrections records indicate that there have been regular deliveries of cleaning supplies to both facilities since December 31, 2019, the start of the dataset reviewed.[48]  Delivery records reflect that historically

---

[47]  The DOC Medical Director informed *amici* that she had seen email correspondence regarding the issue but had not been involved in advising staff about how to handle this matter.  The Medical Director referred *amici* to the DOC Deputy Director for Administration to determine whether contact tracing related to the contractor's staff had been conducted.  The Deputy Director was contacted and informed *amici* that the contractor was notified that the contractor's workers should self-quarantine if they did not feel well.  There was no recognition of the fact that food service contract workers may have potentially been close contacts of the detail inmate who tested positive and should have been quarantined regardless of how they felt.  Moreover, in response to amici's inquiries, the manager of Unity's infection control program at the CDF advised *amici* that Unity's involvement was limited to determining the identity of the inmates and health care providers who may have had contact with the detail inmate while he was in the medical unit.

[48]  Ex. 8, Table, Dates and Quantities of Cleaning Supplies and Soap Delivered to the CDF and CTF, by Date, December 31, 2019 – April 13, 2020.

three types of cleaning and sanitizing agents were made available to clean housing units and that in mid-March 2020 a fourth, peroxide-based multi-surface cleaner was also made available.[49]

Observations and interviews with inmates and staff indicated that inmate access to sufficient cleaning supplies on housing units varied from unit to unit. For example, on one unit, all of the cleaning supplies had been depleted.[50] Furthermore, on several units that had a supply of cleaning agents, inmates reported that they were unable to access them to clean their own cells. *Amici* did not observe any inmates with facility-issued rags that could be used to clean their cells. Most inmates who were interviewed reported that they made rags by tearing facility-issued towels or t-shirts, a phenomenon *amici* observed. For the most part, these make-shift rags were tattered and soiled. *Amici* observed that paper towels were available for inmates to use for cleaning on a small number of housing units, but this was not common and on one of the units, the inventory of paper towels was extremely low.

*Amici* could not assess whether the concentrations of disinfecting and sanitizing solutions were mixed in the appropriate concentrations necessary to achieve their intended effects. It was evident that knowledge regarding the appropriate use of the different cleaning and sanitizing agents was generally at a very low level.

Access to cleaning and sanitizing solutions is necessary, but not sufficient. Knowledge of proper mixing and appropriate application of cleaning and sanitizing solutions is also necessary. For example, at least two of the products that the DOC distributes – a concentrated surface cleaner and a concentrated sanitizing solution – have prescribed dilution ranges (*i.e.*, must contain a minimum concentration of the chemical agent, which has implications for how

---

[49] The manufacturer's product description states that it is "effective against emerging viral pathogens after the CDC has declared an outbreak."
[50] Ex. 9, Photograph of empty cleaning supply containers, Correctional Treatment Facility, Building D, April 12, 2020.

much water can be added to the concentrate before the agent is no longer effective).  One of these products also has specific prescriptions regarding how long the product must remain on a surface for it to reduce pathogens to indicated levels.

The DOC assigns correctional officers to "environmental posts" and these officers are responsible for cleaning and sanitizing assigned zones of the facilities.  One environmental officer informed *amici* that he had never received formal training, but rather reviewed his responsibilities with his supervisor and acknowledged that it had "been a while" since that discussion occurred.  The same officer noted that he had begun to mix his own bleach solution to sanitize the areas of the facility he was responsible for and relied on his own judgement regarding the appropriate concentration of bleach solution.

**Recommendation**:  There is a critical need for the defendants to strengthen the environmental health and safety program at both the CDF and the CTF.  *Amici* recommend that the DOC immediately retain a registered sanitarian to oversee the environmental health and safety programs at both facilities and provide training so that cleaning tools and products are used properly.  A registered sanitarian should bring the appropriate knowledge, oversight, and quality control necessary to mitigate at least some of the critical public health concerns that are evident in both facilities.

**Question Six:  Do housing units, and particularly common spaces such as bathrooms and showers, appear to be sufficiently cleaned?**

Cleaning the common spaces in housing units is the responsibility of designated inmate "detail workers" at the CDF and CTF, who are supervised by correctional officers.  As indicated in the response to Question Five, several different cleaning, disinfecting, and sanitizing solutions are available on the housing unit of both facilities.  Nevertheless, the cleanliness of common spaces was inconsistent from one housing unit to the next.  With cleaning responsibilities

delegated to the inmate level, there is little quality control.  Some housing units appeared

relatively clean and tidy, others were not.  This was especially the case in some of the housing

units at the CDF that appeared to have significant inmate management and supervision

challenges.[51]  In addition to the limitations in the cleanliness of some housing units, some cell

block corridors had trash on the floor.  Moreover, Building D at the CTF includes showers with

tiles and in some of those showers there was visible mold growth.[52]

**Recommendation**:    In addition to engaging a sanitarian, supervisory correctional staff must

ensure that housing unit staff properly manage the work performed by the inmate detail workers.

