# EXHIBIT 1

**Supplemental Declaration of Dr. Jaimie Meyer**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut.  I am a physician who is board certified in Infectious Disease, Addiction Medicine, and Internal Medicine, with expertise in infectious diseases in prisons and jails.  I previously submitted a Declaration in this case dated March 29, 2020 along with a copy of my CV.

2. To prepare this Supplemental Declaration, I reviewed the following reports and declarations:
    - Report submitted by *amicus curiae* pursuant to April 9, 2020 consent order, dated April 18, 2020, including Exhibits 1-11;
    - Transcript of proceedings in US v. Brown (Docket number 2019 CF3 012779), dated April 29, 2020;
    - Declaration of Brian Thomas, dated May 7, 2020;
    - Declaration of Anthony Jenkins, dated May 6, 2020;
    - Declaration of Craig Barksdale, dated May 6, 2020;
    - Declaration of Delonte Johnson, dated May 12, 2020;
    - Declaration of Jarvis Burl, dated May 11, 2020;
    - Declaration of Ladaunte Perry, dated May 7, 2020;
    - Declaration of Romiel Hightower, dated May 11, 2020;
    - Declaration of Tony Horne, dated May 11, 2020;
    - Declaration of Elijah Warren, dated May 14, 2020;
    - Transcript of telephone conference in Banks v. Booth (Civil Action No. 20-CV-00849), dated May 11, 2020; I also listened to portions of this telephone conference on May 11, 2020;
    - Redacted emails provided from the FOP/DOC Labor Union.

3. Based on my review of these materials and my knowledge and expertise in infectious diseases and public health, I reaffirm that people living and working in DC DOC facilities remain at risk of serious harm due to COVID-19 infection.  Despite clear efforts made by DC DOC to be responsive to concerns by generating updated policies, a number of key problem areas persist as detailed further below. I also reaffirm the deficiencies identified in my earlier declaration regarding poor ventilation and insufficient medical facilities to control the spread of COVID-19. The rapid increase in the number of identified cases over the past several weeks reflects major and pervasive system-level deficits.

4. The biggest threat to DC DOC's ability to contain the ongoing COVID-19 outbreak is under-recognition of and limited testing for COVID-19 disease.  Residents in non-quarantine units who experience symptoms consistent with COVID-19 must rely on a sick call request system to access medical care.  Although most sick call requests are

processed within 1-2 days, site evaluations and resident declarations describe that some requests take over 1 week to process. These delays in medical attention may result in worsening of the disease and ongoing spread of COVID-19, when those who are infected but not isolated remain on the general housing unit. Many requests for medical care appear to have come through an ad hoc urgent care mechanism, rather than the sick call request system. Urgent care should not serve as an alternate channel for accessing medical care because it does not allow clinical care providers to triage the urgency of the issue or appropriately plan for staffing and space. Increased reliance on urgent care mechanisms suggest challenges to accessing medical care and that the sick call request system is failing to address the medical needs of people in the DC DOC.

5. According to declarants, people who are afebrile but exhibiting other symptoms of COVID-19 (including shortness of breath, cough, and difficulty breathing) are not tested. This suggests fever is the sole trigger for testing. This is highly problematic because people infected with COVID-19 may exhibit a wide range of symptoms which, according to the CDC include: cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, new loss of taste or smell, or gastrointestinal symptoms like nausea, vomiting, or diarrhea. Moreover, many people with COVID-19 do not have symptoms at all. Limited testing will result in people who are infected with COVID-19 remaining on housing units and likely transmitting the disease to others.

6. DC DOC policy appropriately dictates that "people under investigation" (PUI) for COVID-19 who have tests pending are placed on cell restriction until they either: a) are confirmed positive and moved to medical isolation; or b) are confirmed negative and can return to the general population. Yet declarations confirm that cell restriction for PUI is inconsistent and people who are later confirmed to be COVID+ are interacting with others, including cellmates, while tests are pending. In this way, disease transmission will continue unabated.

