**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| EDWARD BANKS, et al., |
|      Plaintiffs |
|      v. |
| QUINCY L. BOOTH, *et al*., |
|      Defendants |

Civil Action No. 20-849(CKK)

**MEMORANDUM OPINION**
(June 18, 2020)

This case is brought by various inmates of the District of Columbia's Department of

Corrections ("DOC") detained in the Central Detention Facility ("CDF") and the Correctional

Treatment Facility ("CTF"). Plaintiffs bring claims against Quincy Booth, in his official capacity

as Director of the DOC, and Lennard Johnson, in his official capacity as Warden of the DOC.

Plaintiffs' claims relating to the conditions of their confinement during the COVID-19 pandemic

are brought pursuant to the due process clause of the Fifth Amendment of the United States

Constitution and the Eighth Amendment of the United States Constitution. Plaintiffs' claims

relating to release from confinement are brought pursuant to writs of habeas corpus.

Before the Court is Plaintiffs' [70] Amended Motion for a Preliminary Injunction, which

is opposed.  Upon consideration of the pleadings,[1] the relevant legal authorities, and the record

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Am. Mot. for a PI ("Pls.' Mot."), ECF No. 70;
- Opp'n by U.S. to Pls.' Mot. for a PI ("Def. U.S.'s Opp'n"), ECF No. 80;
- Defs.' Opp'n to Pls.' Am. Mot. for a PI ("D.C. Defs.' Opp'n"), ECF No. 82;
- Pls.' Reply Brief in Support of Am. Mot. for a PI ("Pls.' Reply"), ECF No. 89;
- Defs.' Notice of Supp. Decs. ("Defs.' Notice"), ECF No. 94;
- Defs.' Notice of Supp. Authority ("Defs.' Auth."), ECF No. 95; and
- Pls.' Res. to Defs.' Notice of Supp. Authority ("Pls.' Res."), ECF No. 96.

for purposes of this motion, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs'

[70] Motion. The Court concludes that Plaintiffs have shown a likelihood of success on the

merits, irreparable harm, and that the balance of the equities and the public interest favors

injunctive relief. However, as will be further explained below, the Court concludes that some of

the relief requested by Plaintiffs is not appropriate at this time.

## I.      BACKGROUND

The Court previously recounted the background of this case in its Memorandum Opinion

granting Plaintiffs' Motion for a Temporary Restraining Order ("TRO"). ECF No. 51. However,

for ease of reading, the Court shall recount that background here.

Prior to proceeding through the procedural background of this case, the Court notes that

the hearings held in this matter have been conducted either telephonically or through video

conferencing. Due to the restrictions of the COVID-19 pandemic, the United States District

Court for the District of Columbia postponed all civil hearings to occur before July 15, 2020. In

Re: Further Extension of Postponed Court Proceedings in Standing Order 20-9 and Limiting

Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic, Standing

Order No. 20-29 (BAH), May 26, 2020. As such, in compliance with the standing order and

recommended precautionary measures, the Court has conducted these emergency matters

virtually.

On March 30, 2020, Plaintiffs filed their Complaint in this matter. That same day,

Plaintiffs also filed a Motion to Certify a Class of all persons confined or to be confined in DOC

facilities, a Motion for a TRO, and a Motion for a Preliminary Injunction. ECF Nos. 3, 5, 6.

On March 31, 2020, the Court ordered that a teleconference be held to discuss scheduling for Plaintiffs' pending Motion for a TRO. March 31, 2020 Minute Order. During the hearing, the Court ordered Defendants to provide specific, relevant information to the Court over the following two days. For example, the Court ordered Defendants to provide a list of the names of the approximately 94 inmates who had been sentenced to misdemeanors and who could be released; the numbers of people who had been tested for COVID-19 and a break-down of the identities of those individuals (such as inmates, visitors, etc.) and the results of those tests; the date on which Defendants began testing people coming into the jails; the number and a breakdown of the results of COVID-19 tests which had been done on those who were incarcerated prior to the date on which Defendants began testing all incoming inmates; all relevant written procedures and practices concerning COVID-19; and Defendants' process which was in place or would be put in place to allow legal counsel to communicate with their clients electronically or by other means. April 1, 2020 Minute Order. The Court also ordered Defendants to provide Declarations about the processes and procedures in place and the conditions of DOC facilities in light of COVID-19. *Id.* The Court further set a briefing schedule for Plaintiffs' Motion for a TRO and stayed Defendants' Responses to Plaintiffs' Motion for a Preliminary Injunction, Complaint, and Motion for Class Certification pending the resolution of the TRO. *Id.* A court reporter was present at the hearing, and a transcript of the hearing is on the docket. ECF No. 18.

On April 1, 2020 and April 2, 2020, Defendants filed Responses to the Court's Order. ECF Nos. 19, 20, 21.

On April 2, 2020, the Fraternal Order of Police for the District of Columbia Department of Corrections Labor Committee filed for leave to submit an amicus curiae brief in support of

Plaintiffs' Motion for a TRO. ECF No. 23. After considering Defendants' opposition, the Court granted the motion, finding that the amicus brief could assist the Court in its analysis of certain, relevant issues. April 3, 2020 Minute Order.

On April 3, 2020, Plaintiffs filed an Emergency Motion to Expedite the Hearing on the Application for a TRO. ECF No. 24. In consideration of Plaintiffs' arguments, the Court scheduled a videoconference on the merits of Plaintiffs' Motion for a TRO for April 7, 2020. April 3, 2020 Minute Order.

Prior to the hearing on Plaintiffs' Motion for a TRO, Defendants filed their Opposition to Plaintiffs' Motion for a TRO on April 3, 2020, and Plaintiffs filed their Reply in support of their Motion on April 4, 2020. ECF Nos. 25, 26.

On April 7, 2020, the court conducted a two-hour video conference on the merits of Plaintiffs' Motion for a TRO. A court reporter was present, and a transcript of the hearing is on the docket. ECF No. 37. Also on that day, the Court conducted a second teleconference with the parties. The parties determined that they would confer and propose names for an amicus of the Court to inspect the conditions of CTF and CDF. April 8, 2020 Minute Order.

On April 8, 2020, the Court again conducted a teleconference with the parties to ascertain their proposed amicus of the Court. The parties ultimately agreed to the appointment of Grace Lopes and Mark Jordan as amici of the Court to provide information on the actual conditions of CTF and CDF and to make findings on Defendants' responses to COVID-19. A court reporter was present, and a transcript of the hearing is on the docket. ECF No. 33. On April 9, 2020, the Court issued a consent order appointing Ms. Lopes and Mr. Jordan as amici. ECF No. 34.

The amici reviewed records from the DOC facilities and conducted unannounced and unescorted site visits on multiple shifts at both CDF and CTF on April 10, 11, and 12, 2020.

Defendants cooperated with amici in providing them with necessary materials and in providing them access to the facilities, staff, and inmates during their visits.

On April 15, 2020, the Court held a telephone conference at which the amici presented their oral preliminary findings and both parties as well as the Court asked questions. A court reporter was present, and a transcript of the hearing is on the docket. ECF No. 45.

On April 18, 2020, the amici submitted their final written report. Attachment 1.[2] The Court incorporates that report into this Memorandum Opinion. The Court further notes that on April 17, 2020, following the amici's oral presentation of their preliminary findings, Mr. Booth provided a memorandum to all DOC employees and contractors entitled "Reminders and Updated COVID-19 Policies and Procedures." Exhibits to Report Submitted by Amicus Curiae, Attachment 2, Ex. 11. In this memorandum, Mr. Booth addressed some of the deficiencies identified by the amici.

