**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EDWARD BANKS, *et al.,* | |
| Plaintiffs, | |
| v. | No. 1:20-cv-849 (CKK) |
| QUINCY BOOTH, in his official capacity as Director of the District of Columbia Department of Corrections, *et al.,* | |
| Defendants. | |

**REPORT SUBMITTED BY *AMICUS CURIAE* PURSUANT**
**TO SEPTEMBER 16, 2020 ORDER**

**(Table of Contents, Report Narrative, Index to Exhibits, Appendix A Exhibits 1A – 6 and Appendix B Exhibit 1)**

**December 11, 2020**

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................2

II.     METHODOLOGY .........................................................................................3

III.    BACKGROUND .............................................................................................5

        A.  Population ............................................................................................5
        B.  Single versus Double Celling................................................................7
        C.  Operations in Response to the Pandemic................................................9
        D.  Staffing.................................................................................................10
        E.  Support from the DOH.........................................................................11

IV.     FINDINGS ..................................................................................................11

        **Requirement One** ....................................................................................11

                A.  The Sick Call Process ..........................................................12
                B.  Sick Call Data ....................................................................16
                        1.      Sick Call at the CDF ................................................18
                                Table One:  Summary of Length of Time to be Seen By A
                                Provider At CDF .....................................................20
                        2.      Sick Call at the CTF ...............................................20
                                Table Two:  Summary of Length of Time to be Seen By A
                                Provider At CTF ....................................................21
                C.  Conclusion, Requirement One ...............................................22

        **Requirement Two**......................................................................................23

                A.  Efforts to Promote Social Distancing......................................23
                B.  Conclusion, Requirement Two ...............................................27

        **Requirement Three** ...................................................................................28

                A.  The Environmental Health and Safety Vendor and
                    Contract Cleaning Services....................................................28
                B.  Hiring Registered Sanitarian....................................................31
                C.  Access to Cleaning Materials and Related Training................33

        **Requirement Four**......................................................................................34

        **Requirement Five** ......................................................................................35

                A.  Attorney-Initiated Legal Calls ................................................35
                B.  Inmate-Initiated Legal Calls ..................................................38
                C.  Conclusion, Requirement Five................................................39

**Requirement Six** ...................................................................................................39

    A.  Testing of Newly Admitted Inmates ......................................................40

    B.  Testing of Inmates Transferred to Saint Elizabeths Hospital ................41

    C.  Testing of Inmates Transferred to Federal Correctional Facilities .........42

    D.  Testing of Cellmates of Inmates Who Test Positive ..............................43

    E.  Testing of Inmates Who Report COVID-19 Symptoms ........................44

    F.  Timeliness of Testing Results ...............................................................46

    G.  Conclusion, Requirement Six ...............................................................46

V.       CONCLUSION ...........................................................................................47

Index to Exhibits .............................................................................................. Index-1

APPENDIX A
      Exhibits IA – 6

APPENDIX B
      App. B, Ex. 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDWARD BANKS, *et al.*,

           Plaintiffs,

   v.

QUINCY BOOTH, in his official capacity
as Director of the District of Columbia
Department of Corrections, *et al.,*

          Defendants.

No. 1:20-cv-849 (CKK)

## REPORT SUBMITTED BY *AMICUS CURIAE* PURSUANT TO SEPTEMBER 16, 2020 ORDER

Pursuant to the September 16, 2020 Order issued in the above-captioned matter, (Dkt. Nos. 125, 126), [1] *amici*, Grace M. Lopes and Mark Jordan,[2] submit the following report for consideration by the Court and the Parties.

---

[1] The Court amended the initial order issued on September 16, 2020 to clarify the date by which *amici* were required to begin their review. The amended order required *amici* to provide the Parties and the Court with an oral report no later than October 31, 2020 and a written report no later than November 16, 2020. Thereafter, on October 26, 2020 a Second Amended Order Appointing Amicus was entered (Dkt No. 129), which was identical in all respects to the prior order except, upon request of the *amici* and with the consent of the Parties, it changed the date of the oral report from October 31, 2020, (which was a Saturday), to November 9, 2020, and the date for the written report from November 16, 2020 to November 20, 2020. (Dkt No. 129). The Court granted a consent motion to further enlarge the filing deadline for the written report to December 11, 2020, (Dkt. No. 132), to afford *amici* sufficient time to complete additional unanticipated assessment activities. (Dkt. No. 133).

[2] *Jerry M. v. District of Columbia*, C.A. No. 1519-85 (D.C. Super. Ct.) is a class action lawsuit related to the conditions of confinement and treatment in the District of Columbia's juvenile justice system. Grace M. Lopes has served as the court-appointed Special Arbiter in this lawsuit and Mark Jordan has worked and collaborated with her on monitoring and reporting on the District government's compliance with the remedial orders issued in the case. The plaintiff class is represented by multiple attorneys, including counsel from the District of Columbia Public Defender Service and the District of Columbia defendants are represented by counsel from the District of Columbia's Office of the Attorney General. Pursuant to a Settlement Agreement approved by the Superior Court in July 2020, during a hearing conducted on December 1, 2020, the presiding Judge in *Jerry M.* indicated that he found the conditions established by the Settlement Agreement had been satisfied and that he would be issuing a termination order later in the month. One of the conditions established by the Settlement Agreement required the District of Columbia's Mayor to issue a Mayoral Order establishing the Office of Independent Juvenile Justice Facilities Oversight. A second condition required the Mayor to appoint Mark Jordan as the Executive Director of

## I. INTRODUCTION

This is the third report submitted by *amici* in this case.  *Amici* were initially appointed

in an order issued on April 9, 2020, (Dkt No. 34 ), to provide specific information to the Court

regarding medical services and environmental health and hygiene related to COVID-19, the

disease caused by SARS-CoV-2, the novel coronavirus, at two detention facilities operated by

the District of Columbia Department of Corrections ("DOC"), the Central Detention Facility

("CDF") and the Correctional Treatment Facility ("CTF").  Pursuant to that order, *amici*

provided information to the Court and Parties during an April 15, 2020 teleconference and in a

written report submitted on April 18, 2020 (Dkt. No. 47).  One day later, on April 19, 2020, the

Court issued an order granting the Plaintiffs' request for a Temporary Restraining Order

("TRO") and requiring the Defendants to take certain specified actions (Dkt. No. 48). Thereafter,

in an order issued on April 28, 2020 (Dkt. No. 62), *amici* were appointed for the second time, to

provide information to the Court regarding certain matters related to the TRO.  Following

issuance of the April 28, 2020 order, *amici* provided an oral report to the Court and Parties on

May 11, 2020, and submitted a written report on May 20, 2020 (Dkt. No. 77).

On June 18, 2020, the Court issued a preliminary injunction in this case (Dkt. Nos. 99,

100).  The preliminary injunction requires the Defendants to take certain specified actions, which

are described more fully in the next sections of this report, related to the following six conditions

of confinement:  medical care; social distancing; environmental health and safety; conditions in

isolation units; access to legal calls; and testing for COVID-19.  *Amici* were appointed for the

---

this oversight office.  As required by the Settlement Agreement, these Mayoral Orders will become effective upon
the issuance of the termination order.  At that time Mr. Jordan will become a District government employee, with
unique authority and independence, for a three-year term subject to removal only for cause.  The Court and counsel
for the Parties in the instant case, including counsel for the United States, have been apprised of these circumstances.
In response, all counsel indicated that there are no objections to Mr. Jordan's participation as an *amicus* in this
matter.

third time on September 16, 2020 (Dkt. Nos. 125, 126), to provide information to the Court and the Parties regarding the Defendants' compliance with the June 18, 2020 preliminary injunction.

Pursuant to the September 16, 2020 Order, *amici* provided an oral report to the Court and the Parties during a hearing conducted by telephone on November 9, 2020. During that proceeding, the Court requested that in their written report *amici* address certain matters which were not initially contemplated by the September 16, 2020 Order, and also provide additional details related to some of the matters that were the subject of the November 9, 2020 oral report.

This report summarizes *amici's* November 9, 2020 presentation and includes the supplemental information *amici* were asked to address. In addition, this report explains the methodology *amici* relied upon to conduct their assessment, describes relevant background data regarding the facilities subject to the assessment, and presents updated information concerning identified cases of COVID-19 at both the CDF and CTF.

The Defendants have continued to cooperate fully with *amici's* requests for information. As a general matter, DOC and contract staff at every level have made substantial efforts to respond to *amici's* requests promptly. *Amici* recognize and appreciate the efforts the Defendants have continued to make to facilitate their review.

## II. METHODOLOGY

Following the issuance of the September 16, 2020 order, *amici* conducted unannounced and unescorted site visits on multiple shifts on October 22, 23, 29, November 13 and December 2, 2020 at the CDF, and on October 27 and November 2, 2020 at the CTF. During the course of these site visits, *amici* visited general population, maximum and medium security housing units as well as housing units designated for enhanced monitoring, intake, special management, and for inmates with mental health needs. A total of 18 housing units were visited, some on multiple

occasions on different days or shifts (NO-1, SO-1, NO-3, SO-3, NW-2, NW-3, SW-3, SW-2, SO-2, C2A, C4C, SMUB, E2A, E4A, E4B, D3A, D4B, C2B).  Observations in housing units included cells, dayrooms and case manager's offices.  At both facilities, medical units, administrative offices, and visitor entry areas were visited.  In addition, the case management suite, where many legal calls are conducted, as well as the videoconferencing and visitation areas that are used at the CDF for attorney-client videoconferences and meetings, were visited.

Structured in-person and/or telephone interviews were conducted with members of the DOC executive management team, including the DOC Deputy Directors of Administration, Operations, Programs and Case Management, and Professional Development and College and Career Readiness; the Audit and Compliance Manager; the Sanitation Inspection Specialist; the DOC Medical Director;  members of the Correctional Health Program at Unity Health Care, Inc. ("Unity"),[3] including the Medical Director, Dental Director, Mental Health Director, Lead Dentist, Director of Nursing, and other health care staff; the CDF and CTF Warden and the Deputy Wardens assigned to each facility; maintenance supervisors and staff; records office staff; and dozens of correctional officers and supervisory correctional staff assigned to various posts throughout the facilities.  In-person interviews were also conducted with approximately 80 inmates at both facilities.  At the request of the DOC Medical Director, *amici* also interviewed an epidemiologist under contract with the D.C. Department of Health ("DOH"), assigned to provide support to the DOC and several other District agencies during the pandemic.[4]

In addition to the information collected during site visits and from interviews, *amici* requested and continued to receive access from the DOC to the electronic health records

---

[3]  Unity provides medical services on a contractual basis to inmates at the CDF and CTF.
[4]  At the request of the DOH General Counsel, this interview was conducted with counsel present.  It was the only interview conducted during the assessment in the presence of counsel.

