UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDWARD BANKS**, *et al.*,<br><br>        *Plaintiffs*,<br><br>v.<br><br>**QUINCY BOOTH**, *et al.*,<br><br>        *Defendants*. | **Civil Action No. 20-0849 (CKK)** |

### DEFENDANTS QUINCY BOOTH AND LENNARD JOHNSON'S SUPPLEMENTAL BRIEF IN RESPONSE TO *AMICI*'S DECEMBER 11, 2020 REPORT

### INTRODUCTION

Defendants Quincy Booth and Lennard Johnson (the District) provide the following supplemental brief in response to the Report submitted by *Amicus Curiae* (Dec. 11, 2020) [105] (Report). In almost 47 pages, the Report confirms that the District of Columbia Department of Corrections (DOC) has effectively eliminated the risk of COVID-19 infection facing its residents and is therefore not (and has not been) deliberately indifferent. Accordingly, the Court's June 18, 2020 preliminary injunction (PI) should be vacated.[1] Indeed, as noted in the Report, between the issuance of the PI on June 18, 2020 and December 1, 2020, only 11 inmates tested positive for COVID-19, and all but one of those were COVID-positive at the time of admission and detected

---

[1]     As the District already notified this Court, *see* Notice of Filing [128], the PI expired on September 16, pursuant to the Prison Litigation Reform Act, because it did not contain the requisite "need-narrowness-intrusiveness" findings and the injunction was not made final within 90 days. *See* 18 U.S.C. § 3626(a)(2) (providing that, under either of these circumstances, preliminary injunctive relief "shall automatically expire" after 90 days). Once the PI expired, the District's motion to alter or vacate the preliminary injunction [105] became moot. If for some reason the motion is not moot, though, it should be granted.

through DOC's intake testing protocols.[2] Report at 34.

This case was filed at the start of the COVID-19 pandemic, with plaintiffs seeking extensive, mandated changes to DOC's operations to address the risk of infection to DOC's residents. Even before that filing, DOC took numerous actions to develop and improve its policies and operations to effectively address the pandemic. As the record also shows, in addition to successfully contending with the pandemic in its facilities, DOC altered its operations to take on responsibilities for its *other* partners in the criminal justice system, including federal law enforcement agencies, public defender services, and the local and federal courts. DOC's extraordinary efforts to keep its residents safe while providing them unprecedented services have succeeded, and plaintiffs cannot credibly contend otherwise. The District addresses below some of the specific matters discussed by *amici*.

## ARGUMENT

I. **Medical Care**

The Report demonstrates that DOC has a high-functioning medical care response process for inmates. The Report discusses in detail the increased staffing and modifications to the sick-call process and finds that inmates had "positive impressions" of the medical care response, with most inmates being seen within 24 hours, either through the sick-call process or the urgent care or chronic care clinics. Report at 16. The Report also spends several pages discussing inmate requests for dental and mental-health care, neither of which was addressed in the PI or relates to COVID-19.

But the Report's discussion of the sick-call process is incomplete and, notably, does not

---

[2] Since December 1, 2020, four additional residents have tested positive for COVID-19 at the time of admission. Declaration of Beth Jordan (Jordan Decl.), Ex. A ¶ 4. Three of the four residents remain at DOC facilities and are in isolation.

address the fact that DOC's practices were modified to respond to *medical* concerns regarding COVID and not to further improve access to mental health or dental services. Jordan Decl. ¶ 5. Thus, the Report's findings related to inmates' accessing medical care within 24 hours are skewed, not only by the inclusion of mental health and dental cases in their analysis of what was designed to be a purely *medical* enhancement to assessment and clinical services, but also by *amici*'s small sample size. Out of the 1,338 sick call slips reviewed, only 38 of those slips addressed medical concerns, representing only about 3% of cases reviewed. *Id.* ¶ 8.[3]

The Report also fails to discuss the many reasons why a resident might not have been seen in a timely fashion, even though those reasons were contained in the electronic medical records (EMR) available to *amici* and were discussed with them by Dr. Beth Jordan, Dr. Eleni O'Donovan (Director of Correctional Medicine at Unity Health Care (Unity)) and Director of Nursing Bianca Thompson. *Id.* ¶ 6. That omission may lead readers of the Report to infer—incorrectly—that some inmates were not timely seen through some fault of DOC.

