# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDWARD BANKS**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **QUINCY BOOTH**, *et al.*, <br><br> **Defendants.** | **Civil Action No. 20-00849 (CKK)** |

## DECLARATION OF BETH JORDAN

Pursuant to 28 U.S.C. § 1746, I, Dr. Beth Jordan, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge acquired in the course of my official duties. I have previously submitted declarations in this matter [20-2], [82-2], [94], [105-3], [119-1].

2. I have reviewed the Report submitted by Amicus Curiae on December 11, 2020 [105] (Report) and submit the following in response, to address potentially misleading or incomplete aspects of the Report.

3. As I have stated before, the spread of coronavirus (COVID-19) in Department of Corrections (DOC) facilities has been effectively stopped. Largely through enhanced access to COVID testing during the first week of incarceration, effective PPE use by staff and residents, and by continuing to limit residents' movement, DOC has drastically reduced the risk of COVID in our facility. DOC reports every day, publicly, the number of positive coronavirus (COVID-19) cases in residents at DOC's correctional facilities.

4. The Report notes, correctly, that between the issuance of the preliminary injunction on June 18, 2020 and December 1, 2020, only 11 inmates tested positive for COVID-19, and all but one of those were COVID-positive at the time of admission. Since December 1, 2020, four inmates have tested positive for COVID-19, all of whom were positive at the time of admission. DOC's robust intake testing was what identified those positive statuses. DOC has effectively contained the risk of COVID-19 infection to inmates in its facilities, something correctional facilities across the country have struggled to achieve.

5. The Report discusses some of the increased staffing and modifications to the policies and practices of DOC to try to ensure that all inmates who request medical care are seen within 24 hours, either via the sick-call process or through DOC's urgent care or chronic care clinics. The 24-hour clinic access was designed to respond to *medical* concerns to help assure rapid COVID diagnosis as warranted and was not designed to further improve access to mental health or dental services during the pandemic. With our dual accreditation through the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA), DOC continues to demonstrate its adherence to high standards with respect to residents accessing mental health and dental services in a timely manner.

6. The Report's discussion of the sick-call process was incomplete and did not discuss the many reasons why a particular inmate might not have been seen within 24 hours. However, reasons noting why an inmate was not seen within 24 hours are contained in the EMR (electronic medical records) available to *amici* and this process was discussed with them by both me, Dr. Eleni O'Donovan (Director of Correctional Medicine at Unity Health Care) and Director of Nursing Bianca Thompson. Moreover, the Report fails to use a statistically significant sample of sick call slips.

2

7. Some of the reasons a particular inmate might not be seen in a timely fashion include a resident refusing a clinic visit (forms are signed documenting this occurrence and providers are tasked to note the reason for an appointment "no show" to be documented in the clinical record). Residents also miss clinic visits due to participating in court, problems with officers getting residents on a housing unit to the sick call clinic (*e.g.*, if the unit is in lock down or if there is an acute security issue), or because they are off site at a medical appointment.

8. The Report's findings related to inmates' accessing medical care within 24 hours are skewed not only by the inclusion of mental health and dental cases in their analysis of what was designed to be a purely *medical* enhancement to assessment and clinical services in the sick call clinic, but also by *amici*'s sample size. Out of the 1,338 sick call slips reviewed, only 49 of those slips (CDF + CTF) addressed medical concerns, thus representing only about 4% of cases reviewed.

9. Similarly, the Report fails to describe the robust joint-audit procedure that DOC and Unity Health Care use to monitor this enhanced sick-call process. This process was discussed in detail with *amici* and a form used by the auditing team was provided. DOC and Unity conduct daily audits of that process in an effort to address any potential problems with inmates' timely access to medical care. That audit examines numerous factors potentially impacting sick call access, including: 1. Sick call date noted per resident; 2. Discrepancies between inmate date and date of Unity pick up and stamp; 3. Date nurse triages sick call slip (within 24 hours of slip submission); 4. Inmate seen within 24 hours of sick call slip submission; 5. Reasons provided in EMR when inmate is not seen within 24 hours of sick call slip submission; 6. Verification between Unity and Custody that all sick call slips in the box have been picked up; and 7. Sick call slip tracking process completed per date and unit. In reviewing every sick call slip submitted from mid-

July through November 2020, DOC's practice of conducting joint audits of all the aforementioned audit categories reveals 100% compliance regarding: 1. Sick call date noted per resident; 2. Any discrepancies between inmate date and date of Unity pick up and stamp; 3. Verification between Unity and Custody that all sick call slips in the box have been picked up; and 4. Sick call slip tracking process completed per date and unit.

