UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDWARD BANKS, *et al.*,

    *Plaintiffs-Petitioners,*

v.

QUINCY BOOTH, *et al.*,

    *Defendants-Respondents*.

No. 1:20-cv-00849 (CKK)

## PLAINTIFFS' SUPPLEMENTAL BRIEF

Defendants have asked this Court to vacate its carefully tailored and abundantly necessary preliminary injunction to protect the vulnerable prisoners in Defendants' custody. But *amici*'s report (Dkt. No. 138 ("*Amici* Rep.")) shows that Defendants have not even fully complied with this Court's original order, much less that they are harmed by its continuation. *See* Dkt. No 116, at 4 (citing the Rule 54(b) requirement that the party seeking to vacate an injunction must prove "some harm" that flows from the injunction). It is the Plaintiffs who still face a grave risk of harm based on current conditions. To take just a few examples of the persistent problems with COVID-control measures at the jail, in defiance of this Court's prior orders:

- The Court ordered Defendants to "ensure[] inmates receive attention from a medical provider within 24 hours of reporting health issues," Dkt. No. 99 ("PI Order") 1, but *amici* report that 29% of residents at CDF, and 40% of residents at CTF, wait over 24 hours to receive medical care, *Amici* Rep. 22.
- The Court ordered Defendants to comply with social distancing regulations and address staffing shortages, PI Order 1, but *amici* report that staffing levels remain unchanged and video surveillance showed "as many as 100 examples" of regulation violations in one shift, *Amici* Rep. 25.
- The Court ordered Defendants to test residents who are "transferred . . . to a federal correctional facility," PI Order 2, but *amici* report that Defendants "do not complete a COVID-19 test as a matter of course" before transfer to those facilities, *Amici* Rep. 43.

- The Court ordered Defendants to test residents who "report . . . COVID-19 symptoms," PI Order at 2, but *amici* report that Defendants test fewer than 40% of residents who report symptoms, and tests often occur weeks after the symptoms are first reported, *Amici* Rep. 44.

The deficiencies highlighted by *amici* are particularly concerning in light of the rising number of positive COVID-19 tests among Department of Corrections ("DOC") staff and in the community. Just this past week, an additional eight DOC staff members tested positive, three DOC residents tested positive, and cases in the community are spiking.[1] Having reviewed *amici*'s report and the current testing data, Dr. Meyer concludes in an updated report that "DOC practices diverge from standards of care, as laid out by the CDC." Ex. A ("Meyer Decl.") ¶ 5.

While *amici* report some improvements, Defendants are clearly still struggling to comply not only with the Court's order, but with basic precautions. With cases on the rise in the region and with "significant deficiencies in COVID-19 prevention and management," residents "and staff within the DC Jails [are] at ongoing substantial risk of infection." Meyer Decl. ¶ 5. This substantial "risk of infection, combined with the delays in receiving medical care . . . puts DC Jails residents at higher risk of harm if they do become infected." *Id.* Accordingly, the Court should deny Defendants' motion and issue a new order that is "narrowly drawn, extends no further than necessary to correct the violation[s] of [Plaintiffs'] Federal right, and is the least intrusive means necessary . . . ." 18 U.S.C. § 3626(a)(1)(A).[2]

---

[1] *See* District of Columbia, Public Safety Agency COVID-19 Case Data (last accessed Dec. 18, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data; ABC7, *DMV Has 2nd Highest 1-Day Spike in COVID Deaths at 114, Over 4K Hospitalized in Region*, WJLA, Dec. 15, 2020, https://wjla.com/news/coronavirus/dmv-sees-second-highest-one-day-covid-death-increase.

[2] Plaintiffs dispute Defendants' contention, raised only in the D.C. Circuit, *see* Dkt. No. 128, that the Court's injunction has expired. Nevertheless, to ensure that Plaintiffs' rights are protected and to protect the community's public health, the Court should find that the narrowly tailoring requirements of 18 U.S.C. § 3626 are met.

