# EXHIBIT A

**Supplemental Report of Dr. Jaimie Meyer**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I am Dr. Jaimie Meyer, an Associate Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am a physician who is board certified in Infectious Disease, Addiction Medicine, and Internal Medicine, with expertise in infectious diseases in prisons and jails. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I previously submitted a Declaration in this case dated March 29, 2020, along with a copy of my CV. I also submitted Supplemental Declarations in this case dated May 14, May 29, and August 8, 2020.

3. To prepare this Supplemental Declaration, I reviewed the Amicus Curiae Report, ECF No. 138, *Banks v. Booth*, 20-cv-849 (CKK) (D.D.C. Dec. 12, 2020).

4. The *Amici* report (p. 27) notes significant improvements in the provision of personal protective equipment (PPE) for both staff and inmates in the DC Jails and adequate provision of cleaning supplies and soap to inmates (p.33). I commend the DOC for improving these infection prevention measures with court oversight.

5. Despite some improvements in practice, significant deficiencies in COVID-19 prevention and management persist, leaving inmates and staff within the DC Jails at ongoing substantial risk of infection. The risk of infection, combined with the delays in receiving medical care – over 24 hours for a substantial percentage of inmates (p.12) – puts DC Jails residents at higher risk of harm if they do become infected. I will describe here the ways in which DOC practices diverge from standards of care, as laid out by the CDC,[1] and what measures should be taken to improve these practices and align them with standard expectations.

6. Continued improvement in infection prevention and control practices is especially critical now because the population at CDF and CTF continues to rise, increasing by 19 percent over the last few months (*Amici* report, p.8). Increases in admissions are primarily attributable to pretrial felonies, pretrial misdemeanors, and parole violations (p.9), which means new intakes are mostly arriving from the community.

7. At the same time, new cases are rising in the surrounding community, as elsewhere in the country, with a 32% overall increase in new cases in the District of Columbia in the past

---

[1] Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

1

14 days[2] and a 26% overall increase in new cases in Maryland in the past 14 days.[3] This means that new intakes arriving from the community and staff who reside in the community are now much more likely to be infected with COVID-19 and can potentially infect others inside the facility. Indeed, cases have been rising among staff in recent weeks, according to public-facing websites.[4] In other large urban jails earlier in the pandemic, upticks in staff cases were quickly followed by upticks in inmate cases, with devastating consequences including staff and inmate deaths.[5]

8. Until a safe and effective COVID-19 vaccine is available (and taken) by staff and inmates inside the DC jails, the most important tools we have at our disposal are testing, mitigation, and containment strategies, as I have previously described. Here I will describe the ways in which these strategies remain deficient in the DC jails.

**Testing**

9. The DOC continues to undertest for COVID-19 in the DC jails. Per the *Amici* report, testing is supposed to occur on intake, prior to transfer to St. Elizabeths or BOP facilities, after return from court, if residents are symptomatic, and cellmates of any resident who tests positive (p.40). In each of these scenarios, testing and/or quarantining has been problematic. One should not be falsely reassured that there have been few new COVID-19 cases identified in the DC jails over the past few months[6] (and *Amici* report p.34) because identification of new cases depends on how testing is being conducted.

10. The *Amici* report (p.40) describes that, on admission to the facility, individuals simultaneously receive a rapid antigen test and PCR-based testing for COVID-19 infection. This simultaneous testing strategy enables rapid medical isolation of people screening COVID-19 positive, while awaiting PCR-based test results from an outside lab that are often delayed. Individuals are tested again at least 7 days later and prior to joining the general population. It is unclear whether these second tests are rapid or PCR-based testing, which is important because rapid antigen-based tests have a relatively high false negative rate. It is also unclear from the *Amici* report whether new intakes complete a full 14-day quarantine on intake if their re-test is negative, as is recommended by the CDC. While guidance has recently changed on the duration of quarantine for people in the community, the CDC still recommends for correctional facilities that "The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days."[7] If new intakes in the DC jails are not quarantined for a full 14-days, even with a negative test on intake and day 7, it is possible that they are infected with COVID-19 and can still transmit the infection to other inmates and staff inside the facility.

---

[2] District of Columbia Coronavirus Map and Case Count - The New York Times (nytimes.com)
[3] Maryland Coronavirus Map and Case Count - The New York Times (nytimes.com)
[4] Public Safety Agency COVID-19 Case Data | coronavirus (dc.gov)
[5] Coronavirus spread at Rikers is a 'public health disaster', says jail's top doctor | US news | The Guardian
[6] Public Safety Agency COVID-19 Case Data | coronavirus (dc.gov)
[7] Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

11. Although the DOC was supposed to test individuals prior to transfer to St. Elizabeths, the *Amici* report that "in most cases the testing was not conducted in close temporal proximity to the transfer." (p.42) Individuals can potentially be infected and transmit COVID-19 to transport staff and staff or inmates at the receiving facility. It also places the onus on the receiving facility to test and quarantine transferred individuals. If the reason for not testing is that "medical staff are not notified in advance of an inmate transfer to St. Elizabeths" (p.41), then the systems-based solution would be to improve communication to the DOC medical staff. In addition, since the DOC has rapid testing platforms available on site, rapid testing could be deployed prior to transfer, with results available in as little as 15 minutes.

12. Although the DOC was supposed to test individuals prior to transfer to the BOP, this is also not happening (*Amici* report p.43) The fact that "most of those who were tested were tested over a month prior to their transfer" (p.43) means that those test results are essentially meaningless to the receiving facility, since individuals could be exposed to and infected with COVID-19 in the time between initial testing and transfer. Individuals can potentially therefore transmit COVID-19 to transport staff and staff and inmates at the BOP receiving facility. It also places the onus on the receiving facility to test and quarantine transferred individuals.

