**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| EDWARD BANKS, *et al.*,<br>　　　Plaintiffs<br>　　　v.<br>QUINCY L. BOOTH, *et al.*,<br>　　　Defendants | Civil Action No. 20-849(CKK) |

**MEMORANDUM OPINION**
(January 26, 2021)

Plaintiffs Edward Banks, D'Angelo Phillips, Keon Jackson, and Eric Smith ("Plaintiffs") bring this action on behalf of themselves and a putative class of similarly situated persons, alleging that Defendants Quincy Booth, Director of the District of Columbia Department of Corrections ("DOC") and Lennard Johnson, Warden of DOC ("Defendants") violated their constitutional rights under the Fifth and Eighth Amendments by failing to ensure safe conditions in the face of the COVID-19 pandemic.[1]  *See* Compl., ECF No. 1.  On June 18, 2020, the Court granted in part Plaintiffs' Amended Motion for a Preliminary Injunction, and ordered Defendants to implement certain infectious disease control and prevention measures, to ensure inmates' timely access to medical care, and to provide access to confidential legal calls.  On July 16, 2020, Defendants filed the present [105] Motion to Alter and Vacate the Court's Preliminary Injunction, which is opposed.  Defendants contend that changed factual circumstances, intervening decisions of other courts, and legal errors in the Court's previous opinion support reconsideration of the preliminary injunctive relief granted to Plaintiffs.

---

[1] Plaintiffs also seek injunctive relief or writs of habeas corpus to reduce the inmate population at the DOC facilities. *See* Compl.  The Court did not order the release of any inmates at the preliminary injunction stage, and Defendants do not challenge that conclusion in the present Motion.

Upon consideration of the pleadings,[2] the relevant legal authorities, reports of *Amici Curiae*, and the record as a whole, the Court DENIES Defendants' Motion.  Defendants have failed to demonstrate that justice requires reconsideration of the preliminary injunction.

## I.   BACKGROUND

The Court previously recounted in detail the background of this case in its Memorandum Opinions granting in part and denying in part Plaintiffs' Motion for a Temporary Restraining Order ("TRO Op."), ECF No. 51 and Plaintiffs' Amended Motion for a Preliminary Injunction ("PI Op."), ECF No. 100.  Accordingly, the Court shall limit its discussion to developments since the Court granted in part Plaintiffs' Amended Motion for a Preliminary Injunction on June 18, 2020.[3]

The Court's [99] Order granting in part Plaintiffs' Amended Motion for Preliminary Injunction ("PI Order") directed Defendants to address deficiencies related to conditions of confinement, discussed in greater detail *infra* Part III(A).  The Court ordered Defendants to provide updates about the steps being taken to address these deficiencies.  *See* PI Order. Pursuant to the Court's PI Order, on June 29, 2020, Defendants filed a [101] Notice of

---

[2] The Court's consideration has focused on the following documents:
- Defendants' Motion to Alter and Vacate the Court's Preliminary Injunction ("Defs.' Mot."), ECF No. 105;
- Plaintiffs' Opposition to Defendants' Motion to Alter and Vacate the Preliminary Injunction ("Pls.' Opp'n"), ECF No. 116;
- Defendants' Reply in Support of Motion to Alter and Vacate the Court's Preliminary Injunction ("Defs.' Reply"), ECF No. 119;
- Defendants' Supplemental Brief ("Defs.' Suppl. Br."), ECF No. 140; and
- Plaintiffs' Supplemental Brief ("Pls.' Suppl. Br."), ECF No. 141.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[3] As with the previous proceedings in this case, hearings in this matter have been conducted telephonically due to the restrictions of the COVID-19 pandemic.  *See* PI Op. at 2.

Compliance with the Court's Preliminary Injunction ("Notice of Compliance").  Defendants indicated that there had been no positive tests of COVID-19 at DOC facilities since the Court issued its PI Order, and all residents who had previously been in isolation due to positive tests had returned to the general population. *See* Notice of Compliance at 1.  Defendants also indicated that DOC had tested a sample of asymptomatic inmates, who all tested negative for COVID-19.[4] *Id.* at 8–9.  Defendants further provided the Court with updates about Defendants' policies related to inmate access to medical care, social distancing, sanitation, conditions in isolation units, and access to confidential legal calls.  *See id.* at 3–8.

Then, on July 16, 2020, Defendants filed the present [105] Motion to Alter and Vacate the Court's Preliminary Injunction, in which Defendants argue that a material change in the conditions at DOC facilities renders continued injunctive relief unnecessary and improper.[5] Defs.' Mot. at 9–11.  Defendants contend further that the Court erroneously concluded in its PI Opinion that Plaintiffs were likely to succeed on the merits of their claims that Defendants had "recklessly disregarded" risks related to COVID-19.  *Id.* at 11.  Rather, Defendants argue that the policies they implemented had contained the spread of COVID-19, and that any imperfect enforcement of those policies does not amount to "deliberate indifference."  *See id.* at 12–13.

Plaintiffs oppose Defendants' motion, arguing that Defendants are "ask[ing] the Court to fold up an umbrella in the middle of a rainstorm."  Pls.' Opp'n at 1.  Plaintiffs note that—

---

[4] Defendants initially reported that DOC had tested 150 asymptomatic residents, *see* Notice of Compliance at 9, but subsequently corrected that figure, indicating that only 87 inmates had been tested. *See* Errata, ECF No. 102.

[5] On the same date, Defendants filed a Notice of Appeal, appealing the Court's PI Order to the U.S. Court of Appeals.  *See* Defs.' Notice of Appeal, ECF No. 106.  The Court of Appeals, on its own motion, held in abeyance Defendants' notice of appeal and requested that this Court "notify [the Court of Appeals] promptly upon conclusion of its proceedings." *See* Order, *Banks et al. v. Booth et al.*, No. 20-5216 (D.C. Cir. July 22, 2020).

subsequent to Defendants' filing of their Motion to Alter and Vacate—Defendants reported positive COVID-19 tests. *Id.* at 2. Plaintiffs further submitted affidavits by DOC staff and inmates demonstrating "continued failures to implement protocols." *Id.*; *see* Pls.' Opp'n Ex. A, Bess Decl.; Pls.' Opp'n Ex. C, Taylor Decl. Plaintiffs requested that the Court direct amici curiae Grace M. Lopes and Mark Jordan ("Amici") to continue monitoring Defendants' compliance with the PI Order. Pls.' Opp'n at 18.