In order to accomplish that goal, correctional staff and detail workers require guidance from a

sanitarian trained to oversee the facility's environmental health program.

**Question Seven:  Do professional cleaning crews clean hallways and common areas (not in housing units)? Do inmate details clean the housing units? common spaces?**

A professional cleaning contractor was engaged to clean certain common areas on the

non-secure side of both facilities on a daily basis in late March 2020.  However, there was an

apparent misunderstanding about the scope of the contractor's services and none of the floors in

the common areas on the administrative side of both facilities were cleaned, including bathroom

floors and floors in the Officer's Dining Room. The DOC Deputy responsible for the

administration of the contract informed *amici* earlier this week that this limitation is being

corrected.

Inmate detail workers clean the common areas in the housing units.  They have not been

adequately trained and are not appropriately supervised.  The detail workers have inconsistent

knowledge about the products they use and do not have adequate equipment.  For example, they

---

[51]  In at least two housing units at the CDF, *amici* observed food and other refuse scattered on the cellblock floors, including on the floors under stairwells.
[52]  Ex. 10, Photograph of a Shower in the Correctional Treatment Facility, Building D, April 12, 2020.

reuse mops and make-shift rags that do not appear to have been appropriately sanitized between uses.  As part of the DOC response to COVID-19, detail workers are required to clean all surfaces in the common areas of the housing units at two-hour intervals.  This appears to occur on a consistent basis; however, the efficacy of these efforts is undermined by inadequate training, limitations in supervision, the absence of any quality controls, and the apparent limitations in the equipment and possibly in the cleaning and disinfecting agents that they are using.[53]

**Recommendation**:  In addition to engaging a sanitarian, the defendants should consider contracting for professional cleaning services on the secure side of the facility at least until a sanitarian is hired to bolster the existing environmental health and safety program at both facilities.  Additionally, proper cleaning supplies that have been sanitized regularly should be immediately provided to each unit, and a schedule for cleaning common areas and cells should be established and enforced.

**Question Eight:  Is hand sanitizer provided, or available to, to residents?**

There is no evidence that hand sanitizer is provided to the inmates at either the CDF or the CTF.

**Question Nine:  Is social distancing possible in common areas in units and in the recreation spaces, and what is the approximate size of common areas?**

*Amici* did not have the opportunity to measure the common areas at the CDF and CTF. However, given the configuration of the physical plant in the housing units, social distancing is possible if inmate out-of-cell time is limited to small groups of inmates at one time.  However, as noted elsewhere in this report, the defendants are not enforcing social distancing requirements.

---

[53]  On some housing units the detail workers expressed concerns that the cleaning agents they were using had been inappropriately diluted; on others, inmates complained about fumes associated with the apparent strength of the cleaning products the detail inmates were using.

Enforcing social distancing requires consistent, direct observation by staff.  Ensuring that

correctional officers carry these functions out requires active supervision by mid-level managers,

who must provide both oversight to correctional officers and support (*i.e.,* by ensuring officers

get appropriate relief for breaks over the course of their 12-hour shifts).  *Amici* observed

numerous instances in which correctional officers assigned to housing units left their posts

without relief, leaving housing units short staffed.  It appears that the DOC does not have

sufficient line and supervisory  staff available to appropriately enforce social distancing policies.

**<u>Recommendation</u>**:  The defendants should reduce the extent to which common spaces

encourage inmates to congregate in close quarters (*e.g.,* around a single television in a small

enclosed area, or next to one another in order to use telephones that are mounted closer than six

feet apart).  The effectiveness of this strategy would increase if the defendants were to

consistently apply their stated policy of allowing no more than small groups of inmates out of

their cells at any given time.  Whatever strategies the defendants adopt, increased active and

direct supervision will be required by both housing unit correctional officers and the midlevel

managers responsible for overseeing and supporting the correctional officers assigned to housing

units.  Enforcing social distancing standards as a public health measure is a new responsibility

for correctional staff and they must be supported as they adjust to this new role.  Moreover, the

defendants should assess whether any additional security staff are needed to provide appropriate

supervision, on a unit-by-unit basis, taking into consideration the layout of the housing units, the

number of inmates housed on the units, and the security designation of the unit, in order to

enforce social distancing policies.