7. Testing is critical for disease containment because it allows people who are diagnosed with COVID-19 to be medically isolated. This is beneficial for the individual who is infected in terms of receiving increased medical attention and for the population writ large in terms of reducing transmission. One solution to the problem of limited testing is to conduct facility-wide surveillance and test all residents and staff at least once. Surveillance testing (and, ideally retesting), enables a clinical and public health response that is informed by real data.

8. Social distancing policies are meaningless if not enforced. While protocols call for fewer than 10 individuals out of cell at a time for recreation, showers, and phone calls, and kept six feet apart during that time, declarants and surveillance video depict otherwise. In DC DOC facilities that are experiencing severe staffing shortages, it will be difficult if not impossible to ensure adequate custodial supervision to allow for social distancing. Given that COVID-19 is a highly contagious virus spread by droplets within close contact, the disease will continue to spread in facilities where

social distancing is not enabled.

9. When social distancing is not possible, personal protective equipment (PPE) can help provide a barrier to reduce person-to-person disease transmission. Again, PPE protocols are essentially meaningless if not implemented and enforced. Site visits describe inconsistent use of PPE observed among staff and residents in quarantine units, limited availability of PPE, and few receptacles available for safe PPE disposal.

10. In the setting of understaffing and growing anxiety, there have been disruptions to safety and security described inside DC DOC facilities. In usual circumstances, mace or capsaicin spray may be used to facilitate extractions by dedicated teams and mitigate unrest. When these techniques are used in the context of a COVID outbreak, however, they may actually facilitate disease transmission. These inhaled irritants disrupt the mucous membranes of the nose, throat, and upper respiratory system that can increase risk of COVID-19 infection if exposure occurs. The irritants also cause people to cough, thereby increasing potential disease transmission within the unit.

11. COVID-19 is primarily transmitted from person to person via respiratory droplets, but transmission also occurs through contaminated surfaces. Cleaning and disinfecting practices can mitigate this risk of disease transmission but remains inadequate in the DC DOC. The cleaning materials shown in *amici* Exhibits are among those approved by the EPA as having activity against COVID-19, but only at specific concentrations (Please see EPA website: https://cfpub.epa.gov/giwiz/disinfectants/index.cfm). Activity against COVID-19 is reduced when cleaning supplies are repeatedly diluted, as is described in the DC DOC. Education, training, and supervision are necessary to ensure that supplies are being used properly (for instance, if a chemical agent needs to sit for an hour before it is wiped away), or in proper concentrations. Moreover, some declarants describe other cleaning products that are being used, including Ecolab Laundry Fresh Room Refresher, that do not have activity against and is not approved for disinfection for COVID-19.

12. COVID-19 is a serious problem for detention settings everywhere and this is no less true in the DC DOC. But this is not a problem that can be protocolled away. Even the most comprehensive protocols and policies that are informed by science are totally meaningless if not implemented, enforced, and continuously monitored. Implementation will be challenging if not impossible in DC DOC, which is strained by severe understaffing. When staff are not adequately equipped, trained, or supported, health and safety of everyone inside the facility will suffer.

13. In the DC DOC, as in health systems everywhere, COVID-19 has become the top priority for healthcare providers. Yet when attention is devoted exclusively to COVID-19 and medical staff are stretched thin during an outbreak, limited resources remain for the management of chronic diseases. As declarants note, care for non-COVID conditions has suffered in the DC DOC since the start of the outbreak. This may result in undue negative health outcomes related to chronic health conditions, but also increased risk of complicated COVID-19 infections for people living with

underlying health conditions like diabetes, chronic lung disease, heart disease, and kidney disease. Inadequate responses to medical issues within DC DOC place inmates at an increased risk of death or serious harm from COVID-19 and other diseases.

14. Reduction in the size of the prison population is a public health strategy that supports all of the above infection prevention and control efforts. When people inside the facility have the physical space to socially distance and the inmate population is small enough for the staff to enforce social distancing and proper sanitation, there is reduced disease transmission. A reduced inmate population also results in the greater availability of adequate medical attention. Finally, it improves safety because appropriate supervision is assured.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Dr. Jaimie Meyer

May 14, 2020
Wilton, Connecticut