On April 19, 2020, the Court granted in part and denied in part Plaintiffs' motion for a TRO. Specifically, the Court ordered that Defendants follow many of the recommendations set out in the amici report relating to the conditions of confinement at DOC facilities. However, the Court did not order the release of any inmates. ECF Nos. 50, 51.

On April 22, 2020, the Court held a teleconference during which the parties agreed to propose a schedule for briefing Plaintiffs' Amended Motion for Preliminary Injunction. April 23, 2020 Minute Order. A court reporter was present, and a transcript of the hearing is on the docket. ECF No. 57.

---

[2] On April 19, 2020, the amici filed a corrected version of their Report with minor edits. The corrected version is attached to this Memorandum Opinion.

On April 28, 2020, the Court entered a consent Order setting out a schedule for briefing on Plaintiffs' Amended Motion for a Preliminary Injunction, structuring the role of the amici, and extending the TRO Order pending the Court's resolution of Plaintiffs' Amended Motion for a Preliminary Injunction. ECF No. 62.

On May 1, 2020, the Court issued a Memorandum Opinion and Order joining the United States as a necessary party limited to issues involving the release of inmates under Plaintiffs' claims for writs of habeas corpus. ECF Nos. 63, 64.

On May 11, 2020, the Court held a telephone conference at which the amici presented their oral preliminary findings in response to particular questions and both parties as well as the Court asked additional questions. A court reporter was present, and a transcript of the hearing is on the docket. ECF No. 69, Attachment 3. And, on May 22, 2020, the amici submitted their final written report. Attachment 4. The Court incorporates that report into this Memorandum Opinion. The Court has excerpted portions of the report in this Memorandum Opinion, focusing on the issues which are most exigent and most relevant to the resolution of Plaintiffs' Amended Motion for a Preliminary Injunction.

As explained in the report, in preparation for their oral findings and their final written report, the amici reviewed records from the DOC facilities, conducted telephonic and in-person interviews with members of the DOC, and conducted unannounced and unescorted site visits on multiple shifts at both CDF and CTF on May 7 and 8, 2020. Amici also conducted an unannounced and unescorted site visit at CDF during the PM shift on May 14, 2020. Defendants cooperated with amici in providing them with necessary materials and in providing them access to the facilities, staff, and inmates during their visits.

Finally, on May 27, 2020, the Fraternal Order of Police for the District of Columbia Department of Corrections Labor Committee filed for leave to submit an amicus curiae brief in support of Plaintiffs' Amended Motion for a Preliminary Injunction. ECF No. 83. After considering Defendants' opposition, the Court granted the motion, finding that the amicus brief could assist the Court in its analysis of certain, relevant issues. June 8, 2020 Minute Order.

In resolving Plaintiff's Amended Motion for a Preliminary Injunction, the Court relies on the record evidence as it currently stands, including the findings in the amici's final report. In consideration of the above information, the materials which have been provided, and the present factual record, the Court now issues its decision on Plaintiffs' Amended Motion for a Preliminary Injunction.

## II.    LEGAL STANDARD

A preliminary injunction is an extraordinary form of relief. An application for a preliminary injunction is analyzed using factors applicable to a motion for a TRO. *See, e.g., Gordon v. Holder*, 632 F.3d 722, 723-24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; internal quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp*., 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291. Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.

The Court notes that it is not clear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter. See Save Jobs USA v. U.S. Dep't of Homeland Sec*., 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.; see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall evaluate the proper weight to accord the likelihood of success only if the Court finds that its relative weight would affect the outcome.

### III.   DISCUSSION

The Court will proceed to analyze each of the requirements for granting a preliminary injunction.

### A.  Likelihood of Success on the Merits

The Court will begin by analyzing whether or not Plaintiffs have shown a likelihood of success on the merits of their constitutional claims for inadequate conditions of confinement and their habeas claims for release of inmates.

### 1.  Conditions of Confinement

In order to meet the first requirement for granting injunctive relief on their conditions of confinement claims, Plaintiffs must show that they have a likelihood of success on the merits of their Fifth Amendment claim for pre-trial detainees and of their Eighth Amendment claim for post-conviction detainees. The Court concludes that Plaintiffs have made a sufficient showing as to some of the conditions of their confinement.

It is undisputed that the proper avenue for relief for pre-trial detainees, such as Plaintiffs Phillips and Smith, is the Fifth Amendment due process clause and the proper avenue for relief for post-conviction detainees, such as Plaintiff Banks, is the Eighth Amendment. However, the parties dispute whether or not the standards for sustaining a claim under the different Amendments are the same. The parties agree that to show a violation of the Eighth Amendment, jail officials must have (1) exposed inmates to an unreasonable risk of serious damage to their health and (2) acted with deliberate indifference in posing such a risk. D.C. Defs.' Opp'n, ECF No. 82, 25. However, the parties disagree on the standard for showing a violation of the Fifth Amendment. Defendants contend that the two standards are the same.  *Id.* at 26. However, under the due process clause, Plaintiffs argue that they need only show that the Defendants knew or should have known that the conditions posed an excessive risk to the health of the inmates. The

main difference being that the due process clause analysis does not require a finding of deliberate indifference. As explained in the Memorandum Opinion granting Plaintiffs' Motion for a TRO, the Court agrees with Plaintiffs. ECF No. 51, 9-12.

The rights of pre-trial detainees are different than the rights of post-conviction detainees. Because pre-trial detainees are presumed innocent, they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)).

In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the United States Supreme Court considered the differences between pre-trial and post-conviction detainees in deciding that, to state an excessive force claim, a pre-trial detainee need only show that the use of force was objectively unreasonable. 135 S. Ct. at 2473-74. The officers' subjective state of mind in using the force was irrelevant. *Id.* While *Kingsley* relates to excessive force rather than prison conditions, in making its decision, the *Kingsley* court relied on *Bell v. Wolfish*, 441 U.S. 520 (1979), a case pertaining to prison conditions. According to the *Kingsley* court, "as *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* Together *Kingsley* and *Bell* provide persuasive authority that a pre-trial detainee need only show that

prison conditions are objectively unreasonable in order to state a claim under the due process clause.

The parties did not cite, and the Court could not find, a D.C. Circuit case interpreting *Kingsley* in the context of a claim for deficient prison conditions. However, many circuit courts have extended *Kingsley's* objective standard to apply to other due process claims by pre-trial detainees. For example, the United States Court of Appeals for the Second Circuit has held that, following *Kingsley*, in the context of challenged prison conditions for pre-trial detainees, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d 2017); *see also Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (applying *Kingsley* standard to failure to protect claims by pre-trial detainees); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (finding that "*Kingsley's* objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees"). And, at least one district court within this Circuit has also applied *Kingsley's* objective standard to due process claims brought by pre-trial detainees. *See United States v. Moore*, Case No. 18-198-JEB, 2019 WL 2569659, *2 (D.D.C. June 21, 2019) (explaining that a pretrial detainee could prevail on a due process claim "if she either introduces evidence of a subjective intent to punish or demonstrates that a restriction is objectively unreasonable or excessive relative to the Government's proffered justification").