("EHR") of inmates confined at the CDF and CTF.[5]  Review and analysis of samples from these records has been conducted and the results are presented herein.  The following data for both facilities were also obtained from the DOC or Unity and analyzed:

- Daily census data, including inmate housing assignments for the period June 18, 2020 to October 31, 2020;
- Data related to admissions and length of stay for the period June 18, 2020 to October 31, 2020;
- Data related to releases and transfers for the period June 18, 2020 to October 31, 2020;
- Date related to inmate legal status for the period June 18, 2020 to October 31, 2020;
- Sick call requests and related logs for the period June 18, 2020 to October 31, 2020;
- Data related to all COVID-19 tests conducted on inmates through December 1, 2020; and
- Data related to DOC correctional staffing levels.

## III.  BACKGROUND

Since the issuance of *amici's* May 2020 report, there have been a number of changes in population levels, housing practices, housing unit operations, staffing levels, and the support the DOC receives from the DOH.  Each of these topics is addressed below.

### A.  Population

On June 18, 2020, the day the Court issued the preliminary injunction, the combined population of the CDF and the CTF was 1,249 inmates.[6]  The Defendants subsequently reported to the Court that as of June 29, 2020, the combined population of the CDF and CTF was 1,261.[7]  Over the four-and-a-half months between the issuance of the preliminary injunction and October

---

[5]  The team *amici* assembled for this stage of their work included two additional members.  The majority of case record reviews were conducted by Janet Maher, an attorney who has extensive experience in working in institutional and healthcare settings.  Ms. Maher headed the Office of Corporation Counsel's Mental Health Division from 1992 to 2000, worked as Deputy General Counsel and Chief of Staff for the District's Child and Family Services Agency from 2000 to 2007 and as DOJ Compliance Officer at Saint Elizabeths Hospital from 2007 to 2014.  From 2013 to her retirement in 2016, she headed the Hospital's Performance Improvement Department.  She also has provided consultative services to the Maryland and Pennsylvania behavioral health systems and to the Office of the Special Arbiter in *Jerry M. v. District of Columbia*, C.A. No. 1519-85 (D.C. Super Ct.)  Case records were also reviewed by Julia Cade, a senior paralegal with substantial experience in similar institutional contexts.

[6]  During the November 9, 2020 hearing, *amici* incorrectly reported that the lowest population count between June 18, 2020 and October 31, 2020 was 1,254.  However, upon further review, 1,248 inmates on June 18, 2020, the day the preliminary injunction was issued, represented the lowest population count for the period.

[7]  Notice of Compliance with the Court's Preliminary Injunction (Dkt. No. 101) at 3.

31, 2020, the population of the two facilities increased by 19 percent to 1,487 inmates.  Based on an analysis of data submitted by the Defendants, this was driven primarily by increases in the number of inmates confined on pretrial felony charges and to a lesser extent by increases in the number of parole violators and pretrial misdemeanants confined at the CDF and the CTF.[8]

Because population increases in secure facilities are driven by either increases in the number of admissions, increases in the amount of time admitted inmates remain incarcerated, or a combination of the two, *amici* analyzed admission and length of stay trends of inmates housed at the CDF and the CTF, by legal status.  The analysis revealed that after June 18, 2020, admission rates increased each month through September 2020, then decreased somewhat in October 2020.[9]  There were increases in admission rates for all three cohorts (*i.e.,* pretrial felons, parole violators, and pretrial misdemeanants) that drove the population increase.  For pretrial felons, the number of admissions per month was significantly higher in August, September, and October 2020 than in the second half of June and in July 2020.[10]  Among parole violators, after relatively few admissions in the second half of June, admissions increased in July and to a lesser extent in August, but then nearly doubled between August and September from 63 to 118, before dropping somewhat in October to 83.[11]  Finally, among pretrial misdemeanants, there were

---

[8]  Ex. 1A, Chart, "Combined Population of CDF and CTF, by Day and Legal Status," June 18 - October 31, 2020; Ex. 1B, Table, "Combined Population of CDF and CTF, by Status and Day," June 18 - October 31, 2020. During this period, the population of pretrial felons increased by 163 inmates, from 483 to 646; the population of parole violators increased by 63 inmates, from 88 to 151; and the population of pretrial misdemeanants increased by 38 inmates, from 68 to 106.  The Appendix to this report is divided into two parts.  Appendix A [hereinafter App. A] contains the exhibits that are cited in this report.  Some of the exhibits in App. A have been redacted, as appropriate, for filing in the public record.  The updated CDC Guidelines are contained in Appendix B [hereinafter App. B].  Unless designated by a citation to App. B, all citations to the exhibits included in the Appendix refer to App. A.

[9]  Ex. 1C, Table, "Admission to CDF and CTF, by Status and Month," June 18, 2020 - October 31, 2020.  Monthly admissions in August were 25 percent higher than in July, and monthly admissions in September were 21 percent higher than August.  Although admissions dropped by 13 percent during October relative to the prior month, admission levels were still higher than July and August.

[10]  *Id.*

[11]  *Id.*

increases in admissions in August and September before admissions dropped somewhat in October.[12]

The average length of stay among all inmates housed at the CDF and CTF increased between June 18 and October 31, 2020, albeit only slightly, by approximately four percent.[13] Among the three cohorts that primarily accounted for the increases in population, the changes in lengths of stay varied. The average length of stay among pretrial felons increased by approximately eight percent between June 18 and October 31, 2020. For pretrial misdemeanants, the average length of stay increased by substantially more over the same period, approximately 51 percent, from 43 days to 65 days. In contrast, among parole violators the average length of stay dropped by approximately 28 percent over the same period.

### B. Single versus Double Celling

*Amici* also analyzed single versus double celling practices at each facility during the period June 18 to October 31, 2020. As *amici* previously reported, the CDF contains 18 housing units, most with 80 cells.[14] Over the period reviewed, the CDF's population ranged from a low of 819 inmates to a high of 1,039 inmates. While there are over 1,300 cells at the CDF, over the period analyzed the average daily percentage of inmates housed in single cells was 83 percent (*i.e.,* 17 percent of inmates had cellmates).

The double celling practices at the CDF were at least in part attributable to closed housing units and cells on open housing units that were taken out of service due to maintenance issues. During *amici's* site visits in October and early November 2020, five housing units were

---

[12] *Id.*

[13] Ex. 1D, Table, "Average Length of Stay of Inmates Housed at CDF and CTF, by Status and Month," June 18, 2020 - October 31, 2020.

[14] *See Report Submitted by Amicus Curiae Pursuant to April 28, 2020 Consent Order*, filed May 20, 2020 [hereinafter *May 20, 2020 Report*] at 4-5 for a more complete description of the CDF.

closed, but during *amici's* most recent site visit to the CDF on December 2, 2020, only two housing units were closed: NO-2[15] and SE-1.[16] A*mici* observed numerous cells that were unoccupied on housing units with double-celled inmates. Maintenance and correctional staff reported that unoccupied cells were out of service in some instances because the metal bunks in the cells were damaged. *Amici* were told that in other instances the cells were unoccupied because of plumbing problems. CDF staff reported that on November 30, 2020, approximately 43 cells on open housing units were out of service.[17]

At the CDF, *amici* additionally analyzed single versus double celling practices in SO-2, the Intake unit. Except for inmates with acute mental health issues, who are transferred to SO-3, and women, who are admitted at the CTF, the Defendants report that new intakes are housed on SO-2 until they are medically cleared following COVID-19 testing. Between June 18 and October 31, 2020, the population of SO-2 ranged from a low of 44 inmates to a high of 111 inmates. The average daily percentage of inmates housed in single cells on that unit was 57 percent, lower than the percentage of inmates housed on single cells on non-Intake housing units. During *amici's* December 2, 2020 site visit, the population of SO-2 was 76. At that time, 36 inmates were double celled (*i.e.,* occupying 18 cells) while 22 cells were unoccupied.

At the CTF, there are 27 housing units, including the infirmary.[18] During *amici's* most recent site visit to the CTF on November 2, 2020, seven housing units were closed. The CTF houses significantly fewer inmates than the CDF. Between June 18 and October 31, 2020, the

---

[15] NO-2 is designated to house inmates who test positive for COVID-19.

[16] SE-1 was closed because it was being used for storage. CDF management reported that they are considering opening the housing unit as part of a plan to enable them to eventually open a second Intake housing unit elsewhere in the facility.

[17] *Amici* attempted to obtain records reflecting the number of cells out of service daily; however, neither of the two CDF administrative units that *amici* were told maintain these data (*i.e.*, Maintenance and "Countbook"), were able to provide precise information.

[18] *See* May 20, 2020 Report at 5-6 for a more complete description of the CTF facility.

facility population ranged from a low of 350 inmates to a high of 464 inmates and during that period, it was rare for inmates to have a cellmate.  Department of Corrections records indicate that the average daily percentage of inmates housed in single cells at the CTF during this period was 99 percent.

### C.  Operations in Response to the Pandemic

Both the CDF and CTF have continued to implement a 23-hour per day lockdown.  In effect, this means that most inmates remain in their cells except for one hour per day when they are released to shower, make personal telephone calls, watch television, sit in the day room, and /or make use of small recreation areas within the housing units.[19]  Inmates assigned to segregation units are locked down for 24 hours per day on weekends.

Beginning in the fall, the DOC has made tablets available to inmates that they can use in their cells.  There are two types of tablets, one with paid content that includes entertainment options such as videos and games and another with free educational content.  As explained below, the tablets include educational materials related to COVID-19 and also can be used for attorney-client communications. [20]

During *amici's* prior site visits in April and May 2020, the DOC had designated numerous housing units at both facilities as quarantine or isolation units.  In contrast, during site visits conducted from late October to early December 2020, there were no isolation or quarantine housing units at the CTF due to the absence of known or suspected COVID-19 cases.  At the CDF, there was briefly an isolation unit in November after an inmate tested positive upon admission and another housing unit was quarantined after a reported exposure to two staff

---

[19] Inmates in many CTF housing units also spend out-of-cell time heating meals in microwave ovens.
[20] *See infra* 26 and 38-39.

9

members who tested positive for COVID-19.[21]  In addition to quarantine and isolation units, the DOC also established "enhanced monitoring" housing units at both facilities for inmates who return from in-person court appearances or face-to-face visits with an attorney.  Inmates housed on enhanced monitoring units have their temperature checked by medical staff daily for up to a 14-day period.

### D.  Staffing

*Amici* previously reported that the large number of correctional staff unavailable for duty, including staff who were not available for reasons related to COVID-19, had a significant impact on facility operations.[22]  *Amici's* comparison of correctional staffing levels from mid-May to staffing levels in early December 2020 indicates that the number of staff available to work remains virtually unchanged.