A particular resident might not be seen in a timely fashion for a number of reasons, including a resident refusing a clinic visit. *Id.* ¶ 7. Residents may also miss clinic visits because of participation in court proceedings, being off site at a medical appointment, or problems with correctional officers getting residents on a housing unit to the sick call clinic (for example, if the resident's unit is in lockdown or if there is an acute security issue). *Id.*

Similarly, the Report fails to discuss the robust audit procedure that DOC and Unity use to monitor the enhanced sick-call process. *Id.* ¶ 9. This process was discussed in detail with *amici*, and the auditing team also provided *amici* with the form the team uses. *Id.* DOC and Unity conduct

---

[3] DOC's 24-hour system goes well beyond its accrediting organizations' requirements. The National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA) provide for a sick-call visit within 48 hours. Jordan Decl. ¶ 11.

daily audits of that process to address any potential problems with inmates' timely access to medical care. *Id.* That audit examines numerous factors potentially affecting timely sick call access, including any discrepancies between the date entered on the slip by the inmate and the date of pick-up and time-stamp by Unity; any reasons in the EMR why an inmate was not seen within 24 hours; and the sick-call slip tracking process. *Id*. Audit results showed strong compliance with the goals for the sick call system, including 96% compliance with the primary goal of seeing inmates within 24 hours of sick call slip submission. *Id.* ¶ 10.

The Report also notes the "very helpful" results of DOC's regular, weekly collaboration with an experienced epidemiologist from D.C. Health, Report at 11, but does not detail the many positive aspects of that collaboration, including how PPE training and auditing are helping prevent COVID's return to DOC facilities. *See* Jordan Decl. ¶¶ 12–13. Indeed, one state court judge in Texas consulted DOC and Unity to learn about DOC's response to the pandemic and viewed its success as a model for other jurisdictions nationwide. *Id.*

## II.     Social Distancing

The Report shows that DOC is continuing efforts to implement strategies to reduce contacts between inmates and to enforce social-distancing requirements. The Report discusses various instances of inmates gathering in groups or without regard to social distancing, Report at 24–25, but does not address the practical difficulties of enforcing those requirements. *Amici* do not suggest reasonable (or any) additional methods by which DOC could improve enforcement of social distancing between inmates. The Report also discusses supervisors' real-time video monitoring of correctional officers that has resulted in almost 350 disciplinary actions against staff for failure to properly enforce social distancing. *Id.* at 25.

The Report notes the fluctuation in population at DOC facilities since the Court issued the

PI and that the population has increased almost 20% since then, but does not explicitly state that this increase was driven largely by factors outside the control of DOC (the leading change being the increase in the number of inmates confined on pretrial felony charges, which is driven by the U.S. Attorney's Office). *See id.* at 6 (increase in population "driven primarily by increases in the number of inmates confined on pretrial felony charges").

The Report discusses the continuing staffing issues at DOC, finding that while the number of hired staff unavailable for work has decreased since the PI, there has been an increase in vacancies, leaving the size of the available workforce essentially unchanged. *See id.* at 27–28. The Report states that DOC "has bene [*sic*] unable to increase the complement of staff that is available for duty[,]" *id.* at 23, but does not mention the continuing challenges in recruiting and hiring correctional officers for this difficult work in the midst of a pandemic.

### III. Environmental Health and Safety

The Report shows that DOC's efforts to enhance environmental health and safety in its facilities has been successful. The Report discusses DOC's ongoing efforts regarding environmental health, finding that its hiring of companies to regularly clean and sanitize DOC resulted in "noticeably cleaner" facilities than during previous inspections. *Id.* at 31. In addition, the Report notes that the contract with the sanitarian company previously retained has been extended for a three-month period, subject to renewal, as DOC continues its efforts to hire an in-house, registered sanitarian. *Id.* at 29. The Report also highlights the "significant improvement" in inmate access to appropriate cleaning supplies and materials and does not find any problems in that regard. *See id.* at 33.

IV.     **Isolation**

Because DOC has effectively eliminated COVID-19 in its facilities, there has been little need for medical isolation housing. Between June 18, 2020 and December 1, 2020, only 11 residents were in isolation. *Id.* at 34. And, as the Report concludes, residents "on isolation status are able to make personal telephone calls, take daily showers, and receive clean clothing and clean linens on a weekly basis." *Id.* at 34-35.