10. Audit results for that time period (mid-July through November) for "Date Nurse triages sick call slip (within 24 hours of slip submission)" was 99%; for "Inmate seen within 24 hours of sick call slip submission" was 96% and for "Reasons provided in EMR when inmate is not seen within 24 hours of sick call slip submission" was 71%, which is below our self-imposed benchmark of 95%. Unity's Medical Director has been working with her medical staff to improve provider documentation in the EMR.

11. Moreover, DOC's new 24-hour medical sick call system is a DOC-lead innovation that goes above and beyond that required by DOC's accrediting organizations, the NCCHC and the ACA. Those organizations mandate that inmates be seen for a sick call visit within 48 hours of receipt of a sick call slip. DOC's new practice is to pick up the slip and have the patient seen within 24 hours, a fact which *amici* mentioned in our conversation is unprecedented for jail healthcare systems, except systems in "receivership status."

12. Additionally, the Report also briefly mentioned the positive results of DOC's collaboration with a senior epidemiologist employed by D.C. Health, Dr. Anil Mangla, but did not detail the many positive aspects of that collaboration. On November 6, 2020, Dr. Mangla sent me and senior DOH staff an email recounting his meeting with *amici*; he noted that our data demonstrate DOC's success in eliminating the COVID pandemic from our facility; how that trend preceded his collaboration with DOC; and how DOH's regular weekly collaboration with DOC

4

(regarding PPE training, PPE audits and general weekly discussions) are showing that we continue to keep staff and residents safe by preventing COVID's return to the jail. The Report also does not accurately reflect Dr. Mangla's role. He is an experienced epidemiologist, not a clinician, hence did not "ensure appropriate monitoring of COVID-19 positive cases" nor did he "confer with Unity's medical director on treatment in individual cases" as the Report inaccurately described. *See* Report at 11. DOC and Unity continue to consult with subject matter expert, Dr. Anne Spaulding, on those matters as they arise.

13. Impressed by our success in effective systems changes and excellence in clinical response to the COVID pandemic, Dr. Mangla spoke to a former judicial colleague from Texas about DOC's success. Dr. Mangla arranged a meeting between Unity and DOC with his colleague, Chief Justice Rebeca Martinez of the Fourth Circuit Court of Appeals in Texas, who expressed interest in hearing about how DOC was able to successfully eliminate COVID from our facility, in contrast to most correctional facilities across the country. During our virtual meeting on December 3, 2020, Judge Martinez noted that our success reflects a model that she felt should be a national template for COVID elimination in complex institutions, one that she will seek to model in her jurisdiction.

14. Unity staff conduct COVID testing for all transfers to Saint Elizabeth's hospital when they are alerted a transfer is occurring. Prior to early November, the transfer paperwork from Saint Elizabeth's did not specifically ask for a recent COVID testing result, which is the system "alert" to do testing prior to transfer. When Dr. Gontang (Chief Clinical Officer at Saint Elizabeth's) and Dr. Cadillas (Director of Medical Affairs at Saint Elizabeth's) realized that not all residents were entering Saint Elizabeth's with a COVID test within several days prior to transfer, we worked quickly to enhance the notification system between Saint Elizabeth's and

Unity's medical records department. The requesting form from Saint Elizabeth's now indicates the need to receive a COVID test within days prior to transfer; that request alerts clinicians of the need to test and testing now regularly occurs 2-3 business days prior to transfer.

15. The U.S. Marshals Service (USMS) contacted DOC initially asking for COVID testing on all residents prior to transfer to the FBOP through their services. Unity complied with those requests. USMS now only asks for a form to be completed prior to transfer asking about a resident possibly having COVID related symptoms. As the USMS no longer requests COVID testing on all residents prior to transfer, Unity completes the required form and sends the requisite medical information.

16. Finally, the Report does not make clear that DOC's testing protocols follow best practices. As I have explained previously, DOC tests all new inmates a minimum of three times—twice on intake (a regular and a rapid swab) and again on day seven with a regular swab, assuring that inmates leaving the Intake unit are COVID-free. The Report notes that DOC "administer[s] COVID-19 tests to inmates in the following circumstances: upon admission; prior to certain transports, including transports to court; if inmates are symptomatic; and, to any cellmate of an inmate who tests positive for COVID-19." Report at 40. While the Report is correct that DOC tests inmates in these circumstances, this list is not exhaustive. DOC also tests inmates who may have been exposed to a person who tested positive for COVID-19, even if they are not the cellmate of a positive inmate or exhibiting symptoms. For example, DOC tested all inmates on the mental health housing unit after an inmate who resided there briefly upon admission tested positive, and DOC tests all inmates who reside in housing units who may have been exposed to a correctional officer who tests positive. Between June 18, 2020 and December 16, 2020, DOC conducted 3,195 tests, averaging 18 tests per day.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 18, 2020

_____
BETH JORDAN, M.D.