*Medical Care*

The Court ordered Defendants to "ensure[] inmates receive attention from a medical provider within 24 hours of reporting health issues." Dkt. No. 100 ("PI Op.") at 18. *Amici*'s report belies Defendants' claim to have complied with this basic requirement, *see* Dkt. No. 105-1 ("Defs.' Br.") at 2, as *amici*'s report revealed that "inmates are not consistently seen by a medical provider within 24 hours of reporting health issues in a significant percentage of cases." *Amici* Rep. 12. Based on the sample reviewed by *amici*, 29% of CDF residents and 40% of CTF residents requesting medical attention did not receive it within 24 hours. *Id.* at 22.[3]

Taken together with Defendants' continued systemic failure to test residents reporting symptoms of COVID-19, discussed below, an unreasonable risk to Plaintiffs and proposed class members' health remains during the deadliest phase of the pandemic to date.

*Social Distancing*

Recognizing that "better policies mean little if they are not correctly implemented in practice," the Court ordered Defendants to "comply with District of Columbia and Centers for Disease Control regulations on social distancing in DOC facilities," and to "address challenges which have prevented the implementation of social distancing including . . . staffing shortages." PI Op. 19, 38. But *amici* report continued staff shortages, an increase in population throughout both facilities, double-celling, and systemic violations of social distancing policies.

---

[3] These totals exclude requests for dental and mental health care, which are less likely to be related to COVID-19. *Amici* noted that questions remain about the timeliness of the sick call process, in part because a number of sick call forms had no date and, on others, "medical staff added a notation that the date recorded by the inmate was the 'wrong date,'" often without providing a basis for the notation. *Amici* Rep. 17-18. Additionally, 179 sick calls submitted during a one-month period were not produced for review and *amici* could not "reconcile this discrepancy." *Amici* Rep. 16.

3

In contrast to Defendants' representation that staffing levels have "significantly improved since the pandemic began," Defs.' Br. at 5, "*[a]mici's* comparison of correctional staffing levels from mid-May to staffing levels in early December 2020 indicates that the number of staff available to work *remains virtually unchanged*," *Amici* Rep. 10 (emphasis added). Dr. Meyer underscores the danger of this unchanged "chronic understaffing," which "threatens the health and safety of everyone who lives and works inside the D.C. jails." Meyer Decl. ¶ 21.

In fact, while staffing remains virtually unchanged, the jail population has gone up by 19 percent, *Amici* Rep. 5-6—meaning that the staff-to-resident ratio has actually *decreased* since the Court's order. With the continued interruption in jury trials, the population will continue to rise. The Court rightly recognized that "reducing the inmate population will likely slow the spread of COVID-19." PI Op. 32. With the population trending the wrong way and with Defendants having failed to implement measures this Court ordered six months ago, this is no time to withdraw judicial supervision.

An alarming by-product of increased population and decreased staff-to-resident ratio is the rise of double-celling, which makes social distancing impossible. The effects of rising population on double-celling are exacerbated, some by Defendants' own choices: "*Amici* observed numerous cells that were unoccupied on housing units with double-celled inmates." *Amici* Rep. 8. Most concerning, residents on the Intake Unit (SO-2) continue to share cells at a high rate. Defendants acknowledge that intake has been the primary means by which COVID-19 has been introduced into DOC facilities since the issuance of the preliminary injunction. *Id.* 46. Nonetheless, *amici* reported that almost half of the incoming residents on the intake unit were double-celled, despite the availability of unoccupied cells. *Id.* 8 (During a visit to the Intake Unit, *amici* saw that "36 inmates were double celled (*i.e.*, occupying 18 cells) while 22 cells were unoccupied.").

4

Defendants have a duty to adequately care for all residents, including the newest arrivals, but they nonetheless force new arrivals into close contact with one another in shared cells.