13. The DOC continues to undertest people with symptoms consistent with COVID-19. Per the *Amici* report (p.44), of 36 sick call slips reviewed with dates in which an individual reported COVID symptoms and requested a test, only 14 were ultimately tested for COVID-19 and 8 of those tests were done between 20 and 52 days later, meaning they were likely done not in relation to reported symptoms. Although medical providers do have clinical discretion on when to test, as Unity's medical director indicated to *Amici*, "if there is no 'obvious or clear' explanation for the symptoms, a COVID-19 test should be administered." (p.48) In other words, during a pandemic and in a highly congregate setting where COVID-19 infection can spread like wildfire, one should have a very low threshold to test.

14. One example of where low thresholds to test come into play is respiratory symptoms in a patient with asthma. When a patient with diagnosed asthma describes a new cough or shortness of breath, prior to COVID-19, healthcare providers would generally treat these symptoms as an asthma flare and prescribe nebulized breathing treatments, inhalers, or steroids. But during the COVID-19 pandemic, with rising cases in the community, one cannot assume that "the symptoms [are]…consistent with something other than COVID-19," as Unity's medical director told *Amici.* (p.48) Instead, COVID-19 testing should be performed whenever someone has signs and symptoms that may be consistent with COVID-19 infection and is particularly important in patients with conditions known to be associated with severe COVID-19 infection, such as chronic lung disease. In these patients, diagnosing COVID-19 infection is not only important for the medical care of the patient themselves but also for the prevention of onward transmission to others.

15. In the DC jails, contact tracing includes only the cellmate of the individual testing COVID-19 positive (*Amici* report p.43). Contact tracing should include more than the

3

cellmate if people spend time out of cell with anyone else in the housing unit, including during showers, use of phones, or recreation. According to the CDC, a close contact is defined as "Someone who was within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated."[8] For this reason, in many prison and jail systems outside of the DC jails, contact tracing includes the entire housing unit.

16. In the contact tracing case described in the *Amici* report, two cellmates were tested on the same day, one testing positive and one testing negative. It is unclear from this description whether the cellmate was re-tested within 7 days, since initial tests may be falsely negative so soon after exposure. It is also unclear from the report whether the cellmate was quarantined for the full 14 days after exposure, as should be standard practice.

17. In contrast to current testing strategies in the DC jails, I'd like to provide an example of well-executed broad-based testing in a state-wide integrated system of prisons and jails. Since March 2020, the Connecticut Department of Corrections has conducted four rounds of mass testing of everyone who is incarcerated within and works in any of their facilities. This includes testing over 9,200 inmates and 6,000 staff with each of the four rounds. In addition to these broad-based testing sweeps, beginning in December 2020, the CT DOC began testing all inmates twice per month and all staff weekly, using PCR-based testing. A partnership with a commercial lab has enabled relatively rapid turnaround times for results. Contact tracing is done for entire housing units or quarter-unit cohorts (depending on the facility), with rapid antigen testing at days 1, 4, and 7 following exposure. Despite best efforts taken to conduct intake screening, cleaning and disinfecting, universal masking, and quarantining, each round, hundreds of mostly asymptomatic individuals infected with COVID-19 have been identified.[9] This identification allowed for rapid and effective containment of what would have otherwise been a widespread outbreak. Though CT DOC is not the DC jail and context and resources may differ, the example goes to show that this type of testing is feasible, acceptable, and effective, even on a much larger scale.

**Quarantining**

18. Individuals returning from in-person court appearances or face-to-face visits with attorneys are placed in "enhanced monitoring units" at both facilities for 14 days of monitoring with daily symptom checks (p.10). It is unclear why the term "enhanced monitoring units" is used here (this is not a public health term), when in practice the facility is quarantining these individuals after potential exposure from in-person contact with courts or attorneys. Individuals in these units should be treated as "in quarantine" in

---

[8] Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC
[9] Health Information and Advisories (ct.gov)

terms of the use of PPE and regular monitoring, and the individuals should be counted as being in quarantine on public-facing websites.[10]

**Physical Distancing**

19. Enforcing physical distancing remains a challenge for the DC Jails, as per the *Amici* report (p.25), with approximately 347 disciplinary actions against staff for violations of COVID-19 policies (p.25) Approximately 17% of inmates at CDF have a cellmate and nearly half of inmates in the intake unit have a cellmate (p.8), wherein physical distancing is impossible. In the absence of physical distancing, COVID-19 can still be easily transmitted from person to person within 6 feet.

**Cleaning and Disinfecting**

20. Cleaning and disinfecting is a cornerstone of infection prevention. Yet the court-ordered registered sanitarian has not yet been hired (*Amici* report pp.29, 33). The registered sanitarian vendor whose contract had recently expired was reportedly renewed but had not yet completed the inspection at the time of the *Amici* report (p.29-30). This lapse in cleaning and disinfecting practices is unacceptable during a COVID-19 pandemic and can contribute to ongoing transmission of COVID-19 within the facility.

**Conditions inside the facility**

21. Both CDF and CTF remain on 23-hour lockdown and residents in segregation are locked down 24 hours per day on weekends (p.9). One of the potential reasons for continuous total lockdowns may be understaffing. Indeed, the *Amici* report describes that "staffing limitations have persisted, creating challenges that impede mitigation efforts" (p.28) and that the "staff to resident ratio has actually decreased" (p.13). Chronic understaffing is at the very heart of the COVID-19 problem in the DC jails, as I have written about in previous declarations. Understaffing threatens the health and safety of everyone who lives and works inside the DC jails.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature]*

Jaimie P. Meyer
December 17, 2020
Wilton, Connecticut

---

[10] Public Safety Agency COVID-19 Case Data | coronavirus (dc.gov)