On September 16, 2020, the Court ordered the continued appointment of Amici to review and report on Defendants' compliance. *See* Order Appointing Amicus, ECF. No. 125.[6] The Court noted that "Defendants contend that they have implemented all safety protocols, thus creating a factual dispute with Plaintiffs as to the conditions at Defendants' facilities." *Id.* at 1. The Court requested that Amici "provide the Court with information as to Defendants' compliance with the Court's preliminary injunction." *Id.*

On November 9, 2020, the Court held a telephone conference during which Amici presented their preliminary findings regarding Defendants' compliance with the preliminary injunction. Both parties and the Court asked questions—including some requesting Amici to provide additional information in their subsequent written report. A court reporter was present, and a transcript of the hearing is on the docket. *See* Attachment A, Hr'g Tr. 11/9/20, ECF No. 131.

On December 11, 2020, Amici submitted a written report. The Court incorporates that report into this Memorandum Opinion. *See* Attachment B, Report Submitted by *Amicus Curiae*

---

[6] The Court twice amended its Order for *Amici Curiae* to clarify the timing of inspections of DOC facilities and to modify the deadlines for Amici's oral and written reports. *See* ECF Nos. 126, 129. The Court also granted a consent motion to extend the time for Amici to submit a written report in light of issues raised during the Amici's oral report on November 9, 2020. *See* Consent Motion for Extension of Time, ECF No. 132; Order, ECF No. 133.

Pursuant to September 16, 2020 Order ("Amici Report"), ECF No. 138.  The Court has excerpted portions of the Amici Report in this Memorandum Opinion, focusing on the issues which are most relevant to the resolution of Defendants' pending motion.

As explained in their report, Amici reviewed records from the DOC facilities, conducted telephonic and in-person interviews with members of the DOC staff and approximately 80 inmates, and conducted unannounced and unescorted site visits on multiple shifts on October 22, 23, 29, November 13, and December 2, 2020 at the Central Detention Facility ("CDF") and on October 27 and November 2, 2020 at the Correctional Treatment Facility ("CTF").  Attachment B, at 3–4.  Amici reported to the Court that Defendants cooperated in providing necessary materials and access to the facilities, staff, and inmates during their visits.  Attachment A, at 8:17–24.

Upon Plaintiffs' request, and with the Court's leave, *see* Pls.' Mot. for Leave to File Suppl. Br., ECF No. 135; Dec. 2, 2020 Minute Order, the parties submitted supplemental briefs on December 18, 2020 to bring to the Court's attention any additional facts or developments since the parties' earlier briefing on Defendants' Motion.

## II.  LEGAL STANDARD

Defendants move for relief under Federal Rules of Civil Procedure 54(b), 59(e), and 60(b)(5).  Defs.' Mot. at 7–9.  Plaintiffs argue that Rule 54(b) is the only appropriate standard. Pls.' Opp'n at 3.  For the reasons set forth below, the Court concludes that Defendants have not satisfied the standard for reconsideration under Rule 54(b)—the standard affording the Court most flexibility.  *See Shvartser v. Lekser*, 330 F. Supp. 3d 356, 360 (D.D.C. 2018) ("[O]ut of an abundance of caution . . . the Court will apply the less demanding standard of Federal Rule of Civil Procedure 54(b), which governs the reconsideration of interlocutory decisions." (internal citation omitted)); *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) ("[C]ourts have more

flexibility in applying Rule 54(b) than in determining whether reconsideration is appropriate under Rules 59(e) and 60(b)." (internal citation and quotation marks omitted)). Accordingly, the Court shall not separately evaluate whether Defendants are entitled to relief based on what appear to be the higher standards associated with Rules 59(e) and Rule 60(b)(5).

However, because courts in this jurisdiction have reached different conclusions as to whether Rule 54(b) or Rule 59(e) governs a motion seeking reconsideration of an order granting or denying preliminary injunctive relief, the Court shall briefly discuss both standards.[7] *See N.S. v. Hughes*, 2020 WL 4260739, at *1 (D.D.C. July 24, 2020) (applying Rule 59(e)); *but see Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 80–81, 84 (D.D.C. 2018) (applying Rule 54(b)); *Shvartser*, 330 F. Supp. 3d at 360–61 (same). The D.C. Circuit does not appear to have ruled directly on which standard applies. *See N.S.*, 2020 WL 4260739, at *1. Rule 54(b) allows the Court to revise "any order or other decision" that "adjudicates fewer than all the claims . . . at any time before the entry of a judgment adjudicating all the claims[.]" Fed. R. Civ. P. 54(b). Rule 59(e) permits a party to move to "alter or amend a judgment . . . no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e).

The Court has broad discretion to grant relief under either rule, though "the Court has more discretion to grant a motion brought under Rule 54(b)." *N.S.*, 2020 WL 4260739, at *1; *see also Cobell*, 224 F.R.D. at 272. "[T]his jurisdiction has established that reconsideration [under Rule 54(b)] is appropriate '*as justice requires*.'" *Lyles v. District of Columbia*, 65 F. Supp. 3d 181, 188 (D.D.C. 2014) (emphasis added) (quoting *Cobell v. Norton*, 355 F. Supp. 2d 531, 540

---

[7] Neither party has identified any cases in this jurisdiction analyzing a motion for reconsideration of a preliminary injunction under Rule 60(b). To the contrary, several cases reason that Rule 60(b) does not apply to reconsideration of preliminary injunctive relief. *See, e.g.*, *Dunlap*, 319 F. Supp. 3d at 84–85; *Cobell*, 224 F.R.D. at 271.