**Question Ten:  Approximately how many residents share a cell, and what is the approximate size of the cell?**

*Amici* analyzed individual-level inmate housing data for the period between March 15, 2020 and April 13, 2020.  At the CDF, as of April 13, 2020, 586 inmates, 56 percent of the population, shared a cell.[54]  At the CTF, as of April 13, 2020, 22 inmates, five percent of the population, shared a cell.[55]

A representative-sized cell was measured at each of the two facilities.  The selected cell at the CDF measured 85.6 square feet and the selected cell at the CTF measured 72.4 square feet.

**Question Eleven:  Do all residents have access to sinks, soap, and toilets in their cells?**

As noted above, at the CDF, all cells include sinks and toilets.  At the CTF, the housing units in the portion of the facility known as Building D contain cells without sinks and toilets.  Inmates assigned to housing units in Building D share common sinks and toilets.  On each housing unit there are two, double-tiered corridors of cells.  Each tier of each corridor is comprised of eight cells.  Inmates housed in the eight cells share two sinks, two toilets, and a shower.  The cell doors in Building D, by design, do not lock in order for inmates housed in the cells to access the sink and toilet without the intervention of a correctional officer.  *Amici* identified multiple sinks and toilets in housing units in Building D that were not functional or out of service at the time of the site visit.

Representatives of the DOC stated that every inmate receives a facility-issued bar of soap each week.  Every inmate that *amici* spoke with indicated that they possessed at least one bar of soap.  Some inmates verified that soap was distributed to them weekly; however, others stated that they had purchased their soap from the commissary and that soap was not distributed

---

[54] *See* Ex. 1, *supra* note 4.
[55] *See* Ex. 2*, supra* note 9.

weekly.  There were multiple reports that inmates sometimes use their bars of soap to clean their clothes in the shower and under those circumstances a single bar of soap does not last an entire week.

## V.      Conclusion

Communicable disease outbreaks in locked facilities such as jails and prisons where individuals live in close proximity can spread rapidly through a population if not addressed quickly with appropriate prevention, detection, and management systems.  The current novel coronavirus pandemic, which is already present within both the CDF and the CTF, poses a serious risk to the health and safety of inmates and staff alike.

This report describes certain efforts undertaken by the DOC to respond to the current public health emergency.  DOC staff and Unity's contract providers should be commended for performing essential public health and safety functions while knowingly exposing themselves to significant health risks on a daily basis.

In light of the limitations identified in this report, substantial effort must be undertaken to ensure that the DOC manages its response to COVID-19 in a manner that ensures conformity with CDC Guidelines.  This will require active on-site support at both facilities from public health professionals.  For example, contact tracing must be strengthened, staff and inmate education on relevant public health considerations must be intensified, and business processes must be refined to ensure inmates and staff presenting with symptoms potentially consistent with COVID-19 are quickly identified, tested and isolated.  Moreover, on an expedited basis, the defendants must provide inmates in isolation who have tested positive for COVID-19 with access to showers, clean clothing, clean laundry, personal telephone calls and legal calls.

*Amici's* investigation reveals that there is an equally urgent need for the DOC to substantially bolster the agency's environmental health program in the immediate and longer term.  A professional sanitarian with appropriate health and safety credentials should be charged with organizing and managing the DOC's environmental health program to ensure, among other matters, appropriate cleaning and sanitizing practices are implemented, regular facility inspections are conducted, and corrective actions are undertaken to resolve systemic risks.  In the immediate term, the defendants should ensure that they have a sufficient number of both line level and supervisory staff throughout both facilities to promote appropriate supervision and enforce the altered operational policies adopted to address the contagion during this public health crisis.

As *amici* were in the process of finalizing this report, defendants provided counsel for plaintiffs and amici with a copy of an April 27, 2020 memorandum from the DOC Director, Quincy Booth, to all DOC employees and contractors.[56]  The memorandum addresses COVID-19 policies and procedures, including updated policies and procedures that appear to be intended to respond to the matters addressed during the April 15, 2020 teleconference.  In light of the current filing deadline, *amici* have not had an opportunity to consider the content of the memorandum, but have included it in the appendix to this report so that the Court can be promptly apprised of the most current information that the defendants have provided.

*Amici* recognize the substantial challenges that confront both parties and are available to answer any questions the Court or the parties have about the matters addressed in this summary report.

---

[56]  Ex. 11,  Memorandum from Quincy L. Booth, Director, to All DOC Employees and Contractors, April 17, 2020, Reminders and Updated COVID-19 Policies and Procedures.

Respectfully submitted,


/s/_Grace M. Lopes_____
*Amicus Curiae*
Grace M. Lopes
Bar No. 358650
Executive Director
Rising for Justice
901 4th Street, N.W., Suite 6000
Washington, D.C. 20001
202-607-2224
gmlopes@risingforjustice.org

Mark Jordan
mark@markjordan.consulting
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036
202-525-6732

April 19, 2020
Washington, D.C.