Based on the pertinent reasoning of *Kingsley* and the persuasive authority of other courts, the Court concludes that pre-trial detainee Plaintiffs Phillips and Smith do not need to show deliberate indifference in order to state a due process claim for inadequate conditions of confinement. As such, under the due process clause, pre-trial detainee Plaintiffs Phillips and

Smith are likely to succeed on the merits by showing that the Defendants knew or should have known that the jail conditions posed an excessive risk to their health and intentionally or recklessly failed to act. And, under the Eighth Amendment, post-conviction detainee Plaintiff Banks must show that the jail conditions exposed him to an unreasonable risk of serious damage to his health and that Defendants acted with deliberate indifference in posing such a risk.

Despite recognizing that pre-trial detainee Plaintiffs need not demonstrate deliberate indifference to show a likelihood of success on their due process claims, the Court will also analyze the deliberate indifference prong as such a showing is still required for post-conviction Plaintiff's Eighth Amendment claim.

### a. Unreasonable risk to Plaintiffs' Health

Now that the Court has determined the standards under the due process clause and the Eighth Amendment, the Court will assess whether or not Plaintiffs have shown a likelihood of success in proving that they have been exposed to an unreasonable risk of damage to their health. Determining whether or not Plaintiffs have been exposed to an unreasonable risk is an objective analysis which "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). In sum, Plaintiffs "must show that the risk of which [they] complain[] is not one that today's society chooses to tolerate." *Id.*

Both parties and the Court recognize the seriousness of the threat posed by COVID-19. Despite the seriousness of the threat, in their briefing for Plaintiffs' Motion for a TRO, Defendants argued that Plaintiffs were unlikely to succeed in establishing that they have been exposed to an unreasonable risk to their health. ECF No. 25, 15-17. While Defendants previously

disputed the unreasonable risk factor, in their briefing for this Motion, Defendants make little mention of unreasonable risk, focusing instead on deliberate indifference.

Lacking substantial argument on this issue from Defendants, the Court finds that Plaintiffs have been exposed to an unreasonable risk to their health. It is undisputed that as of May 15, 2020, the rate of infection in DOC facilities was 13.5%, which is nearly 14 times higher than the rate of infection for other District of Columbia residents. Pls.' Mot., ECF No. 70, 29. The Court notes that this percentage represents an increase from April 4, 2020, when the infection rate in DOC facilities was only 7 times the infection rate of the District of Columbia at large. ECF No. 51, 13.

In a supplemental declaration, Defendants state that on May 22, 2020, the DOC tested a sample of 304 asymptomatic DOC residents which revealed a positive testing rate of 4.6%. Dec. of Beth Jordan, ECF No. 94, ¶ 7. While any progress in decreasing the positive testing rate of asymptomatic inmates is to be lauded, such progress does not negate the fact that those detained in DOC facilities are far more likely to be exposed to and infected by COVID-19. Defendants further highlight a downward trend in the number of new positive cases. Again, the Court commends Defendants on this progress; however, this progress post-dates the Court's TRO Order and the mandated steps for improvement of conditions at DOC facilities. Additionally, Defendants' identification of potentially infected inmates relies primarily on self-reporting, which may be affected by deficiencies with the sick call system and the punitive conditions of isolation units discussed further below. *See Supra* III.A.1.b.

Plaintiffs' statistical data is also supported by Plaintiffs' unrefuted expert declaration.  In her Declaration, Dr. Jaimie Meyer, who reviewed reports on conditions in DOC facilities,

reaffirmed that "people living and working in DC DOC facilities remain at risk of serious harm due to COVID-19 infection." Dec. of Jaimie Meyer, ECF No. 70-2, ¶ 3.

The Court further considers the conditions in the DOC facilities which pose an unreasonable risk of harm to Plaintiffs' health. These conditions include issues with medical care, social distancing, sanitation, and conditions in isolation units. These conditions will be discussed in greater detail in the Court's discussion of deliberate indifference. *See Infra* Sec. III.A.1.b. However, for purposes of establishing an unreasonable risk to Plaintiffs' health, the Court notes that Defendants' policies, and the delayed and insufficient implementation of many of those policies, has prevented Plaintiffs from being able to take the preventative and precautionary steps that the larger, non-detained population has been able to take to slow the spread of COVID-19.

The Court recognizes that Defendants' response to this sudden and unprecedented pandemic is ongoing. And, the Court recognizes that additional evidence will likely be provided as litigation proceeds. But, based on the current record, the Court credits Plaintiffs' argument that they experience a significantly higher rate of infection and risk of harm than the population at large. Plaintiffs' argument is supported by statistical evidence, Plaintiffs' expert evidence, the declarations of DOC inmates and staff, and the amici reports. Accordingly, based on the limited record before the Court, the Court finds that Plaintiffs have established a likelihood that they will be able to show that they have been exposed to an unreasonable risk of damage to their health.

### b.  Deliberate Indifference

The Court will next determine whether or not Plaintiffs have shown a likelihood of success in establishing Defendants' deliberate indifference. A showing of deliberate indifference requires "that officials had subjective knowledge of the serious medical need and recklessly

disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). In order to establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

There does not appear to be any dispute that Defendants are aware of the threat that COVID-19 poses to the health of Plaintiffs. Instead, the only dispute is whether or not Defendants have recklessly disregarded the risk to Plaintiffs' health. In analyzing this standard, the Court recognizes that COVID-19 poses an unprecedented challenge and that the precautionary measures taken by Defendants are rapidly evolving.

In its Memorandum Opinion granting Plaintiffs' TRO, the Court thoroughly recounted the conditions at DOC facilities as they stood at that time. ECF Nos. 50, 51. The Court will not recount that information in full and instead fully incorporates its findings from that Memorandum Opinion. Instead, the Court will focus on any new arguments presented by the parties. The Court will focus on difficulties noted in providing medical care to inmates in the general population units, in social distancing, in sanitation, in conditions on isolation units, and in access to legal calls.

To begin, the Court notes that much of Defendants' argument opposing injunctive relief is based on steps which Defendants have taken subsequent to the Court's TRO Order to remedy the cited deficiencies. While the Court appreciates that efforts have been made to improve conditions, "Defendants cannot claim that the need for an injunction is now moot because the [Defendants have] 'ceased [their] wrongful conduct.'" *Costa v. Bazron*, Case No. 19-3185, 2020 WL 2735666, *4 (May 24, 2020 D.D.C.) (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d

1497 (D.C. Cir. 1995)). The inability of Defendants' actions to moot the need for injunctive

relief is true particularly where those actions "follow[ed] the entry of a TRO." *Id.* A "'court's

power to grant injunctive relief survives discontinuance of the illegal conduct,' ... because the

'purpose ... is to prevent future violations.'" *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F.

Supp. 3d 132, 143 (D.D.C. 2015), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016) (quoting *United States

v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). In so finding, the Court is in no way impugning

the good faith behind Defendants' efforts to ameliorate conditions at DOC facilities. However,

"[i]f compliance with the terms of a TRO were sufficient to defeat entry of a preliminary

injunction, few—if any—cases would make it past the TRO stage." *Costa*, 2020 WL 2735666, at

*4.

 The Court begins by assessing Defendants' efforts in supplying general population

inmates with adequate medical care. During their oral presentation, amici "described significant

barriers to access to health care" for inmates on non-quarantine, non-isolation units. Attachment

4, 9. Most inmates who access care on general population units rely on the sick call process by

which they request sick call forms from correctional officers and submit those forms to health

care staff through designated collection boxes. *Id.* at 10. In their inspections, amici found that the

sick call forms were not readily available to inmates and that many correctional officers were

unable to produce the forms when requested to by amici. *Id.*; *see also* Attachment 3, 17: 2-4.