*Amici* previously reported that as of May 9, 2020, the DOC had a total of 994 funded correctional officer positions.[23]  Of that total, 51 positions were vacant, five percent.  Moreover, an additional 170 filled positions, 17 percent, were encumbered by correctional officers who were on unavailable for duty status.  Thus, 22 percent of the funded correctional complement was either vacant or not working.

*Amici* obtained updated data related to the correctional staffing complement from December 2020.  As of December 1, 2020, the DOC had a total of 1,014 funded correctional positions, 20 more funded positions than on May 9, 2020.  DOC management reported that as of December 3, 2020, 110 positions were vacant, 11 percent, and an additional 133 staff in filled

---

[21]  All of the inmates on the quarantined housing unit were tested for COVID-19 and none tested positive.

[22]  *See May 20, 2020 Report* at 7-8; *Report Submitted by Amicus Curiae Pursuant to April 9, 2020 Order*, filed April 19, 2020 [hereinafter *April 2020 Report*] at 21.

[23]  *May 2020 Report* at 7.  The total included 844 correctional officer positions, 93 lead correctional officer positions, and 57 supervisory correctional officer positions.

correctional positions, 13 percent, were unavailable for duty.  Thus, while the number of staff who were unavailable for duty decreased, an increase in the number of staff vacancies left the size of the available workforce essentially the same as it was in May.[24]

### E.  Support from the DOH

Starting at some point in June 2020, a nurse working with the DOH began providing health education related to COVID-19 to DOC staff and conducting  audits, at times on a weekly basis, related to the use of personal protective equipment ("PPE") at both the CDF and CTF. Unity and DOC managers report that they have been regularly briefed on the audit findings and recommendations.  In early August 2020, an epidemiologist under contract with the DOH began to visit the CDF and CTF to ensure appropriate monitoring of COVID-19 positive cases and the related submission of data to public health officials; provide consultation on quarantine, isolation and testing practices; and confer with Unity's medical director on treatment in individual cases. By all accounts, this increase in DOH support has served as a very helpful resource to both DOC and Unity managers.

## IV.  FINDINGS

This section summarizes *amici's* findings regarding the Defendants' performance relative to each of the six requirements related to conditions of confinement addressed by the June 18, 2020 preliminary injunction.

> **Requirement One:**
>
> **Defendants [shall] implement a medical care system on general population units that ensures inmates receive attention from a medical provider within 24 hours of reporting health issues.  If this system continues to use sick call slips, Defendants shall ensure that inmates have consistent and immediate access to such sick call slips and that said slips are collected at regular intervals.**

---

[24] *See infra* at 26-27 for additional information.

The DOC and Unity have added resources to enhance the sick call system at the CDF and CTF.  The evidence shows that for the most part, the Defendants are now providing inmates at the CDF and CTF with consistent access to sick call slips and they are collected at regular intervals; however, inmates are not consistently seen by a medical provider within 24 hours of reporting health issues in a significant percentage of cases.  These findings are described below.

**A.  The Sick Call Process**

The DOC relies on a sick call system on general population housing units[25] to ensure that inmates receive attention from a medical provider within 24 hours of reporting a health issue.[26] The Defendants have increased staffing for health services and made several modifications to the business process related to sick call requests in response to this requirement.

The DOC's contract with Unity Health Care, Inc. was modified to add funding for the hiring of two additional nurse practitioners or physician assistants and two medical assistants for the period May 18 through September 30, 2020.[27]  The contract modification includes two contract line items to extend the contract for two additional time periods subject to funding availability: from October 1, 2020 to January 31,2021 and from February 1, 2021 to April 14, 2021.  Subsequent to September 30, 2020, the increased staffing levels authorized by the modification have remained in effect.[28]

---

[25]  As *amici* noted during the November 9, 2020 hearing, *amici* interpret "general population units" in this context to mean housing units that have not been designated as quarantine or isolation units.

[26]  Inmates can also access medical care through the urgent care and chronic care clinics.

[27]  Ex. 2A, Amendment of Solicitation/Modification of Contract Number CW68868, effective May 18, 2020.  The contract modification was signed by a Unity representative on June 2, 2020 and by a District government contracting officer on August 11, 2020.

[28]  *Amici* requested that DOC management produce documentation supporting the exercise of the option for the additional period that began on October 1, 2020, and reflecting the associated availability of funding.  According to DOC management, the agency intends to maintain funding to support the modification throughout both additional periods specified in the contract modification, funding is available, and there is no need for supplemental documentation reflecting the exercise of the additional period and the availability of funding.

Interviews with Unity staff indicate that this modification was intended to strengthen the business process related to sick call by adding clerical staff to collect and track sick call requests obtained from the housing units on a more frequent basis and by increasing the number of clinicians available to deliver medical services.[29]  Under this new system, which was implemented on June 23, 2020, inmates are expected to continue to obtain sick call request forms from the correctional staff, and fill them out by entering their name, date of birth, DCDC number, housing unit, cell number, the date, and information about the nature of their request.[30]  The June 2020 revisions to the form add certain specific COVID-19 symptoms and inmates are asked to check all that apply to them.[31]  The revised form does not provide a prompt for inmates to indicate the time the request was made or for medical staff to note the time the request was received.

Inmates are instructed to continue to place the sick call request forms in the secure collection boxes that are maintained on the housing units.  As part of the new business process the Defendants have implemented, medical assistants at each facility pick up the forms twice daily from each housing unit, generally in the early morning and mid-day.  The medical assistants count the forms as they retrieve them and manually record the total number of slips they have collected in a handwritten log before leaving each housing unit.  After the medical assistant has retrieved the request forms, a member of the correctional staff assigned to the

---

[29]  Unity managers report that they began piloting this new process on May 18, 2020.

[30]  Ex. 2B, sample revised Sick Call Form used at CDF and CTF.  Inmates are expected to check one of the following boxes:  I wish to be seen at sick call, dental treatment, mental health or other.

[31]  The symptoms listed on the revised sick call request form are fever, coughing, difficulty breathing/shortness of breath, headache/body ache and upset stomach.  *Id.*  In an effort to make the forms more readily identifiable, DOC and Unity managers report that the correctional staff have been instructed to print the forms on pink paper.  *Amici's* observations indicate that while use of the revised forms is widespread, inmates also submit sick call requests using a variety of documents, including the previous version of the sick call request forms, random sheets of paper, and by filling out "inmate request slips," which are intended for initiating case management and other administrative requests.  *See* Ex. 2C, Inmate Request Slip, for a copy of the form used at both facilities to make requests that are processed by case management staff.

housing unit examines the interior of the box and documents that there are no sick call request forms remaining in the box.

In contrast to previous site visits, sick call request forms were available on most of the housing units *amici* visited before the November 9, 2020 hearing.  In fact, of the 16 housing units *amici* visited up to the time of the hearing, the forms were available on every unit other than NO-1, a high security housing unit and except for inmates confined on NO-1, inmates at both the CDF and CTF did not report difficulty accessing the sick call forms.  During a subsequent site visit *amici* conducted on December 2, 2020, the forms were available on NO-1.  Moreover, logs and interviews with correctional officers, inmates, medical providers, and medical assistants establish that as a general matter sick call request forms have been picked up twice daily from the housing units at both facilities since June 23, 2020.[32]

After sick call request forms are picked up from all housing units in the morning and mid-day, the medical assistant assigned to each facility transfers the tally for each housing unit into an electronic database.  The sick call requests are then triaged for urgency by a charge nurse.  If the request is deemed urgent, the inmate is expected to be brought to the urgent care clinic.  If the charge nurse determines the request is routine, inmates whose sick call request forms are picked up in the morning are expected to be scheduled for a same-day sick call appointment.  If the sick call form was collected mid-day, the inmate is expected to be scheduled for a next-day sick call appointment.

According to Unity's mental health manager, sick call requests for mental health services are initially triaged by medical staff.  Any that are deemed urgent are hand delivered to mental health staff for immediate attention.  Inmates who submit requests that are not identified as

---

[32]  At the CTF, in an effort to ensure access to health services, medical providers walk the tiers of both special management units on a daily basis.

urgent are expected to be seen by a mental health provider within 24 hours.

If a sick call request indicates the inmate has a dental problem *and* is in pain or has swelling or other indication of a possible infection, the charge nurse is expected to schedule the inmate to be seen by a medical provider on either an urgent basis or the next day at sick call.  If there is no indication of pain, swelling or other indication of a possible infection, the sick call request is expected to be referred to the dental program for follow up as either a Priority One, Two or Three.  Priority One is limited to patients who have indicated on their sick call request form that they are in pain or have swelling or some other indication of infection.  It is anticipated that they will be seen by a medical provider urgently or within 24 hours and seen by a dental provider within seven days.  Priority Two is identified with routine dental problems and no apparent pain.  These patients are not seen by a medical provider but are scheduled to be seen by a dental provider.  Priority Three includes requests for procedures such as routine cleaning, and like Priority Two, these patients are not seen by a medical provider, but are scheduled to be seen by a dental provider.

Unity and DOC managers have informed *amici* that there have been discussions about using the newly adopted educational tablets as a supplemental method (*i.e.,* it would not replace hard copy forms) through which inmates could directly submit sick call requests to the health care staff.  They have described a system in which an inmate could complete an electronic sick call request form on the tablet and transmit it electronically to a designated electronic inbox available only to medical staff.  Department of Corrections management has reported that the sick call request form has been digitized for use on the educational tablets.  As of December 2, 2020, the electronic sick call form submission process had not been implemented.

*Amici* interviewed numerous inmates at the CDF and CTF regarding sick call and access to medical care.  In contrast to earlier site visits, inmates generally had positive impressions of the sick call process and asserted that they expected that if they submitted a sick call request form they would be seen by a medical provider timely.

### B.  Sick Call Data

In order to assess the Defendants' performance relative to the 24-hour requirement, *amici* selected a sample of 92 sick call requests submitted by inmates confined at the CDF and CTF between June 18, 2020 and October 31, 2020.[33]  The sample was selected from the original hard copies of the sick call request forms that are submitted by inmates.  To test the completeness of the data source provided by the Defendants (*i.e.,* whether all sick call forms submitted by inmates during this period were produced for review), *amici* compared the number of forms produced by the Defendants from July 2020 at the CDF with the total number of sick call requests for the same month documented in the spreadsheet maintained by the medical assistants who pick up the sick call requests at the CDF.[34]  For the month of July 2020, the spreadsheet generated by the medical assistant assigned to the CDF indicated that a total of 1338 sick call requests were submitted by inmates; by comparison, the Defendants produced for review by *amici* a total of 1,159 hard copies of sick call requests at the CDF for the same period.  *Amici* were not able to reconcile this discrepancy.