V.      **Legal Calls**

DOC has overhauled and dramatically expanded its capacity to facilitate residents' legal calls since the pandemic began. The Report finds that DOC "made a substantial investment in new technology," "repurposed space … to accommodate confidential attorney-client video conferences," provided correctional staff with training to administer the new technology, required correctional staff to develop skills "that were not contemplated by their job descriptions," and restricted case management's job responsibilities "in order to prioritize the volume of attorney-client … communications." *Id.* at 37. But *amici*'s discussion of DOC's efforts does not fully capture the scope of DOC's undertaking and the dramatic shift in the way DOC facilitates legal calls to meet the challenges posed by the pandemic. In fact, as of December 12, 2020, DOC has facilitated over 24,357 attorney-client contacts using technology and procedures that did not exist in DOC facilities only nine months ago. Declaration of Camille Williams (Williams Decl.), Ex. B ¶ 5. This is an example of DOC's extensive efforts to provide additional services to residents even while responding to the health concerns related to COVID-19.

Between April 20, 2020 and December 12, 2020, DOC case managers were responsible for facilitating 10,681 attorney-initiated calls (also referred to as "emergency" legal calls in the

Report).[4] *Id.* While DOC managed the high daily call volume in the early months of the pandemic, DOC was also implementing and pivoting to new technology aimed at improving the confidentiality of attorney-client contacts. The Report incorrectly suggests that residents began using cell phones in their cells for attorney-initiated calls since mid-November 2020. *See* Report at 37. In fact, inmates have been able to use these phones in their individual cells for legal calls since June 15, 2020. Williams Decl. ¶ 6. Indeed, since the implementation of this policy, using cell phones has been the default method of connecting attorneys to residents for attorney-initiated calls, and those calls have taken place in the case managers' offices only if there is an issue with the technology (for example, poor reception) or on the unit (for example, excessive noise) that impedes cell phone use.[5] *Id.* ¶ 6.

Residents also have ample ability to initiate legal calls with their attorneys. The Report incorrectly suggests that inmate-initiated calls are generally arranged through their case managers and take place in case manager offices or by using a cell phone in the cells, and that there are delays in these calls being facilitated. Report at 28. Not so. Case managers primarily facilitate inmate-initiated calls by inputting residents' attorneys' phone numbers into a system provided by DOC's telephone service provider, which then allows each resident to make a free, unmonitored, and unrecorded telephone call to an attorney each day for up to 30 minutes at the phone banks available in each housing unit. Williams Decl.¶ 7. Case managers generally input attorneys' phone numbers within 24 hours of receiving the information from the attorney, ensuring that residents

---

[4] As *amici* correctly reported that between April 20, 2020 and October 14, 2020, DOC case managers facilitated 8,602 attorney-initiated calls. Report at 36.

[5] For security reasons, case managers must remain in or near the office during these calls to prevent inmates from making other calls or gaining possession of objects or information that may jeopardize the safety of others. *Id.* ¶ 6.

7

have the timely ability to contact their attorneys. *Id.* ¶ 8. Indeed, this system has been successful: Between April 20, 2020 and December 12, 2020, residents used this phone system to make over 11,499 legal calls.[6] *Id.* ¶ 5. Additionally, if a resident wants to speak with an attorney, but the attorney did not follow the proper protocol to provide their phone number to the case managers, then the resident may utilize the inmate request slip process to request an emergency legal call, which may be delayed depending on the urgency of the need to speak with an attorney (and those calls would be reflected in the attorney-initiated call statistics described above). *Id.* ¶ 8. Moreover, as the Report notes, the telephone service provider for CDF has also provided CDF with a limited number of tablets for inmates to make legal calls. Report at 38-39. Between June 18, 2020 and December 6, 2020, inmates at CDF made 334 legal calls using these tablets. *Id.* at 39.

DOC has also set up technology and space to facilitate video legal calls. Between May 18, 2020 and December 11, 2020, DOC facilitated a total of 1,843 videoconferences between residents and their attorneys.[7] Williams Decl. ¶ 11. To facilitate video legal calls, DOC has coordinated closely with the Federal Public Defender for the District of Columbia, the Public Defender Service for the District of Columbia, the District of Columbia Criminal Justice Act panel and the Office of the Federal Public Defender for the District of Maryland, in addition to private defense attorneys. *Id.* ¶ 12. DOC has devoted substantial resources and adjusted its operations to accommodate and coordinate with these organizations. *Id.*

---

[6]   Though full confidentiality is not possible for inmates using the phone banks, DOC has encouraged both social distancing and privacy during these calls by deactivating every other phone in the phone bank, which creates space between residents making calls. *Id.* ¶ 7.