Compounding the crowding problem, *amici* observed failures in mitigation efforts, including repeated violation of social distancing and PPE policies. Defendants' team that monitors video feeds report "as many as 100 examples [of violations of COVID-19 mitigation requirements] per shift." *Id.* 25. Violations observed by *amici* included residents "congregat[ing] in small groups," out of their cells but "not maintain[ing] six feet of social distance," "masks . . . not properly covering both the inmates' noses and mouths," and "some staff not wearing appropriate PPE[.]"[4] *Id.* 27. "*Amici* also observed staff members not maintaining social distance on housing units and elsewhere throughout both facilities." *Id.*

With COVID-19 infection rates in the community on the rise, social distancing failures on the intake unit pose a dire risk to DOC residents and show that Defendants are not complying with the Court's injunction.

### *Environmental Health and Safety*

The Court ordered that "Defendants shall further continue their efforts to hire a registered sanitarian." PI Op. 38. Six months later, Defendants still have not complied. Never having solicited applications for a registered sanitarian, Defendants hired a "supervisory employee of the agency *without* a background in environmental health and safety" who "was not a registered sanitarian and did not have the training, experience[,] or credentials" of a sanitarian. *Amici* Rep. 29, 32 (emphasis added). Now, only after inquiry by the Court, DOC has informed *amici* that the

---

[4] One resident reported, as recently as December 8, 2020, "DOC staff did not wear PPE at all times. I saw 4-5 correctional officers walking around the unit without masks on." Ex. B ("Winston Decl.") ¶ 7.

5

agency finally "intends to post a position vacancy for a registered sanitarian."[5]  *Id*. 32.  This reversal underscores the critical role of Court oversight in ensuring appropriate safety measures.

Defendants' implementation of increased sanitation measures lapsed when it decided not to extend contracts for its environmental health and safety vendor.  In the injunction, the Court explicitly ordered Defendants to "continue the services of their newly-contracted environmental health and safety vendor."  PI Op. 38.  Despite the Court's order, Defendants decided not to continue the contract past October 31, 2020, even in the absence of having hired its own sanitarian.  Again, and only "in response to the concerns raised" by the Court, *amici* report that DOC "has decided to contract with the environmental health and safety vendor whose contract expired on October 31, 2020 and reinstitute its efforts to hire a registered sanitarian."  *Amici* Rep. at 29.  "This lapse in cleaning and disinfecting practices is unacceptable during a COVID-19 pandemic and can contribute to ongoing transmission of COVID-19 within the facility."  Meyer Decl. ¶ 20.

Absent Court intervention, there is no indication that Defendants would continue efforts to improve sanitation in DOC facilities.  On the contrary, e-mail correspondence indicates that the cleaning services ordered by the Court would cease absent the injunction ordering Defendants to "continue their contract to provide COVID-19 cleaning services on the secure and non-secure sides of the DOC facility . . . ."  PI Op. 100.  As *Amici* reported, the Chief Procurement Officer at the D.C. Department of General Services, when discussing whether to continue outside cleaning services, noted that "the contracts 'should [be] review[ed] in January [2021] *to ensure that [the] Court Order is still valid* and *if so* we may need to prepare a competitive solicitation in January *if*

---

[5] The rationale offered by Defendants for not initially posting the position for a qualified sanitarian was to avoid delay in filling the position, as "the sanitarian position did not already exist."  *Amici* Rep. 31.  It is difficult to square this justification with *amici's* discovery that, as of September 30, 2020, 36 District of Columbia employees held the job title "sanitarian."  *Id.*

6

*we must continue* the contract beyond February 2021." *Amici* Rep. 30 (citing Ex. 4I) (emphasis added). It remains true that "while progress has been made, most of that progress post-dates the Court's TRO Order." PI Op. 22. Without the Court's injunction, DOC would regress—and at a time when the pandemic is in its most deadly phase yet.

### *Access to Legal Calls*

Ten months into the pandemic, there are still significant barriers to confidential attorney-client communication. *Amici* report how attorney-initiated legal calls occur "1) in the case manager's office with the case manager present; 2) in the inmate's cell using a cellular telephone; and 3) in an empty cell on the housing unit using a cellular telephone." *Amici* Rep. 37. The longstanding lack of confidentiality continues: "[M]ost of the inmates and case managers interviewed confirmed that the case manager is present in the office when these calls are conducted, which is consistent with the observations that *amici* have made." *Id*. Although DOC now allows residents to make calls to their attorney from individual cells, these calls are not necessarily confidential as they can be overheard by other residents. *Id.* 37, n. 89. Moreover, in some cases calls from individual cells "cannot be implemented—such as instances of poor reception, excessive noise in the unit, or if a single or designated cell is unavailable" and case managers conduct the calls. Decl. of Camile Williams, Dkt. No. 105-7 ¶ 6. In these cases, defense counsel is forced to choose between having a confidential call or hearing her client.