(D.D.C. 2005)).  In general, a court will grant a Rule 54(b) motion for reconsideration of an interlocutory order "only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Dunlap*, 319 F. Supp. 3d at 81 (internal citations and quotation marks omitted). "Justice [also] may require reconsideration 'where a controlling or significant change in the . . . facts has occurred since the submission of the issue to the court.'" *McLaughlin v. Holder*, 864 F. Supp. 2d 134, 141 (D.D.C. 2012) (quoting *Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010)).  The proponent of reconsideration carries the burden of proving that "some harm, legal or at least tangible, would flow from a denial of reconsideration." *United States v. Dynamic Visions, Inc.*, 321 F.R.D. 14, 17 (D.D.C. 2017) (quoting *Cobell*, 355 F. Supp. 2d at 540).  "In order for justice to require reconsideration, logically, it must be the case that, some sort of 'injustice' will result if reconsideration is refused." *Id.* (quoting *Cobell*, 355 F. Supp. 2d at 540).

Although similar considerations guide a Rule 59(e) analysis, motions under Rule 59(e) are "disfavored" and "the moving party bears the burden of establishing '*extraordinary circumstances*' warranting relief from a final judgment." *United States v. Burwell*, 253 F. Supp. 3d 283, 285 (D.D.C. 2017) (emphasis added) (quoting *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2011)); *see also Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (Rule 59(e) motions are "discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (internal quotation marks omitted)).

There are limits to the Court's discretion under either rule, as "once the parties have 'battled for the court's decision, they should neither be required, nor without good reason

permitted, to battle for it again.'" *Hispanic Affairs Project v. Perez*, 319 F.R.D. 3, 6 (D.D.C. 2016) (quoting *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 30–31 (D.D.C. 2013), *aff'd sub nom. Wannall v. Honeywell, Inc.*, 775 F.3d 425 (D.C. Cir. 2014)). A motion under either Rule 54(b) or Rule 59(e) is not "simply an opportunity to reargue facts and theories upon which a court has already ruled." *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995); *see also Messina v. Krakower*, 439 F.3d 755, 759 (D.C. Cir. 2006) (Rule 59(e) motions may not simply "rely on the same arguments . . . originally made" by the moving party); *Shvartser*, 330 F. Supp. 3d at 360 (addressing Rule 54(b) motion). Nor is a motion for reconsideration an avenue to "present[ ] theories or arguments that could have been advanced earlier." *Shvartser*, 330 F. Supp. 3d at 360; *see also Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4, 8 (D.D.C. 2005) ("Rule 59 was not intended to allow a second bite at the apple.")

## III.  DISCUSSION

### A.  Justice Does Not Require Reconsideration of the Preliminary Injunction Based on Changed Factual Circumstances

Defendants' primary argument is that changed factual circumstances render continued injunctive relief improper. Defs.' Mot. at 9. Courts in this jurisdiction have noted that justice "may require reconsideration" where there is a "fundamental," *McLaughlin*, 864 F. Supp. 2d at 141, or "controlling or significant" change in facts. *Ficken*, 696 F. Supp. 2d at 35 (quoting *Cobell*, 224 F.R.D at 272). Defendants contend that their efforts to address the risks posed by COVID-19 "have effectively eliminated the risk of COVID-19 infection facing its residents." Defs.' Suppl. Br. at 1–2. Defendants argue, therefore, that a material change in the facts renders continued injunctive relief inequitable. Defs.' Mot. at 10–11. In response, Plaintiffs cite continued deficiencies in Defendants' efforts to implement and enforce the requirements of the Court's PI Order. Pls.' Opp'n at 6–11. Plaintiffs also argue that Defendants have failed to

demonstrate any harm caused by the Court's injunction. *Id.* at 4–6. For the reasons below, the Court concludes that ongoing systemic deficiencies undermine Defendants' claim of "significant or controlling" changed factual circumstances.

In its Memorandum Opinions granting in part Plaintiffs' TRO and granting in part Plaintiffs' motion for a preliminary injunction, the Court thoroughly recounted the conditions at DOC facilities as they stood at each juncture. *See* TRO Op. 12–22; PI Op. 14–26. Based on these factual findings, the Court specifically noted "that the relief which will be granted . . . is narrowly tailored and does not impose an undue burden on Defendants." PI Op. at 36. The Court will not recount those findings in full, but incorporates its findings from those Memorandum Opinions.

The Court's focus here is whether "justice requires" reconsideration based on a "controlling or significant change in the facts" since the Court's PI Order. *McLaughlin*, 864 F. Supp. 2d at 141. This inquiry does not compel the Court to undertake a "fresh analysis of whether the Court should grant a preliminary injunction under the standard four-factor test that this Court previously applied." *Dunlap*, 319 F. Supp. 3d at 85. Rather, the Court considers whether relevant factual developments are "controlling or significant for purposes of compelling reconsideration of whether Plaintiff[s] satisf[y] the standards for preliminary relief." *Id.*

Before addressing the relevant factual developments regarding each requirement of the Court's PI Order, the Court notes that much of Defendants' argument in support of vacating or amending the preliminary injunction (as it was in opposing injunctive relief at the outset) is based on steps Defendants have taken subsequent to the Court's TRO and PI Orders. *See* PI Op. at 15, 23. The Court appreciates Defendants' efforts to improve conditions at DOC facilities, and in no way seeks to impugn or discourage continued good faith efforts. But, as the Court

noted in its earlier Opinion, "Defendants cannot claim that the need for an injunction is now moot because the [Defendants have] 'ceased [their] wrongful conduct.'"  PI Op. at 15–16 (citing *Costa v. Bazron*, 2020 WL 2735666, *4 (D.D.C. May 24, 2020) (quoting *Taylor v. Resolution Trust Corp*., 56 F.3d 1497 (D.C. Cir. 1995))).  Similarly, the Court finds it difficult to conclude that "justice requires" the Court to vacate the preliminary injunction against Defendants based on purported factual changes resulting from steps taken to address deficiencies noted in the Court's PI Opinion—especially where, as discussed below, Defendants' compliance with the preliminary injunction is incomplete.  As the Court previously noted, the aim of injunctive relief is to "prevent future violations," *Costa*, 2020 WL 2735666, at *4 (internal citations and quotation marks omitted), and for that reasons its power to grant injunctive relief "survives the discontinuance of the illegal conduct." *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016).

Several months have passed since Defendants first sought reconsideration of the Court's preliminary injunction, and the Court now has the benefit of the Amici Report and the parties' supplemental briefs. The Court shall discuss the conditions of the facilities in response to the Court's PI Order.  Upon careful review of the factual circumstances presented by both parties and Amici, the Court concludes that Defendants have not established a significant or controlling change in the factual circumstance requiring reconsideration of the preliminary injunction.