Without consistent access to sick call forms, "the sick call process does not provide reliable,

timely access to health care for inmates." Attachment 4, 10. For example, at CDF, 20% of sick

call forms were collected two to three days after submission and 5% were collected four days

after submission. Attachment 3, 18: 16-22. And, at CTF, 24% of the sick call forms were

collected two to three days after submission and 12% were collected 4 to 5 days after they were

submitted. *Id.* at 18: 25-19: 3. In at least one case, an inmate at CDF had to wait over a week for medical assistance. *Id*. at 19: 22-23.  Another inmate at CDF who requested care for COVID-19 symptoms was not seen for approximately four days and later tested positive for COVID-19. *Id*. at 20: 1-7.

The difficulties with obtaining medical care through the sick call process, which were documented by amici, are also supported by the declarations of various inmates. One inmate reported that "they ran out of sick slips" in his housing unit so no residents in that unit were able to utilize the system. Ex. 4, Dec. of LeDauntae Perry, ECF No. 70-5, ¶ 8. Another inmate reported that "[s]ick call slips and Inmate Grievance Procedure forms were not … available on my unit between the dates of April 23, 2020 and May 12, 2020." Ex. 30, Dec. of Kenneth Knight, ECF No. 70-31, ¶ 5. A housing unit in CTF, which houses inmates over 50 years of age, reportedly did not have sick call slips "[f]or the entire week of May 4, 2020." Ex. 5, Dec. of Joseph Stankavage, ECF No. 70-6, ¶ 15. This delay in obtaining medical care allows those who may be infected with COVID-19 to spread the infection to others.

Defendants contend that, as of May 18, 2020, they have enhanced the sick call process by tasking medical providers with visiting housing units daily to retrieve sick call slips thus ensuring that inmates are seen by a high-level medical provider within 24 hours. Dec. of Beth Jordan, ECF No. 82-2, ¶ 9. However, it is not evident that this new system will address the issues that amici identified involving difficulties accessing sick call forms. Additionally, Defendants failed to make these improvements until recently, despite having been previously alerted to the insufficiencies with the medical care system in the Court's TRO Order. ECF No. 50, 1. And, the Court has no evidence as to how or whether this new procedure works in practice.

Defendants primarily rely on inmates to self-report symptoms of COVID-19. If inmates cannot adequately access medical care, then they will not be effectively or efficiently tested for infection. Absent testing, sick inmates may continue to reside in the general population and infect others. Following amici's initial report, Defendants were on notice of the deficiencies in the sick call process; however, many of these deficiencies continue to hinder Defendants' response to the COVID-19 pandemic.

The Court next examines Defendants' efforts in maintaining social distancing. In its TRO Memorandum Opinion, the Court described in detail the insufficiencies in social distancing practices at DOC facilities. ECF No. 51, 13-15.  Following the TRO Order, amici have reported some improvements in social distancing practices. Amici cited additional educational materials on social distancing as well as reports that "staff are being disciplined for the failure to enforce social distancing." Attachment 3, 42: 14-16.  Amici further reported that, because fewer inmates are allowed out of their cells at any given time, "at least some housing units are less chaotic." *Id*. at 43: 1-2. Despite these improvements, amici reported that social distancing in DOC facilities "certainly is not prevalent, certainly not during our visits." *Id*. at 42: 18-19. Amici further stated that "there still isn't a prevalence of social distancing." *Id*. at 43: 14-15. Amici attributed this deficiency, in part, to insufficient staffing on the housing units. *Id*. at 43: 16-18.

In arguing that it has made progress in enforcing social distancing, Defendants cite a decrease in the overall inmate population as well as an increase in the percentage of inmates housed in single cells. Dec. of Rena Chakraborty, ECF No. 82-3, ¶¶ 5-6. Defendants have also provided inmates and staff with increased educational information about social distancing. Dec. of Lennard Johnson, ECF No. 82-1, ¶¶ 6-7. Defendants echo the amici finding that staff are being monitored for inmate compliance with social distancing requirements and are being

disciplined for failures. *Id.* at ¶ 6. Given the steps which have been taken to enforce social distancing, Defendants contend that they cannot be blamed for isolated instances of clustering.

The Court commends Defendants for their increased focus on social distancing policies. However, better policies mean little if they are not correctly implemented in practice. *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) (explaining that "a 'paper' policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation."). And, amici found more than isolated instances of clustering. They specifically stated that social distancing "is not prevalent." Attachment 3, 42: 18-19.

In addition to the amici findings, Plaintiffs have presented evidence that social distancing is still inadequately enforced. One inmate reported that he was never told to socially distance himself from others. Ex. 2, Dec. of Brian Thomas, ECF No. 70-3, ¶ 17. Another inmate on a different housing unit stated that, sometimes, more than 10 inmates are allowed out of their cells at one time, resulting in clustering. Ex. 11, Dec. of Tony Horne, ECF No. 70-12, ¶ 9. One inmate reported that, on May 12, 2020, DOC staff forced him into an elevator with approximately a dozen other inmates from various housing units to travel to the medical unit. Ex. 5, Dec. of Joseph Stankavage, ECF No. 70-6, ¶ 3. Once at the medical unit, the inmate had to await medical attention in a small room with 15 to 20 other inmates. *Id.* at ¶ 6. These inmate declarations are supported by video footage from DOC facilities showing approximately 10 inmates out of their cells congregating around telephones and DOC staff. Ex. 32.

As such, the Court finds that many of the deficiencies in social distancing practices which were identified in the Court's TRO Order remain present today. Plaintiffs have provided expert evidence that social distancing is a crucial part of containing the spread of COVID-19. Dec. of

Marc Stern, ECF No. 1-1, ¶ 13. With the closures of schools, theaters, and restaurants,

governments across the nation have emphasized social distancing as a way to slow the spread of

the disease. In the District of Columbia, Mayor Muriel Bowser has implemented an order for

social distancing which requires individuals "to maintain a distance of at least six (6) feet from

persons not in their household." Phase One Order, https://coronavirus.dc.gov/phaseone (May 27,

2020). Despite widespread understanding of the importance of social distancing, Defendants

have taken insufficient and delayed steps to ensure that social distancing is occurring

consistently.

The Court next examines the status of sanitation efforts at DOC facilities. In its TRO

Order, the Court noted the deficiencies in sanitation. The court ordered DOC to retain a

registered sanitarian and to provide appropriate cleaning products, and training on the use of

those products, to inmates and staff. ECF No. 50, 2-3.

Defendants have made progress on ensuring adequate sanitation. Defendants have

received authorization to post a vacancy for a full-time sanitarian at the DOC. Attachment 4, 14.

Until a sanitarian can be hired, beginning on May 18, 2020, Defendants contracted with a vendor

to provide services related to environmental health and safety. *Id*. Additionally, as of May 12,

2020, Defendants contracted for professional cleaning services on the secure and non-secure

sides of the DOC facility, including the common areas of all housing units. *Id.* at 15. And,

Defendants have created new protocols to ensure that cleaning supplies are available and to

require correctional officers to verify that cells are cleaned daily. Dec of Michele Jones, ECF No.

82-6, ¶¶ 5, 9.

However, there are other aspects of sanitation which have not improved. The amici noted

that during their visits, availability of cleaning materials and cleaning equipment was not

uniform between the housing units. Attachment 3, 40: 24-41: 3. Defendants began providing

inmates with paper towels sprayed with cleaning solution; however, because the paper towels are

not absorbent, many inmates continue to have difficulties cleaning their cells. *Id*. at 41: 9-15.