*Amici* drew separate samples of sick call requests from the CDF and CTF.  Because medical, dental, and mental health sick call request forms are stored separately after they are

---

[33]  During the November 9, 2020 hearing *amici* explained that they had conducted a review of a sample of sick call requests based on what they believed were all sick call request forms submitted by inmates between June 18 and October 31, 2020.  However, *amici* later learned that the sick call requests from which they drew the sample were not all sick call requests that were submitted by inmates, but rather a sample selected by Unity staff.  Thus, a new sample was selected by *amici*.

[34]  *See supra* at 13-14 for a more detailed description.

triaged by the charge nurse, and because some inmates reported delays in responses to sick call

requests concerning dental and mental health services, *amici* structured a sampling methodology

that ensured sick call requests of all three types were included in the sample.[35]   In total, 51 sick

call requests were reviewed from the CDF and 41 sick call requests were reviewed from the

CTF.[36]   The samples from both facilities were structured to include sick call requests from every

month in the review period.

Because sick call request forms include recorded dates, but not times, it was not possible

to calculate the number of elapsed hours between an inmate reporting health issues and the

inmate receiving attention from a medical provider.[37]   For this reason*, amici* analyzed the data at

the most specific time interval possible given the available data sources:  the number of elapsed

*days* between an inmate reporting health issues and the inmate receiving attention from a medical

provider.  *Amici* used the date recorded by the inmate on the sick call request form as the basis

for the calculation of the number of elapsed days between an inmate reporting a health issue and

receiving attention from a provider.[38]   On 21 of the 92 sick call request forms in the sample, 23

percent, medical staff added a notation that the date recorded by the inmate was the "wrong

date."   In certain cases, the reason for the notation was clear (*e.g.,* the date recorded by the

---

[35]  The volume of requests for dental and mental health care is much smaller by comparison to requests for medical care.  In order to ensure a sufficient number of sick call requests for dental and mental health care were included in the analysis, *amici* established a minimum number of each type to include in the sample.

[36]  The difference in the sample sizes was principally attributable to the fact that the Defendants produced three mental health sick call requests from the CTF during the review period, all of which were included in the sample.  At the CDF, the Defendants produced a larger number of mental health sick call requests and *amici* selected a sample of 11 mental health sick call requests from that facility.

[37]  Dates are generally recorded in two places on sick call request forms.  First, there is a field labelled "Date/Fecha" for the inmate to record the date s/he fills out the sick call request form.  Second, medical staff typically stamp each form with a "Received" stamp and generally, but not always, hand write a date under the stamp.  There is a third field in a portion of the form designated for the medical provider to fill out that also includes a date and a time field; however, these fields were not completed in any of the sampled forms *amici* reviewed.  However, the EHR provides a record of the date and time of any clinical encounters between inmates and medical providers.

[38]  During the sample selection process, *amici* observed a significant number of sick call requests with no date recorded by the inmate.  These forms were excluded from the sample because they would not allow *amici* to make any findings regarding timeliness.

inmate was a month *after* medical staff collected the form); however, in most other cases, there was a difference of one or two days between the date recorded by the inmate and the date recorded as received by medical staff.  In these cases, the basis for the "wrong date" notation was not evident.

### 1.  Sick Call at the CDF

*Amici's* sample of sick call requests submitted at the CDF included 25 requests for medical care, 15 requests for dental care, and 11 requests for mental health care.[39]  *Amici's* analysis indicates that for all categories of sick call requests combined, in 22 of 50 sick call requests, 44 percent, inmates were seen by a medical provider on the day they submitted their sick call request or the next day.  An additional three sick call requests, six percent, were for medication refills and the prescriptions were refilled the day after the sick call request was submitted without the inmate seeing a medical provider.

Among the 24 requests for medical care, 17 requests made by inmates (including the three prescriptions that were timely filled without the inmate having to see a provider), 71 percent, received attention from a medical provider within one day of the submission of the sick call request.[40]  Among the remaining seven sick call requests for medical care, five of the inmates were seen between two and five days following submission of the sick call request form and two were seen more than five days following the submission of the request form.

Although the sample of sick call requests *amici* analyzed included requests for dental and mental health services, the sample sizes for those subgroups were not large enough to reach

---

[39]  One sick call request for medical care was excluded from the sample because the date recorded by the inmate was subsequent to the date medical staff collected the form.

[40]  Fourteen of the 17 patients were seen by a provider within one day.  In the other three instances, the inmate requested prescription refills for skin cream, eye ointment and nasal spray, respectively, and a provider ordered the refill within one day without seeing the inmate.

meaningful conclusions about the timeliness of provider responses to those subcategories of requests.  However, because a number of inmates *amici* interviewed complained about delays in responses to sick call requests for mental health and dental services, *amici* reviewed the EHR related to 15 sick call requests for dental services and 11 sick call requests for mental health services at the CDF.  The findings from those reviews are summarized below.

As explained above, sick call requests for dental services are triaged and requests that reflect pain, swelling, or another indication of a possible infection are expected to be seen by a medical provider within one day, or sooner if indicated.[41]  Among the 15 sick call requests for dental care in the CDF sample, three inmates were seen by a sick call provider the day they submitted the request or the next day.[42]  Among the remaining 12 sick call requests for dental care that did not result in a timely provider visit, seven requests included reference to a chipped or broken tooth, cavity, toothache, or a non-specific reference to "wisdom tooth."  None of the inmates associated with these latter categories of requests were seen by a provider within one day of submitting their sick call request.  In the remaining five instances, the sick call request forms referenced the need for a dental cleaning, filling, or simply stated "dental."

Among the 11 sick call requests for mental health services in the CDF sample, the inmates associated with four requests were seen the day the request was submitted or the subsequent day. In the remaining seven instances, the inmate was seen anywhere from two to six days after requesting services.  The table below summarizes the timeliness of sick call services at the CDF.

---

[41]  *Supra* at 15.  While inmates who indicate pain or swelling are assigned priority for services, the form does not ask if the inmate is experiencing dental pain or swelling, but leaves it up to the inmate to specify these symptoms.
[42]  Only one of these three sick call requests included a description by the inmate indicating any pain or swelling.

| TABLE ONE:  SUMMARY OF LENGTH OF TIME TO BE SEEN BY PROVIDER AT CDF | | | |
|---|---|---|---|
| **TYPE OF SERVICE REQUESTED** | **1 day of request** | **2-5 days of request** | **More than 5 days of request** | **Not Seen by Provider** |
| **MEDICAL** | 17 | 5 | 2 | 0 |
| **DENTAL** | 3 | 3 | 5[43] | 4[44] |
| **MENTAL HEALTH** | 4 | 6 | 1 | 0 |
| **COMBINED** | 24 | 14 | 8 | 4 |

## 2. Sick Call at the CTF

At the CTF, *amici's* sample included 25 requests for medical care, 13 requests for dental care, two requests for mental health care, and one request for both medical and mental health care.  *Amici's* analysis indicates that at the CTF, for 23 of all 41 of the sick call requests, 56 percent, inmates received attention from a medical provider on the day they submitted their sick call request or the following day.  Among the 25 requests seeking medical care, inmates associated with 15 requests, 60 percent, were seen by aa medical provider within one day of the submission of the sick call request; inmates associated with six requests, 24 percent, were seen between two and five days of the submission of the request; and inmates associated with four requests, 16 percent, were seen anywhere from six to 20 days after the submission date noted by the inmate on the request form.

---

[43]  One of the five inmates did not appear for his appointment, which was scheduled for 24 days after the sick call request was submitted.

[44]  One of the four inmates was not seen within three weeks of his sick call request and two inmates were not seen within two months of their sick call requests as of December 1, 2020.  The remaining inmate was released 56 days after his request without being seen.

Thirteen of the 41 requests in the sample were for dental services.  Seven of those requests resulted in inmates being seen by a medical provider within one day after the request was submitted.[45]  Among the remaining six requests for dental care, one request referenced dental pain and the inmate was not seen until three days after the request was submitted, three requested dental cleanings and two were non-specific requests for dental services.

Among the three sick call requests for mental health care,[46] one resulted in an inmate being seen the day after the sick call request was submitted.  The inmates associated with the other two requests received attention from a provider two days and four days, respectively, after the request was submitted.

The table below summarizes the distribution of time between the submission of sick call request forms and inmates being seen by a provider at the CTF:

| TABLE TWO:  SUMMARY OF LENGTH OF TIME TO BE SEEN BY PROVIDER AT CTF | | | |
|---|---|---|---|
| TYPE OF SERVICE REQUESTED | 1 Day of Request | 2-5 Days of Request | More Than 5 Days of Request | Not Seen by Provider |
| MEDICAL | 15 | 6 | 4 | 0 |
| DENTAL | 7 | 4 | 2 | 0 |
| MENTAL HEALTH | 1 | 1 | 0 | 0 |
| MEDICAL AND MENTAL HEALTH | 0 | 1 | 0 | 0 |
| COMBINED | 25 | 12 | 6 | 0 |

---

[45]  Six of those seven sick call request forms included a specific description indicating pain, swelling or a broken or "eroding" tooth.
[46]  One of the three was the sick call request that also included a request for medical care.

## C. Conclusion, Requirement One

The Defendants have invested additional resources in the sick call process by augmenting staffing in order to collect sick call request forms twice daily and increase the number of providers available to assess and treat inmates at sick call.  Inmates generally had positive impressions of medical staff responses to sick call requests for medical services; however, inmates reported delays accessing dental and mental health services through the sick call system.

These reports are generally consistent with the sample reviewed by *amici*.  At the CDF, 71 percent of sick call requests for medical services resulted in inmates being seen within one day and at the CTF, 61 percent were seen within one day.  *Amici* recognize that there is some inherent margin of error in these calculations for several reasons.  First, the timeliness of the responses to many sick call requests could not be calculated because in identifying a sample, *amici* determined that a significant number of inmates did not record a date (or time) on the sick call request forms they submitted and therefore these forms were automatically excluded from the sample since timeliness could not be determined.  Second, none of the sick call request forms included the time of submission and, as noted above, the form does not prompt inmates to record the time of submission.  Finally, it is possible that submission dates recorded on some sick call request forms are incorrect.  Medical staff at times include a notation stating that the "wrong date" was entered by the inmate on the request form.  However, it was not possible for *amici* to assess the accuracy of the submission date inmates recorded on the request forms nor the accuracy of the staff's "wrong date" designation.[47]

---

[47] An advantage of an electronic sick call request submission process would be that it would include data regarding the date and time of each sick call request submission, which could serve as an audit trail.  This would also eliminate the need for inmates to rely on correctional officers to provide sick call request forms.  For some inmates, however, the use of tablets to complete an electronic form could present a barrier to submission.