[7]   *Amici* correctly report that between May 18, 2020 and October 31, 2020, DOC facilitated a total of 1,209 videoconferences between residents and their attorneys. Report at 38.

DOC also created new spaces and expanded its technological capacity to accommodate video conference hearings with the Superior Court of the District of Columbia and the U.S. District Court for the District of Columbia. Declaration of Kathleen Jo Landerkin (Landerkin Decl.), Ex. C ¶ 4. DOC began facilitating video conference hearings on March 16, 2020 and began using a dedicated space set up specifically for court hearings on July 6, 2020. *Id*. DOC allows each resident scheduled for a hearing to speak with an attorney for a 15-minute video call prior to the start of the hearing and for a few minutes after the hearing. *Id*.

Since June 23, 2020, DOC began scheduling in-person legal visits at CDF and CTF. Approximately 293 legal visits have occurred since that time. *Id.* ¶ 5.

DOC's residents are also able to use tablets to exchange messages with their attorneys through the tablets' messaging system. As the Report notes, 187 inmates have used the messaging platform. Report at 39. All inmates now have access to tablets with the messaging platform, except those on segregation or intake units, and inmates have access to the tablets daily between 9:00 a.m. and 11:00 p.m. *Id.* at 26.

## VI. Testing

DOC's testing protocols have proven effective. As *amici* concludes, "ten out of the 11 positive tests [since June 18, 2020] were detected by a COVID-19 test administered upon admission to the facility."[8] *Id.* at 41. In accordance with best practices and beyond any requirement, DOC tests all new residents a minimum of three times—twice on intake (using a

---

[8] As *amici* explain, the one positive case that was not found upon admission apparently resulted from an inmate who was not placed in isolation upon admission and was instead placed on the mental health unit in order to provide him appropriate mental health treatment. After that inmate's lab test came back positive, he was moved to an isolation unit and the entire mental health unit was tested, resulting in one additional inmate testing positive. Report at 41.

regular and a rapid swab) and again on day seven with a regular swab, ensuring that inmates leaving the intake unit are COVID-free. Jordan Decl. ¶ 14.

The Report notes that DOC "administer[s] COVID-19 tests to inmates in the following circumstances: upon admission; prior to certain transports, including transports to court; if inmates are symptomatic; and, to any cellmate of an inmate who tests positive for COVID-19."[9] Report at 40. While the Report is correct that DOC tests inmates in these circumstances, this list is not exhaustive. Jordan Decl. ¶ 14. DOC also tests inmates with possible exposure to a person who tested positive for COVID-19, even if they are not the cellmates of a positive inmate or exhibiting symptoms. *Id*. For example, DOC tested all inmates on the mental health housing unit after an inmate who resided there briefly upon admission tested positive, and DOC tests all inmates who reside in housing units who may have been exposed to a correctional officer who tests positive. *Id*. Between June 18, 2020 and December 16, 2020, DOC conducted 3,195 COVID-19 tests, averaging 18 tests per day. *Id.* ¶ 16.

## CONCLUSION

For the foregoing reasons, the Report confirms that DOC has effectively eliminated the risk of infection from COVID-19 at its facilities, and DOC is therefore not (nor has been) deliberately indifferent.

Dated:  December 18, 2020.            Respectfully submitted,

                                                                  KARL A. RACINE
                                                                  Attorney General for the District of Columbia

---

[9]     As *amici* reports, DOC tested inmates in advance of their release to Saint Elizabeths when DOC was notified prior to the transfer, but DOC did not receive that notification prior to every transfer. Report at 42. In early November, DOC and Saint Elizabeths enhanced the transfer notification system, and residents have been tested within 48 hours of the transfer to Saint Elizabeths since then. Jordan Decl. ¶ 14.

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Pamela Disney*
PAMELA DISNEY [1601225]
Assistant Attorneys General
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 807-0371
pamela.disney@dc.gov

*Counsel for Defendants*