Legal calls initiated by residents from the unit are "unmonitored," but "not confidential," *Amici* Rep. 38, because they are made from public phones in the day room, where other residents and staff are present. Although residents may request legal calls through their case managers, "[i]nmates reported substantial delays receiving responses to these requests." *Id*.

### *Testing for COVID-19*

"The DOC continues to undertest for COVID-19 in the DC jails." Meyer Decl. ¶ 9. The Court ordered Defendants to continue testing new residents upon intake, residents who report COVID-19 symptoms, and residents who are transferred to St. Elizabeths or the Bureau of Prisons. While Defendants do test new residents, it is now clear that despite Defendants' assurances,[6] they are not testing all residents who are transferred to St. Elizabeths or the Bureau of Prisons, nor are they testing all residents who report COVID-19 symptoms. These failures put DOC, St. Elizabeths, and BOP residents and staff at risk, as the Court found that "absent testing, sick inmates may continue to reside in the general population and infect others." PI Op. 18. According to Dr. Meyer, "[o]ne should not be falsely reassured that there have been few new COVID-19 cases identified in the DC jails over the past few months because identification of new cases depends on how testing is being conducted." Meyer Decl. ¶ 9 (internal citation omitted).

Residents who are being transferred to St. Elizabeths or BOP facilities are not consistently tested for COVID-19 before transport. "The evidence indicates that the DOC does not as a matter of general practice test inmates who are transferred to Saint Elizabeths hospital[,]" nor do they "routinely test inmates who are transferred to federal correctional facilities." *Amici* Rep. 47. Where testing is conducted, "in most cases [COVID-19] testing was not conducted in close temporal proximity to the transfer." *Id.* 42. According to Dr. Meyer, "[t]hose test results are essentially meaningless to the receiving facility, since individuals could be exposed to and infected with COVID-19 in the time between initial testing and transfer." Meyer Decl. ¶ 12. Similarly,

---

[6] "DOC began testing (on May 5, 2020) any resident to be transferred to Saint Elizabeths Hospital . . . and any resident being transferred to a federal correctional facility (on May 22, 2020)." Decl. of Beth Jordan, Dkt. No. 105-3 ¶ 10. *See also*, Decl. of Andre Matevousian, Dkt. No. 124-2 ¶ 7. ("[T]he USMS informed me that D.C. Jail staff had certified that all transferring prisoners had been tested by the local health department before they were transferred.").

Unity staff "do not complete a COVID-19 test as a matter of course" for individuals released to the Marshals service. *Amici* Rep. 43.[7] As a result, "[i]ndividuals can potentially be infected and transmit COVID-29 to the transport staff and staff or inmates at the receiving facility." Meyer Decl. ¶ 11.

Moreover, Defendants' failure to conduct even rudimentary contact tracing, also poses a challenge to their testing regime, as Defendants are unaware of who in their facilities have been exposed. *See* Ex. C ("Deterville Decl.") ¶¶ 7-9; *see also* Ex. B, Winston Decl. ¶ 4 (explaining that DOC never notified Mr. Winston of his positive test result). In November, the staff member responsible for searching bags and patting down other staff at the jail's entrance tested positive after coming to work sick. Deterville Decl. ¶¶ 7-9. Defendants did not notify any staff (let alone those whom he had searched) that he had tested positive. *Id.* Among residents, contract tracing is limited to the cellmate of residents who test positive for COVID-19. *See Amici* Rep. at 43. But, given that out-of-cell time is spent with others on the housing unit, it should include the entire housing unit, as it does "in many prison and jail systems outside of the DC jails[.]" Meyer Decl. ¶ 15. Defendants' failures to notify affected staff and residents demonstrate that they will not take necessary precautions absent Court intervention.