### 1.  Medical Care

The Court begins by assessing Defendants' efforts in supplying general population inmates with adequate medical care.  In its PI Opinion, the Court identified deficiencies in Defendants' sick call process, citing both Amici's observation of "significant barriers to access to health care," as well as declarations of inmates detailing the unavailability of sick call forms

on their housing units.  *See* PI Op. at 16–17.  Based on these findings, the Court ordered

Defendants to implement a medical care system for general population housing units that

"ensures inmates receive attention from a medical provider within 24 hours of reporting health

issues."  *Id.* at 38.  If Defendants continued to rely on the use of sick call slips, Defendants were

to "ensure that said slips are collected at regular intervals."  *Id.*

Amici describe in detail Defendants' revised sick call process, implemented as of June

23, 2020 (after the Court's PI Order): inmates obtain sick call request forms from correctional

officers and deposit completed forms in secure collection boxes maintained on each housing unit.

Attachment B, at 12–16.  The forms are collected by medical staff twice a day, logged, and

triaged for urgency.  *Id.* at 14–15.  Amici observed that the "use of the revised forms is

widespread," and "[i]n contrast to previous site visits, sick call request forms were available on

most of the housing units [Amici] visited before the November 9, 2020 hearing."  *Id.* at 13 n.31,

14.  Amici further noted that inmates "generally had positive impressions of the sick call process

and asserted that they expected that if they submitted a sick call request form, they would be seen

by a medical provider timely."  *Id.* at 16.  Sick call forms were available on all except one of the

housing units visited by Amici prior to the November 9, 2020 hearing.  *Id.* at 14.  When Amici

returned to the facilities after the hearing, sick call forms were available on the one housing unit

that had previously lacked them.  *Id.*

To assess Defendants' compliance with the Court's requirement that Defendants ensure

that inmates receive medical care within 24 hours of requesting it, Amici reviewed a random

sample of sick call requests from both the CDF and CTF.[8]  *Id.* at 16–18.  Of the inmate sick call

_____

[8] Amici also assessed the timeliness of DOC's responses to requests for dental care and mental
health care.  Plaintiffs and Defendants both acknowledge that these requests are less likely to be
related to COVID-19. *See* Pls.' Suppl. Mem. at 3 n.3; Defs.' Suppl. Mem. at 2.  Accordingly, the

requests reviewed, 71% of CDF inmates and 56% of CTF inmates were seen by a medical provider within one day of submitting their sick call forms.[9]  *Id.* at 18–20.  Defendants contend that Amici's small sample size presents an incomplete picture of its sick call response, noting that Amici reviewed only a small portion of requests for medical care and omitted from their Report discussion of a "robust audit procedure" implemented by DOC officials to monitor the sick call process.  Defs.' Suppl. Br. at 3–4 (citing Defs.' Suppl. Br. Ex. A, Jordan Decl. ¶ 9).  Defendants further contend that the Amici Report fails to address other reasons why an inmate may not be seen by a medical provider within 24 hours.  *Id.* at 3.

The Court appreciates Defendants' revisions to the sick call process and the improved availability of sick call forms.  The Court, however, finds that Defendants have not demonstrated a significant change in the facts warranting reconsideration of the preliminary injunction— especially taking into consideration Amici's finding that "inmates are not consistently seen by a medical provider within 24 hours of reporting health issues in a significant percentage of cases." Attachment B, at 12.

## 2.  Social Distancing

In granting the preliminary injunction, the Court also cited Amici's finding that social distancing in DOC facilities "certainly is not prevalent, certainly not during our visits."  PI Op. at

---

Court shall focus on Amici's findings with respect to the timing of responses to requests for medical care.

[9] Although the PI Order directs Defendants to ensure inmates receive medical attention within 24 hours, the sick call forms only provide a space for inmates to enter the date of their request, not the time.  Attachment B, at 17.  Accordingly, Amici analyzed each sample based on the days elapsed between the submission of the form and the time inmates received medical attention.  *Id.* Amici note additional discrepancies with the forms, including some that contained notations by medical staff for "wrong date"—the reason for which was not evident to Amici in every case. *Id.* at 17–18.  Amici further note that for the month of July 2020, they received 179 fewer sick call request forms than were indicated on the spreadsheet tallying the number of forms received. *Id.* at 16.  Amici were "not able to reconcile this discrepancy."  *Id.*

18 (internal citation omitted).  Amici attributed this issue, in part, to insufficient staffing on the

housing units.  *Id.*  The Court noted that although Defendants developed policies and educational

materials to address social distancing, their steps to implement and enforce such policies were

insufficient and delayed.  *Id.* at 19–20.  Accordingly, the Court ordered Defendants to comply

with District of Columbia and CDC regulations on distancing in the DOC facilities and to

"address challenges which have prevented the implementation of social distancing including but

not limited to lack of education and staffing shortages."  *Id.* at 38; PI Order.

 Amici reported continued inconsistencies in social distancing practices and enforcement.

Attachment B, at 24.  Amici noted, for example, that they "often" observed inmates who were

out of their cells congregating in small groups, "sometimes while not wearing a mask properly

covering their noses and mouths."  *Id.*  And despite limits on the number of inmates allowed out

of their cells at a given time, Amici observed inmates out of their cells "communicat[ing]. . .

often while in close proximity" with those in their cells, "while not wearing a mask properly[.]"

*Id.*  Amici also observed staff members "at times" failing to wear "required masks and/or face

shields on housing units and not maintaining social distance among themselves and when

interacting with inmates and other non-correctional DOC staff."  *Id.* at 25.  Surveillance teams

monitor compliance with social distancing by live video feeds and are expected to report failures

to enforce social distancing policies.  *Id.*  But some of these surveillance personnel reported to

Amici "frequent" violations of COVID-19 mitigation policies—"as many as 100 examples per

shift."  *Id.*  Yet, Defendants reported to Amici only 347 disciplinary actions against correctional

officers taken over the course of months (April through November 2020) for violations of

COVID-19 mitigation policies.  *Id.*  Plaintiffs also submitted evidence of inadequate enforcement

of social distancing, including a declaration from a DOC officer who observed groups of inmates

congregating in a small waiting room, as well as "mixed groups" from general population units and quarantine being escorted together in an elevator.  Pls.' Opp'n at 8 (citing Pls.' Opp'n Ex. A, Bess Decl. ¶¶  14–15, 17–18).  Amici further reported that the number of staff available to work as of December 2020 remains "virtually unchanged" from mid-May 2020.  Attachment B, at 10, 26.  As such, the many deficiencies in social distancing practices and enforcement identified in the Court's previous orders remain.