Some inmates continue to rely on ripped towels and ripped t-shirts to clean their cells. *Id*. at 41:

13-15. Amici noted that this issue is "[a]bout the same" as it was prior to the Court's TRO Order.

*Id*. at 44: 2. Amici concluded that "appropriate sanitation is … a continuing issue at both

facilities, and clearly especially deficient at the jail [CDF]." *Id*. at 41: 20-22.

 Plaintiffs have provided evidence from inmates which echoes these noted deficiencies.

Many inmates explained that they lack cleaning supplies to clean their cells. *See, e.g*., Ex. 14,

Dec. of Delonte Ingraham, ECF No. 70-15, ¶ 47 ("On April 27, our unit ran out of cleaning

supplies"); Ex. 16, Dec. of Jarvis Burl, ECF No. 70-17, ¶ 8 ("I have not been provided any

cleaning supplies to clean my cell") Ex. 12, Dec. of Delonte Johnson, ECF No. 70-13, ¶ 3

("During the period from April 22, 2020 to May 8, 2020 I did not have access to any chemicals

to clean my cell"). At least one inmate reported having to clean the cells of inmates who tested

positive for COVID-19 with Oasis Pro Laundry Fresh Room Refresher, a product which does

"not have activity against and is not approved for disinfection for COVID-19." Ex. 1, Dec. of

Jaimie Meyer, ECF No. 70-2, ¶ 11; Ex. 21, Dec. of Elijah Warren, ECF No. 70-22, ¶ 21. Even

when residents have adequate access to cleaning materials, often they have not been informed on

how to effectively use those materials. Ex. 14, Dec. of Delonte Ingraham, ECF No. 70-15, ¶ 44

("Since April 19, my unit has not received any instructions on which cleaning chemicals to use

on which surfaces").

 Without proper cleaning materials used effectively, COVID-19 can linger on surfaces

allowing the virus to spread swiftly in contained environments such as DOC facilities. Ex. 1,

Dec. of Jaimie Meyer, ECF No. 70-2, ¶ 11. "Cleaning and disinfecting practices can mitigate this risk of disease transmission but remains inadequate in the DC DOC." *Id*. While progress has been made, most of that progress post-dates the Court's TRO Order. And, many of the issues initially identified by the amici persist.[3]

Next, the Court considers conditions in isolation units. In its TRO Order, the Court ordered Defendants to make conditions in the isolation unit non-punitive by providing reliable access to telephone calls, daily showers, and clean clothing and linens. ECF No. 50, 2. In conducting their review, the amici noted some continuing issues in the isolation units. While inmates in the isolation unit at the infirmary in CTF had access to calls through a rolling telephone cart, inmates in isolation at CDF had continued difficulties with personal and legal calls. Attachment 3, 29: 12-30: 8. The rolling telephone cart was not available to isolation inmates in a particular segment of the housing unit. Instead, they had to make calls from the office area which was not always available. *Id*. at 30: 3-10. While there has been improvement in the isolation units with access to legal and personal calls, "[i]t appears that additional progress may be necessary." *Id*. at 33: 10-12. The amici also noted that while showers were being provided to inmates in isolation, sometimes several days would pass between showers. *Id*. at 34: 15-18. Amici attributed the lack of shower access to inadequate staffing combined with other incidents and disturbances. *Id*. at 34: 19-23. Amici further explained that staff and inmates had reported clothing and linen exchanges. However, those exchanges were occurring with increased

---

[3] The Court notes that Defendants contend that they have now provided each inmate with a microfiber towel for cleaning. Defendants cite paragraph 12 of the declaration of either Kathleen Landerkin or Michele Jones. However, neither declaration contains a paragraph 12, and the Court did not see mention of a microfiber towel. *See generally*, Dec. of Kathleen Landerkin, ECF No. 82-5; Dec. of Michele Jones, ECF No. 82-6. Additionally, these towels were not provided until after the amici's visit, and the Court has no evidence of how this new cleaning tool works in practice.

frequency only very recently. It was too early for amici to be able to judge whether or not those exchanges occurred with consistency. *Id*. at 35: 9-16.

Defendants contend that conditions on the isolation unit are greatly improved. According to Defendants, following the amici review, all residents in isolation units have access to the rolling telephone carts. Dec. of Kathleen Landerkin, ECF No. 82-5, ¶ 11. Defendants also highlight that residents in isolation units are checked by medical staff at least twice daily. Dec. of Beth Jordan, ECF No. 82-2, ¶ 4.

Again, the Court credits Defendants for their progress in making isolation units less punitive environments. However, the Court notes that this progress occurred only subsequent to the Court's TRO Order. Moreover, there remains progress to be made. While Defendants claim that all inmates in isolation units now have access to the rolling telephone cart for personal and legal calls, this was not the case during the amici visits. Additionally, amici noted that Defendants had only recently increased the frequency of the clothing and linen exchanges for those in isolation. And, amici found that many inmates in isolation were having to wait several days between showers. Amici's findings are supported by declarations of inmates who have been in the isolation units. Ex. 7, Dec. of Romiel Hightower, ECF No. 70-8, ¶ 9 ("I had many fewer opportunities to shower, only once every three or four days after lots of complaining"); Ex. 13, Dec. of Anthony Robertson, ECF no. 70-14, ¶ 10 ("Between April 23rd and April 28th [in isolation unit], I was not able to shower"). The lack of daily access to showers for those in isolation violates Defendants' own policies and procedures. *See* Attachment 2, Ex. 11, 2 ("All residents housed in isolation units shall be allowed to shower each day."). The continuation of punitive conditions on the isolation units serves as a barrier to containing the spread of COVID-19 as Defendants primarily rely on inmates to self-report symptoms.

Finally, the Court addresses inmates' access to confidential legal calls. In its TRO Order, the Court required Defendants to "ensure that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters." ECF No. 50, 3. As previously explained, inmates in isolation have access to a rolling telephone cart to make personal and legal calls. Lacking telephone carts, those in general population units have been forced to make calls through the case managers' office; however, these calls are not confidential. Dec. of Camile Williams, ECF No. 82-9, ¶ 4. Defendants state that they have recently obtained 50 cellphones and 10 wired headsets to allow inmates to make confidential calls. *Id*. at ¶ 5. Defendants have ordered an additional 50 wireless headsets which will arrive in June 2020. *Id*. Additionally, Defendants state that they have harnessed digital tablets to allow inmates to message securely with their attorneys. Dec. of Amy Lopez, ECF No. 82-8, ¶¶ 4-6. Defendants currently have 500 tablets and expect an order of 1,000 more to arrive in June 2020. *Id*. at ¶¶ 5, 8.

The use of cellphones, wireless headsets, and tablets is a recent development and was not seen during the amici visit. Amici reported that, in order to obtain 30-minute unmonitored legal calls, attorneys are required to email DOC case managers to register for the call system. Attachment 3, 31: 13-15. Once the attorney has registered, the attorney notifies the client by mail and provides contact information. *Id*. at 31: 23-32: 4. Due to mail delays, some inmates have difficulty accessing this information. *Id*. at 32: 4-8. When these calls are conducted, they are conducted in the presence of a case manager, so the calls are not confidential. *Id*. at 33: 13-23. Amici witnessed two to three inmates "conducting legal calls in the case manager's office with the case manager clearly within earshot." *Id*. at 33: 18-21; *see also* Ex. 9, Dec. of Kennard Johnson, ECF No. 70-10, ¶ 16 ("On April 27, 2020, I had a legal call in the case manager's

office. The case manager was sitting right there during the legal call and could hear the

conversation.").