Additionally, *Amici* did not review large enough samples to reach conclusions about the timeliness of responses to requests for sick call related to dental and mental health needs. However, there is some indication that at least with respect to dental services, there are delays in inmates accessing timely services. The dental sick call request system is designed so that inmates experiencing pain, swelling, or other signs of infection are seen within 24 hours, but in the absence any indications of these symptoms, inmates are not scheduled to be seen on sick call. If inmates are unaware of the decision rules adopted by medical staff, inmates who do have urgent dental problems may submit a sick call request for dental services without including the appropriate information to be seen timely.

> **Requirement Two:**
>
> **Defendants [shall] comply with District of Columbia and Centers for Disease Control regulations on social distancing in DOC facilities. Defendants shall address challenges which have prevented the implementation of social distancing including but not limited to lack of education and staffing shortages. Defendants shall provide the Court an update on their improvements to enforcing social distancing by JUNE 29, 2020.**

As explained below, the Defendants have continued to promote social distancing, but ongoing limitations are evident. The agency has bene unable to increase the complement of staff that is available for duty. These matters are explained below.

## A. Efforts to Promote Social Distancing

Current CDC Guidelines applicable to detention and correctional facilities recommend implementation of "social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units."[48]  District of Columbia

---

[48]  *See* App. B, Ex. 1, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, updated December 3, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html,

regulations related to social distancing in the context of the current pandemic are consistent with this guidance.[49]

The DOC has continued to implement strategies intended to reduce both the number of different inmates who come into contact with one another (*e.g.,* by reducing opportunities for inmates from different housing units to interact with one another) and the number of inmates who interact with one another at any given time (*e.g.,* by reducing out-of-cell time).  As noted above,[50] at both the CDF and CTF, the DOC has continued to implement a "medical lockdown," during which inmates are allowed out of their cells one hour per day in small groups.[51] Department of Corrections managers and staff report that they limit the number of inmates out of their cells at one time in each housing unit to a maximum of six inmates in addition to four inmates on work detail, who are responsible for certain cleaning duties throughout the day.[52]

During site visits, *amici* observed variability in the number of inmates out of their cells at any time, ranging from one inmate to as many as 15 inmates.  When inmates were out of their cells, social distancing practices were not consistent.  Often *amici* observed inmates congregate in small groups to talk, sometimes while not wearing a mask properly covering their noses and mouths.  At other times inmates who were in common areas would communicate with inmates inside of cells through the pass through slot on the cell door, often while in close proximity and while not wearing a mask properly covering both their noses and mouths.

---

[49] On November 1, 2020, a*mici* asked counsel for both parties to identify the D.C. regulations that would fall within the scope of this requirement.  *Amici* were informed by the Defendants that on March 31, 2020, the Department of Health issued Emergency Rule-making to order persons to stay at home due to the pandemic.  The regulation included this definition of social distancing requirements:  "Social Distancing Requirements means maintaining at least six (6) foot social distancing from other individuals."  67 D.C. Reg. 3829-3833 (Apr 3, 2020) (amending 22B DCMR Sections 220 and 229.1).  Mayor's Order 2020-075 (June 19, 2020) adopts this definition as well.  Mayor's Order 2020-075 at Section II. 1.

[50] *Supra* at 9.

[51] Inmates confined on segregation housing units are locked down for 24 hours on weekend days.

[52] The cleaning activities performed by the inmate work details supplement the cleaning performed by the contractors who perform daily cleaning on the housing units.

DOC executive staff and other managers have informed *amici* that they expect correctional officers to enforce social distancing requirements or potentially be subject to personnel action.  They have explained that a Correctional Surveillance Center Team ("CSC Team") monitors video feeds from both facilities around the clock.  Team members are responsible for, among other matters, reporting to DOC executives if social distancing on housing units is not being enforced.  *Amici* visited the CSC Team video monitoring center. According to CSC Team staff, the CSC Team was instructed in March or April 2020 to monitor video feeds and identify instances of inmates not wearing masks and/or not properly social distancing and for staff not wearing masks, shields, or enforcing social distancing requirements. CSC Team staff reported that violations of these COVID-19-related mitigation requirements are frequent and that the CSC Team may see as many as 100 examples per shift.  Information provided to *amici* by the DOC Deputy Director of Operations, to whom the CSC Team reports, indicates that between April and November 29, 2020, "approximately 347" disciplinary actions were taken against staff for violations of COVID-19 requirements, 84 percent of which were based on CSC Team observations.[53]  While less frequent than among inmates, during recent site visits *amici* observed correctional staff at times not wearing required masks and/or face shields on housing units and not maintaining social distances among themselves and when interacting with inmates and other non-correctional DOC staff.[54]

The DOC has taken steps to provide additional educational materials to inmates regarding COVID-19 and the importance of social distancing.  Signage has been placed throughout both

---

[53] *Amici* received a summary of the DOC's analysis of the data, but not the underlying data itself and thus *amici* did not independently analyze this data.

[54] For example, at one point during a site visit, *amici* observed correctional officers respond to a medical emergency.  A sergeant who responded to the emergency, entered the housing unit without a face shield.  He was offered a shield by a colleague, but he refused to wear it.

facilities reminding inmates and staff to remain at least six feet apart.  Additionally, DOC executive staff report that beginning in March 2020, educational materials are distributed to every inmate's cell every Wednesday and those materials at times include information related to COVID-19.

More recently, starting at the end of September 2020, the DOC widely distributed electronic tablets intended for educational purposes to inmates at the CDF and CTF.  Distribution of the tablets is expected to be completed by December 14, 2020.  The tablets, which are available to all inmates except those on intake or segregation status, may be used daily between 9:00 a.m. and 11:00 p.m.  Among other content, the tablets include educational materials regarding COVID-19, including a "Quick Guide to COVID-19,"[55] a "Response to COVID-19: Survival Guide,"[56] and instructions on "Wearing Personal Protection Equipment."[57]

Finally, with respect to staffing, since *amici's* last report in May 2020, the DOC received authorization and funding for 20 additional correctional officer positions; however, as explained above,[58] as of December 1, 2020, the size of the correctional workforce that is available for duty has remained essentially unchanged.  While the number of staff on unavailable for duty status decreased by 37, from 170 to 133 staff unavailable between May 9 and December 1, 2020, the number of vacant positions increased by 59, from 51 to 110 position.[59]  Consequently, the number of staff available for duty remained virtually unchanged.  The chart below compares staffing levels on May 9 and December 1, 2020.

---

[55]  Ex. 3A, "Quick Guide to COVID-19."
[56]  Ex. 3B, "Response to COVID Survival Guide."
[57]  Ex. 3C, "Wearing Personal Protective Equipment."
[58]  *Supra* at 26-27.
[59]  Twenty of the 59 positions were newly authorized positions in fiscal year 2021, which began on October 1, 2020.



### B.  Conclusion, Requirement Two

Since the issuance of the preliminary injunction, the DOC has continued to adopt operational practices to encourage social distancing.  These practices have resulted in substantial restrictions in the time inmates spend out of their cells.  While fewer inmates are out of their cells at any time than they would otherwise be in the absence of the out-of-cell time restrictions, inmates who are out of their cells often do not maintain six feet of social distance.  *Amici* also observed staff members not maintaining social distance on housing units and elsewhere throughout both facilities.  Personal protective equipment, including masks for every inmate, was widely available and with few exceptions inmates donned masks.  Frequently, however, masks were not properly covering both the inmates' noses and mouths.  Although *amici* observed some staff not wearing appropriate PPE, these incidents were infrequent.

27

As part of their effort to mitigate the spread of COVID-19, the DOC has made educational materials available to inmates in both hardcopy format and, more recently, electronically on new educational tablets that have been widely distributed to inmates at both facilities. Staffing limitations have persisted, creating challenges that impede mitigation efforts.

> **Requirement Three:**
>
> **Defendants shall continue the services of their newly-contracted environmental health and safety vendor. Defendants shall further continue their contract to provide COVID-19 cleaning services on the secure and non-secure sides of the DOC facility, including the common areas of all housing units. Defendants shall further continue their efforts to hire a registered sanitarian. Defendants shall ensure that inmates have access to the necessary materials to clean their cells, including cleaning solutions which protect against COVID-19 and adequate cleaning textiles and tools. Defendants shall further ensure that DOC staff and inmates are informed of and trained on the proper techniques for mixing and preparing cleaning solutions as necessary. Defendants shall provide the Court an update on their improvements to sanitation by JUNE 29, 2020.**

The Defendants' implementation of the requirements related to environmental health and safety is described below.

## A. The Environmental Health and Safety Vendor and Contract Cleaning Services

The DOC's contract for environmental health and safety services began in May 2020 and included an initial term of three months, with three one-month options to extend.[60] The contract included the services of a sanitarian. In mid-August 2020, the Defendants exercised an option to extend the contract through October 31, 2020, at which point the contract expired.[61]

During the term of the contract, a sanitarian employed by the vendor developed a cleaning and disinfecting protocol[62] to provide guidance to the cleaning companies that the

---

[60] *See May 20, 2020 Report*, Ex. 10 for a copy of the contractual agreement the Defendants entered for environmental health-related services.
[61] Ex. 4A, August 18, 2020 Modification of Contract CW82753, extending the contract period to October 31, 2020).
[62] Ex. 4B, "SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols."

DOC contracted with in response to the April 19, 2020 Temporary Restraining Order ("TRO"), (Dkt. No. 48),[63] and later conducted site visits to monitor implementation of cleaning practices at the CDF and CTF.  The vendor issued a total of four inspection reports, two in July 2020,[64] one in September 2020,[65] and one in October 2020.[66]

Department of Corrections management informed *amici* that the vendor's services were not extended beyond October 31, 2020 because the agency anticipated the environmental health and safety services provided by the vendor would be performed by a soon-to-be-hired DOC employee who would perform job duties associated with a sanitarian position.  As discussed below, the individual the Defendants hired to provide these services was not a registered sanitarian and did not have the training, experience or credentials to perform the same functions that were performed by the contracted sanitarian.  In response to the concerns raised about this matter at the November 9, 2020 hearing, DOC management recently informed a*mici* that the agency has decided to contract with the environmental health and safety vendor whose contract expired on October 31, 2020 and reinstitute its efforts to hire a registered sanitarian.  On December 11, 2020, the filing date of this report, the Defendants submitted documentation to *amici* indicating they had entered into a contract with the vendor for a three-month period, with

---

[63]  An Amended Order filed on April 19, 2020 corrected an error in the initial Order that was issued.  The error was based on a typographical error in *amici's* initial April 2020 report, which *amici* corrected.  The Amended Order addressed professional cleaning services on the secure side of the facility, and in relevant part states:  "In addition to engaging a sanitarian, the defendants shall consider contracting for professional cleaning services on the secure side of the facility, at least until a sanitarian is hired to bolster the existing environmental health and safety program at both facilities."  (Dkt. No. 50).