Even residents who report COVID-19 symptoms may not get tested. When reporting symptoms of COVID-19, "most inmates were not tested for COVID-19 in response to the sick call request." *Amici* Rep. 47. "Although medical providers do have clinical discretion on when to test

---

[7] Those residents who were tested were not tested close in time to or in connection with their release to the Marshals Service. For example, when *amici* assessed a random sample of 33 of the 165 inmates transferred to the Marshals Service between June 18 and October 31, they found that while 21 residents "received a COVID-19 test at some point prior to their release to the custody of the Marshals Service," none received a test in the two weeks prior to their release, and more than half received a test between 33 to 181 days prior to their release. *Amici* Rep. 43.

. . . . during a pandemic and in a highly congregate setting where COVID-19 infection can spread like wildfire, one should have a very low threshold to test." Meyer Decl. ¶ 13.[8] DOC does not. Out of a sample of 36 residents who submitted sick call requests reporting symptoms consistent with COVID-19, only 14, or 39%, were tested, and 61% were never tested. Of the 39% tested, many were not tested for several weeks and do not appear to have been tested in connection with their COVID-19 symptoms. More than half of those residents received tests "between 20 and 52 days after the sick call requests were submitted." *Amici* Rep. 44. This, in combination with the systematic delay in responding to a significant percentage of sick calls, discussed above, creates a tinderbox in which there is an unreasonable risk to residents' health.

## CONCLUSION

*Amici's* report shows that despite the rosy picture Defendants painted in seeking reconsideration, they have failed to comply with multiple components of this Court's injunction. As a result, "[s]ignificant deficiencies in COVID-19 prevention and management persist, leaving inmates and staff within the DC Jails at ongoing substantial risk of infection." Meyer Decl. ¶ 5. Worse still, because of delayed access to medical care, "residents are at higher risk of harm if they do become infected." *Id.* The Court should deny Defendants' motion.

Respectfully submitted,

/s/ Jenna Cobb
Jenna Cobb (D.C. Bar # 979506)

---

[8] According to Unity's Medical Director, practitioners exercise "clinical discretion in deciding when to administer a test to inmates reporting COVID-19 symptoms," and said there are sometimes other explanations for the symptoms, such as "inmates diagnosed with asthma reporting a cough." *Amici* Report at 45 & n.101. But, as Dr. Meyer explained, "[d]uring the COVID-19 pandemic, with rising cases in the community, one cannot assume that 'the symptoms [are] consistent with something other than COVID-19[.]'" Meyer Decl. ¶ 14 (quoting *Amici* Report at 45). Instead, testing should occur "whenever someone has signs and symptoms that may be consistent with COVID-19 infection and is particularly important in patients with conditions know to be associate with severe COVID-19 infection, such as chronic lung disease." *Id.*

Steven Marcus (D.C. Bar # 1630882)
Jonathan Anderson (D.C. Bar # 475306)
PUBLIC DEFENDER SERVICE FOR D.C.
633 Indiana Ave. NW
Washington, DC 20004
(202) 824-2502
jmcobb@pdsdc.org

 /s/ Scott Michelman
Scott Michelman (D.C. Bar # 1006945)
Arthur B. Spitzer (D.C. Bar # 235960)
Michael Perloff (D.C. Bar # 1601047)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org

 /s/ Jacob S. Kreilkamp
Jacob S. Kreilkamp
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071-3426
Tel.: 213-683-9260
Fax: 213-593-2960
*jacob.kreilkamp@mto.com*

Jonathan S. Meltzer (D.C. Bar # 888166546)
Jeremy S. Kreisberg (D.C. Bar # 1048346)
Brendan B. Gants (D.C. Bar # 1031419)
Rachel G. Miller-Ziegler (D.C. Bar # 229956)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington DC, 20001
(202) 220-1100
jonathan.meltzer@mto.com

December 18, 2020
Washington, D.C.