In arguing that they have made progress in enforcing social distancing, Defendants identify many of the same policies and practices they noted in opposing preliminary injunctive relief.  *See, e.g.*, Defs.' Mot. at 5 ("[a]s previously noted. . ."; "a surveillance team *continues* to monitor"; "signs *remain* posted;"; "DOC *continues* to provide . . ." (emphases added)); *see also* PI Op. at 18–19.  For example, Defendants indicate that they require correctional officers to document compliance, require inmates and staff to wear PPE, remind inmates to socially distance, have signs posted throughout the facilities, and have provided staff and inmates with educational materials about social distancing.  Defs.' Mot. at 5.  Defendants also reported to Amici that they had begun to distribute electronic tablets which include educational content about COVID-19.  Attachment B, at 26.  But Defendants claim that "practical difficulties" hamper enforcement of these policies and "continuing challenges in recruiting and hiring correctional officers" hinder efforts to increase staffing.  Defs.' Suppl. Br. at 4.

As the Court noted in granting Plaintiffs' preliminary injunction, "better policies mean little if they are not correctly implemented in practice."  PI Op. at 19 (citing *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000)).  The Amici Report—together with the evidence offered by Plaintiffs—demonstrate ongoing deficiencies with respect to Defendants' enforcement of social distancing.  Accordingly, the Court finds that justice does not require

14

reconsideration of the preliminary injunction's social distancing requirements, as Defendants have fallen short in complying with the Court's PI Order in this area.

### 3.  Environmental Health and Safety

The Court next examines the status of sanitation efforts at DOC facilities.  In its PI Order, the Court noted that Defendants had made some progress since the TRO Order in ensuring adequate sanitation, but also noted inmates' lack of regular access to appropriate cleaning supplies.  PI Op. at 20–21.  The Court ordered Defendants to continue their contracts with an outside health and safety vendor and professional cleaning vendors to provide cleaning services (including to common areas); to continue their efforts to hire a registered sanitarian; to ensure inmates have access to necessary materials to clean their cells; and to ensure that inmates and DOC staff are informed of and trained on proper use of mixing and preparing cleaning solution. PI Op. at 38–39; PI Order.

Amici reported that Defendants have made progress in ensuring adequate sanitation of both the CDF and CTF.  During their site visits, Amici observed that "common areas and public spaces" appeared "noticeably cleaner than amici observed during previous visits at both the CDF and CTF."  Attachment B, at 30–31.  Defendants have continued their contracts with outside professional cleaning vendors to provide cleaning services through February 2021.  *Id.* at 30.  In addition, Amici reported "significant improvement in inmate access to appropriate materials to clean their cells."  *Id.* at 33.  Amici further noted that inmates and staff reported consistent access to clean microfiber cloths and peroxide cleaning solution.  *Id.*  These are marked improvements since the Court's PI Order, in which the Court noted that appropriate sanitation was a "continuing issue" at both facilities, and especially deficient at the CDF.  PI Op. at 21 (internal citation omitted).

Defendants' efforts to hire a registered sanitarian have proven less successful. Defendants contracted with an outside vendor as of May 18, 2020 to provide services related to environmental health and safety.  PI Op. at 20.  At the same time, Defendants indicated that they had received approval to solicit applications for an in-house sanitarian.  *Id.*  The contract with the environmental health and safety vendor expired at the end of October 2020, and DOC initially did not renew it, intending instead to rely on a new internal hire.  Attachment A, at 45:5–8; Attachment B, at 29.  At the hearing on November 9, 2020, Amici explained that Defendants had posted a vacancy notice for a "sanitarian inspection specialist," the qualifications for which would not meet the eligibility criteria to sit for the registered sanitarian exam by the pertinent credentialing body.  Attachment A, at 38:2–12; *see also* Attachment B, at 31. After posting the vacancy announcement six times, DOC did not receive applications from any registered sanitarians, and instead hired an applicant with no background in environmental health and safety.  Attachment A, at 38:2–19.  The Court questioned whether the qualifications provided in the job vacancy posting may have discouraged registered sanitarians from applying for the position.  *Id.* at 41:6–13; 42:13–43:2.  After this issue was raised at the hearing, as of December 11, 2020, Defendants indicated to Amici that they re-entered a three-month contract with the health and safety vendor whose contract expired on October 31, 2020, with three one-month options, and "renewed" their efforts to hire a registered sanitarian. Attachment B, at 29–30.

Although Defendants have complied with the Court's order to continue their contracts with professional cleaning services, this is not necessarily a "change" in factual circumstances since the Court's PI's Opinion, as Defendants had those contracts in place at the time of the PI briefing.  *See* Defs.' Opp'n to Pls.' PI Mot. at 14–15 (internal citations omitted).  And Defendants appear to be in a similar position with respect to hiring a registered sanitarian as they

were at the time the Court issued its preliminary injunction.  Accordingly, there are no "significant or controlling" changed factual circumstances supporting reconsideration of the health and environmental safety requirements of the preliminary injunction.

### 4.  Conditions in Isolation Units

Next, the Court considers conditions in isolation units.  The Court previously noted deficiencies with respect to access to legal and personal phone calls, regular showers, and consistent linen exchanges.  PI Op. at 22–23.  Although the Court credited Defendants' progress in making isolation units less punitive, the Court observed that such progress had been made only subsequent to the Court's TRO Order and "there remains progress to be made."  *Id.* at 23. Accordingly, the Court ordered Defendants to make conditions in the isolation unit non-punitive by providing reliable access to telephone calls, daily showers, and clean clothing and linens.  *Id.* at 39; PI Order.