In addition to the case manager system, inmates in general population can use phones in

the housing units to contact their legal counsel. However, a barrier to the use of phones in the

housing units is the fact that inmates are frequently locked in their cells and sometimes "do not

receive an hour out of their cells daily." Attachment 3, 17: 13-17. When inmates are let out of

their cells, it may be in the middle of the night. *Id.* at 36: 10-19. So, while general population

inmates may be allowed to call their attorneys from phones in the housing units, the inability to

leave their cells during business hours prevents inmates from being able to reach their attorneys.

Ex. 10, Dec. of Eric Cooper, ECF No. 70-11, ¶ 13 ("Sometimes I am not let out for my hour of

recreation time. Sometimes when they do let me out it is done at 3:00 in the morning so I cannot

call my family or attorney.").

The Court credits Defendants for their efforts to obtain new technology to ensure inmates

have access to confidential legal calls. However, it appears that some of these new processes

have not yet reached the implementation stage. Defendants report that they "*have been working*

to set up accounts for each resident" to be able to use the tablets to message their attorneys. Dec.

of Amy Lopez, ECF No. 82-6, ¶ 6 (emphasis added). Defendants "*have also been working*" with

defense attorneys to ensure that they have access to the messaging system. *Id.* (emphasis added).

Similarly, as to the cellphones, Defendants report that "[c]ase managers *will use* these cell

phones to facilitate secure, unmonitored attorney calls." Dec. of Camile Williams, ECF No. 82-9,

¶ 5 (emphasis added). Defendants do not provide a timeline for the implementation of this new

technology. As such, nearly four months into the COVID-19 pandemic, Defendants have not yet

developed a consistent procedure for all inmates to be able to make and receive confidential legal calls.

Based on the current record, Plaintiffs have provided evidence that Defendants are aware of the risks that COVID-19 poses to Plaintiffs' health and have disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus. Again, the Court acknowledges that additional development of the record may show that Defendants are taking sufficient precautions and that Defendants' response continues to evolve. However, on the current record, the Court finds that Plaintiffs have established a likelihood of success in showing deliberate indifference.

### c. Municipal Liability

Defendants further argue that Plaintiffs cannot show a likelihood of success on the merits of their constitutional claims because Plaintiffs have failed to establish a municipal policy or custom necessary for liability. "'[E]pisodic failures of process do not make out a constitutional violation.'" *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 335 (D.D.C. 2007) (quoting *Lightfoot v. District of Columbia*, 448 F.3d 392, 402 (D.C. Cir. 2006) (Silberman, S.J., concurring)). Instead, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978)); *see also Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) ("One instance, however egregious, does not a pattern or practice make."). Generally, in order to establish a policy or custom sufficient to confer liability, a plaintiff must establish an express municipal policy, actions of a policy maker, consistent conduct by non-policy makers, or

deliberate indifference to the risk of constitutional injury. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003).

Defendants contend that Plaintiffs cannot make such a showing because their evidence of misconduct amounts to no more than anecdotes and hearsay. Defendants further assert that they have established policies to address the conditions, and the imperfect implementation of those policies is insufficient to establish municipal liability. The Court disagrees.

The Court finds that Plaintiffs are likely to establish municipal liability because the challenged conditions are the actions of a policy maker and because Defendants have exhibited deliberate indifference.

First, the challenged conditions represent the policies and procedures approved of by Defendant Booth, the final policy maker at DOC facilities. *See Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (recognizing director of DOC as final policy maker). Defendant Booth has personally approved plans and policies for addressing COVID-19. *See* ECF No. 40-2 (emergency plan for COVID-19, signed by Defendant Booth); Attachment 2, Ex. 11 (update memorandum from Defendant Booth on COVID-19 procedures). Because a final policy maker was involved in addressing the conditions of the DOC facilities in response to COVID-19, and because this was a matter within his authority, the Court finds that Plaintiffs have established a likelihood of municipal liability. *See Costa*, 2020 WL 2735666, at *14 (finding likelihood of municipal liability where the director of the hospital was personally involved in the hospital's response to COVID-19); *see also Thompson v. District of Columbia*, 832 F.3d 339, 347-48 (D.C. Cir. 2016) (explaining that a "single action can represent municipal policy where the acting official has final policymaking authority over the particular area, or ... particular issue" (internal quotation marks omitted)).

Second, the Court finds that Plaintiffs have established a likelihood of success on the merits of their claim of municipal liability through a showing of deliberate indifference. A municipality is liable where the government failed "to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F. 3d at 1306-07. The standard for deliberate indifference for purposes of municipal liability is lower than the standard for deliberate inference for purposes of Eighth Amendment violations because a showing of subjective indifference is not required. Rather the plaintiff must show that the government "knew or should have known of the risk of constitutional violations, an objective standard." *Id*. at 1307. For the reasons discussed above, the Court has already found that Defendants' conduct meets this standard of deliberate indifference. *See Supra* III.A.1.b.

Based on both the conduct of a final policy maker and deliberate indifference, the Court finds that Plaintiffs have shown a likelihood of success on the merits of their municipal liability claims for the conditions of their confinement.

### d. Exhaustion

Finally, Defendants contend that Plaintiffs cannot show a likelihood of success on the merits of their constitutional claims because Plaintiffs have failed to exhaust their administrative remedies. Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 520 (2002) (holding that the PLRA's "exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences").

Defendants contend that Plaintiffs cannot bring their conditions of confinement claims because they have not exhausted the DOC's Inmate Grievance Procedures.

However, Defendants appear to be mistaken. Plaintiff Banks has submitted evidence that he filed an emergency grievance with Defendant Booth on March 24, 2020. *See* Ex. H, ECF No. 89-8. DOC policies require a response to emergency grievances within 72 hours. Ex. G, ECF No. 89-7, 17. However, Plaintiff had not received a response when this lawsuit was filed six days later on March 30, 2020. "[A] prison's failure to timely respond to an inmate's properly filed grievance renders its remedies 'unavailable' under the PLRA." *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016); *see also Lineberry v. Fed. Bureau of Prisons*, 923 F. Supp. 2d 284, 293 (D.D.C. 2013) ("If . . . prison officials . . . ignore such a request . . . exhaustion may be excused." (internal quotation marks omitted)).

Because at least one Plaintiff has pursued available administrative remedies through the emergency grievance process, "the plaintiff class has met the filing prerequisite." *Jackson v. District of Columbia*, 254 F.3d 262, 269 (D.C. Cir. 2001) (internal quotation marks omitted). The Court acknowledges that it has not yet ruled on Plaintiffs' Motion to Certify a Class. ECF No. 3. However, the Court finds Plaintiffs' evidence of exhaustion sufficient to show a likelihood of success on the merits of exhaustion.

### 2.  Claims for Release

While the Court finds that Plaintiffs have shown a likelihood of success on their claims for Eighth and Fifth Amendment violations based on the conditions of their confinement, the Court further finds that Plaintiffs have not shown a likelihood of success on the merits of their habeas claims for release. Plaintiffs have failed to show a likelihood of success on the merits of

their habeas claims because, without Court intervention, Defendants have already taken substantial steps to decrease the inmate population at DOC facilities.[4]

In the Court's TRO Order, the Court did not order Defendants to take any actions for the release of inmates. *See* ECF No. 50. Even before the Court issued its TRO Order, the adjudication of individualized petitions for release and the doubling of the maximum number of sentencing credits that a misdemeanant could receive had already led to the release of all but nine inmates convicted of misdemeanors. ECF No. 51, 27.