[64]  Ex. 4C, "Onsite Audit Inspection Report, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols," dated July 2020; Ex. 4D, "Follow-Up Onsite Audit Inspection Report, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols," dated July 23, 2020.  Although these reports and the two subsequent reports are all labelled "Draft," DOC representatives informed *amici* that they are all considered final versions of the reports.

[65]  Ex. 4E, "Follow-Up Onsite Audit Inspection Report No. 2, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols," dated September 2020.

[66]  Ex. 4F, "Follow-Up Onsite Audit Inspection Report No. 3, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols," dated October 30, 2020.

three one-month option periods.  The Defendants report that the vendor intends to schedule an inspection before December 25, 2020.

The Defendants continued the contracts for cleaning services on the secure and non-secure sides of the CDF and CTF, including common areas of the housing units.[67]  Since executing the contracts on an emergency basis in May 2020 for an initial three-month period, the Defendants have extended the contracts repeatedly for short periods, typically for one to three months at a time.  In a November 23, 2020 e-mail communication to a DOC executive, the Chief Procurement Officer at the D.C. Department of General Services, the agency responsible for contracting on behalf of the DOC for cleaning services at the CDF and CTF, approved extension of the DOC cleaning contracts to February 2021, stating his office would "work with [its] Budget Team to ensure funding is secured to ensure compliance with the Court Order."[68]  In addition, he stated that the contracts "should [be] review[ed] in January [2021] to ensure that [the] Court Order is still valid and if so we may need to prepare a competitive solicitation in January if we must continue the contract beyond February 2021."[69]

The cleaning contractors at the CDF and CTF are expected to follow the disinfection and cleaning protocols developed by the DOC's environmental health and safety vendor.  The contractors were observed and evaluated by the DOC's contracted sanitarian on multiple occasions between July and October 2020.  Based on *amici's* interviews and observations, it appears that by and large the contractors clean all of the requisite areas of the facilities every day.  Common areas and public spaces on both the secure and non-secure sides of the facilities

---

[67]  One of the two cleaning contractors the DOC engaged was replaced.  *See* Ex. 4G, Modification of Contract DCAM-20-NC-EM-0079C, extending the performance period for the new cleaning contractor (at the CDF) through February 28, 2021; Ex. 4H, Modification of Contract DCAM-20-NC-EM-0079B, extending the term of the cleaning contractor (at the CTF) through February 28, 2021.

[68]  Ex. 4I, November 23, 2020 e-mail correspondence from George Lewis to Gitana Stewart-Ponder.

[69]  *Id.*

appeared noticeably cleaner than *amici* observed during previous site visits at both the CDF and the CTF.  Department of Corrections managers and staff also reported a consistent improvement in facility cleanliness attributable to the contract cleaning teams.

### B.  Hiring Registered Sanitarian

The Defendants posted a position vacancy announcement for a "sanitation inspection specialist" on six dates between May 21 and October 3, 2020.[70]  The qualifications and educational requirements for the posted position do not meet the eligibility requirements to sit for the registered sanitarian examination administered by the relevant credentialing body.[71]  Department of Corrections management has informed *amici* that the agency elected to post a sanitation inspection specialist vacancy rather than a sanitarian position vacancy in order to expedite the hiring process.  According to DOC management, because the sanitarian position did not already exist, additional administrative work would be required to develop a job description and classify the position and these activities would delay filling the vacancy.

A review of publicly available information concerning District of Columbia Government employees indicates that as of September 30, 2020, there were 36 District employees with the title "sanitarian," 34 of whom worked for the Department of Health, and two of whom worked for the Department of Youth Rehabilitation Services and the Child and Family Services Agency, respectively.  Additionally, *amici* found a Department of Health job vacancy announcement for a sanitarian position that was posted in January 2020;[72] however,

---

[70]  Ex. 4J, Sanitarian Inspection Specialist job description and vacancy announcement posted on the following dates: May 21, 2020; June 17, 2020; July 7, 2020; July 31, 2020; September 18, 2020; and September 29, 2020
[71]  The National Environmental Health Association is the credentialing organization for sanitarians.  *See* Ex. 4K, "NEHA Environmental Health Specialist/Registered Sanitarian (REHS/RS) Candidate Information Brochure" at 1-3 for the eligibility requirements to sit for the REHS/RS credentials exam.
[72]  Ex. 4L, Sanitarian job description and vacancy announcement posted on January 6, 2020.

the eligibility requirements for that position also were inconsistent with the requirements set by the National Environmental Health Association for registered sanitarians.[73]

Department of Corrections representatives stated that after serially posting the job opening for the sanitation inspection specialist and conducting outreach to public health networks, the agency did not receive any applications from registered sanitarians from among those applicants who qualified for the position. Ultimately, the DOC hired a candidate from the pool of applicants who was a 13-year supervisory employee of the agency without a background in environmental health and safety. This individual began working as the sanitation inspection specialist on November 9, 2020.

*Amici* interviewed the newly hired sanitation inspection specialist and that person's supervisor. The supervisor developed training materials that have been provided to the new employee.[74] Both the supervisor and the employee stated that training has begun and has included online coursework, studying American Public Health Association Standards for Health Services in Correctional Institutions, and on-the-job training twice per week conducted by a District employee who oversees environmental health and safety programs in the District of Columbia's two secure juvenile facilities.[75] The on-the-job training is anticipated to continue for up to two months.

As noted above, following the November 9, 2020 hearing, DOC management informed *amici* that the agency intends to post a position vacancy for a registered sanitarian. According

---

[73] *Compare* Ex. 4K, *supra* note 71 *with* Ex. 4L, supra *note* 72.
[74] Ex. 4M, "Training Plan for DOC Sanitarian."
[75] Those facilities are operated by the District of Columbia Department of Youth Rehabilitation Services. The individual conducting the on-the-job training has the "sanitarian" job title.

to DOC management, as of December 9, 2020, a job description had been developed and was being reviewed by staff in the District of Columbia's Office of Human Resources.[76]

### C.  Access to Cleaning Materials and Related Training

There was a significant improvement in inmate access to appropriate materials to clean their cells since *amici's* prior site visits.  The Defendants now provide inmates with a peroxide-based cleaning and disinfecting solution and clean microfiber cloths are delivered to housing units twice daily.  At the CDF, inmates and staff reported that they are required to clean their cells with these materials in the morning at the start of the shift.  At the CTF, inmates reported that they had access to bottles of peroxide solution and microfiber cloths when they were allowed out of their cells.  *Amici* observed that an appropriate supply of clean microfiber cloths and bottles of peroxide solution were available on every housing unit visited and inmates and staff consistently reported that they had access to the clean cloths and solution on a daily basis.

The peroxide solution is purchased by the DOC in a concentrated and highly corrosive form.  It is mixed by designated "environmental officers" prior to its distribution to housing units.  The dilution of the concentrated form of the solution is performed by a machine programmed to add a specified amount of water in order to dilute the solution to levels prescribed by the manufacturer.

DOC managers, detail inmates, and some housing unit staff have reported that inmate detail workers and correctional officers assigned to the housing units have been trained on cleaning protocols.  The training, which was conducted by the DOC Compliance and Review

---

[76]  Ex. 4N, Position Description (Draft) for "Environmental Sanitarian CS 1801-12."

Office, was based on the cleaning protocols developed by the contracted environmental health and safety vendor.

> **Requirement Four:**
>
> **Defendants shall ensure that conditions in isolation units are non-punitive. This includes ensuring reliable and regular access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status. Defendants shall provide the Court an update on their improvements to conditions in isolation cells by JUNE 29, 2020.**

Since June 18, 2020, when the preliminary injunction was issued, there have been no isolation units in operation at the CTF; however, an isolation unit has operated on a limited basis at the CDF during this period.

As explained in more detail below in the narrative related to testing requirements,[77] a total of 11 inmates tested positive for COVID-19 at the CDF between June 18, 2020 and December 1, 2020. All but one of these cases were identified as a result of testing conducted at the time of admission, and the last one appears to have been the result of a newly admitted inmate with COVID-19 who was placed on the mental health unit upon admission and infected another inmate.[78] DOC records indicate that upon receipt of a positive test result, each member of this cohort was transferred to NO-2, the unit at the CDF designated for inmates on medical isolation status.

Since the time that the preliminary injunction was issued, there have been a limited number of inmates on isolation status. Unlike the conditions that were evident before the temporary restraining order was issued, it appears that inmates on isolation status are able to make personal telephone calls, take daily showers, and receive clean clothing and clean linens

---

[77] *Infra* at 39 - 47.
[78] This matter is addressed *infra* at 41.

on a weekly basis.[79]  There is, however, some very limited evidence indicating that inmates on

isolation status may not have access to confidential legal calls.[80]

> **Requirement Five:**
>
> **Defendants shall ensure that all inmates have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters. Insofar as inmates' access to confidential, unmonitored legal calls is reliant on the use of new technology, Defendants shall swiftly implement the use of such technology.**

In the context of this requirement, two different categories of legal calls should be

considered:  attorney-initiated legal calls and inmate-initiated legal calls.  The various

processes and practices applicable to each category are discussed separately below.

### A. Attorney-Initiated Legal Calls

Currently, pursuant to a process initiated in April 2020 in response to the pandemic, an

attorney can request a legal call with a client confined at the CDF or the CTF by sending an

email to the DOC case management office.  DOC case management staff report that these

calls, which are referred to as "emergency" legal calls, are generally scheduled for a 30-minute

period, but the duration may be extended for up to one hour or more if the attorney requests

additional time.[81]  After submitting a request, attorneys are advised of the day they will receive

a legal call from the client but not the precise time that the client will contact them.

Reports from DOC management related to the volume of attorney-initiated emergency

legal calls indicate that a high number of legal calls are processed on a monthly basis at both

---

[79]  *Amici* were only able to interview one inmate who was recently on isolation status.  Based on this interview and discussion with medical, correctional and management staff, it appears that since the preliminary injunction was issued, in the limited instances in which an isolation unit has been operated at the CDF, inmates have had access to personal telephone calls, daily showers, clean clothing and clean linens.

[80]  One inmate on isolation status reported that while he was able to speak by telephone to his lawyer in the case manager's office, a correctional officer remained in the office during the telephone call.