In their more recent review, Amici found that inmates on isolation status are "able to make personal telephone calls, take daily showers, and receive clean linens."  Attachment B, at 34.  Amici were unable to make general findings about access to confidential legal calls for inmates on isolation status, but noted that one inmate who had been on isolation status reported that he was only able to speak with his attorney in a case manager's officer while a correctional officer was present and therefore the call was not confidential.  Attachment B, at 35 n.80.

The Court appreciates Defendants' efforts to ensure that inmates in isolation have better access to personal hygiene necessities and the ability to make personal phone calls.  But once again, the Court notes that many these improvements appear to be in response to the issues raised in earlier TRO and PI proceedings, and it does not appear that inmates on isolation units have

access to confidential legal calls.  The Court, therefore, does not find any need to eliminate this requirement of the PI to guard against future violations.

### 5.   Confidential Legal Calls

The Court next addresses general population inmates' access to confidential legal calls. In its PI Order, the Court required Defendants to "ensure that all inmates have access to *confidential, unmonitored* legal calls of a duration sufficient to discuss legal matters."  PI Op. at 3 (emphasis added); PI Order.  Although the Court noted that Defendants had made efforts to obtain new technology to ensure inmates' access to confidential legal calls, it also concluded that many of these new processes had not yet been implemented.  PI Op. at 25.

Amici noted that DOC has made "substantial investment" in new technologies to address challenges in attorney-client communications.  Attachment B, at 39.  Amici reported that legal calls take place in one of three settings: (1) in the case manager's office with the case manager present; (2) in the inmate's cell using a cell phone; or (3) in an empty cell on the housing unit using a cell phone. Attachment B, at 37, 38.  Calls from the CDF may also take place in an office in the facility's case management suite.  *Id.*  Amici noted that "most of the inmates and case managers interviewed confirmed that the case manager is present" for calls conducted in a case manager's office, which is "consistent" with Amici's observations.  *Id.* at 37.  Such calls, then, are not truly "confidential."  Calls made by cell phone from individual cells may afford "inmates the opportunity to speak in a confidential setting with their attorneys," though Amici noted that some inmates reported that they could be overhead by inmates in neighboring cells.  *Id.* at 37 n.89.  Attorneys may also request to speak with their clients by videoconference, which are conducted "under conditions that promote the confidentiality of attorney-client communications."  *Id.* at 37–38.  Inmates who request calls with their attorneys continue to

experience "substantial delays" receiving responses to their requests.  *Id.* at 38.  In addition to the issues noted by Amici, Plaintiffs cited evidence of ongoing issues with legal calls. For example, calls placed from cell phone may be disrupted because of poor reception or excessive noise. Pls.' Suppl. Br. at 7 (citing Defs.' Mot. Ex. E, Williams Decl. ¶ 6).

Defendants argue that Amici's findings  do "not fully capture the scope of DOC's undertaking and the dramatic shift in the way DOC facilitates legal calls to meet the challenges posed by the pandemic," indicating that DOC has "facilitated over 24,357 attorney-client contacts using technology and procedures that did not exist in DOC facilities only nine months ago."  Defs.' Suppl. Br. at 6 (citing Defs.' Suppl. Br. Ex. B, Williams Decl. ¶ 5).  Defendants note, for example, that some inmates have been able to use cell phones for legal calls since June 15, 2020.  *Id.*  Defendants also indicate that inmates may use phone banks located on each housing unit to call their attorneys—but conceded that "full confidentiality is not possible for inmates using the phone banks."  *Id.* at 7, 8 n.6.  Although the Court credits Defendants for implementing new practices, ongoing shortcomings in ensuring access to confidential legal calls counsel against relieving Defendants of this condition of the injunction.

### 6.  Testing

At the time they filed their present Motion, Defendants relied heavily on the lack of positive COVID-19 tests for a period of thirty days as evidence of changed factual circumstances.  *See* Defs.' Mot. at 1–2, 9–10.  Defendants claimed this positive development demonstrated that their policies had "halted" the spread of COVID-19.  Defs.' Mot. at 9.  Since then, at least fifteen positive COVID-19 cases have been reported to the Court.  *See* Attachment B, at 34; Defs.' Suppl. Br. at 2 n.2.  The Court makes note of this development not to impugn

Defendants—as all except one case was discovered upon intake testing[10]—but rather to highlight the need for ongoing vigilance in the face of a swift and dangerous virus that has claimed more than 400,000 American lives.[11]

In Defendants' briefing on the preliminary injunction, Defendants noted that "DOC has broadened its protocols to test all new intakes and *every inmate transferred to another facility*." Defs.' Opp'n to Pls.' Am. Mot. for PI at 2, ECF No. 82 (emphasis added). Defendants noted specifically that DOC "now tests *any* resident to be transferred to Saint Elizabeths Hospital or to a federal correctional facility." *Id.* at 8–9 (emphasis added) (citing *id.* Ex. B, Jordan Suppl. Decl. ¶ 11). Defendants also reported that DOC tests all new residents upon intake, cellmates of any resident who recently tested positive, and any inmate who displays symptoms of COVID-19. *Id.* at 8–9. Accordingly, the Court ordered Defendants to continue these protocols and update the Court about any changes or new practices. *See* PI Order.

Amici reported that Defendants have been performing tests on all new intakes—each new intake receives both a rapid COVID-19 test and a lab test simultaneously. Attachment B, at 40. New intakes then remain housed on an "intake unit" for seven days, at which point another lab test is performed. *Id.* If a new inmate tests positive, that person is then transferred to housing units designated for "isolation." *Id.* Except for one example, *see* note 10, Defendants' positive cases of COVID-19 have been found upon intake testing.

---

[10] Amici reported that the only positive case for the period July–November 2020 not involving a newly admitted inmate was discovered after a new intake was placed on a mental health housing unit (rather than an intake housing unit). Attachment B, at 41. After the newly-admitted inmate tested positive, the entire mental health unit was tested, and one inmate was confirmed positive for COVID-19. *Id.*

[11] *See, e.g.*, Reis Thebault & Lateshia Beachum, *Coronavirus updates: U.S. surpasses 400,000 deaths as Biden invites the country to mourn*, Wash. Post (Jan. 19, 2021), https://www.washington post.com/nation/2021/01/19/covid-coronavirus-updates/.