Since the Court's TRO Order, the population of the DOC facilities has continued to decline. In their oral report, the amici of the Court noted a "significant reduction" in the population of DOC facilities. Attachment 3, 7: 11-16. On March 24, 2020, the total inmate population at DOC facilities was 1,739. Dec. of Aaron Sawyer, ECF No. 80-1, ¶ 7. And, as of June 16, 2020, that population had decreased to 1,260. This reduction represents a population decrease of approximately 28%. *See* Pls.' Mot., ECF No. 70, 1-2 (lauding Arlington County Detention Center for decreasing its inmate population by slightly less than a third).

This reduction has been accomplished through many avenues. As has already been discussed, both the Superior Court for the District of Columbia and the United States District Court for the District of Columbia have adjudicated individual petitions for release relating to the COVID-19 crisis. Additionally, the DOC doubled the maximum number of sentencing credits that a misdemeanant could receive in order to expedite the release of non-dangerous misdemeanants. And, the Metropolitan Police Department and the United States Attorney's

---

[4] Throughout their briefing, the parties devote considerable space to arguing about whether or not the Prison Litigation Reform Act ("PLRA") applies to Plaintiffs' habeas requests for release. Because the Court concludes that Plaintiffs have not shown a sufficient need for the release of inmates, at this time, the Court does not need to determine whether or not the PLRA would apply to Plaintiffs' habeas claims.

Office have made efforts to classify more offenses as citations not requiring detention. Attachment 3, 49: 1-3.

The United States Marshals Service has also taken steps to reduce the inmate population. As of April 14, 2020, the Marshals Service ceased processing federal arrests through DOC facilities. Dec. of Aaron Sawyer, ECF No. 80-1, ¶ 12. And, in early June 2020, the Marshals Service moved approximately 120 sentenced and designated inmates from DOC facilities to BOP quarantine facilities where they will await transfer to other BOP facilities. *Id*. at ¶¶ 7-9. In addition, the Marshals Service has transferred approximately 15 inmates at high risk for contracting COVID-19 and is working to transfer approximately 20 more high-risk inmates. *Id*. at ¶ 10. The Marshals Service has further collaborated with the United States Attorney's Office for the District of Columbia in an effort to transfer 50-100 inmates who are committed to other institutions but are being temporarily detained in DOC facilities. *Id.* at ¶ 11. The Court commends the Marshals Service's success in moving inmates from DOC facilities particularly given the travel restrictions and other regulations stemming from COVID-19 and their other responsibilities.

Additionally, the United States Parole Commission has made progress in reducing the inmate population at DOC facilities. Starting in mid-March 2020, the Parole Commission has reduced the number of warrants issued for parole and supervised release violations to those posing an imminent risk to public safety. Dec. of Stephen J. Husk, ECF No. 80-3, ¶ 5. And, on April 3, 2020, the Parole Commission began reviewing supervised release violators to consider reducing the prison term imposed for offenders 60 years of age or older who meet certain requirements. *Id.* at ¶ 7. During April 2020, the Parole Commission further individually reviewed each inmate confined on a parole matter and considered them for possible release. *Id.* at ¶ 8.

Throughout the end of May and the beginning of June 2020, the Parole Commission has also been reviewing approximately 90 offenders who have detainers against them to apply heightened scrutiny to see if the detainer may be removed. *Id*. at ¶ 13. These efforts have resulted in the DOC inmate population under the Parole Commission's jurisdiction being reduced from 270 on March 16, 2020 to 121 as of May 21, 2020. *Id*. at ¶ 6.

Plaintiffs complain that the steps that Defendants have taken are too little too late. While the Court agrees that more can yet be accomplished, the Court finds that Defendants have taken concrete steps, dating from before the TRO Order, to reduce the inmate population at DOC facilities. Without Court intervention, the DOC inmate population has already decreased by approximately 28%, and Defendants have indicated steps that will be taken to continue to reduce the population. As such, the Court finds that Plaintiffs are unlikely to prevail on their habeas claims for release.

The Court acknowledges that reducing the inmate population will likely slow the spread of COVID-19. However, in addition to individual inmates who have requested reviews for release, Defendants have already initiated systematic approaches to inmate population reduction without Court intervention. The Court finds it necessary and proper for Defendants to continue updating the Court on their approaches to inmate population reduction and for the Court to continue reviewing those approaches. However, at this time, the Court does not find that additional intervention is warranted on this issue.

For the reasons explained above, the Court finds that Plaintiffs have not established a likelihood of success on their habeas claims for release. The Court DENIES WITHOUT PREJUDICE Plaintiffs' Motion on this ground.

### B. Irreparable Harm

Next, the court considers whether or not Plaintiffs have made a showing of irreparable harm on their constitutional claims for conditions of confinement. "[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed.2013)). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical— and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted, emphasis in original).

Plaintiffs' theory of irreparable harm rests on the risk of contracting COVID-19 and the resulting health complication. The Court concludes that Plaintiffs' risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm. *See Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 766 (9th Cir. 2004) (finding irreparable harm from pain, infection, and possible death due to delayed treatment from the reduction of hospital beds). "Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (citing *Wilson v. Group Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (granting preliminary injunction where cancer patient's "health and future remain[ed] in serious doubt" and insurance would not pay for life-saving treatment)).

Defendants do not appear to contest that the risk of contracting COVID-19 constitutes irreparable harm. Instead, Defendants contend that Plaintiffs cannot establish irreparable harm "given that the considerable efforts of DOC are working to slow and prevent the spread of COVID-19 in its facilities." D.C. Defs.' Opp'n, ECF No. 82, 37. Defendants further argue that "the three plaintiffs have failed to show that they are facing any risk of imminent harm themselves" as each Plaintiff has not submitted an individualized declaration of potential risk. *Id*.

The Court disagrees. Plaintiffs have submitted evidence that "people living and working in DC DOC facilities remain at risk of serious harm due to COVID-19 infection." Dec. of Jaimie Meyer, ECF No. 70-2, ¶ 3. While the Court lauds the progress Defendants have made, such progress is not sufficient to negate Plaintiffs' risk of harm from contracting COVID-19. This risk of harm applies to Plaintiffs as COVID-19 is an infectious disease which spreads quickly and fatally in congregate settings, such as DOC facilities. "The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." Dec. of Jaimie Meyer, ECF No. 5-2, ¶ 9. As inmates at DOC facilities, this increased risk of exposure, contraction, and harm applies to Plaintiffs. The fact that the increased risk is widespread among inmates at DOC facilities does nothing to reduce Plaintiffs' potential for irreparable harm.

Defendants, as well as society at large, are facing an unprecedented challenge. The risks of contracting COVID-19 are very real for those both inside and outside DOC facilities. However, Plaintiffs have produced evidence that inadequate precautionary measures at DOC facilities have increased their risk of contracting COVID-19 and facing serious health consequences, including death. Given the gravity of Plaintiffs' asserted injury, as well as the

permanence of death, the Court finds that Plaintiffs have satisfied the requirement of facing irreparable harm unless injunctive relief is granted.