[81]  *Amici* were told that the request for additional time must be made in the initial email.

the CDF and CTF.[82]  Between April 20, 2020 and October 15, 2020, DOC management

reports that case managers were responsible for facilitating 8,602 emergency legal calls.[83]

During this period, DOC management reports that the average daily volume of emergency

legal call requests per month ranged from a low of 50 calls to a high of 83 calls, and the

average number of case managers who were present at both facilities to facilitate these calls

during this period was 13.[84]

      Each housing unit has an assigned case manager.  Many case managers are assigned to

cover multiple housing units.  As of early November 2020, the DOC had a total of 35 funded

case manager positions, nine of which were vacant.  Pursuant to the emergency call request

process initiated in April 2020, each weekday morning case managers receive a list of

emergency legal calls that they are assigned to facilitate that day.  Case management staff

report that most if not all of their workdays are devoted to facilitating attorney-initiated

emergency legal calls.  As a result, they are unable to regularly perform many of their other

job duties,[85] including the timely processing of inmate-initiated requests for legal calls, which

are described in more detail below.[86]

---

[82]  Ex. 5A, chart submitted by DOC Director of Programs and Case Management, Legal Calls, Emergency Calls to Private and Public Attorneys, April 20 - October 15, 2020 (showing for the 10-day period between April 20 and 30, 2020, attorneys requested 448 legal calls of which 378 were completed; for the month of May 2020, attorneys requested 1,286 legal calls of which 1,077 were completed; for the month of June 2020, attorneys requested 1,507 legal calls of which 1,341 were completed; for the month of July, 2020 attorneys requested 1,526 legal calls of which 1,410 were completed; for the month of August 2020, attorneys requested 1,415 legal calls of which 1,331 were completed; for the month of September 2020, attorneys requested 1,623 legal calls of which 1,546 were completed; and for the 15-day period between October 1 and 15, 2020, attorneys requested 831 legal calls of which 789 were completed).

[83]  Ex. 5B, Legal Calls Cont., Number of Emergency Legal Calls Requested by Public and Private Attorneys, April 20 - October 15, 2020 (stating, *inter alia*, that of the 8,636 emergency legal calls requested during this period, 8,602 were the responsibility of case managers).

[84]  *Id.*

[85]  In addition to legal calls, case managers are responsible for inmate classification, reclassification, and facilitating various types of inmate requests for records and services.

[86]  *Infra* at 38 - 39.

In instances in which attorneys contact the DOC case management office to request a legal call, the calls are conducted in one of the following ways at both the CDF and CTF: 1) in the case manager's office with the case manager present; 2) in the inmate's cell using a cellular telephone; and 3) in an empty cell on the housing unit using a cellular telephone.  At the CDF, these legal calls are also conducted in an office in the facility's case management suite.[87]  *Amici* received some conflicting information about whether case managers are present when a legal call is conducted in a case manager's office.  However, most of the inmates and case managers interviewed confirmed that the case manager is present in the office when these calls are conducted, which is consistent with the observations that *amici* have made.

As of mid-November 2020, attorney-initiated emergency legal calls were being conducted via cell phone in individual cells at both the CDF and CTF.[88]  Department of Corrections managers report that the introduction of the cell phones and handsets initially presented connectivity and other challenges that have largely been overcome.  For the most part, inmates and staff report that the use of the cell phones in individual cells affords inmates the opportunity to speak in a confidential setting with their attorneys.[89]

Attorneys can also request to speak to their clients at the CDF and CTF via

---

[87]  During an interview *amici* conducted in the case management suite, an inmate was observed sitting in the doorway of an open office reportedly speaking to his attorney within audible distance of correctional and case management staff.

[88]  The Defendants purchased 50 cell phone and 10 wireless handsets for this purpose on May 1, 2020.  All equipment has been delivered.  *See* Ex. 5C, Order Confirmation, First Net, Order No. 587640299 (cell phones);  Ex. 5D, Proof of Delivery, Vendor Acknowledgement/Acceptance Form, September 30, 2020 (wireless handsets). Records related to the delivery of the cell phones and the order for the handsets were requested but not available. According to case management supervisors and staff, as of mid-November 2020, nine cell phones were available for use (six at the CDF and three at the CTF). In addition, seven wireless handsets and nine non-wireless handsets were also available.  Department of Corrections management reports that the remaining 41 cell phones will be deployed after the Defendants receive the supplies necessary to secure them in locked boxes.  Department of Corrections staff report that the boxes, which are used for the nine phones that are in use, are intended to ensure that the cell phones are not damaged or used for unauthorized purposes.

[89]  Some inmates reported that they could be overheard by inmates confined in adjacent cells when speaking from their closed cells.

videoconference.  These conferences are scheduled for a specific weekday time period by staff

in the DOC General Counsel's Office.  The Defendants report that between May 18, 2020 and

October 31, 2020, the General Counsel's Office coordinated a total of 1,209 videoconferences

for inmates at the CDF and CTF.  Designated correctional staff have been trained to help

inmates use the videoconference technology.  *Amici* have observed and participated in these

videoconferences, which are conducted under conditions that promote the confidentiality of

attorney-client communications.[90]

### B.  Inmate-Initiated Legal Calls

Inmates at the CDF and CTF can initiate legal calls with their attorneys by submitting

an oral or written request to the case manager assigned to their housing unit.[91]  Inmates

reported substantial delays receiving responses to these requests.  Like the attorney-initiated

legal calls, these calls can be conducted in the case manager's office with the case manager

present or in a cell on the housing unit.  In addition, inmates can make free legal calls to their

attorneys during the one-hour daily recreation period, using the phones mounted on the walls

in the day rooms.[92]  While the DOC reports that these calls are unmonitored, they are not

confidential.

The DOC Office of General Counsel reports that inmates at the CDF have been able to

make confidential and free legal calls from their cells using tablets provided by the vendor that

---

[90]  In instances in which counsel requires a client to review documents or other materials, they are able to do so on a confidential basis during the videoconference.  Additionally, DOC staff report that attorneys can send documents to case managers and the General Counsel's Office for transmission to inmates for review.

[91]  See Ex. 2C, *supra* note 31,  Sample Inmate Request Slip.  Inmates can obtain these forms, which are used to request legal calls, among other requests, from correctional staff and case managers.  After the forms are filled out, inmates are required to place them in a box where they are picked up periodically by the case management staff.  Some of the case managers *amici* interviewed reported that they had difficulty keeping up with these request forms.

[92]  Defendants report that these calls are free and unmonitored as long as the attorney's name and telephone number have been appropriately registered in the system.

provides telephone services at the CDF.[93]  Between June 18 and December 6, 2020, the

General Counsel's Office reports that 334 legal calls were made using these tablets at the

CDF.  In addition to telephone communications, inmates can use the DOC-issued educational

tablets to communicate with their attorneys using a confidential electronic messaging

platform.  As of November 30, 2020, DOC management reports that 187 inmates and 155

attorneys have used the messaging platform.

### C.  Conclusion, Requirement Five

The Defendants have made a substantial investment in new technology to address the

attorney-client communication challenges that have emerged as a result of the pandemic.  In

addition, they have repurposed space in different parts of the CDF and CTF in order to

accommodate confidential attorney-client videoconferences.  Moreover, in an effort to ensure

the technology is used appropriately, correctional staff assigned to newly created

videoconferencing posts have received training on skills that were not contemplated by their

job descriptions.  Finally, case management job responsibilities have been restructured in

order to prioritize the volume of attorney-client telephone and video communications

associated, at least in part, with the reported and substantial decrease in attorney visits to the

CDF and CTF.

**Requirement Six:**

**Finally, the Court notes that Defendants have increased testing for
COVID-19, now testing any resident to be transferred to Saint Elizabeths
Hospital or to a federal correctional facility.  Defendants also test any**

---

[93]  Unlike the educational tablets provided to inmates by the DOC, the tablets provided by the vendor contain paid
content.  The tablets furnish inmates at the CDF with the ability to make telephone calls to the same approved
contacts they are allowed to contact from the telephones in the dayrooms, including their attorneys.  Currently, these
tablets are only available in limited quantities at both facilities.  However, although inmates at the CTF also have
access to these tablets, they cannot use the telephonic functionality because a different vendor has the contract for
telephone services at the CTF and these services are currently unavailable under that contract.

**cell mate of an inmate who tests positive and all new residents upon intake. Defendants continue to test those inmates who report positive for COVID-19 symptoms. The Court ORDERS that Defendants continue implementing this increased testing. The Court further ORDERS that Defendants update the Court on any changes to the testing protocol at DOC facilities, including the further testing of asymptomatic inmates.**

The Defendants report that they administer COVID-19 tests to inmates in the following circumstances:  upon admission; prior to certain transports, including transports to court; if inmates are symptomatic; and, to any cellmate of an inmate who tests positive for COVID-19.  In addition to inmate testing, DOC representatives also reported that beginning in October 2020, the Department of Health began making COVID-19 testing available to DOC staff on-site every two weeks.  The testing was made available during hours that included the morning shift change to maximize the number of staff who could take advantage of the testing.

### A.  Testing of Newly Admitted Inmates

For newly admitted inmates, the Defendants report that their protocol is to administer a rapid COVID-19 test and a lab test simultaneously to each inmate upon intake.[94]  An additional lab test is administered to each inmate at least seven days later[95] while the inmate remains housed in the Intake unit.[96]  Once cleared by medical staff, inmates may be moved from the Intake unit into other housing units.  If an inmate tests positive for COVID-19, they are transferred to housing units designated for inmates on isolation status.

---

[94]  The lab test reportedly has a higher sensitivity in detecting SARS-Cov-2; however, results take longer to process. Thus, a rapid test is administered at the same time and the test results are available shortly after the test is administered.  If the rapid test returns a positive test result, the inmate is isolated sooner than s/he would otherwise be if a lab test alone were administered.  Inmates who refuse testing at the time of admission are cell restricted until medical staff clear them.

[95]  This process is intended to identify inmates who may have been COVID-19 positive upon admission, but who were still in an incubation period with viral levels that were too low to detect at the time of the initial test administrations.

[96]  Inmates with acute mental health needs are moved to a specialized unit and do not remain on the Intake unit. Women are admitted at the CTF.

*Amici* obtained COVID-19 testing data through November 30, 2020 from Unity representatives who maintain clinical testing data.  According to that data, over the 165 days between June 18, 2020 and November 30, 2020, the Defendants administered 2,561 tests to inmates, an average of 15.5 tests per day.  Additionally, tests were administered on 91 percent of the days during the period.

The testing records indicate that there were a total of 11 positive tests during the period, four in July, two in August, four in September, none in October, and one in November.  All were at the CDF.  Ten of the 11 positive tests were detected by a COVID-19 test administered upon admission to the facility.  Of those 10 inmates testing positive, nine were housed in SO-2 initially, the Intake unit, or were immediately placed in the isolation unit, NO-2, before spending a night in SO-2.  The 10th case involved an inmate who was placed on the mental health unit, SO-3, upon admission.  When his initial test result came back positive, he was moved to the isolation unit.