Amici also reviewed Defendants' testing of inmates who report COVID-19 symptoms. Amici analyzed a random sample of 36 sick call request forms indicating symptoms consistent with COVID-19.  *Id.* at 44.  Amici found that only fourteen of those inmates were "tested for COVID-19 at some point after they submitted their sick call requests."  *Id.* at 44.  And of those fourteen tested, eight tests were administered between 20 and 52 days after the sick call request forms were submitted.  *Id.*  Defendants' inconsistent and incomplete testing of inmates reporting symptoms of COVID-19 does not compel the Court to relieve Defendants from continued injunctive relief on this point.

Despite Defendants' representations that they tested "any" inmate transferred to St. Elizabeths, Amici reported that, prior to the November 9, 2020 hearing, inmates being transferred to St. Elizabeths were only tested if "Unity staff [were] notified in advance of the transfer."  *Id.* at 42.  In most of the 24 cases between June 18 and October 31, 2020 in which inmates were transferred to Saint Elizabeths, "testing was not conducted in close temporal proximity to the transfer."  *Id.*  In eleven cases, for example, inmates were tested between 24 and 128 days prior to their transfer.  *Id.*  Two inmates were not tested at all prior to their transfer.  *Id.* at 42.  Defendants note in their supplemental brief that "in early November [2020], DOC and St. Elizabeths enhanced the transfer notification system, and residents have been tested within 48 hours of the transfer to St. Elizabeths."  Defs.' Suppl. Mem. at 10.   Similarly, Unity reported to Amici that they do not test inmates being transferred to federal facilities as a matter of course. *Id.* at 42–43.  Rather, a test would only be conducted upon request (for example, if the receiving federal facility requires it). Amici found that at least twelve inmates who had been released to federal custody were not tested before their transfer.  *Id.* at 43. These results contradict Defendants' representations in their prior briefing and fall short of compliance with the Court's

preliminary injunction order.  Justice does not require reconsideration of an order—based on Defendants' own representations of their protocols—with which Defendants have failed to comply.

Upon review of the factual developments since the Court entered a preliminary injunction, the Court finds more than mere isolated examples of incomplete compliance with the Court's preliminary injunction. To be sure, Defendants have made some positive improvements. But ongoing deficiencies with respect to each component of the preliminary injunction undermine Defendants' claim that a significant or controlling change in factual circumstances requires reconsideration of the Court's order.

### B. Purported "Legal Errors" Do Not Compel Reconsideration

Defendants next argue that legal errors in the Court's PI Opinion compel reconsideration of the preliminary injunctive relief granted to Plaintiffs.  Although "clear error" in a court's previous order may justify reconsideration, neither a Rule 54(b) nor a Rule 59(e) motion is an invitation for the Court to re-weigh the evidence considered in making its decision.  *See Dunlap*, 319 F. Supp. 3d at 81; *Zeigler v. Potter*, 555 F. Supp. 3d 126, 129 (D.D.C. 2008).  Nor does either type of motion permit a "losing party" to "raise new issues that could have been raised previously."  *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993); *see also McLaughlin*, 864 F. Supp. 2d at 141 ("A court may properly exercise its discretion by denying a motion for reconsideration [under Rule 54(b)] that 'raise[s]. . . arguments for reconsideration the court ha[s] . . . already rejected on the merits.'"(quoting *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011))).

First, Defendants argue that the Court incorrectly concluded that Plaintiffs are likely to succeed on the merits of their constitutional claims based on an "unduly high legal standard."

Defs.' Mot. at 11–14.  Defendants contend that the Court "focused its analysis of reckless disregard on the wrong evidence" by identifying only "ongoing inadequacies" and "discounting the evidence that DOC had been continually addressing and improving conditions at its facilities." *Id.* at 11–12.  This is precisely the attempt to "reargue facts and theories upon which the court has already ruled" which the Court may not properly consider under Rule 54 (or Rule 59).  *Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 81 (D.D.C. 2015).   And in any event, the Court *did* take into consideration policies that Defendants had adopted subsequent to the TRO Order, and still concluded that many of these policies were "not correctly implemented in practice."  PI Op. at 14, 19, 20.  Moreover, the Court discussed at length systemic deficiencies that continued to persist despite Defendants' notice of them from earlier TRO proceedings.  *Id.* at 16–26.  The Court's finding that Plaintiffs were likely to succeed in showing deliberate indifference was based on Defendants' failure to "take comprehensive, timely, and proper steps to stem the spread of the virus."  *Id.* at 26.  The Court shall not re-weigh the same evidence considered in granting partial preliminary injunctive relief.

Defendants next argue that the Court erred in finding that Plaintiffs were likely to succeed in establishing that they had exhausted their administrative remedies.  Defendants cite a grievance policy implemented in January 2020, which authorized residents to "proceed to the next step in the process if they fail to receive a timely or unsatisfactory response."  Defs.' Mot. at 14.  In their earlier briefing on this issue, Defendants cited to a DOC grievance policy from January 2018.  *See* Defs.' Opp'n to Pls.' PI Mot. at 35–36.  Defendants raise this January 2020 policy for the first time in this litigation in their motion to reconsider.  *See id.* at 36 (citing DOC grievance policy dated January 2018); *but see* Defs.' Mot. Ex. F, Townes Decl. ¶ 4; Errata Ex. 1, DOC Policy and Procedure, at 19, ECF No. 108-1.  "Evidence that the movant knew about (or

should have known about) but which it failed to disclose is not a valid basis for a motion to reconsider." *N.S.*, 2020 WL 4260739, at *2; *see also Ali*, 309 F.R.D. at 81 ("[I]t is well-established that [a] motion[ ] for reconsideration . . . cannot be used . . . as a vehicle for presenting theories or arguments that could have been advanced earlier." (internal citations and quotation marks omitted)).  If Defendants expect Plaintiffs to have been aware of the January 2020 iteration of the grievance policy when they filed this lawsuit in March 2020, then surely Defendants should have been expected to produce it during earlier TRO and PI proceedings.