### C.  The Balance of Hardships and the Public Interest

The Court moves to the final factors to be considered in granting a temporary restraining order—the balance of the equities and the public interest. In this case, where the government is a party to the suit, the harm to Defendants and the public interest merge and "are one and the same, because the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). The Court finds that the public interest weighs in favor of granting injunctive relief on Plaintiffs' constitutional claims for the conditions of their confinement.

First, the Court notes that Plaintiffs have established a likelihood that they will prevail on the merits of their due process and Eighth Amendment claims. And, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted). There is no harm to the Government when a court prevents unlawful practices.

Additionally, granting injunctive relief which lessens the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public health. No man's health is an island. If Plaintiffs contract COVID-19, they risk infecting others inside the DOC facilities. Plaintiffs also risk infecting DOC staff members who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large. Additionally, if Plaintiffs contract COVID-19 and experience complications, "they will be transported to community hospitals— thereby using scarce community resources (ER beds, general hospital beds, ICU beds)." Dec. of Marc Stern, ECF No. 1-1, ¶ 13. As such, ordering

Defendants to take precautions to lower the risk of infections for Plaintiffs also benefits the public.

Defendants argue that imposing injunctive relief will disrupt efforts already underway to address the COVID-19 crisis. Defendants contend that injunctive relief would impose an undue burden which would divert time and resources from the precautions already being undertaken.

However, the Court finds that the relief which will be granted, to be detailed below, is narrowly tailored and does not impose an undue burden on Defendants. The Court begins by noting that the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). Declarations by DOC officials claim that Defendants are already complying with much of the requested relief. *See, e.g.*, Dec. of Lennard Johnson, ECF No. 82-1, ¶ 6 (social distancing enforced); ¶ 8 (clean linens and clothing for inmates); ¶ 10 (availability of free legal calls); Dec. of Beth Jordon, ECF No. 82-2, ¶ 4 (description of practices in isolation units); ¶ 5 (quarantine and isolation standards); ¶¶ 8-9 (enhanced sick call process); ¶ 10 (testing). The Court's Order simply ensures that the precautions are being taken consistently and effectively. Moreover, the Court does not order Defendants to take precautions that are not already being undertaken by much of the population. In lessening the number of inmates infected with COVID-19, Defendants actually lessen the healthcare burden that they will be facing in the weeks and months to come.

Defendants further argue that ordering injunctive relief will impose on the broad discretion of the executive in operating correctional institutions. The Court acknowledges the public interest in permitting the government discretion to carry out its authorized functions. However, "[c]ourts may not allow constitutional violations to continue simply because a remedy

would involve intrusion into the realm of prison administration." *Brown*, 563 U.S. at 511. The

D.C. Circuit has previously authorized injunctive relief against correctional facilities, even where

the injunctive relief imposes a particular set of conditions. *See Campbell v. McGruder*, 580 F.2d

521, 551-52 (D.C. Cir. 1978) (finding specific conditions not unduly intrusive because there was

"no alternative if the rights of pretrial detainees are to be respected"). And, other courts have also

found that the balance of the equities favors injunctive relief to ensure that inmates are

adequately protected from the threat of COVID-19. *See Seth v. McDonough*, Case No. 20-cv-

1028, 2020 WL 2571168 (D. Md. May 21, 2020) (granting injunctive relief requiring

correctional facility to take actions on testing, PPE, training, education, supervision, and medical

care due to COVID-19); *Cameron v. Bouchard*, Case No. 20-10949, 2020 WL 1929876 (E.D.

Mich. April 17, 2020) (injunctive order mandating correctional facility take certain steps

involving sanitation, PPE, and medical care in response to COVID-19); *Mays v. Dart*, Case No.

20-C-2134, 2020 WL 1987007 (N.D. Ill. April 27, 2020) (granting injunctive relief ordering

correctional facility to conduct specific testing, enforce social distancing, provide specified

sanitation materials, and more).

　　For the foregoing reasons, the Court finds that the balance of the equities and the public

interest weigh in favor of granting injunctive relief.

### D. Specific Relief Granted

　　While the Court has concluded that, on the current factual record, Plaintiffs are entitled to

some injunctive relief, the Court is not granting the totality of the relief requested.

　　First, the Court does not order the release of any inmates. However, the Court does

ORDER the United States to provide the Court with a detailed plan for the review and possible

further reduction of DOC inmates under their supervision/care by JULY 1, 2020. The Court

further ORDERS the United States Parole Commission to provide the Court with a detailed plan for the review and possible further reduction of DOC inmates under their supervision/care by JULY 1, 2020.

As to the conditions of Plaintiffs' confinement, the Court ORDERS the following.

First, the Court ORDERS that Defendants implement a medical care system on general population units that ensures inmates receive attention from a medical provider within 24 hours of reporting health issues. If this system continues to use sick call slips, Defendants shall ensure that inmates have consistent and immediate access to such sick call slips and that said slips are collected at regular intervals. Defendants shall provide the Court with details of their enhanced medical care system by JUNE 29, 2020.

Second, the Court ORDERS that Defendants comply with District of Columbia and Centers for Disease Control regulations on social distancing in DOC facilities. Defendants shall address challenges which have prevented the implementation of social distancing including but not limited to lack of education and staffing shortages. Defendants shall provide the Court an update on their improvements to enforcing social distancing by JUNE 29, 2020.

Third, Defendants shall continue the services of their newly-contracted environmental health and safety vendor. Defendants shall further continue their contract to provide COVID-19 cleaning services on the secure and non-secure sides of the DOC facility, including the common areas of all housing units. Defendants shall further continue their efforts to hire a registered sanitarian. Defendants shall ensure that inmates have access to the necessary materials to clean their cells, including cleaning solutions which protect against COVID-19 and adequate cleaning textiles and tools. Defendants shall further ensure that DOC staff and inmates are informed of and trained on the proper techniques for mixing and preparing cleaning solutions as necessary.

Defendants shall provide the Court an update on their improvements to sanitation by JUNE 29, 2020.

Fourth, Defendants shall ensure that conditions in isolation units are non-punitive. This includes ensuring reliable and regular access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status. Defendants shall provide the Court an update on their improvements to conditions in isolation cells by JUNE 29, 2020.

Fifth, Defendants shall ensure that all inmates have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters. Insofar as inmates' access to confidential, unmonitored legal calls is reliant on the use of new technology, Defendants shall swiftly implement the use of such technology. Defendants shall provide the Court an update on their improvements to the legal call system by JUNE 29, 2020.

Finally, the Court notes that Defendants have increased testing for COVID-19, now testing any resident to be transferred to Saint Elizabeths Hospital or to a federal correctional facility. Defendants also test any cell mate of an inmate who tests positive and all new residents upon intake. Defendants continue to test those inmates who report positive for COVID-19 symptoms. The Court ORDERS that Defendants continue implementing this increased testing. The Court further ORDERS that Defendants update the Court on any changes to the testing protocol at DOC facilities, including the further testing of asymptomatic inmates.

After the Court has received the ordered updates, the Court shall schedule a further hearing to discuss next steps and the continued role of the amici of the Court.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' [70] Amended Motion for a Preliminary Injunction is GRANTED IN PART AND DENIED IN PART.   Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of the hardships and the public interest weigh in their favor for their constitutional claims involving the conditions of their confinement. Accordingly, Plaintiffs are entitled to the injunctive relief which is detailed above. However, the Court finds that some of the relief requested by Plaintiffs, such as the immediate release of inmates and the appointment of a downsizing expert, is inappropriate at this time on the current factual record.

An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