The final positive case was not a new admission, but rather involved an inmate who was housed on the mental health unit for an extended period.  He was housed on the mental health unit during the period when the newly admitted inmate referred to above (*i.e.,* the 10th positive case) tested positive.  The day after the newly admitted inmate received his positive test result, the entire mental health unit was tested.  One inmate on the unit was confirmed positive four days later and he was transferred to the isolation unit.

### B.  Testing of Inmates Transferred to Saint Elizabeths Hospital

*Amici* obtained data regarding all transfers to Saint Elizabeths Hospital for the period June 18 to October 31, 2020.  There were a total of 24 transfers to that facility.[97]  *Amici*

---

[97]  According to DOC staff, inmates may be transferred to Saint Elizabeths either as a permanent placement or on a temporary basis pending a mental health assessment.

interviewed DOC and Unity representatives regarding the prerelease and COVID-19 testing

processes applicable to inmates released to Saint Elizabeths.

According to Unity representatives, inmates who are released to Saint Elizabeths are

tested for COVID-19 in advance of their transfer if Unity staff are notified in advance of the

transfer.  Unity and DOC records office staff reported, however, that they often are not

notified in advance of an inmate transfer to Saint Elizabeths.  *Amici* cross referenced the

names of the 24 inmates who were transferred to Saint Elizabeths during the review period

with COVID-19 testing data.  Twenty two of the 24 transferred inmates were tested for

COVID-19 while in DOC custody *at some point* prior to their transfer to Saint Elizabeths;

however, in most cases the testing was not conducted in close temporal proximity to the

transfer.  Department of Corrections records indicate that seven of the 20 inmates were tested

within the week prior to the transfer; four additional inmates were transferred between one and

two weeks prior to the transfer; and the remaining 11 inmates were tested between 24 and 128

days prior to the transfer to Saint Elizabeths.  Two inmates transferred to Saint Elizabeths

during the review period were not tested at all prior to the transfer.

### C.  Testing of Inmates Transferred to Federal Correctional Facilities

*Amici* obtained data regarding all transfers to the United States Marshals Service for

the period June 18 to October 31, 2020:  There were a total of 165 transfers.  *Amici*

interviewed Unity staff regarding COVID-19 testing practices prior to inmate transfers to

federal facilities, including Unity staff involved in the health clearance process for inmates

who are released to the custody of the Marshals Service.  According to Unity staff, there is a

defined process established by the Marshals Service for releasing inmates to their custody,

which Unity follows.  Unity staff are required to complete a "Prisoner in Transit Medical

Summary" form for each inmate scheduled to be transferred.[98]  Unity staff explained that at some point in early 2020, a new section, Section 7, "Mandatory Symptom Screening for COVID-19 Prior to Departure From Facility," was added to the form.  This new section includes a record of the inmate's temperature, three screening questions, and criteria for a "certifying health authority" to medically clear the inmate for transfer.  The form does not require a COVID-19 test prior to release and Unity staff stated that in practice, they complete the form for each inmate released to the Marshals Service, but do not complete a COVID-19 test as a matter of course.  Unity representatives clarified that if a request is made to administer a COVID-19 test (*e.g.,* by the facility to which the inmate will be transferred), they will conduct the test.

Amici cross referenced a random sample of 33 of the 165 inmates transferred to the Marshals Service between June 18 and October 31, 2020 with COVID-19 testing data.  Twenty-one inmates received a COVID-19 test at some point prior to their release to the custody of the Marshals Service and 12 inmates did not.  Among this cohort, three inmates received a COVID-19 test within the month prior to their release (ranging from 14 days to 28 days prior to release) and the remaining 18 inmates received a test more than one month prior to their release (ranging from 33 days to 181 days).

### D.  Testing of Cellmates of Inmates Who Test Positive

As noted above, the Defendants report that cellmates of all inmates who test positive for COVID-19 are tested.  Of the 11 inmates who tested positive for COVID-19 between June 18 and October 31, 2020, one inmate had a cellmate.  The two inmates were housed in a cell in the Intake unit.  Testing records indicate that the cellmate of the inmate who tested positive

---

[98]  Ex. 6, "Prisoner in Transit Medical Summary" [redacted].  This form is referred to as "Form 553."

was tested the same day his cellmate received a positive test result and his test result was

negative.

### E.  Testing of Inmates Who Report COVID-19 Symptoms

Finally, *amici* reviewed a sample of 49 sick call requests submitted between June 18

and October 31, 2020 that reflected reported symptoms consistent with COVID-19 symptoms

identified by CDC Guidelines and/or reflected in Unity's reported symptom-based testing

practices.[99]  Forty-three of the sick call requests were submitted by inmates confined at the

CDF and six were submitted by inmates confined at the CTF.  Because 13 of the sick call

request forms did not include the date the inmate submitted the form, they were excluded from

the analysis.

Among the remaining 36 sick call requests in the sample, 32 were from the CDF and

four were from the CTF.  Fourteen of the 36 inmates who submitted the sick call requests, 39

percent, were tested for COVID-19 at some point after they submitted their sick call request.

Five of the 14 tests were administered within two days of the submission of the sick call

request and one was administered five days after the submission of the sick call request.[100]

The remaining eight tests were administered between 20 and 52 days after the sick call

requests were submitted.  There is no indication in the EHR maintained for these inmates that

these eight tests were administered in response to the sick call requests that reported COVID-

19 symptoms.  Among the 22 inmates who were not tested after reporting symptoms, 17

---

[99] *See* App. B, Ex. 1, supra note 49 ("Symptoms of COVID-19 include cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and new loss of taste or smell …. Other less common symptoms have been reported, including nausea and vomiting.")  Symptoms noted in the sampled sick call requests included, but were not limited to, the following:  coughing; shortness of breath; difficulty breathing; fever; nausea; vomiting; loss of appetite; headache and/or body aches; chills; and sore throat.  Inmate requests for COVID-19 tests were also included in the sample.

[100] Three sick call forms explicitly included a request for a COVID-19 test:  one reported shortness of breath, one reported upset stomach and vomiting, and one reported nausea and loss of appetite.

received a COVID-19 test at some earlier point in their confinement and five were not tested for COVID-19 during their confinement.

*Amici* interviewed Unity's Medical Director regarding clinical expectations for testing inmates who report symptoms consistent with COVID-19.  The director pointed out that there are some cases in which there are sound medical explanations for the symptoms the inmate is experiencing consistent with something other than COVID-19.[101]  The director also acknowledged that providers have some clinical discretion in deciding when to administer a COVID-19 test to inmates reporting COVID-19 symptoms, but she indicated that if there is no "obvious or clear" explanation for the symptoms, a COVID-19 test should be administered.

*Amici* did not assess the clinical decisions made by providers with respect to administering COVID-19 tests for reportedly symptomatic inmates, which seemed beyond the scope of this appointment and would have required consultation with a medical expert. A review of the EHR maintained for inmates in the sample shows that in six cases, the inmate reported during the sick call visit that the COVID-19-like symptoms reflected on the sick call request form was resolved and in five other cases the inmate reported that s/he had requested to be seen in sick call for other reasons despite noting symptoms of COVID-19 on the sick call request form.[102]  The review of the sampled cases also show various diagnoses reached following the sick call visit, such as asthma, constipation, allergies/sinusitis, and acid reflux/gastrointestinal reflux disease.  In none of these cases, was there documentation in the EHR that COVID-19 was suspected but testing was not done.

---

[101]  The director cited as examples inmates diagnosed with Crohn's disease reporting gastrointestinal symptoms and inmates diagnosed with asthma reporting a cough.  In cases such as these, a provider might conclude the symptoms were related to the diagnosed chronic condition rather than COVID-19.
[102]  These other reasons included requests for foot cream, medicine for heartburn or treatment for constipation.

### F.  Timeliness of Testing Results

During the November 9, 2020 hearing, the Plaintiffs inquired whether *amici* were aware of any delays in receiving testing results from laboratories.  *Amici* have reviewed the available data regarding elapsed days from test administration to receipt of testing results. Among the 2,561 tests administered between June 18 and October 31, 2020, data were available for 39 percent of the test results.  Beginning in August 2020, the date test results were received was recorded much less frequently than during June and July 2020.  *Amici* were not able to determine whether the tests with data sufficient to calculate the number of elapsed days between test administration and receipt of testing results (*i.e.,* the 39 percent) were representative of test processing times in general.  With that caveat, in the months of October and November 2020, 97 percent of the tests for which a calculation could be made resulted in test results that were returned within four days of the test administration.[103]

### G.  Conclusion, Requirement Six

Since the issuance of the preliminary injunction, the DOC has administered over 2,500 COVID-19 tests to inmates at the CDF and CTF, over 15 tests per day.  The agency's testing protocols pay particular emphasis to identifying and containing any inmates with COVID-19 before they interact with the general population and have an opportunity to communicate the virus to other inmates or staff.  Since the issuance of the preliminary injunction, 10 of the 11 inmates who tested positive for COVID-19 were discovered during routine intake testing and the 11th case, caused by a newly admitted inmate's placement on the mental health unit, was

---

[103] For reference, there was sufficient data for 149 of the 1,002 tests administered in those two months.  Thirty-three of the tests were administered two days before the data was provided to *amici* and the results of those tests were still pending.

quickly contained because of the intake testing.  In the one case in which an inmate who tested positive for COVID-19 had a cellmate, the cellmate was also tested.

The evidence indicates that the DOC does not as a matter of general practice test inmates who are transferred to Saint Elizabeths Hospital.  Medical staff indicate they often are not informed that an inmate will be transferred to Saint Elizabeths in advance.  The data also indicate that the DOC does not routinely test inmates who are transferred to federal correctional facilities.  Medical staff explained that they follow the procedure established by the Marshals Service.

Finally, a review of a sample of sick call requests that included symptoms consistent with COVID-19 revealed that most inmates were not tested for COVID-19 in response to the sick call request.  Unity medical staff explained that there is clinical judgement involved in deciding whether to administer a COVID-19 test to an inmate.  *Amici* did not assess those decisions.

## V.    CONCLUSION

*Amici* are available to answer any questions the Court or the Parties have about the matters addressed in this report.

Respectfully submitted,


/s/ Grace M. Lopes
*Amicus Curiae*
Grace M. Lopes
Bar No. 358650
Executive Director
Rising for Justice
901 4th Street, N.W., Suite 6000
Washington, D.C. 20001
202-607-2224
gmlopes@risingforjustice.org

47

Mark Jordan
mark@markjordan.consulting
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036
December 11, 2020                    202-525-6732
Washington, D.C.