The D.C. Circuit, however, has directed that a court's consideration of new arguments can be more flexible under Rule 54(b) than under Rule 59(e).  *See Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015).  Even under the January 2020 policy, however, DOC was required to respond within 72 hours of receipt of an emergency grievance.  *See* DOC Policy and Procedure, at 19 ("[A]n emergency grievance shall be responded to within seventy-two (72) hours of its receipt.").  And the Court already concluded in its PI Opinion that Plaintiff Banks had submitted evidence that he filed an emergency grievance with Defendant Booth on March 23, 2020 and had not received a response by the time this lawsuit was filed six days later.  *See* PI Op. at 29. Accordingly, the Court shall not reconsider its conclusion that Plaintiffs presented sufficient evidence of exhaustion to show a likelihood of success on the merits.  *Id.*

**C.  The Decisions of Other Circuit Courts of Appeals Do Not Require Reconsideration**

Finally, Defendants argue that recent out-of-circuit judicial decisions "vacat[ing] or remand[ing] preliminary injunctions in light of changed circumstances" should prompt reconsideration of the Court's preliminary injunction.  Defs.' Mot. at 15–16.  Although none of these decisions is controlling with respect to this Court, the Court shall nonetheless address some of the issues raised by Defendants.  *See Youssef v. Holder*, 62 F. Supp. 3d 96, 98 (D.D.C. 2014)

24

(noting that Rule 54(b) permits reconsideration in light of "*controlling* or significant" change in the law "since the submission of the issue to the Court" (emphasis added)).[12]   Ultimately, however, the Court concludes that these out-of-circuit decisions present distinct legal and factual issues that do not compel reconsideration of the injunctive relief at issue in this case.[13]

Defendants first note that the Sixth Circuit reversed a district court decision cited once by the Court in its PI Opinion.  *See* Defs.' Mot. at 15; PI Op. at 37 (citing *Cameron v. Bouchard*, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) as an example of an "injunctive order mandating correctional facility take certain steps involving sanitation, PPE, and medical care in response to COVID-19").  In that case, the Sixth Circuit vacated the district court's preliminary injunction based on the conclusion that the evidence was "insufficient to demonstrate that the jail officials acted with reckless disregard to the serious risk COVID-19 poses."  *Cameron v. Bouchard*, 2020 WL 3867393, at *3 (6th Cir. July 9, 2020).  But, as Plaintiffs note, the Sixth Circuit decision does not constitute a "change" in the law; it merely involves that court's application of settled law to the unique evidentiary record before it.  *See* Pls.' Opp'n at 15.

---

[12] As Plaintiffs note, most of the cases cited by Defendants were decided prior to the Court's injunction order and so do not represent an intervening "change."  *See* Pls.' Opp'n at 14.

[13] Defendants also brought to the Court's attention the Supreme Court's order granting a stay of the injunction at issue in *Ahlman v. Barnes*, 2020 WL 3547960, at *5 (9th Cir. June 17, 2020). *See* Defs.' Notice of Suppl. Authority, ECF No. 115 (citing *Barnes v. Ahlman*, 140 S. Ct. 2620 (Mem) (2020)). In that case, the Ninth Circuit denied a stay of the preliminary injunction granted by the district court, but remanded to the district court to allow the parties "to present any evidence of changed circumstances to the district court" to permit the court to determine whether "to modify or dissolve the injunction," observing that "the circumstances surrounding the COVID-19 pandemic are evolving rapidly." *Ahlman*, 2020 WL 3547960, at *5.  On August 5, 2020 the Supreme Court stayed the preliminary injunction pending appeal and disposition of a timely petition for a writ of certiorari.  Defendants do not explain how this Supreme Court order affects its arguments seeking reconsideration here—other than to provide an additional example of an appellate court staying an injunction related to COVID-19 measures.

In other cases cited by Defendants, appellate courts vacated or stayed preliminary injunctions based on insufficient factual findings.[14]  In *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020), for example, the Eleventh Circuit vacated a preliminary injunction based on its conclusion that the district court had relied "overwhelmingly—if not exclusively—on two considerations": (1) the fact that COVID-19 was "continuing to spread" at the facility; and (2) the impossibility of achieving adequate social distancing. *Id.* at 1286.  Similarly, in *Marlowe v. Leblanc*, 810 F. App'x 302 (5th Cir. 2020), the Fifth Circuit concluded that the district court's analysis lacked "factual findings" and offered "no reviewable basis" upon which to conclude that the jail's mitigation efforts were "constitutionally deficient." *Id.* at 305.

The Court here, in contrast, made detailed factual findings with respect to numerous deficiencies cited by Plaintiffs and Amici in ordering injunctive relief.  *See* PI Op. at 14–26.  At least one circuit court has affirmed provisions of a TRO based on a district court's factual findings that "assess the requested relief considering the totality of the [defendants'] conduct, rather than reviewing it isolation."  *Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020).  The Court's PI Opinion set forth in detail its factual findings and specifically concluded that the relief granted was narrowly tailored to address the cited deficiencies.  PI Op. at 36.  Accordingly, the Court does not agree that the circuit court opinions cited by Defendants—which rely on distinct factual records at the time injunctive relief was granted—require the Court to reconsider its own decision granting injunctive relief.

---

[14] In another case cited by Defendants, *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020), the Fifth Circuit did not reach the merits of the plaintiffs' deliberate indifference claim, concluding that the district court had misapplied the Eight Amendment standard altogether. *Id.* at 802. Defendants do not appear to contend that the Court made that error here.

The Court here makes new factual findings regarding the deficiencies identified in its order granting Plaintiffs partial preliminary injunctive relief.  And although there are some marked improvements (some enacted only recently), as noted above, there are still substantial deficiencies which require the preliminary injunction to remain in place.  It is important that the improvements are sustained over time.  The Court finds that continued injunctive relief as set forth in the Court's PI Order is narrowly drawn to correct the specific identified deficiencies.

## IV. CONCLUSION

For the foregoing reasons the Court concludes that justice does not require reconsideration of its Preliminary Injunction Order.  The Court therefore **DENIES** Defendants' Motion to Alter and Vacate the Court's Preliminary Injunction.  An appropriate Order accompanies this Memorandum Opinion.

     /s/                         

COLLEEN KOLLAR-KOTELLY
United States District Judge
